UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| MONROE COUNTY EMPLOYEES' RETIREMENT SYSTEM and ROOFERS LOCAL NO. 149 PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>THE SOUTHERN COMPANY, THOMAS A. FANNING, ART P. BEATTIE, EDWARD DAY, VI, G. EDISON HOLLAND, JR., JOHN C. HUGGINS, THOMAS O. ANDERSON,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:17-cv-00241-MHC<br><br><u>CLASS ACTION</u><br><br>CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |

1276051_1

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION AND SUMMARY OF THE FRAUD ............................2

II.    JURISDICTION AND VENUE ..................................................10

III.   THE PARTIES ........................................................................11

IV.    BACKGROUND .....................................................................15

V.     WITNESS ACCOUNTS AND OTHER EVIDENCE ................................21

      A.     *The New York Times* Exposé ............................................21

      B.     Brett Wingo ..............................................................27

      C.     Confidential Witnesses....................................................40

      D.     The Independent Monitor's Reports ...................................50

      E.     The Pegasus Report .....................................................64

VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING
      STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ......67

VII.   POST CLASS PERIOD REVELATIONS AND ADDITIONAL
      EVIDENCE OF SCIENTER .......................................................104

      A.     *The New York Times* Exposé ..........................................105

      B.     Brett Wingo ..............................................................105

      C.     The SEC Investigation ..................................................105

      D.     Internal Directives to Conceal Evidence of the Fraud .....................106

      E.     Motive......................................................................107

      F.     Defendants Actively Managed the Construction of the Kemper
           Plant.......................................................................112

      G.     CWs and Other Sources Confirm that the Construction Delays
           Were Widely Known Within the Company ......................................117

**Page**

H.    The Magnitude of the Schedule Delay .............................................119

VIII.  LOSS CAUSATION .........................................................................................123

IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET .......................................................................139

X.     NO SAFE HARBOR .......................................................................................140

XI.    CLASS ACTION ALLEGATIONS .............................................................141

XII.   CLAIMS FOR RELIEF ..................................................................................143

COUNT I  For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants ......................................................................143

COUNT II  For Violation of §20(a) of the 1934 Act Against All Defendants..............................................................................................144

XIII.  PRAYER FOR RELIEF ................................................................................145

XIV.   JURY DEMAND...............................................................................................145

1276051_1

1.      Plaintiffs, individually and on behalf of all others similarly situated, by plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to plaintiffs and plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiffs' attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by The Southern Company ("Southern Company") and Mississippi Power Company ("Mississippi Power") (and together with Southern Company (the "Company")), as well as media and analyst reports about the Company, internal documents, statements by percipient witnesses to the alleged fraud, and defendants' own post-Class Period admissions.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.      Plaintiffs bring this securities class action on behalf of all persons who purchased or otherwise acquired Southern Company common stock between April 25, 2012 and October 30, 2013, inclusive (the "Class Period"), against Southern Company and certain Company executives for violations of the Securities Exchange Act of 1934 ("1934 Act").

## I.   INTRODUCTION AND SUMMARY OF THE FRAUD

3.      This securities class action arises from defendants' false statements and omissions to investors regarding the construction and completion of a "clean coal" power plant located in Kemper County, Mississippi ("Kemper Plant").  The Kemper Plant – the first of its kind in Mississippi and one of the first in the United States – was designed to turn lignite coal into a synthetic gas ("syngas") that could then be used to fuel the power plant.  A critical component of the plant was the gasifier, in which the lignite coal was subjected to extreme heat and pressurization in order to create syngas.

4.      Southern Company stood to obtain hundreds of millions of dollars in federal tax credits for the construction of the Kemper Plant, but only on one condition: the plant had to achieve a commercial operation date ("COD") of no later than May 11, 2014.[1]  The construction of the Kemper Project was also subject to monitoring by an Independent Monitor retained by the Company's regulator, the Mississippi Public Service Commission ("PSC"), who monitored construction progress, reviewed costs and plans, and advised the PSC on the wisdom of continuing the project.  The Company needed to convince its regulator that construction of the plant was on time

---

[1]   Defendants also faced a May 1, 2014 deadline in order to receive other financial incentives. *See, e.g.*, ¶171.  These May 2014 deadlines are referred to collectively as the "May 2014 COD."

and on budget or risk being precluded from passing on construction costs to ratepayers or, worse, having the plant canceled altogether.

5.     It was imperative that the plant be completed on time.  Indeed, investors and the market focused on this deadline.  As a result, defendants repeatedly assured the market throughout the Class Period that the Kemper Plant "*is on schedule*," "*on target*," and "*will be on line in May 2014*."[2]  Defendants also assured investors that installation and assembly of the gasifier – "a critical piece" – was proceeding "*exceptionally well*."   In addition, defendants offered concrete, objectively-measurable statements concerning the status of the project, stating throughout the Class Period that construction was "halfway," "70 percent complete," and "nearly 75 percent complete."

6.     Defendants' representations were false.   In truth, the plant was measurably behind schedule, and a May 2014 completion date was impossible.  As described in an exposé published in *The New York Times* after the end of the Class Period, which was based on the review of internal Company documents and emails, hundreds of hours of secretly recorded conversations, interviews with a former Southern Company employee turned whistleblower, Brett Wingo, and more than 30

---

[2]   Here, as elsewhere, emphasis is added unless noted otherwise.

interviews with regulators, defendants had "drastically understated the project's cost and timetable, and repeatedly tried to ***conceal problems as they emerged***."  In one phone conversation recorded during the Class Period and eventually revealed by *The New York Times*, a Southern Company engineer told Wingo that "***managers were being 'told to lie' about the pace of progress***."  *The New York Times* reported that still another engineer had recounted during the Class Period that "managers were being allowed to 'screw' with the schedule and 'then claim they can meet all these dates, and ***there's no way***."  Similarly, a Southern Company senior scheduling analyst described defendants stated construction schedule during 2012 as little more than "a pretty picture to show everybody that we're all doing wonderful as opposed to what reality showed on the ground."  Moreover, Wingo explained that the software used to budget and schedule the Kemper Plant construction project had been deliberately altered "so it no longer automatically adjusted the final price and completion date to reflect problems as they emerged."

7.      Whistleblower Wingo described that, in order to meet the May 2014 COD and obtain the millions in federal tax credits, he and others "were under tremendous pressure" during the Class Period to get the Kemper Plant designed, procured, and built.  Wingo, who worked on the gasifier, stated that there could be no delays with the gasifier because that piece of the project was essential to the

- 4 -

schedule's "critical path."  As Wingo explained, "every day we lost in that particular area of the plant, we would lose on the back end of the schedule.  In other words, we would miss our May 1, 2014 COD date."  As detailed by the Independent Monitor, the Company's consultant and numerous percipient witnesses, the gasifier suffered major problems in early 2012 resulting in a delay of at least three to six months.  Accordingly, the May 2014 COD was not achievable.  Nonetheless, the Company "did not report a slip in [its] May 1, 2014 COD."  Wingo, who by 2012 was a project manager working on the gasifier, stated: "[T]hat's when I was pretty certain we had something terribly wrong with our scheduling."  Wingo also discussed the gasifier delays and their overall impact on the plant's COD at monthly production meetings, which defendants John Huggins and Tommy Anderson attended.  Wingo stated that management "threw together these half-assed schedules that made no sense"; once the plant was put on a legitimate schedule showing that the plant could not be completed by May 2014, defendants simply "broke logic ties" to claim that they could meet the prescribed deadline.  Wingo concluded: "Through *lies, deceptions and half-truths* and an unwillingness to confront that, I believe they've damaged [their credibility].  *We chose not to [be truthful] and we did it multiple times*."

8.     Other confidential witnesses similarly observed during the Class Period that there was "no way this thing is going to get done" on time.  One former Southern

- 5 -

Company employee witnessed instances where employees at the Kemper Plant falsified safety and compliance documentation in order to pass inspections by state regulators, leading the employee to quit working at the plant.  Another former employee explained that the schedule delay was widely acknowledged and regularly discussed at the plant.  This employee revealed that there was an internal investigation into the scheduling delays and cost overruns at the Kemper Plant in late spring of 2013.  Another former employee responsible for submitting inspection reports concluded that the May 2014 completion date was "a crazy ass date" and "ridiculous" and another former also responsible for compiling monthly inspection reports was demoted after complaining to his superiors that the May 2014 COD was unachievable.

9.     Problems and delays with other, tangible construction materials necessary to complete the plant further demonstrated that the plant was not on schedule and would not be completed on time.  For example, the plant was also experiencing severe piping issues, such as pipes hanging by makeshift cables and ropes instead of being fastened by pipe hangers, as required.  As one Southern Company scheduling engineer explained to Wingo, analyzing the remaining piping quantities is one of the best ways to forecast the remaining work on a project.  By late 2012 or early 2013, the scheduling engineer informed Wingo that based on the remaining piping quantities, there was no way the Kemper Plant could be completed by May 2014.  The

- 6 -

Independent Monitor similarly found that "[t]he late delivery of the pipe, valves, pipe supports, and pipe hangers created major impacts in the sequence of construction" and "caused a ***rippling effect*** in the succeeding activities in procurement, fabrication, construction, and the startup phases, thus creating the field work-arounds and some additional loss of schedule time." The Independent Monitor also provided objective percentage completion figures for several aspects of the plant, demonstrating that the plant was far behind the completion percentages disclosed by defendants throughout the Class Period.

10.    Fearing that the truth about the construction schedule and the inability to meet the COD would be revealed, defendant Ed Day warned that nothing regarding the plant construction or schedule should be shared publicly: "I would like to remind everyone 'again,' ***no numbers, schedules, or information in general should be communicated to external parties*** until I review it/them first." Similarly, according to *The New York Times* exposé, after Wingo "provided company officials with a binder of documents corroborating his allegations, he said he was ordered to stop sending emails on the matter because they could become public through litigation." Accounts from other confidential witnesses corroborate this admonition. For example, one witness was told that concerns should not be put in writing and that email was the "kiss of death" at the Kemper Plant. This same witness stated that employees were

- 7 -

discouraged from circulating negative information about the Kemper Plant in emails and was warned after identifying problems or concerns with the plant: "You need to learn how to play ball."  Another former employee stated that employees were warned not to discuss scheduling delays with any outsiders, such as members of the press.

11.    The defendants made the Class Period false statements concerning the schedule with knowledge or reckless disregard for the truth.  The Kemper Plant, a first-of-its-kind project, was high on defendants' radar.  They spoke about it on every single quarterly call during the Class Period and routinely issued press releases assuring the market that the plant was "on schedule" and would be in service by May 2014.  Defendant Tom Fanning stated publicly that Company executives "***meet regularly*** on this project" and "continue to ***actively manage*** ongoing pressures on costs and schedule" associated with the Kemper Plant.  Fanning also toured the Kemper Plant in a bright red golf cart every two to three months and participated in the "Executive Review Committee" charged with ensuring that the Kemper Plant remained "on time, on budget, and in full compliance with all pertinent safety and quality requirements."   In addition, defendants Fanning, Beattie, and Day met regularly with senior executives of the division overseeing the Kemper Plant to receive updates on the project.  Moreover, defendant Day, who was "always on site" at the Kemper Plant, witnessed firsthand the construction delays and problems.

- 8 -

Similarly, defendant Huggins had ultimate management responsibilities for the Kemper Plant, was actively involved in managing construction and attended monthly production meetings where delays to critical path items, such as the gasifier, were discussed.  Defendant Anderson, too, was "regularly" on-site and was primarily responsible for managing the Kemper Plant construction effort.

12.   Defendants also had a strong motive to conceal the truth about the schedule delays.  First, defendants promised investors that it would complete the Kemper Plant by the May 2014 COD.  Second, should the completion date slip past May 2014, the Company would lose hundreds of millions of dollars in federal tax credits.  Third, if the schedule slipped, the Company would also be precluded from passing the construction costs on to ratepayers.  Fourth, the Company had a deal with the South Mississippi Electric Power Association ("SMEPA"), whereby SMEPA paid a $150 million deposit toward a 15% ownership interest in the Kemper Plant, which was repayable with interest in the event SMEPA canceled the deal if the plant was not timely completed.  (SMEPA ultimately canceled the deal, requiring repayment of the deposit, plus *$26 million* in interest.)  Finally, the Company had a deal with Treetop Midstream Services, LLC ("Treetop"), whereby Treetop would purchase the $CO_2$ byproduct generated by the Kemper Plant and construct a pipeline to offload the $CO_2$ to its facilities, provided that the plant was timely constructed.  (Treetop has since

- 9 -

sued the Company for fraud, claiming it expended *$100 million* to construct a pipeline.)

13.     Stunningly, today, more than *three years* after the touted May 2014 COD, the Kemper Plant has yet to achieve commercial operation.  Indeed, defendants have missed, and pushed back, the COD *12 times* between late 2013 and 2017. According to a June 2017 Company update, moreover, the plant faces years of additional work on gasifier units – a project defendants stated during the Class Period was nearly complete.  Clearly, the Kemper Plant was not "on schedule," "70 percent" or "75 percent" complete when defendants said as much in 2012 and 2013.

## II.     JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

16.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Southern Company is headquartered in this District and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

1276051_1

17.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE").

## III.   THE PARTIES

18.     Lead Plaintiff Roofers Local No. 149 Pension Fund ("Roofers 149") purchased Southern Company common stock during the Class Period as set forth in the Certification previously filed (Dkt. 20-5) and incorporated herein, and was damaged thereby.

19.     Plaintiff Monroe County Employees' Retirement System ("Monroe") purchased Southern Company common stock during the Class Period as set forth in the certification previously filed (Dkt. No. 1) and incorporated herein, and was damaged thereby.  Roofers 149 and Monroe are hereby collectively referred to as "plaintiffs."

20.     Defendant Southern Company is a utility holding company.  Southern Company's operating subsidiaries include public utility companies located throughout the Southeastern United States, including Georgia Power, Mississippi Power, Alabama Power, Southern Power and Gulf Power.  Southern Company maintains its headquarters at 30 Ivan Allen Jr. Boulevard, N.W., Atlanta, Georgia 30308.  Southern

- 11 -

Company's common stock is traded under the ticker "SO" on the NYSE, an efficient market.

21.    Defendant Thomas A. Fanning ("Fanning") was, at all relevant times, Chairman, President, Chief Executive Officer ("CEO") and a director of Southern Company.

22.    Defendant Art P. Beattie was, at all relevant times, Executive Vice President and Chief Financial Officer ("CFO") of Southern Company.

23.    Defendant Edward Day, VI ("Day") was, from the start of the Class Period through May 20, 2013, an Executive Officer of Southern Company and President and CEO of Mississippi Power.

24.    Defendant G. Edison Holland, Jr. ("Holland") was, at all relevant times, an Executive Officer of Southern Company and, since May 2013, President, CEO and a director of Mississippi Power.

25.    Defendant John C. Huggins ("Huggins") was, from 2010 through May 20, 2013, employed by Southern Company as a general manager overseeing the Kemper Plant startup, engineering, and construction services.  In this role, he was responsible for the overall startup and commissioning activities associated with the project, including development of startup, turnover and initial operating procedures for both the combined cycle facility and the gasification plant.  On May 20, 2013,

- 12 -

Huggins was promoted to Vice President of Generation Development for Mississippi Power and remained in that role through the end of the Class Period.  On August 9, 2013, Huggins, testifying on behalf of Mississippi Power, was asked who had "primary responsibility for the Kemper Project and the decision making process." Huggins responded under oath: "Mississippi Power and the Generation Development team, which I manage, have responsibility for the Kemper Project.  We utilize existing departments and their process and controls to manage the Project, including but not limited to, [Mississippi Power] Accounting, Finance and Treasury, [Mississippi Power] Transmission, [Mississippi Power] Supply Chain, [Mississippi Power] Environmental, and [Southern Company Services] Engineering and Construction Services."

26.    Defendant Thomas O. Anderson ("Anderson") was, from July 2009 through May 2013, Vice President of Generation Development for Mississippi Power. On January 25, 2013, Anderson, testifying on behalf of Mississippi, stated: "I have primary responsibility for managing the Company's effort to develop the Kemper Project.  In this role, I oversee the work being conducted and have access to the resources and information necessary and sufficient to make a determination concerning the Company's efforts to date."

1276051_1

27.     The defendants referenced above in ¶¶21-26 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants and the Company are collectively referred to herein as "Defendants."  The Individual Defendants made, or caused to be made, false and misleading statements that caused the price of Southern Company common stock to be artificially inflated during the Class Period.

28.     The Individual Defendants, because of their positions, possessed the power and authority to control the contents of the Company's quarterly reports, shareholder letters, press releases, securities offering materials and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e*., the market.  They were provided with copies of and/or contributed to the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions, and their access to material non-public information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

- 14 -

## IV.   BACKGROUND

29.    Southern Company is a utility holding company based in Atlanta, Georgia.  Southern Company's operating subsidiaries include public utility companies located throughout the Southeastern United States such as Georgia Power, Mississippi Power, Alabama Power, Southern Power and Gulf Power, among others.

30.    Mississippi Power is a wholly-owned subsidiary of Southern Company. Mississippi Power operates as a vertically integrated utility providing electricity to retail customers within the State of Mississippi and to wholesale customers in the Southeast.

31.    Southern Company Services, Inc., headquartered in Birmingham, Alabama, is the shared services division of Southern Company.  Southern Company Services provides administrative, engineering, and operational services to all of Southern Company's operating divisions, including Mississippi Power.

32.    The Mississippi PSC regulates telecommunications, electric, gas, water and sewer utilities.  The PSC has regulatory authority over Mississippi Power.

33.    In January 2009, Mississippi Power announced its plans to construct a new "clean coal" plant located in Kemper County, Mississippi which would utilize an integrated coal gasification combined cycle technology.  According to Defendants,

"the state-of-the-art plant represents the first advanced gasification generating facility with carbon capture capabilities in Mississippi, and one of the first in the country."

34.     The Kemper Plant's state-of-the-art integrated coal gasification combined cycle ("IGCC") technology involved two main components to produce electricity: a coal-gasification plant and a combined-cycle power plant.  The gasification process involved using extreme heat and pressurization to turn lignite coal into a synthetic gas (syngas) that could then be used to fuel the combined-cycle power plant.  In addition, the Kemper Plant was designed to capture and sequester at least 65% of the $CO_2$ produced by the plant to be used by third parties in enhanced oil recovery.  According to the Independent Monitor, the gasifier was "the most critical and complex part of the project."

35.     During 2009, Mississippi Power received notification from the Internal Revenue Service ("IRS") formally certifying that the IRS had allocated $133 million of Internal Revenue Code §48A tax credits (Phase I) to Mississippi Power for the construction of the Kemper Plant.  The utilization of Phase I credits was dependent upon meeting the IRS certification requirements, including a project completion date, also known as the COD, for the Kemper Plant of no later than May 11, 2014.  The COD is the date when a power plant has (i) been commissioned, (ii) been determined to be mechanically complete, (iii) passed all required performance and emissions tests,

- 16 -

and (iv) been deemed ready to reliably supply electrical energy and capacity to the transmission grid.

36.    In June 2010, the Mississippi PSC issued a certification of public convenience and necessity ("CPCN") authorizing the acquisition, construction, and operation of the Kemper Plant.  The Mississippi PSC's CPCN order (1) approved a construction cost cap of up to $2.88 billion (any costs above this amount could not be passed on to Mississippi Power customers and would be paid by the Company), and (2) approved a ratepayer-funded allowance to cover the financing of construction costs through May 1, 2014 (any construction financing costs incurred after this date could not be passed on to Mississippi Power customers).

37.    The 2010 PSC order further mandated that the PSC would "retain Independent Monitors to assist the Commission in its statutory duties by monitoring Project progress, reviewing costs and plans, and advising the Commission on questions of prudence and on the wisdom of continuing the Project."  Burns and Roe Enterprises, Inc. ("BREI" or the "Independent Monitor") was engaged in early 2011 as an Independent Monitor.

38.    In a July 28, 2010 earnings call, Southern Company announced that the Kemper Plant had been approved by the PSC.  Southern Company officials stated the

- 17 -

plant's construction cost to be $2.4 billion and that it would be in service by May 2014.

39.     On December 16, 2010, the Company broke ground on construction of the Kemper Plant.

40.     Mississippi Power contracted Southern Company Services to provide engineering, design, and construction services for the Kemper Plant.

41.     On March 15, 2012, the Mississippi Supreme Court reversed the PSC's CPCN order for the Kemper Plant.  The Mississippi Supreme Court directed the PSC to correct its order to include substantial evidence supporting its decision granting the CPCN.

42.     The PSC's April 24, 2012 order on remand from the Mississippi Supreme Court issued a new CPCN authorizing the acquisition, construction and operation of the Kemper Plant.  The PSC's order required Mississippi Power to provide monthly progress reports to the PSC and to indicate whether the "[p]roject is on schedule and on budget."

43.     At the start of the Class Period, Defendants assured investors that the project would be completed by the May 2014 COD deadline and total construction costs would not exceed the $2.88 billion PSC cost cap.

- 18 -

44.     Throughout the Class Period, although construction problems and major delays proliferated, Defendants repeatedly assured investors that the project would be completed by the May 2014 COD deadline.  The May 2014 COD date was critical for numerous reasons; most notably, it was the deadline imposed by the IRS to recognize the Phase I tax credits.  According to the Independent Monitor retained by the PSC, "*the May 2014 [completion date] was driven by many factors including, most importantly, the $133 million 48A Phase I Investment Tax Credit . . . that required a COD no later than May 11, 2014*."  Defendants understood the importance of the 48A Tax Credit deadlines.  For example, Defendant Huggins acknowledged that missing the COD associated with the Phase II 48A Tax Credits would constitute "financial Armageddon."  Huggins also acknowledged that the missed deadline would spook investors, garner harsh criticism from the news media and regulators and could lead to bankruptcy.  In addition, Defendants had at least four other powerful motives to conceal the delays, including: (1) the PSC-imposed deadline to recover construction financing costs from ratepayers; (2) the asset purchase agreement with SMEPA; (3) the contract with Treetop; and (4) the PSC's approval of a customer rate increase.

45.     At the end of the Class Period, just months before the promised completion date, Defendants disclosed that the Kemper Plant would miss the critical May 2014 COD deadline and be forced to repay the IRS Phase I tax credits.

- 19 -

46.     Tellingly, the Kemper Plant delays and missed deadlines have continued for over three years after the Class Period.  As depicted in the chart below, Defendants have missed, and pushed back, its COD deadline *12* times between late 2013 and 2017.



47.     Most recently, in June 2017, more than three years after the original COD deadline, Defendants announced that the Kemper Plant had missed yet another COD deadline and the Kemper Plant was not yet fully commercially operable despite a project cost of over *$7.5 billion*, nearly *triple* the original cost cap.

## V.   WITNESS ACCOUNTS AND OTHER EVIDENCE

### A.   *The New York Times* Exposé

48.     *The New York Times* exposé was the first public revelation of the fraud that is alleged herein.   As set forth below, *The New York Times* included details showing that the Defendants' conduct was deliberate and more than mere mismanagement or lack of prudency.

49.     On July 5, 2016, *The New York Times* published an article exposing the fraud at the Kemper Plant entitled, "Piles of Dirty Secrets Behind a Model 'Clean Coal' Project."[3] *The New York Times* pointed out that, as of the date of the article, the Kemper Plant was more than two years behind schedule and more than $4 billion over its initial budget of $2.4 billion, and "it is still not operational" and that "[t]he plant and its owner, Southern Company, are the focus of a Securities and Exchange Commission investigation, and ratepayers, alleging fraud, are suing the Company." *The New York Times* described its extensive investigation into the problems infecting the Kemper Plant:

> [A] review by The New York Times of thousands of pages of public records, previously undisclosed internal documents and emails, and 200 hours of secretly though legally recorded conversations among more than a dozen colleagues at the plant offers a detailed look at what went wrong and why.

---

[3]   *See* https://www.nytimes.com/2016/07/05/science/kemper-coal-mississippi.html.

The internal documents and recorded telephone conversations referenced in *The Times* article are contained on the internet at https://www.thehistoryproject.com/projects/embed-view/2914.  After analyzing the evidence, *The Times* concluded that Southern Company "***repeatedly tried to conceal problems as they emerged***":

> Those documents and recordings, provided to The Times by a whistle-blower, an engineer named Brett Wingo, and interviews with more than 30 current and former regulators, contractors, consultants or engineers who worked on the project, show that the plant's owners drastically understated the project's cost and timetable, and repeatedly tried to conceal problems as they emerged.

*The Times* focused on federal subsidies as providing "***a shared and powerful incentive***" to commit fraud:

> The system of checks and balances that are supposed to keep such projects on track was outweighed by a shared and powerful incentive: The company and regulators were eager to qualify for hundreds of millions of dollars in federal subsidies for the plant, which was also aggressively promoted by Haley Barbour, who was Southern's chief lobbyist before becoming the governor of Mississippi.  Once in office, Mr. Barbour signed a law in 2008 that allowed much of the cost of building any new power plants to be passed on to ratepayers before they are built.

50.    The telephone recordings reviewed by *The Times* pointed to fraud.  Donald Falletta, an engineer, told Wingo during one call that "he too believed that ***managers were being '*** ***told to lie***" about the pace of progress."  Another engineer,

Brent Duncan, recounted in a phone call that "managers were being allowed to '*screw*' *with the schedule and* '*then claim they can meet all these dates, and there's no way*.'"  All told, "at least six senior engineers from the plant said they believed that the delays and cost overruns, as well as safety violations and shoddy work, were *partly the result of mismanagement or fraud*."

> The engineers joked that Mississippi Power, eager to show progress to investors and regulators, overstated certain milestones.  For example, it bragged of achieving the "first fire," which involves the lighting of the gasifier, when what they did fell far short of the actual definition, according to Mr. Wingo.

> "We burned natural gas in a pilot" light, Brandon Davis, an engineer, said during one phone conversation.  "I accomplish that every day in my garage."

Not surprisingly, the "intense deadline pressure" to meet the publicly-disclosed deadline led to shoddy work that ended up delaying the project even more:

> What troubled the engineers most was the poor quality of the work: leaking gaskets, cracked ductwork, and pipes missing inspection records, valves and supports.  Ryan Brown, a plant engineer, said during a phone call that he was having to "go back and do some sort of major repair or rebuild" for every piece of work handed to him by the plant's construction teams, which were under intense deadline pressure.

Rather than disclose the problems, Southern Company fervently concealed the scheduling delays, pretending that they arose from "'unknown unknowns,' as Tom Fanning, the chief executive of Southern Company, has often called them – like bad weather, labor shortages and design uncertainties."  Landon Lunsford, an engineer at

- 23 -

Kemper told Wingo during one recorded call that "[t]he company will never admit the project-management problems because they will attract more scrutiny from regulators. . . . 'As long as they can talk away the results as attributable to something else other than just poor performance, the other public service commissions can't hold them over the fire as much,' he added."

51.     On June 5, 2013, Yvonne Avila (a Project Engineer for the Kemper Plant) sent an email to Brett Wingard (the Engineering & Procurement Manager for the entire Kemper Plant) alerting him to "two potentially big issues."  Avila explained that another manager had instructed her to change the piping quantity needed for construction because an additional 200,000 linear feet of piping was needed to finish the job.  Avila recounted that on a call that afternoon, Coy Graham, an Assistant Construction Site Manager over the gasifier, "started going off about how they keep getting [isometric drawings] everyweek, and that they based all the schedule rebaseline off of the drawings they had at the time, and now the numbers keep increasing and they don't even know what is coming out, etc etc."

52.     In addition to the recorded calls and internal documents, *The Times* article discussed Brett Wingo, who "was hired in 2007 by a subsidiary of Southern" as a "midlevel manager to help oversee scheduling and some design decisions on a project that he believed would make history."

- 24 -

Before long, Southern began flying him around the country to explain the project to others.  He received glowing performance reviews and was awarded an annual $2,000 "Southern Excellence" employee award.

By 2012, though, Mr. Wingo had begun his transition to whistle-blower. . . .

In increasingly testy meetings and emails over succeeding months, Mr. Wingo told his supervisors that other scheduling information that Mississippi Power and Southern Company were providing to the public was infeasible and misleading.

Ed Day, Mississippi Power's chief executive at the time, tried to tighten control over what was shared.  "I would like to remind everyone 'again,' no numbers, schedules, or information in general should be communicated to external parties until I review it/them first," Mr. Day wrote in an Aug. 8, 2012, email to senior staff.

Others shared Mr. Wingo's growing concerns.  Tom Theodore, a scheduling consultant who worked on the Kemper project for about eight months in 2012, described the company's stated schedule as little more than "a pretty picture to show everybody that we're all doing wonderful as opposed to what reality showed on the ground."

His predecessors had altered the software so it no longer automatically adjusted the final price and completion date to reflect problems as they emerged, he said.

53.  "After Mr. Wingo provided company officials with a binder of documents corroborating his allegations, he said *he was ordered to stop sending emails on the matter because they could become public through litigation*."  "Mr. Wingo was fired in February [2016], a move that the Occupational Safety and Health Administration later ruled illegal."  Wingo "refused an offer of roughly $975,000 from

- 25 -

1276051_1

the company to keep quiet, according to interviews and court records related to his whistle-blower claims.  Southern was then granted a restraining order, later dropped, forbidding him from speaking publicly about the plant, court records show."

54.     *The New York Times* concluded that Southern Company duped its "unwitting investors and some of the lowest-income ratepayers in the country":

> In the end, the Kemper project is a story of how a monopoly utility, with political help from the Mississippi governor and from federal energy officials who pressured state regulators in letters to support the project, shifted the burden of one of the most expensive power plants ever built onto the shoulders of unwitting investors and some of the lowest-income ratepayers in the country.

55.     The evidence and conclusions in *The New York Times* publicly revealed for the first time that Defendants had engaged in deliberate conduct to deceive the market and investors regarding the schedule delays infecting the Kemper Plant. Newly revealed internal documents, emails and memoranda, along with the recorded telephone conversations of numerous percipient witnesses to the events at the Kemper Plant (including Brett Wingo), led *The Times* to conclude that Southern Company "repeatedly tried to conceal problems as they emerged."  Notably, *The New York Times* included accounts of "at least six engineers from the [Kemper P]lant" – never revealed publicly before this exposé – who "said they believed that the delays and cost

overruns, as well as safety violations and shoddy work, were partly the result of mismanagement or fraud."

### B.    Brett Wingo

56.    Plaintiffs' counsel interviewed Brett Wingo (both in-person and telephonically) in January, February and May 2017 for more than five hours.   In addition, plaintiffs' counsel reviewed footage of Mr. Wingo's half-hour televised interview with the Public Broadcasting System on September 9, 2016.[4]   The following is a summary of Mr. Wingo's statements during those interviews and court filings after Wingo was placed on administrative leave.   Mr. Wingo's first-hand account demonstrates that Defendants knowingly or recklessly made false and misleading statements that Southern Company would meet the May 2014 deadline.

57.    Wingo began working as an engineer for the Engineering and Construction Services ("E&CS") division of Southern Company in 2007 as a contract employee.   In that position, Wingo helped to design the Kemper Plant and ran pilot tests for coal drying technology.   In June 2009, he was hired by Southern Company as a Senior Engineer and was charged with design responsibility over cooling water, steam and condensate systems.   Once the Kemper Plant was approved in 2010, Wingo moved into a schedule-intensive procurement role, requisitioning equipment that was

---

[4]    *See* http://www.pbs.org/video/2365833231.

eventually installed in the plant.  In August 2011, Wingo was promoted to Project Manager over the gasifier island – the part of the plant that converts the lignite coal into syngas.  In this role, Wingo was responsible for managing the engineering contract with KBR, a third-party contractor, and for ensuring that the engineering and procurement for the coal gasification and cleanup systems, which Wingo described as constituting the majority of the Kemper Plant, were on time and met the construction schedule.  As a Project Manager, Wingo reported to Brett Wingard, who was the Engineering & Procurement Manager for the entire Kemper Plant.

58.     In May of 2010, Southern Company's upper management told Wingo and others that if they missed the May 2014 COD, Southern Company would lose $133 million in federal tax credits.  Wingo said that he and others "were under tremendous pressure" to get the Kemper Plant designed, procured and built.  Wingo said that he first began notifying people that the projected May 2014 completion date for the Kemper Plant was not realistic in early 2012, when the site started to have gasifier delays caused by refractory failures.  Prior to this time period, he was told that they could not afford any delays with the gasifier, because it was essential to the schedule's "critical path."  Therefore, any delay in the completion of the gasifier would delay the ultimate completion of Kemper.

59.     Specifically, Wingo stated:

- 28 -

[W]e were told that in the gasifier area, particularly in the gasifier structure, where the gasifier is installed, this is the huge 200 foot tall, you know, 10 foot wide vessel that gasifies the coal as the centerpiece of the new technology, we were told that in late 2011, that we had no time to lose on that because every day we lost in that particular area of the plant, we would lose on the back end of our schedule.  In other words, we would miss our May 1, 2014 COD date.  Well in 2012 we had major refractory failure issues at our fabricator.  Now this is not a huge deal in terms, it is a problem you can fix and we fixed it.  The problem was it took a lot of time.  And we lost somewhere between three and six months on the overall schedule and yet even through 2012 when we had a three to six month delay on the gasifier, we did not report a slip in our May 1, 2014 COD.  That's when I was pretty certain that we had something terribly wrong with our scheduling.

60.     The refractory is a concrete lining in the gasifier that needed to have a "cure-out," which involved heating it to 1,800 degrees Fahrenheit to prepare the structure for coal gasification.  In February 2012, they tested the refractory by attempting to heat it to 1,800 degrees.  When the refractory reached a heat level of 600 degrees, an enormous steam explosion caused the refractory to fail.  The cause of the failure was unclear, and most of the gasifier construction had to be stopped while there was an investigation.  Although the construction team tried to do a "parallel path," also called "workarounds," wherein they worked on other parts of the gasifier and the plant while fixing the refractory problems, this was not effective.  Wingo compared the refractory failure to stopping traffic on five lanes of a six-lane highway.

In other words, very little progress on the gasifier could be made while the gasifier refractory problem was being fixed.

61.     This gasifier delay lasted from February 2012 until approximately August 2012.   Wingo said that as soon as he learned in February 2012 that there were refractory failures on the gasifier, he knew that there was "no way in hell" that Southern Company could meet the May 2014 deadline.   During 2012, Wingo expressed this view to his supervisor, Brett Wingard, and to other engineers. According to Wingo, Coy Graham, an Assistant Construction Site Manager over the gasifier, wrote a June 2012 email chain including his supervisor, David Empfield, advising that the gasifier component delivery was so critical to the schedule the gasifier delays they were facing would ultimately amount to a six-month delay to the total project schedule.   Wingo said that the gasifier delays and their impact on the overall schedule were discussed during this time during monthly production meetings, which Wingo usually attended.   John Huggins, who was in charge of Startup at the time, attended these production meetings and would have been aware of the gasifier delays.   Ashley Baker (Southern Company) and Aaron Abramowitz (Mississippi Power) also regularly attended these meetings.   Wingo said that Mississippi Power Vice President Tommy Anderson occasionally attended these monthly production meetings.   Wingo also spoke with Anderson on an almost weekly basis, either over the

- 30 -

phone or in person, because Anderson needed to approve all procurement purchases during the late 2011 through 2012 timeframe.  Therefore, Anderson would have been well aware of the implications of the gasifier delay.  Wingo concluded: "[W]e lost somewhere between three and six months on the overall schedule and yet even through 2012 when we had a three to six month delay on the gasifier, we did not report a slip in our May 1, 2014 COD.  That's when I was pretty certain that we had something terribly wrong with our scheduling."

62.    In addition to the gasifier delay, piping was another area during 2012 that led Wingo to conclude that the May 2014 COD was unrealistic.  Although the piping should have been supported by something called a pipe hanger, the pipe in the gasifier was jerry-rigged, held up by cables and ropes.  Southern Company construction employees actively complained that they were not getting enough pipe or pipe hangars to build the plant.  Wingo described the piping issue as a visible sign that the schedule was off track.  Specifically, Wingo stated:

> Well right off the bat, the first thing people noticed was that a lot of the pipe that we were hanging, when you build a multiple story structure and you run pipe through it at different levels, you have to support it, you don't just lay it on the ground.  It is usually over your head.  So it has to be supported by something called a pipe hanger.  We saw pipe in the gasifier structure that was being held up by cables and ropes, I mean it was not a good look and when you talk to construction about what was going on, which you didn't have to talk to them, they were actively complaining, they said they weren't getting enough pipe or pipe hangers

- 31 -

to build the plant.  This was happening in 2012, so that was the first visible sign of something at the site.

63.     Wingo said that when Defendants were faced with clear evidence of scheduling delays, they simply "broke logic ties" to claim that they could meet the May 2014 deadline.  Wingo later discussed this with Tom Theodore, a contract employee who was one of six to ten schedulers allowed to physically interact with the schedule file (only a select group was allowed network rights to do so).  Theodore worked on the schedule for about eight months in 2012.  Theodore recounted that any time something came up that would push the completion date past May 2014, Steve Owen instructed the schedulers to break logic ties in order to keep the completion date.  Babar Suleman replaced Tom Theodore in December 2012.  At a meeting between Wingo and Suleman in December 2012 or early 2013, Suleman agreed with Wingo that it was not possible to meet the May 2014 deadline and said that based on his thirty years of experience, piping quantities was one of the best ways to forecast the remaining work on a project.  Suleman said that he had already looked at the remaining piping quantities, and there was no way the project could be completed in 2014.

64.     Wingo stated: "They threw together these half-assed schedules that made no sense that you couldn't use as a project management tool.  If you took Kemper and

- 32 -

put it on a real schedule and then you asked people that were actually responsible for executing their part of the schedule for input, to see if we can keep our promises, that schedule would have blown way out to 2015, possibly beyond. ***In 2012, we had a purposely broken project schedule that was designed to confuse everybody***."

65.     In late 2012 or early 2013, Wingo, Brett Wingard (Wingo's supervisor) and Bruce Harrington (the Kemper Plant Manager) attended a meeting regarding delays with the Kemper Plant's gasifier.  At that meeting, Wingard asked, "[w]hen are we going to admit we're not going to hit the May 1 deadline."  Bruce Harrington responded, "[o]n May 2nd."

66.     In early 2013, Penny Manual was fired as the head of E&CS.  Shortly thereafter, Ed Day and Tommy Anderson were also fired.  Around this time, Ted McCullough, who replaced Penny Manual as the head of E&CS, visited the site and was very upset at the very poor condition of the pipes, which had not been properly installed.  Around May 2013, COO Mark Croswhite sent an internal email lamenting "failures of culture" and "failures of leadership" throughout the Company.  In June 2013, all Southern Company departments were told to conduct a "cultural survey."  As part of this survey, Ken Boyd and Brad Burke, high level managers from Southern Company's Research and Environmental Services division, interviewed Wingo and other individuals in the Gasification Technologies Group.  At the beginning of the

- 33 -

interview, Wingo told Boyd and Burke that the "schedule is a lie" and that the May 2014 deadline was unachievable.  He spoke with them for over an hour and gave details on problems with the gasifier, other delays and the compressed commissioning schedules that were unrealistic.  He also explained that working with an impossible schedule was very stressful and that poor morale could lead to turnover in the Gasification Technologies Group.  Wingo recalled that Boyd and Burke took notes during the interview.  Wingo never heard any follow-up from Boyd or Burke regarding the issues he raised.

67.    Wingo's concern for the morale of his group led him to demand in the summer of 2013 that someone produce a Resource Loaded Schedule.  The Gasification Technologies Group engineers were critical to the Startup of the plant, and Kemper could not afford to lose these engineers.  The uncertainty of the schedule created chaos for the engineers, who were unable to plan vacations or anticipate when they would be needed to complete various tasks.  In addition to speaking with Boyd and Burke during the cultural survey, Wingo and Landon Lunsford, who supervised the engineers, reported the morale problems to Randall Rush, General Manager of Gasification Technologies.  Rush asked John Huggins to have a team meeting in Tuscaloosa, Alabama (the midway point between the Kemper Plant and Birmingham, where many of the engineers lived).  Gasification engineers and various senior

- 34 -

managers (including John Huggins, Ashley Baker and Steve Owen) met in Tuscaloosa for three or four days in July 2013.  During that time, the engineers conveyed all the stress they were under, but Wingo felt that the managers were not really addressing the source of the engineers' stress, which was the uncertainty of the schedule.  At the meeting, which was attended by several dozen people, Wingo stood up and said that in order to do their work properly and efficiently, his team needed an accurate Resource Loaded Schedule "so that we're not blamed for missing the COD."  Because Wingo knew that Huggins would be reluctant to approve something that would contradict the official plant schedule (showing a May 2014 completion date), Wingo suggested that he build a completely parallel "play" or "sandbox" schedule so that Huggins would not feel intimidated if Wingo came up with a different finish date than the official schedule.  Huggins, Rush, Baker, Owen and Lunsford went behind closed doors for approximately twenty or thirty minutes.  When they came out of the room, they announced that they were naming Wingo as the new project manager for a Resource Loaded Schedule for the Gasification Technologies Group.

68.     Wingo was then transferred from the Engineering & Procurement group under Brett Wingard to the Commissioning & Startup group.  In his new role, he reported to Joe Miller, the Commissioning & Startup Manager for the Kemper Plant (a role that John Huggins held until he moved to Mississippi Power after Ed Day and

- 35 -

Tommy Anderson were terminated).   Wingo was tasked with providing to John Huggins a Resource Loaded Schedule for gasification technologies employees, who would have a significant role in the Startup of the plant.   In order to schedule these engineers and coordinate when various employees or experts would be assigned to certain testing/startup duties, Wingo had to have a good handle on the total project schedule so that he could anticipate when construction would be complete and startup/testing could begin.   Wingo described the Resource Loaded Schedule as a "road map to commercial operation."   As he started working on a schedule for Gasification Technologies, it became clear to Wingo that the official Kemper Plant schedule was impossible to achieve.   He concluded that the construction phase would not be completed on schedule.   Moreover, even if construction was completed on time, there was insufficient time allotted for Commissioning and Startup in the Kemper Plant's official schedule.   By mid-September 2013, Wingo completed his own schedule for gasification technologies, which demonstrated there was no possible way for the gasification testing and Startup processes to be completed by May 1, 2014.   Wingo provided the schedule to Joe Miller.   Wingo said that his schedule anticipated various "excuses" that individuals in the Construction and Startup groups would come up with to rebut his conclusions.   Such excuses included that certain construction packages could be sped up or certain "test packages" could be

- 36 -

compressed or eliminated.  Wingo removed these excuses by including a theoretical contingency that construction could be completed by November 2013, which would allow them to move to the testing and commissioning phase.  He also eliminated all test packages, reducing them to zero duration.  Even with these hypotheticals, Wingo determined that May 1, 2014 was "impossible"; Wingo's schedule showed that the Kemper Plant would not be complete until March or April 2015.  When he presented his own gasification technologies schedule to Joe Miller, Wingo emphasized that there was something seriously wrong with the official schedule, and asked Miller what he should do because he did not want to work with that schedule.

69.   Wingo noted that key benchmarks for Startup included the first gasifier heat-up and the first syngas production, which would have occurred within a few days of the heat-up.  In 2013, everyone with whom he spoke in the Gasification Technologies Group believed that it would take a minimum of one year to get from the first syngas production to the completion date.  The Commissioning and Startup phase was not just fine-tuning, but rather a huge endeavor in which the Startup team is trying to get the plant to run.  The Startup team had to anticipate major control, erosion and corrosion problems, among a myriad of issues.  They also anticipated problems with the computer code they wrote, which Wingo said was likely the largest computer code ever written for an Emerson Ovation digital control system.  When

- 37 -

asked about Defendant Fanning's statements attributing the delays on Kemper to the fact that only about ten percent of engineering had been conducted in 2010, Wingo said that Fanning's excuses were a "false narrative" because (a) it is normal for such projects to begin without being fully designed and (b) well over ninety percent of the design on Kemper had been completed by late 2012.

70.    Wingo concluded: "Through **lies, deceptions and half-truths** and an unwillingness to confront that, I believe they've damaged [their credibility]. **We chose not to [be truthful] and we did it multiple times**."

71.    Ultimately, after reporting his concerns about the schedule delay to his supervisors, Wingo was ostracized. Isolated as a Project Manager, Wingo noticed a severe drop off in high-level communication. Asked why he believed this occurred, Wingo responded:

>    Because I was messing up the story. There are two different stories. There's the real story and then there's the public story. The public story is that it's all going great, we're going to be online inside of 2014, it's going to be a great project for the people of Mississippi. What we could see internally was there was no way we we're going to finish the project before the third or fourth quarter of 2016. A lot of that had to do with the fact that construction quality was terrible. One of the ways they were able to keep proclaiming earlier finish dates was construction would have something halfway complete with a lot of quality issues which would normally prevent the commissioning group from taking it over and testing it. But that's not what happened on our project. Due to executive pressure, our commissioning group took these construction packages which still had sometimes 50% of the construction still left and

- 38 -

a lot of the inspection documentation was missing.  But that was never added back to the schedule.  It made it appear like we were finishing when in fact they were just kicking the can further down the road.  We had a lot of construction work left.  So when we were telling the world that we were going to finish in 2014, and this is back in 2014, I was telling management we were not going to finish until the third or fourth quarter of 2016 and I think time has vindicated that.

In August 2014, Wingo was put on paid administrative leave for eighteen months.  On September 23, 2014, while he was on paid leave, Wingo presented a binder of information summarizing his allegations against Southern Company to Chief Operating Officer Kim Greene.  Wingo was ultimately terminated in 2016.

72.    On February 19, 2015, the Southern Company filed an emergency request to bar Wingo from, among other things, disclosing "certain allegations" he had made against the Company.  Southern Company sought to keep confidential "any information concerning events which occurred during the course of Mr. Wingo's employment with [Southern Company Services]."  The Company described the information it sought to prevent Wingo from disclosing as highly confidential information that would cause it "substantial and irreparable injury" were it to become public.  In its request to seal its court filings, the Southern Company conceded that it "faces particularized harm associated with the public disclosure of confidential settlement negotiations as well as the subject matter of the dispute resolved through the settlement agreement."

- 39 -

C.    **Confidential Witnesses**

73.    Several former Company employees or consultants have provided information demonstrating that Defendants' Class Period statements were false and misleading and that Defendants knew or recklessly disregarded the falsity or misleading nature of their statements.  The confidential witnesses ("CWs") include individuals formerly employed at the Company during the Class Period, whose accounts corroborate one another, other sources set forth herein and facts now admitted by Southern Company.  The CWs provided information to plaintiffs' counsel and/or its investigator on a confidential basis and are particularly described by job description and responsibility, and duration of employment, thereby providing sufficient detail to establish their reliability and personal knowledge.  As set forth below, the information provided by the CWs supports a strong inference that Defendants acted with scienter.

74.    Confidential Witness No. 1 ("CW-1") was employed by Southern Company from the summer of 2013 to 2014 as a contract employee at the Kemper Plant.   CW-1 was responsible for quality assurance for the electrical and instrumentation segments; CW-1's duties and responsibilities involved monitoring construction, reviewing safety issues, and ensuring that the construction complied with regulatory codes.  In that position, CW-1 reviewed reports prepared by various

- 40 -

quality control contract employees.  CW-1 also prepared summary reports.  These reports were uploaded to the PIMS system, which CW-1 described as a data acquisition management and archiving program that kept track of all documents required to meet construction deadlines and government regulations.  While employed by Southern Company, CW-1 interacted with and sat in on monthly quality assurance meetings with Dave Empfield, who managed construction of the Kemper Plant.  CW-1 said that the cost and schedule of the Kemper Plant was radically underestimated.  In fact, CW-1 explained that it became clear to CW-1 only two weeks after beginning work at the Kemper Plant that construction of the plant would not be completed by the May 2014 deadline and likely would not be completed for several years past that deadline.  For example, shortly after arriving at Kemper (August 2013), CW-1 noticed that the gasifier was only two stories high and should have been 10 stories by that date, an indication it was behind schedule.  In about September 2013, CW-1 conveyed this to a manager, Tom Noble.  CW-1 told Noble, "no way this thing is going to get done" on time.  CW-1 noted that the Kemper Plant was "built to substandard guidelines," which CW-1 realized early in CW-1's employment would create compliance issues and construction delays.  In September or October, CW-1 conveyed the concerns about engineering and construction quality to Dave Empfield (Kemper construction manager) and electrical managers Greg Watson and Brett Andrews.

- 41 -

After expressing concerns regarding these issues to managers in emails, CW-1 was told by managers Tom Noble and Mark Webb that these concerns should not be put in writing and that email was the "kiss of death" at the Kemper Plant. CW-1 said that generally employees were discouraged from circulating negative information about the Kemper Plant in emails. CW-1 said that every time CW-1 identified a problem or concern, CW-1 was told to be a team player: "You need to learn how to play ball." CW-1 said that Tom Noble (quality control manager) reported to Bob Collins who reported to Dave Empfield. CW-1 stated that Tom Fanning visited the Kemper Plant every two or three months. On each of those occasions, Dave Empfield escorted Fanning on a site tour using a bright red golf cart. When CW-1 left the Kemper Plant in the summer of 2014, CW-1 felt sure that construction on the Kemper Plant would not be completed until 2017 or 2018. CW-1 also observed instances where employees at the Kemper Plant, including manager Tom Noble, were falsifying instrumentation safety and compliance documentation in order to pass inspections by state regulators. When CW-1 reported this to the head of quality assurance, CW-1 was told not to worry about it. CW-1 became so frustrated by this falsified inspection documentation (and the direct involvement of Kemper Plant supervisors in the falsification of documents) that CW-1 chose to quit working at the Kemper Plant.

75.    Confidential Witness No. 2 ("CW-2") was employed by Southern Company from 2011 to Fall 2013 at the Kemper Plant.  CW-2 was employed as an office coordinator and was responsible for providing administrative support to approximately 25 construction managers, including Dave Empfield, Steve Owen, Coy Graham, Ashley Baker, Brent Collins and Kelli Williams.  CW-2 also provided some support to other managers, including Defendants Anderson and Huggins.  Based on discussions with Dave Empfield, who CW-2 supported, CW-2 stated that Empfield did not think the May 2014 completion deadline would be possible to achieve.  Based on plant logistics to which CW-2 was privy, CW-2 said that it was clear from the start of CW-2's employment in 2011 that the May 2014 deadline would not be possible to achieve.  According to CW-2, this concern was widely acknowledged and regularly discussed by employees at the Kemper Plant with whom CW-2 spoke.  In addition, CW-2 said that Kemper employees were warned not to discuss the scheduling delay at the Kemper Plant with any outsiders, such as members of the press.  CW-2 said that Southern Company executives, including Defendant Fanning, often visited the Kemper Plant during CW-2's employment at the plant and met with construction managers once every approximately three months.  CW-2 was involved in setting up meeting space for Fanning's visits.  In addition to a site tour, CW-2 said that Ashley Baker provided Fanning with a power point presentation about the status of the plant

- 43 -

during Fanning's visits.   Meetings between Ashley Baker, other construction managers and Fanning occurred in trailers on-site at the Kemper Plant. John Huggins was at the Kemper Plant "all the time."  Tommy Anderson was "regularly" at the site, at least every two weeks and he would often remain at the Kemper Plant for a week at a time.  Day was "always" at the Kemper Plant.  CW-2 revealed that there was an internal investigation into scheduling delays and cost overruns at the Kemper Plant in late Spring of 2013.

76.    Confidential Witness No. 3 ("CW-3") was employed by Southern Company from 2008 to 2012 in Atlanta.  From 2008 to 2010, CW-3 was employed as an analyst in the risk management department.   In early 2010, CW-3 changed positions, working for Southern Company as a Financial Planning Analyst through the summer of 2012.   As a Financial Planning Analyst, CW-3 was responsible for forecasting Southern Company's cash and financial needs, compiling financial data from subsidiaries such as Mississippi Power, and providing Southern Company's rating agencies with financial projections and metrics.  In this role, CW-3 reported directly to the Director of Investor Relations and Financial Planning at Southern Company, Dan Tucker.  CW-3 received data from Southern Company's subsidiaries, including Mississippi Power, which included monthly forecasts of revenues (based on various rate-paying models) and expenditures for various projects, such as the Kemper

- 44 -

Plant.  The financial planning team in Atlanta aggregated the information from all subsidiaries, put the information into complex models and analyzed the information for Southern Company's Treasury, Finance and Investment Departments.  CW-3 learned that there were scheduling delays at some point before August 2012.  At that time in early 2012, there were certainly discussions among employees that Kemper would not be completed in time.  During 2012, CW-3 regularly participated in conference calls with Moses Feagin, the CFO of Mississippi Power, to discuss Mississippi's future financing needs.  CW-3 noted that while the Southern Company finance team held similar calls with other Southern Company subsidiaries, the Southern Company finance team took particular interest in the Kemper Plant due to the size and risk associated with the plant, as well as the "haziness of the schedule." In addition to Feagin, other Mississippi Power employees participating in the conference calls often included Matt Grice (the supervisor of Mississippi Power's forecasting team), Cindy Shaw (Mississippi's Controller), Dan Tucker (Southern Company's Director of Investor Relations and Financial Planning), Mark Lantrip (Southern Company's Vice President of Finance) and John Haygood (Southern Company's finance manager).  During these conference calls, Feagin and others from Mississippi Power warned that there could be scheduling delays and budget overruns for Kemper.  This was relevant to the Southern Company finance team because any

- 45 -

major delays or cost overruns could prompt the state regulators to change the rate models that the financial planning team was using for projections. CW-3 noted because Kemper was a "first of its kind" project, it was considered especially risky and received heightened scrutiny from risk management employees and C-level executives. CW-3 said that executives participated in risk management meetings held on either a monthly or quarterly basis that gauged the risk for all major projects, including Kemper. Fanning, Beattie and Todd Perkins also met regularly with senior executives at the Engineering and Construction Services Division, as well as with Mississippi Power executives like Ed Day, to receive updates on the project.

77.     Confidential Witness No. 4 ("CW-4") was a contract employee who worked as a quality control manager at the Kemper Plant from January 2013 through early 2014. CW-4 said that Tom Noble was responsible for coordinating the various quality control managers, including CW-4. CW-4 performed quality control inspections on various aspects of the construction (including welding, piping and concrete) of a conveyer system that was designed to bring lignite coal from the mine into the plant. CW-4 completed routine inspection reports that were submitted to Southern Company. CW-4 said that when CW-4 began working at the Kemper Plant in January 2013, the plant was slated to be completed in May 2014. CW-4 thought the 2014 deadline was "crazy" and that it was clear to CW-4 while CW-4 worked at the

- 46 -

Kemper Plant that there was "no way it could have made that date."  CW-4 said that any 2014 deadline was "a lot of smoke" and "a crazy ass date."  When CW-4 stopped working at the Kemper Plant in early 2014, the Startup group had not even begun to test the gasification equipment, which was a clear indication to CW-4 that the Kemper Plant was not even close to being finished.  CW-4 said that throughout 2013, CW-4 and other individuals working at the Kemper Plant routinely discussed that it was not realistic that the plant would be finished at any time in 2014.  CW-4 also encountered workers who were supposed to have been working at the site for only one year in order to complete a limited project, but had been there for as long as three years – which CW-4 took as another indication that completion in 2014 was "ridiculous." CW-4 noted that the project CW-4 was working on – the construction of the lignite conveyer system – was slated to be completed within eight months of when CW-4 started at Kemper in January 2013.  However, when CW-4 left the Kemper Plant 13 months later, the conveyer system had still not been completed.  CW-4 said that the dome that housed the lignite coal collapsed during the summer of 2013, and had to be rebuilt.  This contributed to delays in the construction of the conveyer system.  After the collapse, the original dome had to be demolished and a new one had to be completely rebuilt.

- 47 -

78.     Confidential Witness No. 5 ("CW-5") was employed as a contract employee at Southern Company as a quality control manager from 2009 through spring 2014.  CW-5 started working at the Kemper Plant when the project broke ground in 2010, and CW-5 continued to work there throughout the rest of CW-5's tenure at Southern Company.  According to CW-5, it was the job of quality control personnel to make sure everyone at the Kemper Plant, including Southern Company employees and contractors, "were doing their job properly."  CW-5's duties included reviewing and monitoring both materials and construction work.  CW-5 oversaw three inspectors who completed daily inspection reports.  CW-5 compiled the inspectors' findings into monthly reports that were submitted to Southern Company's office in Birmingham.  CW-5 said that the time constraints that Southern Company set on the project were simply not realistic.  CW-5 said that it was clear to CW-5 that a project of the size and scope of the Kemper Plant was underestimated based on CW-5's experience helping to build power plants for a variety of companies throughout CW-5's career.  One of the challenges to constructing a large power plant is that the construction team is dependent on its suppliers to provide materials and equipment on time, which is "always a wild card."  Throughout CW-5's tenure at the Kemper Plant, most of the suppliers were behind schedule in delivering product.  Additionally, CW-5 said that the amount of "dirt work" and "stone work" required for Kemper was

- 48 -

"astronomical."  CW-5 said another problem was the management at the site.  All of Southern Company's top quality staffers who really knew about construction – those that would normally be put into assistant project manager or project manager positions – avoided being assigned to Kemper "like the plague" because they knew the schedule and budget were impossible to achieve.  Instead, Kemper was staffed with less competent managers and superintendents.  CW-5 said that Southern Company should have had "the best and the brightest" working on the project, "but that's not what happened."  CW-5 said that these managers' solution to scheduling delays seemed to be to increase the amount of workers, which CW-5 thought was a bad idea that "never works in construction."  At its peak while CW-5 was employed at the Kemper Plant, there were 6,000 employees working at the site.  This actually created less efficiency rather than more efficiency because "people were working on top of each other."  CW-5 sat in regular weekly meetings, which CW-5 believed were held every Tuesday, with Kemper Plant upper managers such as Dave Empfield and assistant site manager Brent Collins, as well as project managers representing the various construction contractors.  CW-5 said that Ashley Baker occasionally attended these meetings.  During the meetings, the contractors discussed their own construction schedules for the sections of the plant on which they were working.  CW-5 said that at these meetings, various construction delays were discussed.  CW-5 often left the meetings

- 49 -

perplexed that no one was updating the schedule with a plan "to get us back on track." CW-5 expressed frustration after one of the weekly meetings in 2013. CW-5 approached Baker and Empfield and asked them, "[w]hat the hell is going on?" CW-5 lamented to Baker and Empfield that everyone was so far behind schedule, but no one was talking about how to get everyone back on schedule, which CW-5 thought the managers should have been discussing in the meetings. Baker and Empfield completely dismissed CW-5's concerns, saying only that they had everything under control and CW-5 should not worry about it. At some point after this incident, CW-5 was demoted to senior quality inspector. Mark Webb, a Southern Company employee, took over as manager. CW-5 thought that CW-5's demotion was in response to the conversation CW-5 had with Baker and Empfield in which CW-5 raised concerns about the schedule. CW-5 left Southern Company about six months later. CW-5 was frustrated that CW-5 had been demoted after speaking CW-5's mind.

### D.   The Independent Monitor's Reports

79.   In February 2011, the Mississippi Public Utilities Staff hired BREI, a power plant design, engineering and construction company, to act as an independent monitor of the Kemper Plant. BREI's independent monitoring team was comprised of senior level management and technical experts with extensive experience in the development and execution of complex conventional, FOAK and emerging

- 50 -

technology projects including gasification and IGCC projects.  Gregory Zoll, BREI's project manager for the reviews, is a mechanical engineer with over 35 years of experience in the development, design, engineering, environmental permitting, and construction of independent power projects, combined cycle cogeneration plants, refinery, utility, and bulk materials handling facilities.  As Director of the Strategic Consulting Division at BREI, Zoll had overall responsibility for project development support including both fossil and renewable energy projects which included project conceptual planning and design, environmental permitting, contract development, and project execution oversight following financial closing.   In addition, Zoll has performed over 25 Independent Engineering Due Diligence assignments in the Independent Power, Utility and Advanced Technology areas for project financing and project acquisitions.  Zoll has conducted independent evauations of power projects including coal, gas-fired combined cycle facilities, IGCC, coal to liquids technologies, and projects that have included CO2 separation and sequestration.

80.    As an independent monitor, BREI was responsible for monitoring the regulatory, financial and auditing aspects of the Kemper Plant.  During the Class Period, BREI conducted two primary reviews and prepared a report at the conclusion of each.  First, in 2012, BREI conducted an Independent Project Schedule and Cost Evaluation ("IPSCE").  The findings and recommendations from the IPSCE were

- 51 -

1276051_1

reported to the Company and the PSC in November 2012.  Second, BREI conducted a prudency examination for the period ending March 31, 2013.  It filed its confidential prudency report with the PSC in April 2014 and provided testimony regarding the review in July 2014.

81.    BREI's IPSCE evaluation plan and methodology examined select areas of the project, specifically the gasifier and gas treatment areas, to get a representative cross-section of construction activities, schedule status and costs.  These areas were selected because they represented the highest level of construction criticality, the most complex parts of the project, and the areas with technology risk.  A field evaluation was then conducted by a team of senior professionals experienced in evaluating project engineering and construction status, cost estimating, project scheduling, and procurement to assess the accuracy of the construction percent complete values reported by the Company.

82.    BREI's IPSCE evaluation also included an evaluation of the project's most current project schedule which was updated and re-baselined on August 31, 2012.  This evaluation focused on the Critical Path elements of the schedule using Primavera P6 scheduling software.  The evaluation considered the progress achieved to date compared to the current target completion dates.

- 52 -

83.     In the November 2012 IPSCE Report, the Independent Monitor determined that there were numerous critical path deliveries that were behind the original November 2012 baseline plan.[5]  For example, the Independent Monitor found that the gasifier refractory lined components were up to three months late.  BREI found that this delay also impacted gasifier structural steel erection and equipment installations above a 605 foot elevation.  As of November 2012, BREI determined that these deliveries were about three months behind the original baseline schedule.

84.     BREI also found that the remaining gasifier structural steel installation and gasifier components, which needed to be delayed to accommodate the late gasifier delivery dates, may result in up to a five-month delay in completing the gasifier structure and systems.[6]

85.     In November 2012, BREI found additional "critical path" delays.  Based on the project commodity charts, BREI learned that that several commodities were behind the original baseline schedule as presented in the Company's monthly

---

[5]   "A schedule's 'critical path' is an identification of sequential activities within a schedule that determine minimum time required to complete the project.  A delay of any activity in the critical path will delay the project unless workarounds or other mitigating actions are implemented to accelerate the remaining work."

[6]   Independent Monitor's Project Schedule and Cost Evaluation for the Kemper County IGCC Project prepared for Mississippi Public Utilities Staff (Nov. 15, 2012), at 25.

production report.  BREI noted the following delays, which it described as "a trending indicator of progress to come that may result in impacts on critical path."

- Underground piping was behind the original plan by six months.

- Concrete foundations were three months behind the original plan.

- Structural steel was behind the original schedule by about three months "and continues to slip . . . ."

- Process piping was delayed by at least one month.[7]

86.    BREI concluded that Southern Company should utilize certain "project management and project controls tools and techniques" to better "monitor, track and manage the logistics" for the Kemper Plant.  In addition, BREI concluded that the Kemper Plant was unlikely to be completed by the May 2014 deadline and recommended that the Company "[c]onduct a detailed review of the August 31, 2012, re-baselined schedule to verify and, if necessary, modify the logic, predecessors and successors to each activity."  The 2012 report did note, however, that Mississippi Power has maintained its "schedule and projected [completion] date of May 1, 2014" and "has re-emphasized its commitment to complete construction, commissioning and start-up by that date."

---

[7]    *Id.* at 24-25.

87.    In response to the November 2012 report, Southern Company spokesman Tim Leljedal immediately denied that delays reported by the Independent Monitor would negatively impact the Kemper Plant's schedule. "[Mississippi Power] remains confident and recently confirmed its cost and schedule projects" for the Kemper Plant, Leljedal said.[8]

88.    In April 2014, the Independent Monitor issued its second report, a prudency evaluation. A prudency evaluation is an analysis of the decision-making process and the activities performed during the licensing, construction, and start-up phases of a power plant. It uses specific evaluative criteria to determine whether construction-related decisions were reasonably made and the activities prudently performed. In that report, the Independent Monitor observed that the gasifier delay in 2012 had adversely and "significantly" impacted the schedule:

> The late delivery of the gasifier had a significant impact on construction in the gasifier area of the Project. The fabrication of the gasifiers consisted of 12 sections on each of the two gasifiers. Major delays were experienced primarily due to an issue with the installation of acceptable refractory material. This coupled with other fabrication issues caused an approximate six month delay to the delivery and installation of the gasifiers. The delay caused major impacts to the sequence of steel erection as well as the setting of other major equipment in the gasifier building which resulted in critical delays to the project schedule. The

---

[8]    *See* John Downey, *Cost Overruns Remain Issue For Gasified-Coal Plants*, Charlotte Bus. J., Nov. 29, 2012.

construction group was forced to be creative in developing major work-arounds for the installation of these other critical components, causing additional costs, as well as, major delays to the project schedule.[9]

89.     In January 2013, a full time site monitor was added to the BREI team. BREI's monitoring of the Kemper Plant also included approximately seven trips to Southern Company's offices in Birmingham, Alabama and monthly visits to the Kemper Plant to monitor and review critical engineering, schedule and cost aspects of the project.  BREI's review covered the period from late 2009 through March 31, 2013.  BREI ultimately issued a prudency report in April 2014, which was labelled "confidential" and did not receive media attention until November 2014.

90.     BREI reviewed the following data and information in developing its prudency report:

- Information gathered during the initial project due diligence review in 2011;

- An independent review of the project schedule and project cost which it conducted from May through November 2012;

- BREI's ongoing Project monitoring reviews, including site visits, conducted from early 2011 through March 2013;

- Responses to approximately 325 requests for information provided by the Company during the initial due diligence review;

---

[9]   Independent Monitor's Prudency Evaluation Report for the Kemper County IGCC Project prepared for Mississippi Public Utilities Staff (Apr. 15, 2014), at 55.

- 56 -

- Direct interviews of "key" Mississippi Power executives and Southern Company personnel in Meridian and Gulfport, Mississippi;

- Ongoing project monitoring work; and

- The prudency discovery process.

91.     In order to conduct its prudency review, BREI's review and evaluation focused on the reasonableness of the Company's actions and decisions, and included the following guidelines:

- "[I]t was not within the scope of BREI's review to evaluate decisions made by Southern Company's senior management."

- "The standard that BREI used for determining prudence or reasonableness in an action or decision consisted of the consideration of what a reasonable and informed manager at the appropriate level within a project team in the electric power industry would have done, in light of the conditions and circumstances which were known, or should have been known, *at the time the decision was made or action taken*." (Emphasis in original.)

- "Under no circumstances did BREI evaluate actions or decisions based upon 'hindsight' in its prudence assessments and evaluations.  The decisions/actions were judged purely upon what was known at the time or should have been known by the Project team at the time the decision was made or the action was implemented."

- "BREI examined the major decisions/actions of [Mississippi Power] and [Southern Company] . . . in the execution of the Project to determine whether their decisions/actions fell outside of the bounds of reasonableness."

92.     At the conclusion of the prudency review, the Independent Monitor also reported that, as a result of "major issues with the installation of refractory material by

- 57 -

CFI (the manufacturer of the components), CFI was forecasting a six month delay in

delivering the gasifiers."[10]

93.     According to the Independent Monitor, the actual delivery of major

equipment to the site caused "major delays" and impacted the sequencing of the

construction and installation of the equipment:

> One of the major causes of the delays was the difficulty encountered in delivering this major equipment (absorbers, compressors, tanks, heat exchangers, etc.) from the barge slip to the site due to failure to reach timely agreements with companies and utilities that either controlled or owned the restraining overhead lines in the communities between the site and the barge slip.  These lines consisted of various power, cable, and telephone lines which spanned across the roadways between the barge slip and the site impeding the transportation of the equipment to the site. [Southern Company], after an exhaustive effort to coordinate the various entities to remove or raise the lines to allow clearance of equipment, designated a full time task manager, who negotiated, paid additional fees, attended numerous coordination sessions with each of the companies and utilities and eventually achieved success in coordinating a resolution in raising and/or removal of the impediments.[11]

The Independent Monitor noted that the delay in delivery of major equipment caused

broader problems, including "major delays and impacted the sequencing of the

construction and installation of the equipment."

---

[10]   *Id.* at 52.

[11]   *Id.* at 56.

94.     The Independent Monitor noted that, in March 2012, as the detailed design became further developed, Southern Company's engineering team began to recognize the growth in scope of the balance of the plant equipment and construction bulk quantities (structural steel, piping, cable, instruments, etc.).[12] By March 2013, the growth of major commodities and labor required to build the Kemper Plant had increased dramatically, as shown in the charts below:

| Commodity | Unit of Measure | Certification Quantity | Forecast as of March 2013 | variance |
|---|---|---|---|---|
| Concrete | Cubic Yards | 50,181 | 106,960 | 113% |
| Steel | Tons | 28,168 | 37,810 | 34% |
| Plant Piping | Linear Feet | 605,946 | 855,957 | 41% |
| Cable | Linear Feet | 3,218,675 | 11,860,997 | 269% |

| | Unit of Measure | Certification Quantity | Forecast as of March 2013 | variance |
|---|---|---|---|---|
| Labor | Man-hours | 5,140,288 | 10,515,176 | 105% |

Remarkably, observed the Independent Monitor, "[a]ll of the above *increased quantities and man-hours were being added without a change to the COD of the facility*, which remained at May 2014 as of March 2013."[13]

95.     This large increase of commodities and installation labor hours created severe labor congestion which is sometimes referred to as a "stacking of trades" in

---

[12]  *Id.* at 49.

[13]  *Id.* at 54.

tight areas of the plant.  The Independent Monitor noted that "[t]his stacking of trades

negatively impacted labor productivity":[14]

> The additional commodities and the late delivery of components and
> equipment, coupled with the COD remaining constant, has caused major
> congestion of workers in specific work areas resulting in poor
> performance, low worker productivity and excessive down time.  The
> Project experienced up to 10% to 12% absenteeism for the skilled crafts,
> while the industry average is in the 3% to 5% range.[15]

96.     Piping problems, the Independent Monitor found, continued to plague the

Kemper Plant, causing additional delays:

> The late delivery of the pipe, valves, pipe supports, and pipe hangers
> created major impacts in the sequence of the steel erection in all
> buildings of the facility, creating additional man-hours to perform the
> required work-arounds needed to accomplish the piping installations.
> The work-arounds also required the workers to "drift" or "swing" piping
> into place on a given elevation of a building after the steel has been
> erected as opposed to installing the piping as the steel is initially erected.
> This required additional man-hours for implementation.[16]

The delay of available piping to be installed in accordance with the schedule "***caused***

***a rippling effect*** in the succeeding activities in procurement, fabrication, construction,

and the startup phases, thus creating the field work-arounds and some additional loss

of schedule time."  The Independent Monitor concluded that the "late delivery of pipe

---

[14]   *Id.* at 11.

[15]   *Id.* at 56.

[16]   *Id.* at 55.

hangers and supports, required to complete piping installation, have become a critical path issue in completing the piping installation."

97.     In the prudency report, the Independent Monitor also observed instances in which workers at the Kemper Plant used "temporary lashing and cables" to support the pipes.  "This caused inefficiencies resulting in additional man-hours expended, first to utilize temporary supports, and then to remove the temporary supports in order to install the permanent supports."

98.     The Independent Monitor identified material engineering schedule delays as set forth below.

|            | Baseline Completion | Actual Completion | Duration Overrun |
|------------|---------------------|-------------------|------------------|
| Civil      | February 2012       | Fall 2012         | 6 months         |
| Mechanical | December 2011       | January 2013      | 14 months        |
| Electrical | November 2012       | March 2013        | 4 months         |
| I&C        | November 2012       | March 2013        | 4 months         |

99.     The Independent Monitor also recognized that "many engineering activities and vendor design documents that are required in support of engineering completion were on the critical path."  This was important to the COD because "delayed, activities that are on the schedule's critical path impact other successive critical path activities, causing a direct impact on the project's completion date."[17]

---

[17] *Id.* at 48.

100.   In its prudency evaluation, the Independent Monitor noted that the plant was 58% complete as of March 2013.   In addition, the Independent Monitor determined the percentage completion of mechanical equipment installation as of March 2013, as shown below:

| Area of the Plant | % Complete |
|---|---|
| Combined Cycle area | 72% |
| Gasifier Area | 56% |
| Gas Cleanup | 54% |

The Independent Monitor also determined the progress of above-ground commodity installation as of March 2013, as shown below:

| Commodity | Installed | Total Forecast | % Complete |
|---|---|---|---|
| Concrete (cubic yards) | 100,000 | 107,000 | 93% |
| Cable (linear feet) | 1.5M | 11.8M | 13% |
| Piping (linear feet) | 150,000 | 720,000 | 20% |
| Steel (tons) | 29,000 | 38,000 | 76% |

101.   "Float" is a contingency or cushion which is added to the duration of individual activities to account for unknowns and delays that may occur when completing an activity.  It is common industry practice to employ schedule float, especially when the project is challenging.  Although the Kemper Project was widely accepted to be a challenging project, Black and Veatch ("B&V") – another consultant hired by the PSC and relied on by the Independent Monitor – "observed that an overall schedule margin or float had not been included in the project schedule.  The schedule was noted by B&V to be tight and, without overall margin or contingency,

- 62 -

the Project would be susceptible to unplanned or unexpected schedule events." Despite this lack of float, "the Project team was aware that the project start date had slipped by six months while the COD had not."[18]

102.   The Independent Monitor concluded that Southern Company "should have recognized that there was little margin for error or delay with respect to meeting the May 2014 COD.  However, as early as October 2010, [Southern Company] had twice set targets for awarding equipment procurement packages and twice failed to meet those targets.  This trend of late procurements continued through 2011 and in to 2012."[19]

103.   Further, the Independent Monitor determined that "trending of historical data for quantity growth at Kemper (specifically in structural steel and concrete) starting in September 2011, and the slower than planned progress in engineering (including piping releases for fabrication), should have alerted the Project Team to the probability for schedule delays and cost overruns much earlier."[20]

---

[18]   Independent Monitor's Prudency Evaluation Report for the Kemper County IGCC Project prepared for Mississippi Public Utilities Staff at 31, 42.

[19]   Independent Monitor's Surrebuttal Testimony before the Mississippi Public Service Commission, MPSC Docket No. 2013-UA-189 (July 21, 2014), at 36.

[20]   *Id*. at 41.

1276051_1

104.   According to the Independent Monitor, the 2014 prudency report was "filed confidentially" with the PSC in April 2014.  In November 2014, the first news of the 2014 prudency report broke.  In response, the Company "vigorously denied the veracity of the report" and related testimony:[21]

> "Mississippi Power does not agree with many of the accusations contained in the Burns and Roe surrebuttal testimony," Mississippi Power spokesman Jeff Shepard said in an email.  "Mississippi Power has not been asked to respond to this testimony.  The company is reviewing the allegations and will address them at the appropriate time.  Mississippi Power will continue working with the independent monitors hired by the PSC and the Public Utilities Staff."

**E.   The Pegasus Report**

105.   In response to the Independent Monitor, Mississippi Power hired Pegasus Global Holdings, Inc. ("Pegasus") to conduct its own prudency evaluation in order to rebut the Independent Monitor's conclusions.

106.   On May 23, 2014, Pegasus filed its prudency report ("Pegasus Report") with the PSC.  According to Pegasus,

> Pegasus-Global conducted an independent prudence audit and evaluation of whether the costs incurred for the Kemper IGCC Project (or "Project") were reasonably and prudently incurred.  Pegasus-Global's prudence audit and evaluation focused on the management processes employed by [Mississippi Power] to make decisions and compared them

---

[21]  *See* Steve Wilson, *Report on Kemper Project Casts Embattled Power Plant in Poor Light*, Mississippi Watchdog, Nov. 5, 2014 (available at http://watchdog.org/181052/kemper-project-4/).

to generally accepted prudence standards for decision-making processes. This evaluation considered whether [Mississippi Power] management had an appropriate decision-making structure and processes in place to ensure that MPC management made informed decisions based on information reasonably available to or known at the time management made the decisions.  The evaluation also considered whether [Mississippi Power] management reasonably and prudently implemented its decisions.

According to Pegasus, its work was governed by the following prudence standard: "Decisions are prudent if made in a reasonable manner in light of conditions and circumstances which were known or reasonably should have been known when the decision was made."

107.   In conducting its prudency review, Pegasus stated it had access to "sufficient project documentation to reasonably ensure that the conclusions reached are supported by the facts."  As the Company's own consultant, Pegasus stated it reviewed "thousands" of internal documents, including internal meeting minutes, cost estimates and reforecasts, purchase orders, change orders, project schedules, monthly progress reports and project execution plans.  According to Pegasus, "[b]y reviewing a vast number of documents, Pegasus-Global was able to capture the flow of information from a broad spectrum of Project and utility industry information to produce a significantly more comprehensive prudence analysis upon which to present testimony."  In addition to a comprehensive review of internal documents, Pegasus

stated that it also interviewed "several key members" of the Kemper Plant management, including Defendants Day, Anderson, and Huggins, Ashley Baker, Dave Empfield, Joe Miller, Steve Owen, Randall Rush, Babar Suleman and Brett Wingard. Finally Pegasus stated that it toured the Kemper Plant "to gain a full understanding of the scope of the Project and its complexity."

108.   Unsurprisingly, Pegasus concluded that the decisions made by Mississippi Power were at all times reasonable and prudent:

> Based upon Pegasus-Global's independent prudence review, which included an evaluation [Mississippi Power] management decisions and decision-making processes regarding the costs incurred on the Kemper IGCC Project through March 31, 2013, and in response to the allegations of imprudence made by the Sierra Club, Staff and [Mississippi Power] witnesses, Pegasus-Global has concluded that [Mississippi Power's] management decisions as to the Kemper IGCC Project were reasonable and prudent.  Generally, [Mississippi Power] made rational, deliberate and prudent decisions based on established processes.  [Mississippi Power] used its processes to collect the best information available at the time; evaluated that information in light of the circumstances at the time; identified viable alternatives or options; and made reasonable decisions. There were, in my opinion, no imprudent decisions . . . .

109.   Despite its finding that Mississippi Power acted prudently, the underlying facts found by Pegasus corroborate certain evidence provided by Wingo, the Independent Monitor, *The New York Times* and the CWs, and establish the falsity of Defendants' statements.   For example, Pegasus found that "[d]uring the high temperature curing process of the refractory in the first gasifier components, the

refractory began failing . . . .  The gasifier component contract delivery dates were from April 2012 through September 2012.  However, the actual delivery dates ranged from August 2012 through January 2013."  Pegasus continued: "The first piece was delivered to the site September 9, 2012, approximately five months later than the contract schedule specified."  These delays caused the schedule for the first gasifier heat-up, a key milestone, to be pushed back over two months in August 2012.

110.   According to Pegasus, "[t]he delay in the gasifier was one of several things causing construction delays at the plant [during 2012]" and "[t]he late delivery of some gasifier components did impact gasifier steel erection."  Significantly, by August 2012, the schedule for several key milestones, including first gasifier heat-up, had to be pushed back several months "to account for new quantity projections of the major commodities and the impact late material deliveries were having on the Project."

## VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

111.   On April 24, 2012, the PSC voted to re-certify the construction of the Kemper Plant.  The PSC's certification was based on Defendants' representations to the PSC and investors that the Kemper Plant would meet its original construction

- 67 -

budget of $2.395 billion and would be placed into service no later than May 1, 2014 (the COD).

112.    On April 25, 2012, the first day of the Class Period, Southern Company announced its first quarter 2012 financial results and held a conference call for analysts, media representatives and investors.   On the call, Defendant Fanning confirmed that the start-up phase of the Kemper Plant would begin in June 2013. Fanning also confirmed the May 2014 COD.  Specifically, Fanning stated:

> [Kemper Plant] ***initial startup and testing are now only 14 months away***.  And we remain confident that this project will provide the best value to customers over the long term.  ***Targets remain achievable for . . . the . . . Kemper County project[] with regard to construction schedule*** and cost to customers.

113.    On May 7, 2012, Southern Company filed its consolidated Form 10-Q for the first quarter of 2012.  The Form 10-Q stated: "The Kemper IGCC plant, ***expected to begin commercial operation in May 2014***, will use locally mined lignite (an abundant, lower heating value coal) from a mine adjacent to the plant as fuel."

114.    Defendants Fanning, Beattie and Day signed the consolidated Form 10-Q containing this statement.  In addition, Defendants Fanning, Beattie and Day signed Certifications pursuant to Sarbanes Oxley in which Defendants attested that the report containing this statement "does not contain any untrue statement of material fact or omit to state a material necessary to make the statements made, in light of the

- 68 -

circumstances under which such statements were made, not misleading with respect to the period covered by this report." Defendants Fanning, Beattie and Day also attested that they had designed disclosure controls to ensure that material information relating to the Company was made known to them.

115.    Defendants knew or recklessly disregarded that the statements set forth in ¶¶112-114 were false and misleading or omitted material information necessary to make them not misleading for the following reasons:

(a)    The Kemper Plant was not "on schedule" due to major delays in the installation of the gasifier, the most critical and complex part of the project. *See* §V., *supra*. For example:

- Wingo, who worked as a Project Manager over the gasifier island, stated: "In 2012, we had major refractory failure issues at our fabricator. . . . The problem was it took a lot of time. And ***we lost somewhere between three and six months on the overall schedule*** . . . ." *See* ¶¶56-72.

- The Independent Monitor explained: "***The late delivery of the gasifier had crippling effects in the gasifier area of the Project***. . . . [T]rends in quantity growth and in the early phases of construction costs were clearly identified as early as September 2011 at the time that the initial baseline schedule was completed." Major delays were experienced primarily due to an issue with the installation of acceptable refractory material. This coupled with other gasifier fabrication issues caused an approximate ***six month delay to the delivery and installation of the gasifiers***, causing major impacts to the sequence of steel erection as well as the setting of other major equipment in the gasifier building resulting in ***critical delays to the project schedule***. *See* ¶¶79-104.

- 69 -

- The Company's consultant, Pegasus, acknowledged: "During the high temperature curing process of the refractory in the first gasifier components, *the refractory began failing*. . . . The gasifier component contract delivery dates were [initially scheduled] from April 2012 through September 2012.  However, the actual delivery dates ranged from August 2012 through January 2013."  *See ¶¶*105-110.

- Pegasus also determined: "The late delivery of some gasifier components [] impact[ed] gasifier steel erection" [during 2012]."  *See ¶¶*105-110.

(b)     The Kemper Plant was not "on schedule" as a result of several key engineering schedule delays that began in early 2012.  For example, the Independent Monitor noted that: "The baseline schedule called for engineering to be complete between February and November 2012.  Actual completion was between July 2012 and March 2013, *a delay ranging from four to fourteen months*, with the most significant delays in the mechanical engineering area."  *See ¶¶*79-104; *see also* §V., *supra*.  The following chart depicts the engineering delays that existed in early 2012:

| Engineering Discipline | Planned Completion | Actual Completion | Delay |
|---|---|---|---|
| Civil/Structural | February 2012 | Fall 2012 | 6 months |
| Mechanical | December 2011 | January 2013 | 14 months |

(c)     The Kemper Plant was not "on schedule" as a result of significant construction delays tied to piping, pipe hangers and other major commodities (steel, concrete, cable, etc.).  *See* §V., *supra*.  For example:

- The Independent Monitor noted that piping problems caused major delays to the project schedule: "The late delivery of the pipe, valves, pipe supports, and especially pipe hangers *created major impacts* in the

- 70 -

sequence of the steel erection in all buildings of the facility . . . ." *See* ¶¶79-104.

- The delay of available piping to be installed in accordance with the schedule, the Independent Monitor also noted, "***caused a rippling effect in the succeeding activities*** in procurement, fabrication, construction, and the startup phases." *See* ¶¶79-104.

- Wingo described the piping issue as a ***visible sign*** that the schedule was off track during 2012.  Specifically, Wingo recounted:

> Well right off the bat, the first thing people noticed was that a lot of the pipe that we were hanging, when you build a multiple story structure and you run pipe through it at different levels, you have to support it, you don't just lay it on the ground.  It is usually over your head.  So it has to be supported by something called a pipe hanger.  We saw pipe in the gasifier structure that was being held up by cables and ropes, I mean it was not a good look and when you talk to construction about what was going on, which you didn't have to talk to them, they were actively complaining, they said they weren't getting enough pipe or pipe hangers to build the plant.  This was happening in 2012, so that was the first visible sign of something at the site.  *See* ¶62.

- The Independent Monitor found that in March 2012, as the detailed design became further developed, Southern Company engineering began to recognize the growth in scope of the construction bulk quantities (structural steel, piping, cable, instruments, etc.).  *See* ¶¶79-104.

(d)     In addition to the specific construction delays detailed above,

further evidence that the Kemper Plant was not "on schedule" included:

- CW-3 learned that there were scheduling delays at some point before August 2012.  *See* ¶76.

- 71 -

- CW-2 said that it was clear that the May 2014 COD would not be possible to achieve. According to CW-2, this concern was widely acknowledged and regularly discussed by employees at the Kemper Plant with whom CW-2 spoke. In addition, CW-2 said that Kemper employees were warned not to discuss the scheduling delay at the Kemper Plant with any outsiders, such as members of the press. *See* ¶75.

- CW-5 stated that ***various construction delays were discussed at weekly onsite meetings*** where contractors discussed construction schedules for the sections of the plant on which they were working. CW-5 also stated that most of the ***suppliers were behind schedule*** in delivering product to The Kemper Plant. *See* ¶78.

- The Company's consultant, Pegasus, also noted: "the delay in the gasifier was ***one of several things causing construction delays at the plant*** [during 2012]." *See* ¶¶105-110.

(e) The May 2014 COD was impossible to achieve due to major delays in the installation of the gasifier – the most critical and complex part of the project – described at ¶115(a), above. These delays directly impacted the May 2014 COD. *See* §V., *supra*. For example:

- Wingo stated: "[W]e were told that in the gasifier area, particularly in the gasifier structure, where the gasifier is installed . . . we were told that in late 2011, that we had no time to lose on that because every day we lost in that particular area of the plant, we would lose on the back end of our schedule. ***In other words, we would miss our May 1, 2014 COD date***. Well in 2012 we had major refractory failure issues at our fabricator. . . . And we lost somewhere between three and six months on the overall schedule and yet even through 2012 when we had a three to six month delay on the gasifier, we did not report a slip in our May 1, 2014 COD.

That's when I was pretty certain that we had something terribly wrong with our scheduling." *See* ¶59.[22]

- The gasifier was essential to the schedule's "critical path." As the Independent Monitor explained, "when delayed, activities that are on the schedule's critical path impact other successive critical path activities, ***causing a direct impact on the project's completion date***." *See* ¶¶79-104.

(f)     The May 2014 COD was impossible to achieve given significant construction delays tied to piping, pipe hangers and other major commodities (steel, concrete, cable, etc.) as described at ¶115(a), above. These delays directly impacted the May 2014 COD. *See also* §V., *supra*. For example, according to Wingo, piping problems, in particular, during 2012 rendered the May 2014 COD unrealistic.[23]

(g)     In addition to the evidence of specific delays detailed above, CW-2's account provides additional evidence that the May 2014 COD was impossible to achieve. Based on discussions with Dave Empfield, who CW-2 supported, Empfield did not think the May 2014 completion deadline would be possible to achieve. In

---

[22]   As described at ¶¶45-47, as of June 12, 2017, the Kemper Plant has ***still*** not achieved COD. Southern Company has blamed the continuing delays, in large part, on problems in the gasifier area.

[23]   After the Class Period, Defendant Holland admitted that the piping was ***visibly incomplete as late as April 2015***: "If you had gone [to the Kemper site] in [February-April 2015] and stood up in the top of the facility and looked down, you would have seen pipe and other equipment out in the laydown yards. Go up there today, and it's virtually cleared – all that's been installed."

addition, employees at the Kemper Plant with whom CW-2 spoke widely acknowledged and regularly discussed the inability to achieve the May 2014 COD.

(h)     As a result of the numerous schedule and construction delays described at ¶115(a)-(d) above, Defendants were forced to artificially manipulate the schedule to maintain the May 2014 COD.  For example,

- Wingo stated that when faced with clear evidence of scheduling delays, senior managers simply instructed schedulers to "break logic ties in order to keep the [May 2014] completion date." *See* ¶¶56-72.  As depicted below, this involved artificially collapsing the schedule so that various construction activities were scheduled to occur at the same time rather than normally sequencing construction activities so that one activity would follow another activity.  By improperly collapsing the schedule, Defendants concealed the construction delays and maintained the May 2014 COD.  *See* ¶¶56-72.



- The need to manipulate the schedule was due, in large part, to the fact that the schedule had no "float" or contingency to account for unexpected delays. *See* ¶¶79-104.  Thus, any significant schedule delay

would have necessarily bumped the end date of the schedule beyond the May 2014 COD.   In the absence of adequate float, Defendants improperly broke logic ties in order to maintain the May 2014 COD.

- As Wingo observed, "[t]hey threw together these half-assed schedules that made no sense that you couldn't use as a project management tool. If you took Kemper and put it on a real schedule and then you asked people that were actually responsible for executing their part of the schedule for input, to see if we can keep our promises, that schedule would have blown way out to 2015, possibly beyond.  In 2012, we had a purposely broken project schedule that was designed to confuse everybody."  *See* ¶¶56-72.

- This schedule manipulation also included taking more and more time out of the "start-up and commissioning" phase of the schedule (which was scheduled to occur after construction was completed) in order to maintain the May 2014 COD date.   This resulted in an unrealistic schedule timeframe for the start-up and commissioning phase.   For example, although Defendants allotted just five months to get from first syngas combustion (a key milestone) to COD, the Gasification Technologies Group understood that this phase would take a minimum of one year to accomplish.  *See* ¶¶56-72.[24]

---

[24]  The plant remains in start-up phase as of June 2017, more than three years after the scheduled May 2014 COD date.   Defendants have now admitted that they fully anticipated that start-up and commissioning would take at least a year: "[The construction of the plant is almost 100% complete, but] still needs about a year of tinkering and testing to ensure it can operate safely, reliably and efficiently.  'You don't build any plant and you just turn it on and it works,' said Tim Pinkston, a Southern Company veteran who has worked for more than a decade developing the specific brand of carbon-capture technology being deployed at Kemper.  'There's always things you have to adjust on.'" Darren Samuelsohn, *Billions Over Budget. Two Years After Deadline. What's Gone Wrong for the "Clean Coal" Project that's Supposed to Save an Industry*, Politico, May 26, 2015 (available at http://www.politico.com/agenda/story/2015/05/billion-dollar-kemper-clean-coal-energy-project-000015).

116.   On May 15, 2012, Defendant Beattie presented at the Deutsche Bank Clean Tech, Utilities and Power Conference.  At the conference, Defendant Beattie stated:

> [P]rogress [at the Kemper Plant] is being made.  We'll have first gas to the CT, combustion turbines, in June of next year.  ***We'll have the first heat to the gasifier in October of next year*** and the ***first [syn]gas to the combustion turbines in December of next year***.  So this plant is well on its way.  We're about . . . 72% of its costs are confirmed at this point. 90% of costs will be confirmed by the end of this year – ***so good progress at Kemper County***.

117.   On June 8, 2012, Southern Company issued a news release providing an update regarding the Kemper Project.  That release stated: "***[T]he Kemper Plant construction is progressing on schedule*** and continues to be the best generation option for customers.  ***The plant will be on line May 2014*** . . . ."

118.   Also on June 8, 2012, Mississippi Power filed its Kemper Monthly Status and Cost Report with the PSC.  The report stated: "Overall Project Status: ***Project is on schedule***."

119.   On August 3, 2012, Mississippi Power filed its Kemper Monthly Status and Cost Report with the PSC.  The report stated: "Overall Project Status: ***Project is on schedule***."

120.   On August 6, 2012, Southern Company filed its consolidated Form 10-Q for the second quarter of 2012.  The Form 10-Q included the following information

- 76 -

regarding the Kemper Plant: "The Kemper IGCC, expected to **begin commercial operation in May 2014**, will use locally mined lignite (an abundant, lower heating value coal) from a mine adjacent to the Kemper IGCC as fuel."

121.   Defendants Fanning, Beattie and Day signed the consolidated Form 10-Q containing this statement.  In addition, Defendants Fanning, Beattie and Day signed Certifications pursuant to Sarbanes Oxley in which Defendants attested that the report containing this statement "does not contain any untrue statement of material fact or omit to state a material necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  Defendants Fanning, Beattie and Day also attested that they had designed disclosure controls to ensure that material information relating to the Company was made known to them.

122.   On August 9, 2012, Southern Company issued a news release that stated: "With **commercial operation of its Kemper County integrated gasification combined cycle plant less than two years away**, Mississippi Power is well-positioned to execute the most critical next steps in the peak construction phase beginning later this year."

123.   On September 13, 2012, Southern Company issued a news release that stated:

- 77 -

Recently, Mississippi Power safely **completed a major construction milestone** at its Kemper County energy facility as **plant construction nears the halfway mark**.  Installed was a section of the plant's gasifier . . . .

"**Installation of the gasifier marks a pivotal point in the construction phase of our project** and the advancement of 21st century coal technology," said Mississippi Power Vice President of Generation Development Tommy Anderson. . . .

\*       \*       \*

Commercial operation of the 582-megawatt facility is expected to begin May 2014.

124.   Defendants knew or recklessly disregarded that the statements set forth in ¶¶116-123 were false and misleading or omitted material information necessary to make them not misleading for the following reasons:

(a)   The Kemper Plant was not "on schedule" due to major delays in the installation of the gasifier, the most critical and complex part of the project.  *See* ¶115(a), *supra*.  The gasifier delays from early 2012 described above continued to adversely impact the schedule through the end of the Class Period.  For instance, during the first half of 2012, while the refractory problem was still being investigated, "no gasifier components were delivered to the site."  As a result, "the first piece was delivered to the site September 9, 2012, approximately **five months later than the contract schedule specified**."  Delivery of the gasifier components were originally scheduled to be completed in September 2012, however, due to the refractory

problems, the actual delivery dates were pushed out to January 2013.  *See* ¶¶105-110. Wingo compared the refractory failure to stopping traffic on five lanes of a six-lane highway.  In other words, very little progress on the gasifier could be made while the gasifier refractory problem was being fixed.  *See* ¶¶56-72.

(b)    The Kemper Plant was not "on schedule" due to several key engineering schedule delays that began in early 2012 and continued through early 2013, as described in ¶115(b), above.

(c)    The Kemper Plant was not "on schedule" as a result of significant construction delays tied to piping, pipe hangers and other major commodities (steel, concrete, cable, etc.), as described in ¶115(c), above.  These delays continued to plague the Kemper Plant throughout the Class Period.  For example, by August 2012, "***new quantity projections of the major commodities and the impact late material deliveries were having on the Project***" caused the schedule for several Key Project Critical Milestones, including "first gasifier heat-up" and "reliable syngas to combustion turbines," to be pushed back several months.  *See* ¶¶105-110.

(d)    In addition to the specific delays detailed ¶124(a)-(c), above, the Kemper Plant was not "on schedule" for the reasons set forth in ¶115(d), above.

(e)    The May 2014 COD was impossible to achieve due to major delays in the installation of the gasifier, the most critical and complex part of the

project, described at ¶¶115(a), 124(a), above.  These delays directly impacted the May 2014 COD as described at ¶115(e), above.

(f)     The May 2014 COD was impossible to achieve in light of significant construction delays tied to piping, pipe hangers and other major commodities (steel, concrete, cable , etc.), as described at ¶¶115(c), 124(c), above. These delays directly impacted the May 2014 COD as described at ¶115(f), above.

(g)     In addition to the evidence of specific delays detailed in ¶124(e)-(f), above, additional evidence that the Kemper Plant's May 2014 COD was impossible to achieve included the evidence described at ¶115(g), above.  Further, during 2012, the Company was aware the schedule was slipping: "The company has consistently shown a completion date later than the current baseline date of May 1, 2014, in their summary analysis during the monitor's monthly meetings.  A July 17, 2014, commercial operation date (77 days or 2½ months late) was reported at the July 23, 2012, monthly monitor's meeting." *See* Independent Monitor's Project Schedule and Cost Evaluation for the Kemper County IGCC Project prepared for the Mississippi Public Utilities Staff (Nov. 15, 2012) at 24.[25]

---

[25]  As described below at ¶132, on November 29, 2012, Defendants denied the findings of the Monitor's Report and maintained the May 2014 COD date.

(h)     As a result of the numerous schedule and construction delays described at ¶¶115(a)-(d), 124(a)-(d), above, Defendants were forced to artificially manipulate the schedule to maintain the May 2014 COD, as described at ¶115(h).  For example, this schedule manipulation occurred in August 2012, when Defendants were forced to delay the schedule for several "Key Project Critical Milestones," including "first gasifier heat-up" and "reliable syngas to combustion turbines," "to account for new quantity projections of the major commodities and the impact late material deliveries were having on the Project."  *See* ¶¶105-110.  Despite the several month delay to at least five "Key Project Critical Milestones" in August 2012, the May 2014 COD did not move a single day.  This manipulation involved improperly collapsing the schedule by taking even more time out of the start-up phase.  For example, a key milestone, "reliable syngas to combustion turbines," was pushed back to February 6, 2014.  This left only three months between this milestone and COD.  According to Wingo, the Gasification Technologies Group understood that it would take a minimum of one year to get from the first syngas production to the completion date. *See* ¶¶56-72.

(i)     The Kemper Plant construction was not "near[] the halfway mark," as the Company falsely reported.  According to the Independent Monitor, "[d]uring the monthly independent monitor's meeting held on September 13, 2012 (reflecting

- 81 -

data through July 31, 2012), [Southern Company Services] reported that the project had achieved . . . *a construction completion of 30%*."  *See* ¶¶79-104.

(j)     Defendant Beattie's statement that "first [syn]gas to the combustion turbines" would be achieved by December 2013 was materially false and misleading because Beattie concealed significant, contemporaneous gasifier problems and delays, as described above at ¶¶115(a), 124(a), above.[26]

(k)     Defendants' statements describing the progress of the gasifier, including characterizing the installation of "a section of the plant's gasifier" in September 2012 as a "major milestone" were false and misleading because Defendants concealed the significant gasifier delays, as described in ¶¶115(a), 124(a), above.  In fact, the first piece of the gasifier was delivered *five months late*, which Defendants failed to disclose.

125.   On October 5, 2012, Mississippi Power filed its Kemper Monthly Status and Cost Report with the PSC.  The report stated: "*Project is on schedule*."

126.   On October 19, 2012, Southern Company issued a news release with the headline "Mississippi Power files updated assumptions on Kemper project, *confirms costs and schedule remain on target*."  The news release stated:

---

[26]  In fact, syngas to the combustion turbine was not achieved until November 17, 2016, almost three years after Beattie falsely represented it would be accomplished. *See* November 2016 Kemper Monthly Status and Cost Report filed with the PSC.

As part of its ongoing review process for the Kemper County energy facility project, Mississippi Power filed updated assumptions to both cost and schedule in its monthly construction report to the Mississippi Public Service Commission. *The company confirmed that the project is on schedule to be completed in May 2014* and that cost projections remain on target to stay at or below $2.88 billion. . . .

*Overall, the project is more than 70 percent complete*. The plant is scheduled to begin initial start-up next summer and commercial operation in 18 months.

"With engineering and procurement nearing completion, *construction progressing on schedule* and key startup milestones approaching quickly, Mississippi Power's projections are that cost and schedule targets are achievable," said Tommy Anderson, vice president of generation development for Mississippi Power.

127.   On November 5, 2012, Southern Company announced its third quarter 2012 financial results and held a conference call for analysts, media representatives and investors during which Defendants represented that the Kemper Plant was on schedule.  Specifically, Defendant Fanning stated:

At Plant Ratcliffe in Kemper County, Mississippi, *construction remains on schedule to begin commercial operation in May of 2014*. Cost projections remain on target to finish at or below $2.88 billion. We continue to actively manage ongoing pressures on costs and schedule which are typical for a project of this scale. *Installation of the gasifiers and assembly is proceeding exceptionally well* and the carbon dioxide absorbers are all in place.

\*     \*     \*

Art [Beattie] and I met recently with Moses Feagin, he's the CFO of Mississippi Power; Ed Day; their regulatory people. *We meet regularly on this project*.

128.   On November 7, 2012, Southern Company filed its consolidated Form 10-Q for the third quarter of 2012.   The Form 10-Q included the following information regarding the Kemper Plant: "The Kemper IGCC, *expected to be in service in May 2014*, will use locally mined lignite (an abundant, lower heating value coal) from a mine adjacent to the Kemper IGCC as fuel."

129.   Defendants Fanning, Beattie and Day signed the consolidated Form 10-Q containing this statement.  In addition, Defendants Fanning, Beattie and Day signed Certifications pursuant to Sarbanes Oxley in which Defendants attested that the report containing this statement "does not contain any untrue statement of material fact or omit to state a material necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  Defendants Fanning, Beattie and Day also attested that they had designed disclosure controls to ensure that material information relating to the Company was made known to them.

130.   On November 13, 2012, Southern Company issued a news release with the headline: "Mississippi Power's Kemper County energy facility achieves major milestones toward completion."  The news release stated:

> *With the project now more than 70 percent complete*, Mississippi Power's Kemper County energy facility has achieved several major milestones in recent weeks.

- 84 -

\*       \*       \*

"These milestones are indicators of the tremendous progress being made every day to deliver 21st century coal technology to our customers," said Tommy Anderson, vice president of generation development at Mississippi Power.

131.    Defendants knew or recklessly disregarded that the statements set forth in ¶¶125-130 were false and misleading or omitted material information necessary to make them not misleading for the following reasons:

(a)    The Kemper Plant was not "progressing on schedule" and was not "more than 70 percent complete" as a result of major delays in the installation of the gasifier, the most critical and complex part of the project, as described at ¶¶115(a), 124(a), above.  The gasifier delays from early 2012 described above continued to adversely impact the schedule through the end of the Class Period.  For example, the refractory problems caused the schedule for the first gasifier heat-up – a key milestone – to fall "2-3 months behind schedule" as of November 2012.  *See* Independent Monitor's Project Schedule and Cost Evaluation for the Kemper County IGCC Project prepared for the Mississippi Public Utilities Staff (Nov. 15, 2012) at 24.

(b)    The Kemper Plant was not "progressing on schedule" and was not "more than 70 percent complete" due to several key engineering schedule delays that began in early 2012 and continued through early 2013, as described in ¶115(b), above.

- 85 -

By November 2012, the engineering delays had snowballed as depicted in the chart below:

| Engineering Discipline | Planned Completion | Actual Completion | Delay |
|---|---|---|---|
| Process | December 2012 | April 2013 | 4 months |
| Civil/Structural Architectural | February 2012 | Fall 2012 | 6 months |
| Mechanical | December 2011 | January 2013 | 14 months |
| Electrical | November 2012 | March 2013 | 4 months |
| Instrumentation and Control | November 2012 | March 2013 | 4 months |

(c)     The Kemper Plant was not "progressing on schedule" and was not "more than 70 percent complete" as a result of significant construction delays tied to piping, pipe hangers and other major commodities (steel, concrete, cable, etc.), as described in ¶¶115(c), 124(c), above.  These delays continued to plague the Kemper Plant.  As of November 2012, the Company's project commodity charts showed additional delays, including: (i) underground piping was behind the original plan by six months; (ii) concrete foundations were three months behind the original plan; (iii) structural steel was behind the original schedule by about three months and continued to slip; and (iv) process piping showed at least a one month delay.  *See* ¶¶79-104.

(d)     The Kemper Plant was not "progressing on schedule" and was not "more than 70 percent complete" due to massive increases in the amount of labor required to complete the plant, which led to delays and inefficiencies.  For example:

• Throughout 2012, the forecasted labor required to build the Kemper Plant had increased dramatically.  By March 2013, the forecasted labor had more than doubled as shown in the chart below:

- 86 -

| | Unit of Measure | Certification Quantity | Forecast as of March 2013 | variance |
|---|---|---|---|---|
| Labor | Man-hours | 5,140,288 | 10,515,176 | 105% |

*See* ¶¶79-104.

- This large increase of installation labor hours created severe labor congestion which is sometimes referred to as a "stacking of trades" in tight areas of the plant. The "stacking of trades negatively impacted labor productivity." *See* ¶¶79-104.

- This resulted in inefficiencies because "people were working on top of each other." *See* ¶78.

(e)     In addition to the specific delays detailed at ¶131(a)-(d), above, the Kemper Plant was not "progressing on schedule" and was not "more than 70 percent complete" for the reasons set forth in ¶115(d), above. Further, as of November 2012, the Independent Monitor noted that the Kemper Plant was "nearly three months *behind schedule*." *See* ¶¶79-104.

(f)     The May 2014 COD was impossible to achieve due to major delays in the installation of the gasifier, the most critical and complex part of the project, described at ¶¶115(a), 124(a), 131(a), above. These delays directly impacted the May 2014 COD as described at ¶115(e), above.

(g)     The May 2014 COD was impossible to achieve in light of significant construction delays tied to piping, pipe hangers and other major commodities (steel, concrete, cable , etc.), as described at ¶¶115(c), 124(c), 131(c), above. These delays directly impacted the May 2014 COD as described at ¶115(f)

- 87 -

above.  Further, according to Wingo, at the end of 2012, a senior scheduler reviewed piping quantities and concluded there was no way the project could be completed by the end of 2014 (much less by the May 2014 COD deadline).  *See* ¶¶56-72.

(h)    In addition to the evidence of specific delays detailed in ¶131(f)-(g), above, additional evidence that the Kemper Plant's May 2014 COD was impossible to achieve included the evidence described at ¶¶115(g), 124(g) above. Further, the Independent Monitor concluded in November 2012 that, due to the numerous construction delays, the most likely completion date was December 20, 2014.  *See* Independent Monitor's Project Schedule and Cost Evaluation for the Kemper County IGCC Project prepared for the Mississippi Public Utilities Staff (Nov. 15, 2012) at 5.

(i)    As a result of the numerous schedule and construction delays described at ¶¶115(a)-(d), 124(a)-(d), 131(a)-(e), above, Defendants were forced to artificially manipulate the schedule to maintain the May 2014 COD, as described at ¶¶115(h), 124(h).

(j)    Defendant Fanning's statement that "[i]nstallation of the gasifiers and assembly is proceeding exceptionally well" was materially false and misleading because, in fact, the gasifier was experiencing significant problems and delays throughout 2012, as described above at ¶¶115(a), 124(a), 131(a).

- 88 -

132.   On November 29, 2012, in an article published in the *Charlotte Business Journal*, Southern Company spokesman Tim Leljedal disputed a report, filed by the Independent Monitor, that construction costs were likely to exceed $3 billion.  The article stated: "According to an email from Southern spokesman Tim Leljedal, Mississippi Power '***remains confident and recently confirmed its cost and schedule projects***' for the Kemper County facility."

133.   On December 18, 2012, Southern Company issued a news release, which stated: "As we enter 2013, ***the project is nearly 75 percent complete*** and scheduled to begin commercial operation in May 2014.  In six months, the facility will begin initial start-up activities for the combined cycle portion of the plant, which will generate the electricity."

134.   On December 28, 2012, in an AP news article, Defendant Fanning stated: "Everything that I know, ***this plant was exceedingly well-built and well organized during the construction period***."

135.   On January 9, 2013, Southern Company, issued a new release that stated: "'***We're less than 16 months from commercial operation*** and this facility will utilize the cleanest technology available' . . . said Tommy Anderson, vice president of generation development. . . .  The project, ***which is nearly 75 percent complete***, is on schedule to be completed by May 2014."

- 89 -

136.   On January 24, 2013, Southern Company issued a news release that stated: "The [Kemper] project is on schedule for completion in May 2014 . . . ."

137.   On January 25, 2013, Defendant Beattie participated in Southern Company's Conference Call with securities analysts to discuss the Kemper Plant. During that call, Defendant Beattie stated: "*the project remains on track for a May 2014 in-service date* when it is scheduled to begin providing clean, safe, reliable energy to the citizens of Mississippi."

138.   On January 30, 2013, Southern Company announced its fourth quarter and fiscal year 2012 financial results and held a conference call for analysts, media representatives and investors during which Defendants represented that the Kemper Plant was still expected to be completed and placed in service by the critical May 2014 deadline.  Specifically, Defendant Fanning stated:

> The second priority is achieving success with our major construction projects, specifically Plant Vogtle Units 3 and 4 and *the Kemper project*, both of which are *continuing to progress in an outstanding manner*.
>
> \*       \*       \*
>
> Meanwhile, *the Kemper project is now 75% complete* and remains on track for its May, 2014 commercial operation date.   To date, approximately $2.5 billion has been spent on the project.  The plant is scheduled to begin start-up activities this summer, with first fire going to the CTs in June, and *the first gasifier heat-up taking place in December*.  *Reliable syn gas is expected to begin flowing to the CTs in February, 2014*.

- 90 -

139.   On the same call, Defendant Beattie responded to an analyst question regarding key construction milestones at Kemper.  Specifically, Defendant Beattie stated:

> We've got specific work on the gasifiers going on.  That's going to be completed sometime within the next quarter.  And that is a critical piece of it.  We still have piping that is being installed, as well.  So those are kind of the critical elements, at this point.

140.   On February 26, 2013, Southern Company issued a news release that stated: "***The project is scheduled to begin operation in May 2014***."

141.   On February 28, 2013, Southern Company filed its consolidated Form 10-K for fiscal year 2012.  The Form 10-K included the following information regarding the Kemper Plant: "The Kemper IGCC is scheduled to be placed in-service in May 2014."

142.   Defendants Fanning, Beattie and Day signed the consolidated Form 10-K containing this statement.  In addition, Defendants Fanning, Beattie and Day signed Certifications pursuant to Sarbanes Oxley in which Defendants attested that the report containing this statement "does not contain any untrue statement of material fact or omit to state a material necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  Defendants Fanning, Beattie and Day also attested

that they had designed disclosure controls to ensure that material information relating to the Company was made known to them.

143.   On March 4, 2013, Mississippi Power filed its Kemper Monthly Status and Cost Report with the PSC.  The report stated: "***Project is on schedule***."

144.   Defendants knew or recklessly disregarded that the statements set forth in ¶¶132-143 were false and misleading or omitted material information necessary to make them not misleading for the following reasons:

(a)   The Kemper Plant was not "on schedule," and was neither "nearly 75 percent complete" nor "75% complete," due to major delays in the installation of the gasifier, the most critical and complex part of the project, as described ¶¶115(a), 124(a), 131(a), above.  The gasifier delays from early 2012 continued to adversely impact the schedule through the end of the Class Period.

(b)   The Kemper Plant was not "on schedule," and was neither "nearly 75 percent complete" nor "75% complete," due to several key engineering schedule delays that began in early 2012 and continued through early 2013, as described in ¶131(b), above.

(c)   The Kemper Plant was not "on schedule," and was neither "nearly 75 percent complete" nor "75% complete," as a result of significant construction

delays tied to piping, pipe hangers and other major commodities (steel, concrete, cable, etc.), as described in ¶¶115(c), 124(c), 131(c), above.  Further:

- The Independent Monitor noted that, throughout 2012 and into 2013, there was a dramatic increase in construction bulk quantities.  The increase in major commodities required to build the Kemper Plant as of March 2013 is shown in the chart below:

| Commodity | Unit of Measure | Certification Quantity | Forecast as of March 2013 | variance |
|---|---|---|---|---|
| Concrete | Cubic Yards | 50,181 | 106,960 | 113% |
| Steel | Tons | 28,168 | 37,810 | 34% |
| Plant Piping | Linear Feet | 605,946 | 855,957 | 41% |
| Cable | Linear Feet | 3,218,675 | 11,860,997 | 269% |

*See* ¶¶79-104.

- The number of pipe supports which were required for the Project increased from approximately 16,000 at the start of the project to approximately 59,000 as of March 2013 – an increase of 269%.[27]

(d)     The Kemper Plant was not "on schedule," and was neither "nearly 75 percent complete" nor "75% complete," due to massive increases in the amount of labor required to complete the plant, which led to delays and inefficiencies, as described in ¶131(d), above.  In addition, the Independent Monitor analyzed labor productivity rates as of March 2013 and identified inefficiencies resulting from lack of engineering support, lack of materials availability, and ***craft labor congestion***. Specifically, concrete, steel and piping installation rates (*i.e.* the number of man-hours

---

[27]   Independent Monitor's Surrebuttal Testimony before the Mississippi Public Service Commission at 17.

required per unit of material) through March 2013 were running approximately 30% to 40% higher than plan.[28]

(e)     In addition to the specific delays detailed ¶144(a)-(d), above, the Kemper Plant was not "on schedule," and was neither "nearly 75 percent complete" nor "75% complete," for the reasons set forth in ¶¶115(d), 131(e), above.  Further, by March 2013, the late delivery of major equipment to the site had caused "major delays and impacted the sequencing of the construction and installation of the equipment." *See* ¶¶79-104.

(f)     The May 2014 COD was impossible to achieve due to major delays in the installation of the gasifier, the most critical and complex part of the project, described at ¶¶115(a), 124(a), 131(a), above.  These delays directly impacted the May 2014 COD as described at ¶115(e), above.

(g)     The May 2014 COD was impossible to achieve in light of significant construction delays tied to piping, pipe hangers and other major commodities (steel, concrete, cable , etc.), as described at ¶¶115(c), 124(c), 131(c), 144(c), above.  These delays directly impacted the May 2014 COD as described at ¶¶115(f), 131(g), above.

---

[28]   *Id*. at 62.

(h)      In addition to the evidence of specific delays detailed in ¶144(f)-(g), above, additional evidence that the Kemper Plant's May 2014 COD was impossible to achieve included the evidence described at ¶¶115(g), 124(g), 131(h), above.

(i)      As a result of the numerous schedule and construction delays described at ¶¶115(a)-(d), 124(a)-(d), 131(a)-(e), 144(a)-(e), above, Defendants were forced to artificially manipulate the schedule to maintain the May 2014 COD, as described at ¶¶115(h), 124(h), above.

(j)      Defendant Fanning's statement describing the progress of the gasifier, including his assertion that "reliable syn gas is expected to begin flowing to the CTs in February, 2014," was materially false and misleading because, in fact, the gasifier was experiencing significant problems and delays throughout 2012 and into 2013, as described above at ¶¶115(a), 124(a), 131(a), above.[29]

(k)      Defendant Fanning's statement that the Kemper "plant was exceedingly well-built and well organized during the construction period" was false and misleading because, in reality, the construction period was fraught with

---

[29]  In fact, syngas to the combustion turbine was not achieved until November 17, 2016.

significant construction delays and problems, as described at ¶¶115(a)-(d), 124(a)-(d), 131(a)-(e), 144(a)-(e), above.

145.   On April 2, 2013, Mississippi Power filed its Kemper Monthly Status and Cost Report with the PSC.  The report stated: "***Project is on schedule***."

146.   On April 24, 2013, following the release of its first quarter 2013 financial results, Southern Company held a conference call for analysts, media representatives and investors during which Defendants disclosed a $540 million ($333 million after-tax or $0.38 per share) Kemper Plant cost overrun but, nevertheless, represented that construction of the Kemper Plant was on schedule to be completed and up and running by May 2014.  Specifically, Defendant Fanning stated:

> ***We continue to make tremendous progress at the Kemper site*** with most of the major components in place, the combined cycles, gasifiers, massive gas absorbers and lignite dome as well as a 75-acre reservoir, the facility's appearance reflects our progress with ***start-up activities which are now 40% complete***.
>
> *        *        *
>
> We continue to believe that ***the scheduled in-service date is achievable***.

147.   On May 10, 2013, Southern Company filed its consolidated Form 10-Q for the first quarter of 2013.  The Form 10-Q stated: "The Kemper IGCC [is] scheduled to be placed in service in May 2014."

- 96 -

148.   Defendants Fanning, Beattie and Day signed the consolidated Form 10-Q containing this statement.  In addition, Defendants Fanning, Beattie and Day signed Certifications pursuant to Sarbanes Oxley in which Defendants attested that the report containing this statement "does not contain any untrue statement of material fact or omit to state a material necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  Defendants Fanning, Beattie and Day also attested that they had designed disclosure controls to ensure that material information relating to the Company was made known to them.

149.   On May 15, 2013, Mississippi Power filed its Kemper Monthly Status and Cost Report with the PSC.  The report stated: "***Project is on schedule***."

150.   On June 3, 2013, Mississippi Power issued a Form 8-K which attached the Kemper Plant Monthly Status and Cost Report filed with the PSC.  The status report stated: "***Project is on schedule***."

151.   On July 1, 2013, Southern Company issued a Form 8-K which attached the monthly Kemper Plant status report Mississippi Power filed with the Mississippi PSC.  That monthly status report stated: "***Project is on schedule***."

152.   On July 30, 2013, Southern Company issued a Form 8-K which attached the monthly Kemper Plant status report Mississippi Power filed with the Mississippi

- 97 -

PSC.  The monthly status report revealed that total plant costs had ballooned to $4.72 billion – 47% greater than the amount disclosed at the beginning of the Class Period just 14 months earlier.  Despite the cost overruns, Defendants reassured investors: "***Mississippi Power plans to meet the May 2014 in-service date***, however, the Company could experience schedule delays associated with construction and startup activities for this first-of-a-kind technology."

153.   On July 31, 2013, Southern Company issued a press release announcing its second quarter 2013 financial results.  In the press release, Defendant Fanning stated: "***Despite recent cost challenges, we are making great progress in the construction of the Kemper County energy facility*** . . . ."

154.   After releasing its second quarter 2013 financial results, on July 31, 2013, Southern Company held a conference call for analysts, media representatives and investors during which Defendants represented that construction of the Kemper Plant was on schedule, still expected to be completed and up and running by May 2014. Specifically, Defendant Fanning stated:

> [C]onstruction at the Kemper County energy facility is also progressing well.  Since our last earnings call, the lignite mine has been placed into service and the final heavy lift, as well as ***a significant portion of the startup activities for the combined cycling unit, has been completed***. Recognizing that piping is a key area of focus at this stage of the project, ***it's important to note that 90% of the piping has been fabricated and***

- 98 -

*almost half is installed*.  And that *we have been achieving our key installation targets for steel and pipe*.

Looking ahead for the remainder of 2013, startup activities include the first fire of the first combustion turbine in late August, [synching] the steam turbine to the grid in October, and *heating up the first gasifier by year end*.  *Our May 14 in-service date, to which our construction and startup plans are tied, remains achievable*.

155.   On August 6, 2013, Southern Company filed its consolidated Form 10-Q for the second quarter of 2013.  The Form 10-Q stated: "*The Kemper IGCC . . . [is] scheduled to be placed in-service in May 2014*."

156.   Defendants Fanning, Beattie and Holland signed the consolidated Form 10-Q containing this statement.  In addition, Defendants Fanning, Beattie and Holland signed Certifications pursuant to Sarbanes Oxley in which Defendants attested that the report containing this statement "does not contain any untrue statement of material fact or omit to state a material necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  Defendants Fanning, Beattie and Day also attested that they had designed disclosure controls to ensure that material information relating to the Company was made known to them.

157.   On August 30, 2013, Mississippi Power issued a Form 8-K which attached the Kemper Plant Monthly Status and Cost Report filed with the PSC.  The

- 99 -

report stated: "***Mississippi Power plans to meet the May 2014 in-service date***; however, the Company could experience schedule delays associated with construction and startup activities for this first-of-a-kind technology."

158.   On September 12, 2013, Southern Company issued a press release that stated:

> Construction milestones reached at Kemper, first fire of CT complete.
>
> Gulfport, Miss. – Mississippi Power's Kemper County energy facility has reached several major construction milestones, including the first fire of the facility's two combustion turbines (CT).  The first fires were completed Aug. 28 on the first CT and Sept. 4 on the second CT.
>
> "Firing up the combustion turbines is an important milestone in both the construction and startup phases of the Kemper County energy facility," said John Huggins, vice president of generation development. . . .
>
> "This milestone is further indication that we are one step closer to the startup of the plant."

159.   Defendants knew or recklessly disregarded that the statements set forth in ¶¶145-158 were false and misleading or omitted material information necessary to make them not misleading for the following reasons:

(a)     The Kemper Plant was not "on schedule" due to major delays in the installation of the gasifier, the most critical and complex part of the project, as described in ¶¶115(a), 124(a), 131(a), above.  The gasifier delays described above continued to adversely impact the schedule through the end of the Class Period.  For

example, shortly after arriving at Kemper in the summer of 2013, CW-1 noticed that the gasifier was only two stories high and should have been 10 stories by that date, an indication it was behind schedule.

(b)     The Kemper Plant was not "on schedule" as a result of significant construction delays tied to piping, pipe hangers and other major commodities (steel, concrete, cable, etc.), as described in ¶¶115(c), 124(c), 131(c), 144(c), above.  In addition, on June 5, 2013, Yvonne Avila (a Project Engineer for the Kemper Plant) sent an email to Brett Wingard (the Engineering & Procurement Manager for the entire Kemper Plant) alerting him to "two potentially big issues," including an additional 200,000 linear feet of piping needed to finish the job.  *See* ¶51.

(c)     The Kemper Plant was not "on schedule" due to massive increases in the amount of labor required to complete the plant, which led to delays and inefficiencies, as described in ¶¶131(d), 144(d), above.  In addition,

- By August 2013, construction labor forces peaked at approximately 6,540 craft labor personnel.  By contrast, when the Kemper Project commenced construction, Southern Company Services projected a peak labor force of approximately 1,200 craft labor personnel.  Thus, the total work force was 438% higher than originally forecast.  *See* ¶¶79-104.

- The initial detailed staffing plan for pipe installation, developed in November 2012 called for 450 full time equivalent pipe workers.  The

- 101 -

staffing requirements for the piping ultimately exceeded 1,500 pipe workers – three times the November 2012 plan values.[30]

(d)     In addition to the specific delays detailed ¶159(a)-(c), above, the Kemper Plant was not "on schedule" for the reasons set forth in ¶¶115(d), 131(e), 144(e), above.

(e)     The May 2014 COD was impossible to achieve due to major delays in the installation of the gasifier, the most critical and complex part of the project, described at ¶¶115(a), 124(a), 131(a), 159(a), above.  These delays directly impacted the May 2014 COD as described at ¶115(e), above.  Further, in July 2013, senior managers (including Defendant Huggins) met for three days to discuss the schedule concerns of the Gasification Technologies Group.   At that meeting, Defendant Huggins asked Wingo to create a schedule for gasification startup.  In mid-September, Wingo completed the schedule requested by Huggins, which demonstrated that there was no possible way to achieve the May 2014 COD.  *See* ¶68.

(f)     The May 2014 COD was impossible to achieve in light of significant construction delays tied to piping, pipe hangers and other major commodities (steel, concrete, cable , etc.), as described at ¶¶115(c), 124(c), 131(c),

---

[30]  Independent Monitor's Surrebuttal Testimony before the Mississippi Public Service Commission at 33.

144(c), 159(b), above.  These delays directly impacted the May 2014 COD as described at ¶¶115(f), 131(g), above.

(g)    In addition to the evidence of specific delays detailed in ¶159(e)-(f), above, further evidence that the Kemper Plant's May 2014 COD was impossible to achieve included the evidence described at ¶¶115(g), 124(g), 131(h), above.  In addition:

- The project team discussed the likelihood that the May 2014 COD could not be achieved at the July 2013 monthly production meeting.  *See* Pegasus Global Holdings, Inc. Kemper County IGCC Project (May 23, 2014) at 338.

- CW-4 noted that construction of the lignite conveyer system, a significant component of the Kemper Plant, experienced significant delays during 2013.  *See* ¶77.

(h)    As a result of the numerous schedule and construction delays described at ¶¶115(a)-(d), 124(a)-(d), 131(a)-(e), 144(a)-(e), 159(a)-(c), above, Defendants were forced to artificially manipulate the schedule to maintain the May 2014 COD, as described at ¶¶115(h), 124(h), above.

(i)    Defendants' statements about "several major construction milestones," including "first fire" of the combustion turbines, were materially false and misleading because Defendants concealed significant gasifier problems and other construction delays that were ongoing throughout 2012 and 2013, as described above

- 103 -

at ¶¶115(a), 124(a), 131(a), 159(a).  In addition, while Defendant Huggins touted that "[f]iring up the combustion turbines is an important milestone in both the construction and startup phases of the Kemper County energy facility," he concealed that the milestone was originally scheduled to occur by June 17, 2013 and was, thus, almost three months delayed.

160.   As described in detail at ¶¶190-217, below, beginning in April 2013, partial disclosures regarding construction problems at the Kemper Plant gradually removed artificial inflation from Southern Company common stock.  Ultimately, on October 29 and 30, 2013, Defendants revealed that the Kemper Plant was not on schedule and would not meet the May 2014 COD as a result of significant construction delays caused by the problems alleged herein.

## VII.   POST CLASS PERIOD REVELATIONS AND ADDITIONAL EVIDENCE OF SCIENTER

161.   By virtue of the facts set forth below at ¶¶162-189 and the other facts set forth at §§V. and VI., *supra*, it may be strongly inferred that Defendants knew or recklessly disregarded that the statements in §VI., *supra*, were materially false and misleading to investors.

### A.   *The New York Times* Exposé

162.   As alleged herein, the first public revelation of Defendants' deliberate fraudulent conduct came on July 5, 2016, when *The New York Times* published an investigative report titled: "Piles of Dirty Secrets Behind a Model 'Clean Coal' Project."  *See* ¶¶48-55.  In short, *The New York Times* concluded that "the plant's owners drastically understated the project's cost and timetable, and repeatedly tried to conceal problems as they emerged."

### B.   Brett Wingo

163.   As alleged herein, the Wingo evidence provides additional detail of Defendants' deliberate fraudulent conduct.  *See* ¶¶56-72.  Despite Defendants' attempts to silence Wingo from revealing any information about the Kemper Plant after he rejected a $1 million offer to keep quiet, his story was eventually made public. As alleged in detail at ¶¶56-72, Wingo described Defendants' "***lies, deceptions and half-truths***" related to the Kemper Plant schedule.

### C.   The SEC Investigation

164.   On May 14, 2016, *The Wall Street Journal* reported:

Southern's Clean-Coal Woes Mount

Kemper facility in Mississippi now faces SEC investigation on top of skyrocketing costs

- 105 -

A Mississippi power plant intended as a showcase for clean-coal technology has turned into a costly mess for utility Southern Co., which is now facing an investigation by the Securities and Exchange Commission . . . .

165.   In its May 2016 SEC filing, Southern Company acknowledged that the SEC had commenced a "formal investigation of Southern Company and Mississippi Power concerning the estimated costs and *expected in-service date* of the Kemper IGCC. Southern Company and Mississippi Power believe the investigation is focused primarily on periods subsequent to 2010 . . . ."

**D.   Internal Directives to Conceal Evidence of the Fraud**

166.   Fearing that the truth about the construction schedule and the inability to meet the COD would be revealed, Defendants went out of their way to conceal their fraudulent conduct. CW-2 said that Kemper employees were warned not to discuss the scheduling delay at the Kemper Plant with any outsiders, such as members of the press.

167.   In August 2012, Defendant Day sent the following internal email (which was first revealed to the public by *The New York Times* exposé) ordering employees not to leak schedule information to the public without approval:

From: Day, Ed
Sent: Wednesday, August 08, 2012 9:04 AM
To: Manuel, Penny Morris; Baker, Curtis Ashley; Owen, Steve; Huggins, John C.; Anderson, Thomas O.; Abramovitz, Aaron P.
Cc: Crosswhite, Mark A.
Subject: Communications

I would like to remind everyone "again", no numbers, schedules, or information in general should be communicated to external parties until I review it/them first………no speculation, no estimates, no forecast, etc.

Tommy Anderson will continue to be our project lead.  Run everything by Tommy and he will discuss with me.

Just so everyone is clear on why the contract changes are occurring, below is what I'm telling people when ask:

- Over 100 large pieces of equipment are beginning to arrive on site and will continue over the next 6-8 months. For instance, the first section of gasifier will arrive within the next 7-10 days.
- In order to improve efficiencies, productivity, and overall execution of construction, we are assigning contractors to specific areas of the site.  These moves are in anticipation of peek manpower on site by Dec./ Jan.
- PCI will construct the Gasifier island and gas clean up.
- Yates will construct the combined cycle and up to 9 other main projects on site.

168.   Likewise, in December 2012, Tim Pinkston, a senior manager at the Kemper Plant, sent an email to engineers emphasizing the requirement that upper management approve all external communications related to the Kemper Plant: "[Mississippi Power] is now requiring approval for all presentations both external and internal that have any information related to the Kemper project.  Please let me know if you get a request to do a presentation and be prepared to provide a copy of your presentation for approval as early as possible."[31]

**E.     Motive**

169.   Defendants had the motive and opportunity to commit the alleged fraud during the Class Period.  As previously discussed in ¶44, by the beginning of the Class

---

[31]   https://www.thehistoryproject.com/media/embed/3mVL7.

- 107 -

Period, Defendants had secured hundreds of millions of dollars in financial incentives, including IRS tax credits, in connection with the construction of the Kemper Plant. As a result, it was critically important for Defendants to maintain publicly that the Kemper Plant remained on schedule and would meet its May 2014 COD.

170.   Mississippi Power received $133 million in Phase I 48A tax credits from the IRS under the National Energy Policy Act of 2005.   Retaining this tax credit, however, was entirely contingent on meeting the May 2014 COD.   According to the Independent Monitor, "the May 2014 [completion date] was driven by many factors including, ***most importantly, the $133 million 48A Phase I Investment Tax Credit . . . that required a COD no later than May 11, 2014***."   The importance of meeting the 48A tax credit deadlines – or at least maintaining publicly that the Company would meet these deadlines – was clearly understood by Defendants.   In fact, shortly after the Class Period, Defendant Huggins described the implications of missing the COD associated with the Phase II 48A Tax Credits as a "***financial Armageddon***" of lost tax subsidies, spooked investors, possible bankruptcy, and harsh criticism from the news media, regulators and lawmakers.   *See* ¶¶48-55.

171.   Defendants had further motive to conceal that the Kemper Plant would miss the May 2014 COD because of deadlines imposed by the PSC.   The Mississippi PSC approved a ratepayer-funded allowance to cover the financing of construction

- 108 -

costs through the originally scheduled COD date: May 1, 2014.  Thus, Defendants knew that construction financing costs incurred before this date could be passed on to Mississippi Power utility customers whereas all construction financing costs incurred after this date would be paid by the Company.  Because investors knew this fact too, Defendants had a strong motive to conceal that they would not meet the May 2014 COD.

172.   Defendants' agreement with SMEPA provided them with an additional motive to conceal the Kemper Plant schedule delays.  Prior to the Class Period, Mississippi Power entered into an asset purchase agreement with SMEPA whereby SMEPA agreed to purchase a 15% undivided interest in the Kemper Plant.  As part of the agreement, SMEPA had an option during the Class Period to purchase the 15% interest until the plant was completed.  On March 6, 2012, Mississippi Power received a $150 million interest-bearing refundable deposit from SMEPA to be applied to the purchase price at closing.  However, Mississippi Power would be required to refund the $150 million deposit upon the termination of the asset purchase agreement, within 60 days of a request by SMEPA.  Thus, Defendants were aware during the Class Period that any schedule delays threatened the execution of the agreement and could result in their obligation to immediately refund the $150 million deposit, providing Defendants with a strong motive to conceal the schedule delays.  After the Class

- 109 -

Period, on May 20, 2015, SMEPA terminated the asset purchase agreement.  As a result of the termination, Defendants were required to return $275 million of deposits (including the $150 million deposit received during the Class Period) to SMEPA, with interest of approximately $26 million.  *The Wall Street Journal* reported: "South Mississippi Electric Power Association, which furnishes power to smaller utilities in the state, dropped its plan to buy a $600 million, 15% stake in the project spearheaded by Atlanta-based Southern Co. SO 0.51%, *citing construction delays*."[32]

173.   Defendants' contract with Treetop Midstream Services LLC ("Treetop") gave them yet another motive to conceal the Kemper Plant schedule delays.  Before the beginning of the Class Period, Mississippi Power entered into a contract with Treetop to sell $CO_2$ captured from the Kemper IGCC.  As part of this agreement, Treetop began construction of a $CO_2$ offtake pipeline in March 2013.  Thus, Defendants were aware that any schedule delays, in which the plant was not operational and $CO_2$ byproduct was not being captured and delivered to Treetop, could jeopardize the contract with Treetop.  Thus, Defendants had a motive to conceal the schedule delays from Treetop.  In fact, after Defendants failed to meet the May 2014 COD, Treetop filed a fraud lawsuit on June 9, 2016 against Southern Company,

---

[32]   https://www.wsj.com/articles/coal-fired-power-plant-loses-steam-1432330865.

Southern Company Services, and Mississippi Power for misrepresenting that the Kemper Plant would be operational by May 2014.  In its complaint, Treetop alleged that in reliance on the May 2014 start date, it had expended over $100 million to build a $CO_2$ recapture pipeline.  Treetop also alleged that Defendants knew the May 2014 schedule was not feasible in March 2013 when Treetop began construction on the $CO_2$ pipeline.  Specifically, Treetop alleged:

> Beginning in February 2012, Treetop participated in monthly meetings with the Southern Company Defendants to discuss the construction schedule for Treetop's $CO_2$ pipeline.  When theses monthly meetings began, the Southern Company Defendants were aware that the Facility would not be completed by the May 2014 Start Date reported in their SEC filings.  The Southern Company Defendants also knew that the Facility would not be completed prior to the May 11, 2015 termination date in Treetop's Offtake Agreement.

174.   The PSC approval process for a rate increase provided Defendants an additional motive to conceal the Kemper Plant schedule delays.  During the Class Period, Defendants requested that the PSC approve a customer rate increase to cover the Kemper Plant construction costs.  Defendants were aware that revealing the significant schedule delays and construction problems described herein could endanger the PSC's approval of the rate increase.  In March 2013, the Mississippi PSC issued the 2013 MPSC Rate Order approving retail rate increases of 15% effective March 19, 2013.  However, after the Class Period, on February 12, 2015, the

- 111 -

Mississippi Supreme Court ruled that Mississippi Power had to repay ratepayers approximately $377 million for increasing utility rates 15% in 2013 and 3% in 2014 based on expenses Southern Company incurred in building the Kemper Plant.  In its decision, the Mississippi Supreme Court highlighted the schedule delays and cost overruns that had been disclosed by Defendants at the end of the Class Period: "To put the expanse of the project in context, the projected cost is greater than the entire budget for the State of Mississippi for both the 2014 . . . and the 2015 fiscal year. . . . *As of the date of this opinion, the portion of the plant which uses integrated gasification combined cycle (IGCC) is not online*."

175.   In addition to its promises to investors, Defendants had at least the following five separate and distinct reasons to conceal that the Kemper Plant was not on schedule and would not meet the May 2014 COD: (1) the IRS Phase I 48A tax credits; (2) the PSC-imposed deadline to recover construction financing costs from ratepayers; (3) the asset purchase agreement with SMEPA; (4) the contract with Treetop; and (5) the PSC's approval of a customer rate increase.

## F.     Defendants Actively Managed the Construction of the Kemper Plant

176.   As alleged herein, Defendants actively monitored or managed the construction of the Kemper Plant.  As a result, Defendants knew of or recklessly

- 112 -

disregarded the significant schedule delays and construction problems that existed during the Class Period.

177.   Defendant Fanning, as CEO of Southern Company, spoke frequently regarding the status of the Kemper Plant on earnings calls, providing detailed statements about the gasifier and other construction activities.  Fanning specifically assured investors that executives of Southern Company and Mississippi Power "***meet regularly*** on this project."  Defendant Fanning also indicated during a November 5, 2012 earnings call that with respect to the Kemper Plant "***[w]e continue to actively manage ongoing pressures on costs and schedule***."  As part of his efforts to actively manage the project, Defendant Fanning frequently visited the Kemper Plant, where he toured the construction site in a bright red golf cart and met with construction managers.  *See* ¶74.  As a result of his regular site visits, Fanning witnessed the piping and gasifier problems first hand.   Defendant Fanning also participated in the Executive Review Committee for the Kemper Plant.   The Executive Review Committee was tasked with assessing the Kemper Plant's progress to ensure it remained "on time, on budget, and in full compliance with all pertinent safety and quality requirements."[33]   Defendant Fanning, as Southern Company CEO, was

---

[33]   Southern Company Proxy Statement on Schedule 14A (Apr. 11, 2014).

additionally tasked with approving the Committee's final assessment for the Kemper Plant each quarter.[34]  Fanning met regularly with senior executives at the Engineering & Construction Services division who were in charge of building the plant, as well as with Mississippi Power executives like Ed Day, to receive updates on the project.  *See* ¶76.  Defendant Fanning also signed Sarbanes Oxley certifications in which he attested that he had designed and tested the effectiveness of disclosure controls to ensure that material information relating to the Company was made known to him.

178.  Defendant Beattie, as CFO of Southern Company, likewise spoke frequently regarding the status of the Kemper Plant on earnings calls, providing detailed statements about the gasifier and other construction activities.  *See* §VI., *supra*.  Defendant Beattie ***met* "*regularly on this project*"** with Fanning, Day and other senior managers.   Beattie met regularly with senior executives at the Engineering & Construction Services division who were in charge of building the plant, as well as with Mississippi Power executives like Ed Day, to receive updates on the project.  *See* ¶76.  Further, Defendant Beattie signed Sarbanes Oxley certifications in which he attested that he had designed, and tested the effectiveness of disclosure

---

[34]  *Id.*

controls to ensure that material information relating to the Company was made known to him.

179.   Defendant Day, who was the CEO of Mississippi Power, actively monitored and managed the Kemper Plant project given that it was the largest project in the history of Mississippi Power.   In fact, Defendant Day was "always" at the Kemper Plant (*see* ¶75), and thus witnessed first-hand the visible construction delays. Defendant Day met "regularly on this project" with Fanning, Beattie and other senior managers.  *See* §VI., *supra*; *see also* ¶76.  Defendant Day also signed Sarbanes Oxley certifications in which he attested that he had designed, and tested the effectiveness of, disclosure controls to ensure that material information relating to the Mississippi Power was made known to him.

180.   Defendant Holland was an Executive Vice President, General Counsel, and Corporate Secretary of Southern Company through May 2013 and the Executive Vice President and Chairman, President, and Chief Executive Officer of Mississippi Power from May 2013 through the end of the Class Period.  Defendant Holland was actively involved in the Kemper Plant project given that it was the largest project in the history of Mississippi Power.  Defendant Holland also signed Sarbanes Oxley certifications in which he attested that he had designed, and tested the effectiveness of,

1276051_1

disclosure controls to ensure that material information relating to the Mississippi Power was made known to him.

181.    Defendant Huggins was a Southern Company Services general manager for Kemper Plant startup, engineering, and construction services, prior to his promotion to Vice President of Mississippi Power in May 2013.  In sworn testimony before the Mississippi PSC, Huggins stated: "Mississippi Power and the Generation Development team, which I manage, have responsibility for the Kemper Project."  *See* ¶25.  Defendant Huggins was on site "all the time" (*see* ¶75), and thus witnessed first-hand the visible construction delays.  Huggins was actively involved in managing the construction of the Kemper Plant and attended monthly production meetings in which the gasifier delays and other construction delays were discussed.  *See* ¶¶56-72.

182.    Defendant Anderson served as an executive officer of Mississippi Power, holding the title of Vice President of Generation Development through May 2013.  Anderson was responsible for "***oversee[ing] management of the Kemper IGCC Project***."  *See* Pegasus Global Holdings, Inc. Kemper County IGCC Project (May 23, 2014) at 217.  In sworn testimony before the Mississippi PSC, Anderson stated that he had the "primary responsibility for managing the Company's effort to develop the Kemper Project.  In this role, [he] overs[aw] the work being conducted and ha[d] access to the resources and information necessary and sufficient to make a

- 116 -

determination concerning the Company's [construction] efforts." *See* ¶26. Defendant Anderson was at the Kemper site "regularly." *See* ¶75. Wingo said that Anderson was very "hands on" and would "manage it down to the weeds" by micromanaging the design and procurement process.

183.   Collectively, Defendants actively monitored and managed the Kemper Plant project. Defendants also understood the significance of the construction delays and problems that occurred during the Class Period. As Defendant Anderson testified before the PSC, "***[t]his is not our 'first rodeo.'  We are well aware of the issues affecting successful construction of large generation projects*** . . . ."

### G.   CWs and Other Sources Confirm that the Construction Delays Were Widely Known Within the Company

184.   Multiple sources have confirmed that, during the Class Period, it was widely acknowledged among employees and project managers at the Kemper Plant that the plant was experiencing significant delays and would not meet the May 2014 COD. For example, Wingo stated that, during the Class Period, the gasifier delay and its impact on the overall schedule was discussed during monthly production meetings, which Wingo usually attended. CW-2 stated it was clear from the start of CW-2's employment in 2011 that the May 2014 COD would not be possible to achieve. According to CW-2, this concern was widely acknowledged and regularly discussed

- 117 -

by employees at the Kemper Plant with whom CW-2 spoke.  CW-3 said that there were certainly discussions among employees in early 2012 that the Kemper Plant would not be completed on schedule.  CW-4 said that throughout 2013, CW-4 and other individuals working at the Kemper Plant routinely discussed that it was not realistic that the plant would be finished at any time in 2014.  CW-5 sat in regular weekly meetings, with Kemper Plant upper managers as well as project managers representing various construction contractors from different sections of the plant on which they were working.  CW-5 said that at these meetings, various construction delays were discussed.

185.   These sources also confirmed that Company management directed them not to discuss the delays.  Wingo was ordered to stop sending emails on the matter because they could become public through litigation.  After expressing concerns regarding these issues to managers in emails, CW-1 was told by managers Tom Noble and Mark Webb that these concerns should not be put in writing and that email was the "kiss of death" at the Kemper Plant.  CW-1 said that generally employees were discouraged from circulating negative information about the Kemper Plant in emails.  According to CW-1, every time CW-1 identified a problem or concern, CW-1 was told to be a team player and admonished: "You need to learn how to play ball."  CW-2 said that Kemper employees were warned not to discuss the scheduling delay at the

- 118 -

Kemper Plant with any outsiders, such as members of the press.  CW-5 raised

concerns about the schedule to project managers, who completely dismissed CW-5's

concerns, saying only that they had everything under control and CW-5 should not

worry about it.  At some point after this incident, CW-5 was demoted to senior quality

inspector.  In August 2012, Defendant Day sent an internal email (which was first

revealed to the public by *The New York Times* exposé) ordering employees not to leak

schedule information to the public without approval.

### H.    The Magnitude of the Schedule Delay

186.   The fact that the Kemper Plant is still not operational more than three

years after the May 2014 COD is further evidence that Defendants knew or recklessly

disregarded that the May 2014 COD was not achievable during the Class Period.  The

magnitude of the May 2014 COD miss (totaling 37 months and counting) and

associated cost overruns (the cost estimate is now over $7.5 billion versus $2.395

billion at the start of the Class Period) makes it highly implausible that Defendants

were unaware of the falsity of their Class Period statements that the Kemper Plant was

"on schedule."

187.   As depicted in the chart below, ***Defendants have missed, and pushed***

***back, its COD deadline 12 times between late 2013 and 2017***.  As of June 12, 2017,

the plant is still not operational and according to media reports on the most recent

- 119 -

schedule delay in early June, "***Southern's Kemper plant faces years of continued work on gasifier units***."[35]  In addition, the estimated project now exceeds ***$7.5 billion***, nearly ***triple*** the original cost estimate.



188.   To put the magnitude of the schedule miss in context of Defendants' Class Period statements, the following chart shows how far Defendants' Class Period statements veered from the truth.  For each quarter, the red bar shows the number of months remaining to COD as disclosed by Defendants during the Class Period, whereas the blue bar shows the actual remaining months until COD (assuming the plant reaches COD by June 30, 2017 – the currently disclosed deadline).  For

---

[35]   http://www.utilitydive.com/news/updated-southerns-kemper-plant-faces-years-of-continued-work-on-gasifier/444262/.

example, in August 2012, Defendants assured investors that "***commercial operation of its Kemper County integrated gasification combined cycle plant [is] less than [24 months] away***." As shown below, COD was, at best, almost 60 months away at that time. The sheer magntude by which the Kemper Plant has missed its May 2014 COD makes it highly likely that Defendants knew or recklessly disregarded that their Class Period statements were false or misleading.



189. In addition to the overall schedule COD, the magnitude of the schedule misses on individual construction milestones, all of which were scheduled to be completed during the Class Period, shows that Defendants likely knew or recklessly

disregarded that their Class Period Statements were false and misleading.  For example,

- Defendants stated during the Class Period that a key gasifier milestone, "syngas to combustion turbine" would be achieved by December 2013. In fact, syngas to the combustion turbine was not achieved until November 17, 2016, almost three years later.

- Defendants stated in April 2013 that that "start-up activities . . . are now 40% complete" and that the "scheduled in-service date is achievable." Defendants also represented that the start-up phase would only take a period of several months after the gasifier heat-up was achieved (*see, e.g.*, Defendants' July 31, 2013 statement: "***[t]he first gasifier heat-up in late December, and the in-service date of May 2014***").  In fact, the Kemper Plant remains in the start-up phase as of June 2017, more than three years after the scheduled May 2014 COD date.  Defendants have now admitted that they fully anticipated delays in the start-up and commissioning phase of the Kemper Plant.  *See, e.g.*, May 26, 2015: "[The Kemper Plant is nearly 100% complete but] still needs about a year of tinkering and testing to ensure it can operate safely, reliably and efficiently.  'You don't build any plant and you just turn it on and it works . . . there's always things you have to adjust on.'"[36]  Likewise, by July 2016, over two years after the scheduled completion date of May 2014, Defendants acknowledged that start-up and commissioning process was still nowhere near complete: "[of the 14 systems we need to integrate to achieve COD], so far we think we've integrated or at least demonstrated maybe eight of those 14 systems."

- Defendants stated repeatedly during the Class Period that the Kemper Plant construction was "progressing on schedule."  As alleged herein, piping was one key area that suffered critical delays.  The piping problems were clearly visible throughout the Class Period.  In fact,

---

[36]  Darren Samuelsohn, *Billions Over Budget.  Two Years After Deadline.  What's Gone Wrong for the "Clean Coal" Project that's Supposed to Save an Industry*, Politico, May 26, 2015.

- 122 -

almost two years after the Class Period, Defendant Holland admitted that the piping was visibly incomplete as late as April 2015: "If you had gone[ to the Kemper site] in [February –April 2015] and stood up in the top of the facility and looked down, you would have seen pipe and other equipment out in the laydown yards.  Go up there today, and it's virtually cleared – all that's been installed."[37]

## VIII.  LOSS CAUSATION

190.  Defendants' wrongful conduct, as alleged herein, directly and proximately caused plaintiffs and class members' economic loss.  Plaintiffs' claims for securities fraud are asserted under the fraud on the market theory of reliance.  The markets for Southern Company's common stock were open, well-developed and efficient at all relevant times.  During the Class Period, as detailed herein, Defendants made false and misleading statements by misrepresenting that the Kemper Plant was on schedule and would be completed by the May 2014 COD.  Defendants' conduct artificially inflated the price of Southern Company common stock and operated as a fraud or deceit on the Class.

191.  The Class Period inflation in Southern Company's stock price was removed when information concealed by Defendants' false or misleading statements was revealed to the market.  The information was disseminated through several partial

---

[37]  Haskell Burns, *Holland: Kemper plant* "*about 99 percent complete*," Hattiesberg American, Oct. 7, 2015 (available at http://www.hattiesburgamerican.com/story/news/local/2015/10/07/kemper-county-plant-nearing-completion/73525592/).

disclosures that slowly revealed the nature and extent of schedule delays at the Kemper Plant. These disclosures, as more particularly described below, removed artificial inflation from Southern Company common stock, causing economic injury to plaintiffs and other members of the Class.

192. The corrective impact of the partial disclosures during the Class Period alleged herein, however, was tempered by Defendants' continued false and misleading statements that the Kemper Plant was on schedule and that Defendants would meet the 2014 COD. Defendants' continued misrepresentations maintained the price of Southern Company common stock at a level that was inflated by fraud, inducing members of the Class to continue purchasing shares in Southern Company even after Defendants' partial disclosures.

193. None of the partial disclosures was sufficient on its own to fully remove the inflation from Southern Company's stock price, because each only partially revealed the nature and extent of the Kemper Plant's schedule delays that had been concealed from investors. As a result of these partial corrective disclosures of truth and the materialization of the risks concealed by Defendants' misrepresentations and omissions, the price of Southern Company common stock fell from $48.65 per share at the close of trading on April 23, 2013 (when the truth began to enter the market) to $40.91 per share at the close of trading on October 31, 2013 – a 16% decline.

1276051_1

194.   The disclosures that corrected the market price to eliminate the inflation maintained by Defendants' fraud are detailed below.   The following stock price declines are not necessarily comprehensive since fact and expert discovery are not complete.   These stock price declines were due to firm-specific fraud-related disclosures and not the result of market, industry, or firm-specific non-fraud factors. Furthermore, Southern Company is a low volatility stock in a low volatility industry. During the Class Period, Southern Company's volatility net of market (S&P 500) and industry (S&P Electric Utilities), as measured by the standard deviation, was only 0.35%.   Consequently, very small deviations in Southern Company's stock price returns could still be significant compared to the overall market and industry.

195.   Partial disclosures relating to the schedule delays affecting the Kemper Plant began to enter the market on April 24, 2013, when, following the release of its first quarter 2013 financial results, Southern Company held a conference call for analysts, media representatives and investors and disclosed a $540 million ($333 million after-tax or $0.38 per share) cost overrun for the Kemper Plant, a change to the quantity and quality of piping used, and "[an] increase[] in the amount of labor needed to achieve our in-service date."   At the same time, Defendants reassured investors that construction of the Kemper Plant was on schedule to be completed and operational by May 2014.  Specifically, Defendant Fanning stated:

- 125 -

*We continue to make tremendous progress at the Kemper site* with most of the major components in place, the combined cycles, gasifiers, massive gas absorbers and lignite dome as well as a 75-acre reservoir, the facility's appearance reflects our progress with *start-up activities which are now 40% complete*.

*        *        *

We continue to believe that *the scheduled in-service date is achievable*.

196.    Analysts tied the disclosure of a cost overrun and Defendants' comments regarding piping and labor increases to an increased likelihood that the Kemper Plant could miss its critical May 2014 COD.  For example, on April 24, 2013, KeyBanc issued a report, noting: "We will be focused on . . . [p]otential for delays/cost pressures at the Kemper County plant."

197.    Likewise, on April 24, 2013, Wells Fargo issued a report, stating:

IGCC Costs.  The main culprit behind the Kemper Plant's estimated capital cost increase to $3.42B from $2.88B appears to be three-fold related to piping – (1) increasing the quality and thickness of the pipe, (2) the amount of piping needed was under-estimated and (3) labor/productivity related costs.  [Southern Company] has added an overnight shift in an effort to complete the additional work by the May 2014 in-service date and qualify for the $133MM of investment tax credits.  We note Duke Energy has faced similar piping/labor pressures at its Edwardsport IGCC project which *has led to multiple significant* cost increases *and timing delays*.  *We are hopeful [Southern Company] management has completely and accurately assessed the status of the Kemper project so that further timing* and cost *revisions are not necessary*.

- 126 -

Finally, on April 25, 2013, SunTrust issued a report, stating: "While historically the stock has traded at an 8%-10% valuation premium, *we believe concerns surrounding the potential for further* cost escalation and *timing delays at the large projects in construction – Kemper (coal gasification)* and Vogtle (nuclear) – will prevent that premium from expanding at this time."

198.   Southern Company's announcement that it was increasing (1) its cost estimate for the Kemper Plant, (2) the quantity and quality of piping used, and (3) the amount of labor needed to achieve the May 2014 COD was a materialization of the risks concealed by Defendants' false assurances that the plant was on schedule and would be operational by the May 2014 deadline.

199.   As a result of this partial disclosure, the price of Southern Company stock declined 1.3% on volume of more than 7 million shares to close at $48.03 per share on April 24, 2013.  This decline caused Southern Company to sustain a market cap loss of more than a half-billion dollars.  In contrast to the 1.3% decline in Southern Company common stock, the Philadelphia Utility Index increased by 0.3% on April 24, 2013.[38]  Defendants' continued false and misleading statements that the Kemper

---

[38]   Southern Company was one of approximately 20 companies that constitute the Philadelphia Utility Index.  Southern Company used the Philadelphia Utility Index in its executive compensation analysis, closely tracked it during the Class Period, and acknowledged that it contained many of Southern Company's peers.

Plant would meet the May 2014 COD, however, maintained the artificial inflation in the price of Southern Company's common stock.

200.   After the close of the market on July 1, 2013, Defendants made a second partial disclosure, issuing a Form 8-K which attached the monthly Kemper Plant status report that Mississippi Power filed with the Mississippi PSC.   While the monthly status report reaffirmed the $3.42 billion cost estimate, it cautioned:

> Management is currently reviewing additional cost pressures associated with ongoing construction activities, inventory necessary to mitigate startup risk, startup energy costs, and other startup activities, as well as productivity.  This review is expected to be completed in July 2013 and any related changes to specific cost categories would be reflected in the Monthly Status Report through June 2013.  Management has reviewed a portion of these items on a preliminary basis and has identified a minimum of approximately $160 million in likely cost increases. Further material cost increases may be identified as management completes its review.

Despite the cautions related to the Kemper Plant costs, Defendants reassured the market and investors that the "[p]roject is on schedule."

201.   Following the release of the status report, Deutsche Bank issued a "Southern Company Alert," stating that "management disclose[d] that they are conducting a review . . . associated with ongoing construction activities, inventory necessary to mitigate startup risks, and productivity . . . we suspected there might well be another shoe to drop after [Southern Company] replaced the Mississippi Power

- 128 -

leadership team [in May 2013]."  A July 1, 2013 AP article noted: "[W]hen asked whether the company has control of the project, [Mississippi Power spokeswoman Amoi] Geter replied, '[w]e still believe the 2014 completion date is achievable.' ***She declined to answer additional questions, citing the preliminary status of the review***."

202.  Southern Company's announcement that there were "likely cost increases" and that it was "reviewing additional cost pressures associated with ongoing construction activities, inventory necessary to mitigate startup risk, startup energy costs, and other startup activities, as well as productivity" was a materialization of the risks concealed by Defendants' false assurances that the plant was on schedule and would be operational by the May 2014 deadline.

203.  As a result of this second partial disclosure, the price of Southern Company stock declined 0.5% on volume of more than 4.5 million shares to close at $43.61 per share on July 2, 2013.  This decline caused Southern Company to sustain a market cap loss of nearly $200 million.  In contrast to the decline in the price of Southern Company's common stock, the Philadelphia Utility Index was flat. Defendants' continued false and misleading statements that the Kemper Plant would meet the May 2014 COD, however, maintained the artificial inflation in the price of Southern Company's common stock.

204.   On July 30, 2013, Southern Company made a third partial disclosure, issuing a Form 8-K which attached the monthly Kemper Plant status report Mississippi Power filed with the Mississippi PSC.   The monthly status report disclosed that the estimate of certified costs had increased to $3.87 billion – an increase of $450 million or 13%.  The Kemper Plant status report also disclosed that total plant costs had ballooned to $4.72 billion – 47% greater than the amount disclosed at the beginning of the Class Period just 14 months earlier.  In addition, the monthly status report disclosed the possibility of schedule delays for the Kemper Plant.   Despite disclosing cost overruns and the possibility of schedule delays, Defendants reassured the market and investors: "Mississippi Power plans to meet the May 2014 in-service date . . . ."

205.   On July 31, 2013, Southern Company issued a press release announcing its second quarter 2013 financial results.  In the press release, Defendants disclosed "after-tax charges of $278 million (32 cents per share) . . . related to increased cost estimates for the construction of Mississippi Power's Kemper County project."  The press release included the following reassurance from Defendant Fanning: "'Despite recent cost challenges, we are making great progress in the construction of the Kemper County energy facility . . . .'"

- 130 -

206.   Analysts tied the disclosures of cost overruns and the possibility of schedule delays to the increased likelihood that the Kemper Plant could miss its critical May 2014 COD.  For example, on August 2, 2013, RBC issued a report, noting: "In-service delay or further upside revision to the Mississippi IGCC cost projection prompts need for additional equity and causes further dilution."  On August 5, 2013, UBS issued a report, stating:

> Despite the substantial writedowns in the first two quarters, we remain concerned as to Kemper's schedule, with both the risk of losing the project's Investment Tax Credit (ITC) eligibility if not in service on-time (May 2014), as well as associated funding costs of a project timeline delay (estimated at ~$40 M/month).  We understand the ITC could be upsized $90M should it succeed in capturing 70%+ $CO_2$.  This is a critical issue to follow as not only are additional costs over the ~$2.9B cap not recoverable, but the firm faces substantial penalties/disincentives if it misses the May 2014 date.

207.   Southern Company's announcement of cost overruns and increased cost estimates for the construction of the Kemper Plant was a materialization of the risks concealed by Defendants' false assurances that the plant was on schedule and would be operational by the May 2014 deadline.

208.   As a result of this third partial disclosure, the price of Southern Company common stock declined on both July 31 and August 1, 2013.  On July 31, 2013, the stock declined 1.3% on volume of 9.6 million shares to close at $44.84 per share on July 31, 2013.  This decline caused Southern Company to sustain a market cap loss of

- 131 -

more than a half-billion dollars. In contrast to the decline of Southern Company's stock of 1.9%, the Philadelphia Utilities Index declined only 1.3% on August 1. The decline caused by the partial disclosure continued on August 1, 2013, when the price of Southern Company stock declined 1.1% on volume of 5 million shares to close at $44.35 per share. The decline caused Southern Company to sustain a market cap of approximately $428 million on August 1, 2013. In contrast to the decline of Southern Company's stock, the Philadelphia Utilities Index rose by 0.8% on August 1, 2013. Defendants' continued false and misleading statements that the Kemper Plant would meet the May 2014 COD, however, maintained the artificial inflation in the price of Southern Company's common stock.

209. After the close of the market on October 2, 2013, Mississippi Power made a fourth partial disclosure, filing a Form 8-K with the SEC in which it stated:

> Mississippi Power is revising the construction schedule for the Kemper IGCC as the result of abnormally wet weather and lower-than-planned construction labor productivity, and currently expects that the Kemper IGCC will be placed in service later in 2014 than the originally scheduled in-service date of May 2014.

210. As a result of the news that the Kemper Plant would be delayed, the price of Southern Company stock declined 1.9% on volume of nearly 9 million shares on October 3, 2013. The decline caused Southern Company to sustain a market cap loss

of $679 million.  In contrast, the Philadelphia Utility Index declined only 1.3% on October 3, 2013.

211.   The stock continued to trade at artificially inflated levels, however, because Defendants blamed the schedule delay on inclement weather and concealed the multitude of engineering, start-up, and construction problems that plagued the Kemper Project.  Indeed, in an October 2, 2013 Deutsche Bank report entitled, "Rain delays play at Kemper," analysts emphasized that "the explanation for this latest hiccup seems somewhat benign."  Tellingly, this disclosure paled in comparison to Defendants' disclosure a month later that revealed that the delay was due to "***labor costs*** and productivity, adverse weather conditions, ***shortages and inconsistent quality of equipment, materials, and labor***, or ***contractor or supplier delay or non-performance*** under construction or other agreements" as well as the prospect for "further schedule extensions associated with ***start-up activities*** for this 'first-of-a-kind' technology, including ***major equipment failure, system integration, and operations, and/or unforeseen engineering problems*** . . . ."

212.   On October 29, 2013, Defendants disclosed that the schedule delay was attributable to far more than just bad weather, as they had originally reported.  Defendants further disclosed that the Kemper Plant would not be in operation until the fourth quarter of 2014, rather than late 2014, as they had previously reported.  In a

- 133 -

Form 8-K issued by Southern Company after the close of the market on October 29, 2013, Defendants stated:

> In October 2013, Mississippi Power's management completed its review of the construction schedule and construction costs for the Kemper IGCC.   As a result of this review, on October 28, 2013, Mississippi Power revised the scheduled in-service date for the Kemper IGCC to the fourth quarter 2014 primarily as the result of lower-than-planned installation levels for piping as well as abnormally wet weather.

> Also on October [29, 2013, after the close of the market] Mississippi Power further revised its cost estimate for the Kemper IGCC to approximately $4.02 billion . . . .  The revised cost estimate primarily reflects costs related to the schedule extension, including contingency. Mississippi Power does not intend to seek any joint owner contributions or rate recovery for any costs related to the construction of the Kemper IGCC that exceed the $2.88 billion cost cap, except for amounts subject to the Cost Cap Exceptions and net of the DOE Grants.  As a result of the revised cost estimate, Southern Company and Mississippi Power will record a pre-tax charge to income for this estimated probable loss of $150 million ($93 million after tax) in their third quarter 2013 financial statements in addition to charges totaling $990 million ($611 million after tax) that have been recognized previously.

> Mississippi Power could experience further schedule extensions and/or construction cost increases with respect to the Kemper IGCC as a result of factors including, but not limited to, *labor costs and productivity*, adverse weather conditions, *shortages and inconsistent quality of equipment, materials, and labor*, or *contractor or supplier delay or non-performance* under construction or other agreements. Furthermore, Mississippi Power could also experience further schedule extensions associated with *start-up activities* for this "first-of-a-kind" technology, including *major equipment failure, system integration, and operations, and/or unforeseen engineering problems*, which would result in further cost increases.  To the extent it becomes probable that additional costs will not be recoverable, Southern Company and

- 134 -

Mississippi Power will have additional charges to income, and such charges could be material.

213.   On October 30, 2013, Southern Company issued a press release announcing its third quarter 2013 financial results.  Southern Company reported third quarter 2013 earnings of $852 million, or $0.97 per share, and revenues of $5.02 billion.  Southern Company also disclosed an after-tax charge of $93 million ($0.11 per share) "*related to increased cost estimates for the construction of Mississippi Power's Kemper County project*."

214.   After releasing its third quarter 2013 financial results on October 30, 2013, Southern Company held a conference call for analysts, media representatives, and investors during which Defendants reiterated the $93 million Kemper Plant project cost overrun and a delay of the in-service date to year-end 2014.  Specifically, Defendants stated:

> Now for an update on the Kemper County project.  Earlier this month, we announced that we did not expect to meet the original May 2014 in-service date for the Kemper project, largely as a result of lower-than-expected production rates and delays from wet weather.  After recalibrating our assumptions on the rate of pipe installation, we have revised the in-service date to the fourth quarter of 2014.
>
> In conjunction with the schedule change, we have recorded an additional pretax estimated loss of $150 million.  As a reminder, we estimated the incremental cost for a delay to be approximately $15 million to $25 million per month.  Our new estimate is consistent with that projection and also retains a $100 million contingency.

- 135 -

Tremendous progress continues to be made at the site. We are now nearly halfway complete with pipe installation, have fired both combustion turbines and have synced the entire two-on-one combustion cycle to the grid.

*      *      *

So look, we are very proud of [Kemper]. We made a mistake on the engineering. We agreed to price cap without having done fully our homework on the deal.

*      *      *

And I'll just tell you some. We believe the problem at Kemper was essentially at the time that we made a fixed price commitment with 10% engineering done at 6.7% contingency. In other words, the problem has been one more of a lack of engineering that was completed, rather than construction. By all accounts, the construction of Kemper has gone very well.

*      *      *

Let's go through that a little bit. Early on when we talked about it, we did see weather being the major thing. I remember right out of the gate we had some ambitious targets, and right out of the gate we hit our targets. That's the tone you were getting from us.

As we progressed on installing the pipe, particularly, it's almost hard to imagine unless you've been there. I know some of you have been to the site and you'll know what I'm talking about. A, there's a lot of pipe. B, there's different kinds of pipe, wide bore pipe. There is small bore pipe. Some of the pipe is outside the physical structure of the gasifier island and the gas handling system. Some of it is in constrained spaces inside the structure.

Obviously, what we have found is that production levels that we saw early were not able to be sustained because a lot of the work ended up being detail work inside the structure. We just didn't maintain the kind of productivity that we wanted to see. Further, and we kind of

- 136 -

alluded to this, we are now at over two shifts of 2,000 craft people per day working on this issue.  And to some extent, there's a saturation at the site.

In other words, we don't think it's productive to add more people and add more shifts and everything else.  We're where we want to be here.  And part of changing the schedule – I suppose that we could have done more and try to keep May.  But we felt that for the overall health of the project it was important for us to take this new schedule, put people to work in a more efficient manner and get the work done.  So it's kind of all that combination.

215.   The following day, October 31, 2013, an analyst at Wells Fargo downgraded Southern Company stock.  The analyst report stated:

> [Kemper] IGCC Cost Increased Again . . . to $4.02B – up from the July's $3.87B estimate.  [Kemper] IGCC project charges have been piling up since May 2013 and now total $1.14B . . . .
>
> *            *            *
>
> **[U]ntil important milestones such as the gasifier heat up (mid-to-late Q2'14) and placing it into service (Q4'14) are achieved, additional risks exists**.

216.   When Defendants finally came clean that the Kemper Plant was not on schedule and would not meet the May 2014 COD because of major construction delays, Southern Company's stock declined on both October 30 and 31, 2013.  On October 30, 2013, the stock declined nearly 1.2% on volume of more than 6.7 million shares to close at $41.90 per share on October 30, 2013.  This decline caused Southern Company to sustain a market cap loss of $432 million.  In contrast to the 1.2% decline

- 137 -

in the price of Southern Company stock, the Philadelphia Utility Index declined by just 0.6%. The decline caused by this disclosure continued the following day, October 31, 2013, when the price of Southern Company stock fell almost 2.4% on volume of 7.6 million shares to close at $40.91 per share. This decline caused Southern Company to sustain a market cap loss of $873 million. In contrast to Southern Company's stock price decline of 2.4%, the Philadelphia Utility Index fell by just 0.4%.

217.   The chart below shows Southern Company's stock price during the Class Period and the dates of Defendants' disclosures:



- 138 -

## IX.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

218.   Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   Southern Company common stock traded in an efficient market;

(d)   The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Southern Company common stock; and

(e)   Plaintiffs and other members of the Class purchased Southern Company common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

219.   At all relevant times, the market for Southern Company common stock was efficient for the following reasons, among others:

(a)   Southern Company common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

- 139 -

(b)     As a regulated issuer, Southern Company filed periodic public reports with the SEC; and

(c)     Southern Company regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## X.     NO SAFE HARBOR

220.   Many (if not all) of Defendants' false and misleading statements during the Class Period were not forward-looking statements ("FLS") and/or identified as such by Defendants, and thus did not fall within any "Safe Harbor."

221.   Defendants' verbal "Safe Harbor" warnings accompanying its oral FLS issued during the Class Period were ineffective to shield those statements from liability.

222.   Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Southern Company and/or Mississippi Power who knew that the FLS was false. Further, none of the historic or present tense statements made by Defendants were

- 140 -

assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## XI.   CLASS ACTION ALLEGATIONS

223.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Southern Company common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

224.   The members of the Class are so numerous that joinder of all members is impracticable.  The Company's stock is actively traded on the NYSE, and there are nearly 980 million shares of Southern Company stock outstanding.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Southern Company or its

transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

225.   Common questions of law and fact predominate and include: (i) whether Defendants violated the 1934 Act; (ii) whether Defendants omitted and/or misrepresented material facts; (iii) whether Defendants knew or recklessly disregarded that their statements were false and misleading; and (iv) whether Defendants' statements and/or omissions artificially inflated the price of Southern Company common stock and the extent and appropriate measure of damages.

226.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

227.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

228.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

- 142 -

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.    CLAIMS FOR RELIEF

### COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

229.    Plaintiffs incorporate ¶¶1-228 by reference.

230.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

231.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Southern Company common stock during the Class Period.

- 143 -

232.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Southern Company common stock.  Plaintiffs and the Class would not have purchased Southern Company common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

233.   As a direct and proximate result of these Defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of Southern Company common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934
### Act Against All Defendants

234.   Plaintiffs incorporate ¶¶1-233 by reference.

235.   During the Class Period, Defendants acted as controlling persons of Southern Company within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about the Company, the Individual Defendants had the power and ability to control the actions of the Company and their employees.  Southern Company controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

- 144 -

## XIII.  PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.     Determining that this action is a proper class action, certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and designating plaintiffs' counsel as Class Counsel;

B.     Awarding plaintiffs and the members of the Class damages and interest;

C.     Awarding plaintiffs' reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XIV.  JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  June 12, 2017                    ROBBINS GELLER RUDMAN
                                            & DOWD LLP


                                    _____/s/ John C. Herman_____
                                    JOHN C. HERMAN
                                    (Georgia Bar No. 348370)
                                    Monarch Tower, Suite 1650
                                    3424 Peachtree Road, N.E.
                                    Atlanta, GA  30326
                                    Telephone:  404/504-6500
                                    404/504-6501 (fax)

- 145 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL S. DROSMAN
HENRY ROSEN
DARRYL J. ALVARADO
REGIS C. WORLEY, JR.
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

SULLIVAN, WARD, ASHER
  & PATTON, P.C.
MICHAEL J. ASHER
1000 Maccabees Center
25800 Northwestern Highway
Southfield, MI  48075-1000
Telephone:  248/746-0700
248/746-2760 (fax)

Additional Counsel for Plaintiff

- 146 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 12, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 12, 2017.

<u>/s/ John C. Herman</u>
JOHN C. HERMAN

ROBBINS GELLER RUDMAN
   & DOWD LLP
3424 Peachtree Road, N.E., Suite 1650
Atlanta, GA  30326
Telephone:  404/504-6500
404/504-6501 (fax)

E-mail:  JHerman@rgrdlaw.com

1276051_1

# Mailing Information for a Case 1:17-cv-00241-MHC Monroe County Employees' Retirement System v. The Southern Company et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Darryl J. Alvarado**
  dalvarado@rgrdlaw.com

- **William R. Baker , III**
  william.baker@lw.com

- **Walter W. Davis**
  wwdavis@jonesday.com

- **Daniel S. Drosman**
  dand@rgrdlaw.com,tholindrake@rgrdlaw.com

- **Ashley Heintz**
  aheintz@jonesday.com,weye@jonesday.com

- **John C. Herman**
  jherman@rgrdlaw.com,smeister@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Michele Johnson**
  michele.johnson@lw.com,karen.patterson@lw.com,michele-johnson-7426@ecf.pacerpro.com,#ocecf@lw.com,khadijah-fields-2405@ecf.pacerpro.com

- **Michael Joseph McConnell**
  mmcconnell@jonesday.com

- **Thomas C. Michaud**
  tmichaud@vmtlaw.com

- **Kristin Murphy**
  kristin.murphy@lw.com,kristin-murphy-2919@ecf.pacerpro.com,khadijah-fields-2405@ecf.pacerpro.com,geelan-fahimy-5933@ecf.pacerpro.com,geelan.fahimy@lw.com

- **Henry Rosen**
  henryr@rgrdlaw.com

- **Regis C. Worley , Jr**
  rworley@rgrdlaw.com,karenc@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`