# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| MONROE COUNTY EMPLOYEES' RETIREMENT SYSTEM and ROOFERS LOCAL NO. 149 PENSION FUND, Individually and on Behalf of All Others Similarly Situated<br><br><br>Plaintiffs,<br><br>v.<br><br>THE SOUTHERN COMPANY, THOMAS A. FANNING, ART P. BEATTIE, EDWARD DAY, VI, G. EDISON HOLLAND, JR., JOHN C. HUGGINS, THOMAS O. ANDERSON,<br><br>Defendants. | Civil Action No. 1:17-cv-00241-MHC<br><br><u>CLASS ACTION</u> |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

OF COUNSEL:
Michele D. Johnson*
Kristin N. Murphy*
Latham & Watkins LLP
650 Town Center Drive, 20th Floor
Costa Mesa, California 92626
Telephone: (714) 540-1235
Facsimile: (714) 755-8290

Sarah A. Greenfield**
Latham & Watkins LLP
555 Eleventh Street, NW Ste. 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201

Michael J. McConnell
Ga. Bar No. 485003
Walter W. Davis
Ga. Bar No. 213083
Robert A. Watts
Ga. Bar No. 793350
JONES DAY
1420 Peachtree Street, NE Ste. 800
Atlanta, GA 30309-3053
Telephone: (404) 521-3939
Facsimile: (404) 581-8330

*Attorneys for Defendants*
*Admitted pro hac vice*
**Pro hac* pending

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS ...............................................................................4

A.    The First-Of-Its-Kind, "Clean Coal" Kemper Plant Is Approved..................4

B.    The Kemper Certificate Is Appealed ...............................................7

C.    The Market Receives Regular Updates On The Progress Of The
Kemper Plant Towards The Target May 2014 Operational Date ..................8

D.    Seven Months Before The Target Operational Date, Southern
Discloses That The Kemper Plant Has Been Delayed .................................11

E.    Several Years Later, *The New York Times* Publishes A Negative
Article And This Lawsuit Follows .................................................12

LEGAL STANDARD.................................................................................13

ARGUMENT ..............................................................................................14

I.    PLAINTIFFS' CLAIMS ARE TIME-BARRED ....................................14

II.    PLAINTIFFS FAIL TO PLEAD FALSITY ...........................................18

A.    Defendants' Forward-Looking Statements Are Protected
By The PSLRA Safe Harbor.....................................................18

1.    Statements Regarding The Projected Construction
Schedule For Kemper Are Forward-Looking ...............18

2.    The Statements Were Accompanied By
Meaningful Cautionary Language .................................20

3.    Plaintiffs Fail To Plead Facts Showing
Defendants' Actual Knowledge That The Schedule
Estimates Were False.....................................................21

i

B.     Statements Of Corporate Optimism Are Inactionable .............23

C.     Plaintiffs Fail To Plead With Particularity That Any Challenged Statement Was False Or Misleading ...................24

III.     PLAINTIFFS FAIL TO PLEAD SCIENTER ........................................25

A.     Plaintiffs' Motive Allegations Are Implausible ......................25

B.     The Absence Of Alleged Stock Sales Undercuts An Inference Of Scienter .................................................................27

C.     Plaintiffs Fail To Plead Severe Recklessness ..........................28

     1.     Positions And Responsibilities Within The Company Do Not Support Severe Recklessness ...........28

     2.     Plaintiffs' Witness Allegations Are Not Credible Or Sufficient To Support Severe Recklessness .............29

     3.     Directives Regarding Public Communications Do Not Show Severe Recklessness ......................................33

     4.     Post-Class Period Events Do Not Support Scienter .......34

IV.     PLAINTIFFS FAIL TO STATE A SECTION 20(a) CLAIM .................35

CONCLUSION ....................................................................................................35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*100079 Canada, Inc. v. Stiefel Labs., Inc.*,
   596 Fed. App'x. 744 (11th Cir. 2014) ........................................................15, 16

*Absolute Activist Value Master Fund Ltd. v. Devine*,
   No. 2:15-cv-328-FtM-29MRM, 2017 WL 519066 (M.D. Fla. Feb.
   8, 2017) ........................................................................................................5

*In re Altisource Portfolio Solutions, S.A. Sec. Litig.*,
    No. 14-81156 CIV-WPD, 2015 WL 12001262 (S.D. Fla. Sept. 4,
   2015) ........................................................................................................31

*Amalgamated Bank v. Coca-Cola Co.*,
   No. Civ.A. 1:05-CV-1226, 2006 WL 2818973 (N.D. Ga. Sept. 29,
   2006) ...................................................................................................19, 23

*Anderson v. Spirit AeroSystems Holdings, Inc.*,
   105 F. Supp. 3d 1246 (D. Kan. 2015), *aff'd*, 827 F.3d 1229 (10th
   Cir. 2016) ..................................................................................................35

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
   827 F.3d 1229 (10th Cir. 2016) ...................................................................30

*Barr v. Matria Healthcare, Inc.*,
   324 F. Supp. 2d. 1369 (N.D. Ga. 2004) ........................................................17

*In re Barrick Gold Sec. Litig.*,
   No. 13 Civ. 3851(SAS), 2015 WL 1514597 (S.D.N.Y. April 1,
   2015) ............................................................................................19, 21, 22

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)....................................................................................14

*Bryant v. Avado Brands, Inc.*,
   187 F.3d 1271 (11th Cir. 1999) .....................................................................5

*Cainion v. Bank of America, N.A.*,
   No. 1:12-CV-03520-AT, 2013 WL 12109497 (N.D. Ga. May 1,
   2013) ....................................................................................................5

*City of Pompano Beach Gen. Emps. Ret. Sys. v. Synovus Fin. Corp.*,
   No. 1:09-cv-01811-JOF, 2011 WL 13130185 (N.D. Ga. May 19,
   2011) ..................................................................................................28

*Druskin v. Answerthink, Inc.*,
   299 F. Supp. 2d 1307 (S.D. Fla. 2004) ............................................17

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
   594 F.3d 783 (11th Cir. 2010) ..........................................................20

*In re Eli Lilly and Co. Sec. Litig.*,
   549 F. Supp. 2d 496 (E.D.N.Y. 2008) ..............................................16

*Firefighters Pension & Relief Fund of the City of New Orleans v.
   Bulmahn*,
   147 F. Supp. 3d 493 (E.D. La. 2015) ................................................23

*Garfield v. NDC Health Corp.*,
   466 F.3d 1255 (11th Cir. 2006) ........................................................32

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011) ..............................................27

*Harris v. Ivax Corp.*,
   182 F.3d 799 (11th Cir. 1999) ....................................18, 19, 20, 21

*In re HomeBanc Corp. Sec. Litig.*,
   706 F. Supp. 2d 1336 (N.D. Ga. 2010)........................................27, 33

*Hubbard v. BankAtlantic Bancorp, Inc.*,
   625 F. Supp. 2d 1267 (S.D. Fla. 2008) .............................................35

*In re John Alden Fin. Corp. Sec. Litig.*,
   249 F. Supp. 2d 1273 (S.D. Fla. 2003) .............................................27

*Mizzaro v. Home Depot, Inc.*,
   544 F.3d 1230 (11th Cir. 2008) ................................................*passim*

iv

*Mogensen v. Body Cent. Corp.*,
  15 F. Supp. 3d 1191 (M.D. Fla. 2014) ................................................28

*Patel v. Patel*,
  761 F. Supp. 2d 1375 (N.D. Ga. 2011) ...............................................28

*Plymouth Cty. Ret. Sys. v. Carter's Inc.*,
  No. 1:08-cv-02940-JOF, 2011 WL 13124501 (N.D. Ga. Mar. 17,
  2011) ....................................................................................................30

*In re Republic Services, Inc. Sec. Litig.*,
  134 F. Supp. 2d 1355 (S.D. Fla. 2001) ...............................................34

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) ..............................................................22

*In re Royal Caribbean Cruises Ltd. Sec. Litig.*,
  No. 1:11–22855–CIV, 2013 WL 3295951 (S.D. Fla. Apr. 19,
  2013) ....................................................................................................24

*In re S1 Corp. Sec. Litig.*,
  173 F. Supp. 2d 1334 (N.D. Ga. 2001) ..........................................21, 23

*Sanford v. Aldridge Connors LLP*,
  No. 1:15-CV-1851-MHC, 2015 WL 11439081 (N.D. Ga. July 23,
  2015) ......................................................................................................5

*Sheet Metal Workers Local 28 Pension Fund v. Office Depot, Inc.*,
  No. 07-81038-CIV-HURLEY, 2009 WL 10667541 (S.D. Fla. Mar.
  31, 2009) ..............................................................................................33

*Szymborski v. Ormat Techs., Inc.*,
  776 F. Supp. 2d 1191 (D. Nev. 2011) .................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ...............................................................................4

*Tello v. Dean Witter Reynolds, Inc.*,
  410 F.3d 1275 (11th Cir. 2005) ..........................................................16

*Thompson v. RelationServe Media, Inc.*,
    610 F.3d 628 (11th Cir. 2016) ...................................................................25, 35

*Waterford Township Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*,
    No. 08-CIV-22572, 2010 WL 1332574 (S.D. Fla. Mar. 30, 2010).............29, 31

*Zisholtz v. Suntrust Banks, Inc.*,
    No. 1:08-CV-1287-TWT, 2009 WL 3132907 (N.D. Ga. Sept. 24,
    2009) ................................................................................................................34

## STATUTES

15 U.S.C. § 78j(b) ....................................................................................................14

15 U.S.C. § 78u–5(e) .................................................................................................9

15 U.S.C. § 78u-4(b) .....................................................................................14, 24, 25

15 U.S.C. § 78u-5 ...............................................................................................18, 21

28 U.S.C. § 1658(b) ................................................................................................14

## RULES

Fed. R. Civ. P. 9(b) ................................................................................................14

Fed. R. Civ. P. 12(b)(6)...........................................................................................14

## REGULATIONS

17 C.F.R. § 240.10b-5..............................................................................................14

## **PRELIMINARY STATEMENT**

This case arises out of a $7 billion, first-of-its-kind, clean-coal project constructed by Mississippi Power Company ("MPC"), a wholly owned subsidiary of The Southern Company ("Southern") (together with MPC, the "Company"),[1] in Kemper County, Mississippi ("Kemper" or the "Kemper Plant"). An ambitious attempt to demonstrate the viability of advanced clean-coal technology on a commercial scale, the Kemper Plant was originally projected to be operational by May 2014 ("COD"). Kemper represented one of the first large-scale attempts at commercial power generation through the gasification of lignite coal, and the first attempt to do so using Southern's proprietary gasification technology. While Southern has successfully generated synthetic gas through coal gasification for much of the last year, thereby proving up the science and technology underlying the project, the Kemper Plant has yet to achieve full commercial operation.

It is against this backdrop that Plaintiffs filed their Consolidated Complaint ("CC"), which is limited to a one-and-a-half year period ending more than three years ago—April 25, 2012, to October 30, 2013 (the "Class Period"). Plaintiffs allege that during the Class Period, Defendants made materially false or misleading statements to investors regarding the Company's ability to achieve the May 2014

---

[1] For purposes of Defendants' Motion to Dismiss only, the "Company" will refer to MPC and Southern collectively and interchangeably.

COD.  Plaintiffs' Class Period commences with a single statement allegedly made by the Company's Chief Executive Officer, Tom Fanning, to investors:

> [Kemper Plant] initial startup and testing are now only 14 months away.  And we remain confident that this project will provide the best value to customers over the long term. ***Targets remain achievable for . . . the . . . Kemper County project[] with regard to construction schedule and cost to customers.***

CC ¶ 112 (emphasis added).  The CC provides no basis, let alone a cogent one, for the Court to conclude that (i) the statement was false, (ii) Mr. Fanning knew it was false when made, or (iii) it is not an inactionable forward-looking statement protected under the federal securities laws.  Indeed, that Plaintiffs would choose to rest their case principally on this April 25 statement is telling.  As Mr. Fanning described on that same call, the Mississippi Public Service Commission ("PSC") had ***only one day earlier*** voted to recertify the Kemper Plant for construction—in large measure based on the Company's representations that the May 2014 COD was achievable.  Plaintiffs do not reconcile how these pre-Class Period statements are not false, while Mr. Fanning's April 25 statements and those made by other Defendants until the Company revised the May 2014 target somehow are.

The CC fails to satisfy the rigid pleading standards of the Private Securities Litigation Reform Act ("PSLRA") for three independent reasons.  First, Plaintiffs' claims are time barred.  The PSLRA imposes a statute of limitations on claims for

securities fraud of two years after a plaintiff knew or could have discovered the facts constituting the alleged fraud. When the Company announced in October 2013 that Kemper would not be operational by May 2014, the two-year statute of limitations began to run. Thus, the window to bring Plaintiffs' claims closed in October 2015, but this lawsuit was not filed until January 2017—over a year late.

Second, even if their claims were timely (they are not), Plaintiffs fail to plead a single actionable false statement. Nearly all of the 37 statements Plaintiffs challenge are predictions about when Kemper would be commercially operational. These are all forward-looking statements, accompanied by detailed cautionary language warning of the risks involved in an undertaking of this size, including the risk that construction delays could cause the plant to miss its target operational date—and thus are protected by the PSLRA's safe harbor. Even without the cautionary language, the forward-looking statements are not a basis for liability because Plaintiffs do not allege any facts showing that Defendants actually knew during the Class Period that Kemper would not be complete by May 2014.

Third, Plaintiffs fail to plead the requisite strong inference of scienter. Plaintiffs allege Defendants had motive to conceal construction delays during the Class Period because Southern stood to gain hundreds of millions of dollars in federal tax credits and other financial benefits if Kemper achieved a May 2014

3

completion date.  This alleged motive makes no sense on its face, and there are no well-pled facts to support it.  The alleged financial incentives were not achievable throughout the ongoing construction of the Kemper Plant, but instead were tied to Kemper actually being operational by May 2014 or soon thereafter.  Southern had nothing to gain—whether alleged financial incentives or otherwise—by publicly misrepresenting the status of the project between April 25, 2012, and October 30, 2013.  This conclusion is underscored by the fact that Southern reported that Kemper could not hit the target date nearly *seven months* before May 2014.

Under Supreme Court precedent, the inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  Here, the nonculpable inference is far more cogent and compelling: the Kemper Plant was a first-of-its-kind endeavor that Defendants expected to complete on schedule, but ultimately the precise risks about which Defendants repeatedly cautioned investors came to pass, and rendered the May 2014 date unattainable.  The CC should be dismissed with prejudice.

## STATEMENT OF FACTS

### A.    The First-Of-Its-Kind, "Clean Coal" Kemper Plant Is Approved

Southern is a utility holding company based in Atlanta, Georgia.  CC ¶ 20.

Southern's operating subsidiaries include public utility companies located throughout the Southeastern United States, including MPC.  *Id.*  MPC provides electricity to retail customers within the state of Mississippi.  *Id.* ¶ 30.

Thomas A. Fanning is Southern's Chairman, President, and Chief Executive Officer.  *Id.* ¶ 21.  Art P. Beattie is Southern's Executive Vice President and Chief Financial Officer.  *Id*. ¶ 22.  Edward Day was MPC's President and CEO from August 13, 2010, until May 20, 2013.  *Id*. ¶ 23; Ex. 31.[2]  G. Edison Holland was Southern's General Counsel from 2001 until April 2013, when he became MPC's President and CEO in May 2013.  CC ¶ 24.  John C. Huggins was a Southern

---

[2] "Ex." refers to exhibits included in the Exhibit Index and attached as exhibits hereto.  The Exhibits are properly considered as incorporated by reference in the CC or matters of which the Court may take judicial notice.  *See, e.g.*, *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1281 (11th Cir. 1999) (courts may take judicial notice of SEC filings at the motion to dismiss stage); *Cainion v. Bank of America, N.A.*, No. 1:12-CV-03520-AT, 2013 WL 12109497, at *3 (N.D. Ga. May 1, 2013) (taking judicial notice of news articles regarding certain practices in the subprime lending industry and holding that plaintiffs' fraud claim was time-barred); *Sanford v. Aldridge Connors LLP*, No. 1:15-CV-1851-MHC, 2015 WL 11439081, at *1 (N.D. Ga. July 23, 2015) (Cohen, J.) (documents central to plaintiff's claims may be considered on a 12(b)(6) motion under the incorporation by reference doctrine).  Defendants respectfully request that this Court take judicial notice of Exhibits 1, 3-5, 21, 23 not for the truth of the matters asserted therein, but for their existence and content, and the fact that each was publicly available prior to October 30, 2013.  *See Absolute Activist Value Master Fund Ltd. v. Devine*, No. 2:15-cv-328-FtM-29MRM, 2017 WL 519066, at *12-13 (M.D. Fla. Feb. 8, 2017) (taking judicial notice of "the fact that [two news articles] now exist, but not for the truth of the matters asserted therein").

employee who became a Kemper startup manager in 2010, and became the VP of Generation Development for MPC on May 20, 2013. *Id.* ¶ 25. Thomas O. Anderson (with the other individuals, the "Individual Defendants") was MPC's VP of Generation Development from July 2009 to May 2013. *Id*. ¶ 26.

The Kemper Plant is an integrated gasification combined cycle ("IGCC") power generation plant designed to use extreme heat and pressure to turn lignite coal into synthetic gas used to fuel the combined-cycle power plant. *Id.* ¶¶ 33-34. The Kemper Plant—the first of its kind to use Southern's proprietary gasification technology—was intended to produce electricity from an inexpensive and abundant type of coal present in Mississippi, while emitting less pollution than a typical coal-fired plant. Ex. 13.

In January 2009, MPC sought authorization from the PSC to construct and operate the Kemper Plant. *See* Ex. 45 at 1. Later in 2009, the IRS allocated $133 million in tax credits to MPC, if and only if Kemper were operational by May 11, 2014. CC ¶ 35. MPC could not commit to procure major equipment and commence detailed design efforts prior to certification by the PSC. *See* Ex. 5 at 38-39.[3] Thus, detailed design engineering of the Kemper Plant commenced after the PSC certified the plant for construction in May 2010. Ex. 2. The PSC's

---

[3] The PSC was made aware of the limited design that had been completed for the project through testimony from various Company witnesses. *See, e.g.*, Ex. 1 at 29.

certification of public convenience and necessity ("CPCN") approved Kemper with (1) a construction cost cap of $2.88 billion, and (2) a ratepayer-funded allowance to cover financing costs incurred during construction through May 1, 2014.  CC ¶ 36.  The PSC and its staff retained several independent monitors, including Burns and Roe Enterprises, Inc. (the "Monitor"), to monitor the project.  *Id.* ¶¶ 4, 37.[4]

Prior to the start of the Class Period, MPC entered into two agreements related to the completion of the Kemper Plant.  The first was an asset purchase agreement between South Mississippi Electric Power Association ("SMEPA") and MPC, pursuant to which SMEPA gave MPC a $150 million interest-bearing refundable deposit to be applied toward SMEPA's purchase of a 15% interest in the Kemper Plant.  *Id.* ¶ 172.  The second was a contract with Treetop Midstream Services LLC ("Treetop"), whereby MPC agreed to sell to Treetop carbon dioxide captured from the Kemper Plant once it was operational.  *Id.* ¶ 173.

## B.   The Kemper Certificate Is Appealed

Following the issuance of the original CPCN for Kemper in 2010, the Sierra Club, an intervening party, appealed the PSC's order.  *See* Ex. 4.  In March 2012, the Mississippi Supreme Court reversed and remanded the Kemper CPCN on the

---

[4] In its Order certifying the Kemper Plant, the PSC expressed that the risks associated with the project's "unprecedented scope, cost and uncertainties" warranted "special measures," such as the use of independent experts to closely monitor progress and evaluate deviations in scope, cost, and schedule. Ex. 1 at 43.

grounds that the order lacked sufficient findings of fact to support the decision, as required by statute.  *Id.*  In response, MPC requested that the Kemper CPCN be re-issued on remand by the PSC, and that a temporary order be issued allowing construction to continue until the matter could be addressed.  Ex. 5.  On March 30, 2012, following the Supreme Court's issuance of the mandate, the PSC issued a temporary certificate to allow adequate time for the PSC to consider the status of the Kemper project and address the Supreme Court's opinion.  *See* Ex. 31 at II-86.

## C.   The Market Receives Regular Updates On The Progress Of The Kemper Plant Towards The Target May 2014 Operational Date

On April 24, 2012, the PSC voted to re-certify construction of the Kemper Plant, based on the Company's representations, among others, that Kemper would meet its original budget of $2.395 billion and would be placed into service no later than May 1, 2014.  CC ¶ 111.  The next day, April 25, 2012—the start of the putative Class Period—Southern hosted a conference call to report that the PSC had issued the order the previous day, and that construction at Kemper would proceed under the new order.  *Id.* ¶ 112; Ex. 6.  Mr. Fanning affirmed his belief that the May 2014 COD remained achievable.  CC ¶ 112.

On that call, the Company cautioned the market about forward-looking statements and directed investors to the Company's 2011 Form 10-K.  *See*

Appendix B at 1-6.[5]  That Form 10-K (and subsequent Company filings) contained a multi-page section warning about the significant risks associated with construction projects generally, and the projected construction schedule for Kemper specifically:

> Southern Company intends to continue its strategy of developing and constructing . . . [the Kemper] IGCC . . . .  These types of projects are long-term in nature and may involve facility designs that have not been finalized or previously constructed. The completion of these types of projects without delays . . . is subject to substantial risks, including:  shortages and inconsistent quality of equipment, materials, and labor; . . . contractor or supplier delay . . . delays in or failure to receive necessary . . . regulatory authorizations; . . . adverse weather conditions; unforeseen engineering problems; changes in project design or scope.

Ex. 3 at I-24-25; *see also* Ex. 31 at I-19-20; Appendix B.  The Company further warned that "[t]he completion of these types of projects without delays or significant cost overruns is subject to substantial risks," and that construction delays can "adversely affect the net income and financial position of [MPC or Southern]" and "may result in the loss of . . . investment tax credits and other tax incentives."  Ex. 3 at I-24-25; Ex. 31 at I-19-20.  Southern's quarterly SEC filings contained similar warnings.  *See, e.g.*, Ex. 18 at 129; Appendix B at 7-10.  During

---

[5] For the Court's convenience, Defendants are concurrently filing two appendices: Appendix A, a chart listing each challenged statement and the reasons why it is inactionable, and Appendix B, a chart of cautionary language that accompanied the statements that Plaintiffs challenge in the CC.  Pursuant to the PSLRA, the Court must consider this cautionary language on this Motion.  15 U.S.C. § 78u–5(e).

the Class Period, together with these clear and repeated warnings, Defendants and MPC reaffirmed their expectation that Kemper would be operational by May 2014 despite construction delays.

During 2012, the Monitor conducted an Independent Project Schedule and Cost Evaluation ("IPSCE"), and reported the findings to the PSC on November 26, 2012. *See* Ex. 20 ("IPSCE Report"). The publicly available IPSCE Report indicated that numerous critical-path items were behind the baseline plan, including concrete foundations, structural steel, and piping. CC ¶¶ 83-86. At the same time, the Monitor noted that MPC was committed to completing construction, start-up, and commissioning by May 2014. *Id.* ¶ 86. The Monitor reported that in July 2012, MPC projected a July 2014 COD (*id.* ¶ 124(g)), but then reinstated the May 2014 COD after completing a "re-baselined schedule which identified 48 specific workarounds." Ex. 20 at 24. The Monitor concluded that the May 2014 COD could be met if "all of the specific construction work-arounds are implemented, and future unforeseen delays or difficulties are effectively addressed." *Id.* at 6. The Monitor further explained the gasifier refractory-lined components "were originally running about six months behind schedule" but that "[t]he latest recovery plan by the project team accelerates delivery, and they are now only about three months behind." *Id.* at 25.

10

At the start of 2013, Southern reported that "critical elements," including piping, were still being installed, but that "the Kemper project is now 75% complete" and the "plant is scheduled to begin start-up activities this summer." CC ¶¶ 138-39; Ex. 29.  On April 24, 2013, Southern disclosed a cost increase of $540 million, based primarily on more labor and adjustments to productivity related to piping installation (Kemper required about 172 miles of above-ground piping).  CC ¶ 146; Ex. 34.  On July 31, 2013, Southern stated that installing piping was "challenging" and the "biggest risk" for Kemper's schedule.  Ex. 41.  Seeking to stay on schedule, MPC increased the number of workers at Kemper and the number of shifts, from the scheduled 1,200 craft labor personnel up to 6,540 by August 2013, and from the scheduled 450 pipe workers up to 1,500.  CC ¶ 159(c).

**D.    Seven Months Before The Target Operational Date, Southern Discloses That The Kemper Plant Has Been Delayed**

In or around July 2013, following the termination of Defendants Day and Anderson, Defendant Huggins, Mr. Anderson's replacement, called a meeting of the MPC and Southern Company Services ("SCS") engineering and construction teams to address issues including the project schedule.  *See id.* ¶ 67.  Following this meeting, Brett Wingo, then a mid-level manager with SCS's Engineering and Construction Services division (*id.* ¶ 57), was asked to identify a third-party consultant to assist in the development of a detailed schedule to support start-up of

11

the plant upon completion of construction activities.  *Id*. ¶ 159(e).  According to Plaintiffs, in mid-September 2013 Mr. Wingo completed his schedule, which allegedly concluded that there was no way to achieve the May 2014 COD.  *Id*.

Days later, and still almost seven months before the May 2014 target, the Company announced that the Kemper Plant would not be operational on the originally estimated timeframe.  *Id*. ¶ 209.  On October 2, 2013, MPC disclosed that "as the result of abnormally wet weather and lower-than planned construction labor productivity," MPC expected that Kemper would be placed into service later in 2014 than May.  *Id*.  On October 29, 2013, Southern reaffirmed that MPC had revised the schedule to the fourth quarter of 2014, "largely as the result of lower-than planned installation levels for piping as well as abnormally wet weather," and warned that there could be further extensions.  *Id*. ¶ 212.  The next day, Southern explained that although tremendous progress had been made and construction had gone well, certain engineering issues made the prior timeline unfeasible.  *Id*. ¶ 214.  Plaintiffs allege that these statements were true.

**E.    Several Years Later, *The New York Times* Publishes A Negative Article And This Lawsuit Follows**

Nearly three years later, on July 5, 2016, *The New York Times* published an article entitled, "Piles of Dirty Secrets Behind a Model 'Clean Coal' Project."  *Id*. ¶ 49.  The article criticized regulators' decisions to approve the plant (which

12

occurred before the Class Period), and recounted comments from former engineers and Mr. Wingo about whether Kemper could meet the revised schedule estimate of late 2014 (that is, after the Class Period).  Ex. 46.  These engineers, according to the article, wondered in conversations illicitly recorded by Mr. Wingo starting in August 2014 (after the Class Period) whether the continued schedule delays were partly the result of "mismanagement *or* fraud."  *Id.* (emphasis added).

This lawsuit followed about six months later, on January 20, 2017.  Dkt. 1. On June 12, 2017, Plaintiffs filed the CC (Dkt. 28), challenging 37 statements during the alleged Class Period of April 25, 2012, to October 30, 2013, falling into three categories: (1) schedule estimates about progress at Kemper, including Monthly Status and Cost Reports ("Monthly Reports") filed by MPC with the PSC (CC ¶¶ 112-13, 116-20, 122-23, 125-28, 130, 133, 135-41, 143, 145-47, 149-152, 154-55, 157) ("Schedule Estimates"); (2) statements about milestones achieved at Kemper (*id.* ¶¶ 123, 130, 158) ("Milestone Statements"); and (3) statements of optimism, such as that "tremendous progress" had been made at Kemper (*id.* ¶¶ 112, 116-17, 127, 130, 132, 134, 138, 146, 153).  *See* Appendix A.

## LEGAL STANDARD

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must adequately plead: (i) a material misrepresentation or omission of

fact; (ii) scienter; (iii) a connection with the purchase or sale of a security; (iv) reliance; (v) economic loss; and (vi) loss causation.  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-37 (11th Cir. 2008).  To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs' allegations must be "plausible on [their] face" and more than "speculative."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

Plaintiffs must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA.  Rule 9(b) requires that any fraud claim state "with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Under the PSLRA, Plaintiffs are required to specify with particularity "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"—*i.e.*, scienter.  *Id.* § 78u-4(b)(2)(A).

## ARGUMENT

## I.  PLAINTIFFS' CLAIMS ARE TIME-BARRED

The PSLRA imposes a two-year statute of limitations for securities fraud cases such as this one.  28 U.S.C. § 1658(b) (a private securities fraud action "may be brought not later than . . . 2 years after the discovery of the facts constituting the

14

violation"). "Discovery," as used in Section 1658(b), includes facts the plaintiff actually knew, as well as those facts plaintiff would have known had it "exercised reasonable diligence." *100079 Canada, Inc. v. Stiefel Labs., Inc.*, 596 Fed. App'x. 744, 747 (11th Cir. 2014) (dismissing securities fraud claims as time-barred where plaintiff would have known of the alleged facts through reasonable diligence more than two years before commencing the action).

Even if the Court accepted Plaintiffs' theory of the case—that Defendants misled investors about the Company's ability to achieve the May 2014 COD in order to obtain tax credits and other funding—a reasonably diligent plaintiff would have had sufficient information to plead the elements of a securities fraud claim as of the date the full "truth" was allegedly revealed: October 30, 2013. Therefore, the two-year statute of limitations began to run on that date and expired on October 30, 2015. This lawsuit was filed on January 20, 2017—more than a year too late.

Plaintiffs concede that by October 30, 2013, the Monitor's November 2012 report, which catalogued construction delays and questioned the achievability of the May 2014 COD, had received widespread coverage from the media and the Kemper project's critics. CC ¶¶ 79-88, 131(h); *see, e.g.*, Exs. 21-23. The financial incentives that constitute the basis of Plaintiffs' motive allegations were also widely known. CC ¶¶ 169-175. Plaintiffs are not free to ignore such information

15

until they decide to file suit years later.  *See In re Eli Lilly and Co. Sec. Litig.*, 549 F. Supp. 2d 496, 535 (E.D.N.Y. 2008) (dismissing securities claims as time-barred where plaintiffs claimed defendants' misdeeds were publicly disclosed for the first time in *New York Times* articles, but where information publicly available years prior revealed the facts underlying plaintiffs' claims).   Southern's October 30, 2013 announcement, combined with publicly available information at that time, was sufficient to trigger the duty to investigate.[6]  *See, e.g., Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1283 (11th Cir. 2005) (investor has duty of inquiry triggered "by evidence of the possibility of fraud," not "[f]ull exposition of the scam," and will be imputed with "constructive knowledge" of information in the public domain); *Stiefel Labs., Inc.*, 596 Fed. App'x. at 748-49 (securities fraud claims were time-barred where, given the "stark divergence" of subsequent events from the company's prior statements, a reasonable person in plaintiff's position "would have performed at least a modest investigation").

---

[6] Shortly after October 2013, Plaintiffs could have discovered through reasonable diligence a multitude of additional facts.   For example, in April 2014, the Independent Monitor issued a second report, which also catalogued construction delays and questioned whether the May 2014 COD target had been realistic.   Ex. 45.  Plaintiffs quote extensively from this report and acknowledge that it received widespread media attention in November 2014—more than two years before Plaintiffs filed suit.  *E.g.*, CC ¶ 104.   Additionally, MPC pushed back Kemper's COD several more times prior to two years before this lawsuit.  *See, e.g., id.* ¶ 46.

16

In an effort to avoid this result, Plaintiffs allege that the NYT Article "publicly revealed for the first time" that Defendants had deliberately deceived the market regarding schedule delays at Kemper.  CC ¶ 55.  But the article reveals nothing new about the time period between April 25, 2012, and October 30, 2013. It reports on the views of Mississippi regulators who did not support approval of the Kemper Plant—which occurred before the Class Period.  Ex. 46.  It recounts a debate among Mr. Wingo and other engineers regarding whether the revised estimated completion date of late 2014 could be achieved—a debate which occurred after the Class Period.  *Id*.  The article does not reveal any deliberate misconduct.  At most, it raises the *question* of whether schedule delays were the result of something worse than mere mismanagement.  *Id*.  It is well-settled that "corporate mismanagement" is "insufficient to establish securities fraud."  *Barr v. Matria Healthcare, Inc.*, 324 F. Supp. 2d 1369, 1384 (N.D. Ga. 2004); *see also Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1334 (S.D. Fla. 2004) (no fraud where allegations amounted to "former employees who [ ] disagreed with management's decisions").  And this question could have been asked by Plaintiffs much earlier.  Plaintiffs' allegation that the elements of its claims were first revealed on July 5, 2016, is implausible on the face of the article.

17

## II.     PLAINTIFFS FAIL TO PLEAD FALSITY

### A.     Defendants' Forward-Looking Statements Are Protected By The PSLRA Safe Harbor

Under the PSLRA, forward-looking statements cannot be the basis of Section 10(b) liability if either of one of two things is true:  (1) the statements are accompanied by meaningful cautionary language, or (2) the plaintiff fails to allege that the maker of the statement had actual knowledge that the statement was false or misleading.  *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999); 15 U.S.C. § 78u-5.  The first category of challenged statements, the Schedule Estimates—which are 33 out of the 37 challenged statements—are protected under either prong of the PSLRA's safe harbor.  *See* Appendix A at rows 1-14, 16, 18-32, 34-36.

### 1.     Statements Regarding The Projected Construction Schedule For Kemper Are Forward-Looking

Forward-looking statements are predictive, and are specifically defined by the PSLRA to include the "plans and objectives of management for future operations," and "the assumptions underlying or relating to" those objectives.  15 U.S.C. § 78u-5(i)(1).   The Schedule Estimates are, by their plain language, forward-looking statements regarding future operations and the underlying assumptions.  *E.g.,* CC ¶ 127 (Kemper "remains on schedule to begin commercial operation in May of 2014"); *id.* ¶ 137 ("the project remains on-track for a May

2014 in-service date"); *see* Appendix A at rows 1-14, 16, 18-32, 34-36. Courts have held that analogous statements are forward-looking. *See, e.g.*, *Szymborski v. Ormat Techs., Inc.*, 776 F. Supp. 2d 1191, 1198-99 (D. Nev. 2011) (statements about construction of power plant such as, "[w]e expect to complete [the construction] by the end of 2008," were forward-looking); *In re Barrick Gold Sec. Litig.*, No. 13 Civ. 3851(SAS), 2015 WL 1514597, at *2, *8 (S.D.N.Y. April 1, 2015) (statements that a gold mine was "on schedule for [production in] mid-2013" and regarding an "expected" construction schedule were forward-looking).

Statements about progress toward the expected schedule are similarly forward-looking. The accuracy of Defendants' forecasts that Kemper was "on track," "progressing on schedule," "more than 70 percent complete," and "less than 16 months from commercial operation" (CC ¶¶ 112, 116-19, 122-23, 125-27, 130, 133, 135-41, 143, 145-47, 149-51, 154)—made years and months away from the anticipated deadline—cannot be discerned until the future, and accordingly they are forward-looking. *See e.g.*, *Amalgamated Bank v. Coca-Cola Co.*, No. Civ.A. 1:05-CV-1226, 2006 WL 2818973, at *7 (N.D. Ga. Sept. 29, 2006) ("Whether [Coca-Cola Co.'s] strategy is 'being well-executed' or whether [it] has a 'crystal clear strategy' are facts only verifiable – if verifiable at all – in the future"); *Harris,* 182 F.3d at 806 (statements that a company's fundamental business and

underlying strategies remain intact were forward-looking).

> 2.   The Statements Were Accompanied By Meaningful Cautionary Language

Forward-looking statements accompanied by meaningful cautionary language are inactionable as a matter of law, without regard to the speaker's knowledge. *See Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 796 (11th Cir. 2010) (dismissing claims based on forward-looking statements accompanied by meaningful cautionary language, without regard to whether the speaker knew such statements were false when made).  To be "meaningful," accompanying cautionary language need only warn of "risks of a significance similar to that actually realized."  *Harris*, 182 F.3d at 807.

Here, Defendants' forward-looking statements were each accompanied by meaningful cautionary language warning of the exact risks that materialized: "Mississippi Power could experience . . . schedule delays with respect to the Kemper IGCC as a result of factors including, but not limited to, labor costs and productivity, adverse weather conditions, shortages and inconsistent quality of equipment, materials, and labor, or contractor or supplier delay or nonperformance under construction or other agreements."  Ex. 31 at I-22; *see* Appendix B.[7]

---

[7] Cautionary statements "need not be included in the same document as the alleged misrepresentations as long as the risk disclosures were related to and proximate in

3.   <u>Plaintiffs Fail To Plead Facts Showing Defendants' Actual
Knowledge That The Schedule Estimates Were False</u>

Though the Court can end its analysis there, Defendants' forward-looking statements are also protected under the safe harbor because Plaintiffs fail to show that the statements were made with actual knowledge of their falsity.  *See Harris*, 182 F.3d at 803 ("Even if the forward-looking statement has no accompanying cautionary language, the plaintiff must prove that the defendant made the statement with 'actual knowledge' that it was 'false or misleading.'").  Plaintiffs point to no facts known by any Defendant prior to October 2013 suggesting that any Defendant actually knew it was impossible to meet the May 2014 COD.

Instead, Plaintiffs allege that construction delays in significant aspects of the project caused some lower-level employees at Kemper to speculate that the May 2014 COD was unattainable.  *See, e.g.*, CC ¶¶ 61-62.  The beliefs of a handful of lower-level employees do not show that any Defendant actually knew this to be true, in contrast to the publicly stated expectations.  *See Barrick Gold*, 2015 WL 1514597, at *10 (allegations that internal confidential sources believed a mining project would not be complete by defendants' schedule estimates were insufficient to show defendants' actual knowledge that they could not achieve their goal).

time to the alleged misrepresentations."  *In re S1 Corp. Sec. Litig.*, 173 F. Supp. 2d 1334, 1354, 1357 (N.D. Ga. 2001); 15 U.S.C. § 78u-5(c)(2)(B)(i).

The CC and documents central to Plaintiffs' claims undermine the allegation that Defendants knew before October 2013 that Kemper would not be operational by May 2014.   During the Class Period, MPC constantly re-evaluated the construction schedule.  For example, in July 2012, MPC internally projected a July 2014 COD but then reinstated the May 2014 date after completing a "re-baselined schedule which identified 48 specific workarounds."   Ex. 20 at 24.   These allegations suggest that Defendants took a "'prudent course of action that weakens rather than strengthens an inference of scienter.'"   *Barrick Gold*, 2015 WL 1514597, at *10 (defendants' evaluation of schedule estimates negated an inference that schedule estimates were made with actual knowledge of falsity).

At most, Plaintiffs' allegations suggest that Defendants underestimated the challenges of constructing new technology and misjudged the gravity of known delays.  No construction project of significant magnitude is without problems.  But "[p]roblems and difficulties are the daily work of business people [and] that they exist does not" equal fraud.  *Ronconi v. Larkin*, 253 F.3d 423, 430, 433-34 (9th Cir. 2001) ("Alleging in substance that [a company] underestimated [its problems] does not make out a fraud case.").  By Plaintiffs' own allegations, despite setbacks and delays, prior to October 2013, MPC and Southern poured more resources into the Kemper Plant and identified workarounds, including for the refractory failures

on the gasifier.  CC ¶¶ 60, 78.  These actions are consistent with an inference that Defendants believed they could overcome delays to meet the May 2014 COD.  *See Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 147 F. Supp. 3d 493, 536-37 (E.D. La. 2015) (defendants' continued efforts to borrow money notwithstanding that the company was already "extremely leveraged" suggested that they did not know that the company was "doomed").

### B. Statements Of Corporate Optimism Are Inactionable

Plaintiffs challenge numerous optimistic statements that are of the exact type that courts routinely hold to be inactionable "puffery."  CC ¶¶ 112, 116-17, 122, 127, 130, 132, 134, 138, 146, 153; Appendix A at rows 1, 3-4, 8, 12, 14-15, 17, 21, 27, 33.  These include statements like "we remain confident that this project will provide the best value to customers over the long term" (CC ¶ 112 (Fanning)); Kemper "continues to be the best generation option for customers" (*id.* ¶ 117 (Southern)); and "[w]e continue to make tremendous progress" (*id.* ¶ 146 (Fanning)).  Courts in the Eleventh Circuit routinely reject securities fraud claims based on such statements of corporate optimism.  *See, e.g.*, *Amalgamated Bank*, 2006 WL 2818973, at *3, *8, *10 ("relationships with [Coca-Cola Co. and its] bottling partners have never been stronger" was inactionable puffery); *In re S1 Corp. Sec. Litig.*, 173 F. Supp. 2d 1334, 1355-56 (N.D. Ga. 2001) (statements

23

about achieving "growth milestones" and that costs were "ahead of schedule" were inactionable puffery).

### C.   Plaintiffs Fail To Plead With Particularity That Any Challenged Statement Was False Or Misleading

All of the challenged statements should be dismissed because Plaintiffs fail to allege particularized facts showing why any of these statements were false or misleading.  15 U.S.C. § 78u-4(b).  As to the Milestone Statements, Plaintiffs do not allege that any of the milestones had, in fact, not been achieved.  As to the Schedule Estimates, Plaintiffs allege that the project was experiencing construction delays in installing the gasifier and piping, engineering delays, and poor labor productivity—but no alleged facts show that interim delays were not being factored into the predictions.  Instead, the alleged facts detail efforts to address the delays and still meet the target.  *See, e.g.*, Ex. 20 at 25 (MPC considered gasifier and piping when evaluating the schedule).   In fact, contrary to Plaintiffs' characterizations (CC ¶¶ 86-88, 93-104), the November 2012 IPSCE Report noted that the COD *could* be met, with effective workarounds.  Ex. 20 at 6.  And as to the statements of optimism, Plaintiffs themselves do not challenge as false the similar Fanning statement on October 30, 2013, the last day of the Class Period, that "[t]remendous progress continues to be made at the site."  CC ¶ 214.  Plaintiffs fail to allege falsity.  *See In re Royal Caribbean Cruises Ltd. Sec. Litig.*, No. 1:11–

22855–CIV, 2013 WL 3295951, at *16 (S.D. Fla. Apr. 19, 2013) (no falsity pled absent "description of any reports, generated when and by whom, that contained relevant information in juxtaposition to Defendants' statements").

## III.   PLAINTIFFS FAIL TO PLEAD SCIENTER

The PSLRA's heightened pleading standard requires Plaintiffs to allege particularized facts supporting scienter—a "strong inference that the defendant acted with the required state of mind" (15 U.S.C. § 78u-4(b)(2)(A))—*i.e.*, "intent to deceive, manipulate, or defraud, or severe recklessness." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 634 (11th Cir. 2016) (internal quotation marks omitted).  In the Eleventh Circuit, a showing of "severe recklessness" "'is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care.'"  *Mizzaro*, 544 F.3d at 1238 (citation omitted). Plaintiffs' allegations do not meet these high standards.

### A.    Plaintiffs' Motive Allegations Are Implausible

Plaintiffs allege that Defendants were incentivized to conceal Kemper's scheduling delays in order to obtain tax credits and other funding, and so that their business partners would not cancel contracts.  CC ¶¶ 169-175.  This hypothesis is illogical.  Before the start of the Class Period, the IRS tax credits had been granted,

MPC had entered into contracts with SMEPA and Treetop, and the PSC had approved a ratepayer-funded allowance to cover construction financing and voted to re-certify construction of Kemper, based on unchallenged representations that MPC would meet the May 2014 COD. *Id.* ¶ 111. Plaintiffs allege, implausibly, that *the day after* the PSC voted to re-certify construction of Kemper, Defendants commenced a fraud to conceal scheduling delays that threatened these incentives. *Id.* ¶¶ 42-43. This makes no sense. The alleged incentives—tax credits, financing, contracts—were already in place.

Moreover, Defendants could obtain the benefit of these bargains only if Kemper was *actually* completed—by May 2014 or shortly thereafter: (1) the IRS tax credits were contingent on the May 2014 COD; (2) the PSC imposed a deadline of May 2014 to recover construction financing costs; (3) without a functional power plant, MPC had to refund SMEPA for its deposit, plus interest; and (4) the contract with Treetop for Kemper's $CO_2$ byproduct could be (and was) terminated if the plant was not operational. *Id.* ¶ 175. Whether the plant was on track in the interim made no difference. Plaintiffs do not allege that Defendants could circumvent any penalties by waiting to revise the estimated COD. Moreover, PSC's approval of a 15% rate increase to cover construction costs was contingent on timely completion of the plant—as demonstrated by the fact that MPC was

26

ordered to repay ratepayers for the increases given the delays and cost overruns. *Id.* ¶ 174. And in fact, because the SMEPA deposit was interest-bearing, there was an incentive to disclose as soon as possible if Kemper would not be operational.

In short, Plaintiffs do not plausibly allege that the supposed fraud (dishonesty regarding progress at Kemper) would enable the fraud's alleged goals. *See In re John Alden Fin. Corp. Sec. Litig.*, 249 F. Supp. 2d 1273, 1282 (S.D. Fla. 2003) (motive allegations did not support scienter where common sense suggested defendants' actions were "wholly inconsistent with the motives Plaintiffs suggest"); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591-92 (S.D.N.Y. 2011) (motive allegations did not create scienter inference where there was no credible argument that challenged statements enabled purported motives).

## B. The Absence Of Alleged Stock Sales Undercuts An Inference Of Scienter

The Eleventh Circuit "has expressly noted that any inference of scienter is particularly weak where, as here, the complaint fails to allege inside stock sales." *In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1359 (N.D. Ga. 2010). Plaintiffs' allegations that Defendants fraudulently concealed that the COD date was unattainable are inconsistent with the fact that not one of them is alleged to have taken advantage of the purportedly inflated stock price before revealing the "truth" publicly. This fact weighs against an inference of scienter. *Mizzaro*, 544

27

F.3d at 1253 ("complaint says nothing about suspicious stock transactions by any of the individual defendants, an omission that weighs against inferring scienter").

### C.    Plaintiffs Fail To Plead Severe Recklessness

Where, as here, Plaintiffs fail to plead motive, "other allegations of scienter must be stronger." *City of Pompano Beach Gen. Emps. Ret. Sys. v. Synovus Fin. Corp.*, No. 1:09-cv-01811-JOF, 2011 WL 13130185, at *26 (N.D. Ga. May 19, 2011). The CC contains no facts from which the Court can infer that Defendants acted with severe recklessness as to the truth or falsity of their statements.

### 1.    Positions And Responsibilities Within The Company Do Not Support Severe Recklessness

Plaintiffs' vague allegations about the Individual Defendants' "positions, and their access to material non-public information available to them" (CC ¶ 28) are insufficient as a matter of law. *See, e.g.*, *Patel v. Patel*, 761 F. Supp. 2d 1375, 1380-81 (N.D. Ga. 2011) ("reliance on the defendants' positions" and "access to internal documents and reports is insufficient to allege a strong inference of scienter"). This conclusion is even more appropriate here, where Plaintiffs do not point to any specific information accessible to the Individual Defendants concluding that interim delays could not be effectively addressed to achieve the May 2014 COD. *See Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1220

(M.D. Fla. 2014) (no inference of scienter absent allegations that reports defendants received contained information contrary to public statements).

Plaintiffs' allegations that Individual Defendants signed Sarbanes Oxley ("SOX") certifications (CC ¶¶ 177-180) are also insufficient because the CC lacks any allegations of red flags regarding the specific problems that led to the revised COD that were ignored by the Defendants who signed the certifications. *See Waterford Township Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*, No. 08-CIV-22572, 2010 WL 1332574, at *18 (S.D. Fla. Mar. 30, 2010) (allegedly false SOX certification was not probative of scienter because plaintiffs failed to allege red flags contemporaneously known to and ignored by the certifying defendants).[8]

### 2.   Plaintiffs' Witness Allegations Are Not Credible Or Sufficient To Support Severe Recklessness

Plaintiffs rely on vague statements attributed to five confidential witnesses ("CWs") and Mr. Wingo.   CC ¶¶ 56-78, 184-185.   None of the allegations—individually or collectively—is sufficient to plead scienter.

*First*, none of the CWs recounts interactions with, let alone personal knowledge of alleged wrongdoing by, any Individual Defendant.   The CWs consist

---

[8] To the extent the CC challenges the SOX certifications as "false" in and of themselves, these claims fail for the same reason that the certifications do not support scienter: there are no allegations that the certifying Defendants knew of but ignored red flags of the problems later disclosed, in contrast to their certifications.

29

of three contract employees, one financial analyst, and one administrative assistant. *Id.* ¶¶ 71, 74-78.  Only one had any first-hand interaction with any Individual Defendant:  CW2 provided "some support" to Defendant Anderson.  *Id.* ¶ 75.  Otherwise, the CWs make only generalized references to their interactions with lower-level Southern and MPC employees.  *See, e.g., id.* ¶¶ 61, 63, 65-68, 74-76, 78.  The observations of lower-level employees who did not report to Defendants and were not privy to strategic decisions at an organizational level are entitled to no weight.  *See Mizzaro*, 544 F.3d at 1248 (discounting CW allegations where the CWs were not alleged to have met any defendant); *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1243 (10th Cir. 2016) (CW's "general reports of delay" of company projects, untied to any defendant, did not support scienter).

*Second*, the allegations from the CWs lack details about the alleged facts actually known to the Individual Defendants.  CW1 (a quality assurance contract employee) refers to reports uploaded to a PIMS system (CC ¶ 74), but does not identify the details of those reports, whether and how Defendants received those reports, what they said, or whether they contradicted Defendants' projections.  *See Plymouth Cty. Ret. Sys. v. Carter's Inc.*, No. 1:08-cv-02940-JOF, 2011 WL 13124501, at *16 (N.D. Ga. Mar. 17, 2011) (rejecting CW allegations that "top executives" had "direct access" to a spreadsheet because the CW did not allege that

the defendants looked at the sheet, or that the sheet contained contradictory data). CW2's (an office coordinator) vague reference to a presentation about Kemper that construction manager Ashley Baker provided to Fanning (CC ¶ 75) similarly lacks any details whatsoever about the presentation's content. *See In re Altisource Portfolio Solutions, S.A. Sec. Litig.*, No. 14-81156 CIV-WPD, 2015 WL 12001262, at *9 (S.D. Fla. Sept. 4, 2015) (CW allegations must "flesh out at least some of the details of the conversations, meetings, and internal documents that they describe"). While certain of the CWs allege generally that some of the Individual Defendants visited Kemper, they do not say what Defendants saw or what was said to them during site visits. *See, e.g.*, CC ¶ 74.  Finally, allegations that employees were under "tremendous pressure" to hit the May 2014 deadline do not support scienter. *See, e.g.*, *id.* ¶¶ 7, 58.  Even if such pressure was interpreted to come from the highest level, it does not establish that any Defendant was severely reckless absent allegations showing that Defendants applied pressure because they knew they could not hit the May COD, as opposed to pushing employees to meet a goal they believed was achievable with hard work. *See Waterford Township*, 2010 WL 1332574, at *15-16 (CW allegations that there was "extreme pressure to hit" numbers and that "Defendants pushed hard for greater loan production" failed to plead an inference of severe recklessness).

31

*Third*, according to Mr. Wingo, delays pertaining to the gasifier in 2012 irrevocably doomed the May 2014 COD (CC ¶¶ 59-72), an opinion that Mr. Wingo shared with three managers in late 2012 or early 2013 (*id.* ¶¶ 65-66) and wrote down in mid-September 2013 when he allegedly created his own schedule—mere *days* before Southern and MPC also concluded that May 2014 was not feasible. *Id.* ¶ 68. Plaintiffs do not allege that Mr. Wingo shared his concerns with any Defendant during the Class Period. Although Mr. Wingo allegedly spoke to Defendant Anderson "on an almost weekly basis" (*id.* ¶ 61), and met with Defendant Huggins in July 2013 (*id.* ¶ 67), the CC does not describe any specifics of their alleged conversations. Similarly, Mr. Wingo alleges that Anderson and Huggins sometimes attended monthly production meetings, and that gasifier delays were discussed at those meetings, but does not allege what was said about the achievability of the May 2014 COD during those meetings. *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1265 (11th Cir. 2006) (attendance at monthly operations meetings was insufficient to support scienter where plaintiff could not establish what was said at the meetings, to whom, and in what context). And according to the NYT Article, Mr. Wingo first reported his concerns to Mr. Fanning in March 2014—five months *after* the Class Period. Ex. 20.

At most, the CWs and Mr. Wingo each offer only a narrow viewpoint of Kemper's schedule or operations to which they were exposed and their subjective beliefs regarding the estimated May 2014 COD, *e.g.*, that the timeline was "crazy" (CW4) or "not realistic" (CW5).  In many instances, their concerns were heard— and dismissed—only by their managers.  *See*, *e.g.*, CC ¶¶ 74, 78.  These personal grievances regarding the daily grind and uninformed opinions regarding the bigger picture do not support an inference that any Defendant's statements were made with severe recklessness.  *See In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d at 1350 (rejecting CW allegations based on their "opinions" where there was no suggestion that defendants shared or endorsed the same view).

### 3. Directives Regarding Public Communications Do Not Show Severe Recklessness

Plaintiffs allege in conclusory fashion that there were Company directives to conceal evidence of fraud or known delays.  CC ¶ 166.  The CC points to just two emails (only one of which came from an Individual Defendant) reminding project managers and engineers to have external communications approved by senior management, and not speculate publicly regarding the Kemper project's status.  *Id.* ¶¶ 167-168.  Plaintiffs' accusation that these were directives to conceal fraud is unsupported by the emails; instructions regarding external communications are standard in any public company and do not support scienter.  *See Sheet Metal*

33

*Workers Local 28 Pension Fund v. Office Depot, Inc.*, No. 07-81038-CIV-HURLEY, 2009 WL 10667541, at *9 (S.D. Fla. Mar. 31, 2009) (directives to employees to "pull all the levers" and "make the numbers" did not support allegation that the instructions ordered fraud).

### 4.   Post-Class Period Events Do Not Support Scienter

Plaintiffs' post-Class Period allegations fail to support an inference of Defendants' scienter during the Class Period.  *First*, the CC briefly mentions a Securities and Exchange Commission ("SEC") investigation concerning the estimated costs and expected in-service date of Kemper.  CC ¶¶ 164-165.  It is well established that the existence of an investigation into potential wrongdoing is insufficient to allege scienter.  *See Mizzaro*, 544 F.3d at 1245 (SEC inquiry failed to create a strong inference of scienter); *Zisholtz v. Suntrust Banks, Inc.*, No. 1:08-CV-1287-TWT, 2009 WL 3132907, at *5 (N.D. Ga. Sept. 24, 2009) (same).

*Second*, Plaintiffs allege that the fact that the Kemper Plant is still not operational is further evidence that Defendants knew or recklessly disregarded that the May 2014 COD was not achievable.  CC ¶¶ 186-89.  But whether the May 2014 target was missed by a day or years is irrelevant.  *See, e.g., In re Republic Services, Inc. Sec. Litig.*, 134 F. Supp. 2d 1355, 1360 (S.D. Fla. 2001) (holding that "magnitude" of error is not sufficient to sustain a claim for securities fraud).  This

argument is impermissible fraud by hindsight.  *See Anderson v. Spirit AeroSystems Holdings, Inc.*, 105 F. Supp. 3d 1246, 1252 (D. Kan. 2015), *aff'd*, 827 F.3d 1229 (10th Cir. 2016) (dismissing as fraud by hindsight claims that defendants falsely proclaimed success at reducing costs despite knowing company had cost overruns).[9]

## IV.   PLAINTIFFS FAIL TO STATE A SECTION 20(a) CLAIM

Because Plaintiffs have not alleged a primary violation of Section 10(b), the Section 20(a) "control person" claims also fail.  *See Thompson*, 610 F.3d at 635-36.  At a minimum, the Section 20(a) claims cannot survive against Huggins, Anderson, Holland, and Day because Plaintiffs have not pleaded any facts showing that they had the "power to control the general affairs" of Southern.  *See Mizzaro*, 544 F.3d at 1237; *Thompson*, 610 F.3d at 692 (defendants that did not work for the corporation that allegedly committed securities fraud could not control its general affairs).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Consolidated Complaint with prejudice.

---

[9] Plaintiffs have not adequately pled scienter for any Individual Defendant. Accordingly, they have not pled scienter for Southern.  *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1288-89 (S.D. Fla. 2008) (failure to plead individual defendants' scienter resulted in failure to plead corporate scienter).

Dated: July 27, 2017                            Respectfully submitted,

By:  */s/ Michael J. McConnell*
    Michael J. McConnell
    Ga. Bar No. 485003
    Walter W. Davis
    Ga. Bar No. 213083
    Robert A. Watts
    Ga. Bar No. 793350
    JONES DAY
    1420 Peachtree Street, NE
    Suite 800
    Atlanta, GA 30309-3053
    Telephone: (404) 521-3939
    Facsimile: (404) 581-8330

By:  */s/ Michele D. Johnson*
    Michele D. Johnson
    (*admitted pro hac vice*)
    Kristin N. Murphy
    (*admitted pro hac vice*)
    Latham & Watkins LLP
    650 Town Center Drive, 20th Floor
    Costa Mesa, California 92626
    Telephone: (714) 540-1235
    Facsimile: (714) 755-8290

    Sarah A. Greenfield
    (*pro hac vice* pending)
    Latham & Watkins LLP
    555 Eleventh Street, NW Ste. 1000
    Washington, D.C. 20004
    Telephone: (202) 637-2200
    Facsimile: (202) 637-2201

    *Attorneys for Defendants*

## <u>LOCAL RULE 7.1D CERTIFICATION</u>

Counsel hereby certifies that the text of this memorandum of law (brief) has been prepared with Time New Roman 14 point font, one of the font and point selections approved by the Court in Local Rule 5.1B.

By:  */s/ Michael J. McConnell*
　　　　Michael J. McConnell
　　　　Ga. Bar No. 485003
　　　　Walter W. Davis
　　　　Ga. Bar No. 213083
　　　　Robert A. Watts
　　　　Ga. Bar No. 793350
　　　　JONES DAY
　　　　1420 Peachtree Street, NE, Ste. 800
　　　　Atlanta, GA 30309-3053
　　　　Telephone: (404) 521-3939
　　　　Facsimile: (404) 581-8330

By:  */s/ Michele D. Johnson*
　　　　Michele D. Johnson
　　　　(*admitted pro hac vice*)
　　　　Kristin N. Murphy
　　　　(*admitted pro hac vice*)
　　　　Latham & Watkins LLP
　　　　650 Town Center Drive, 20th Floor
　　　　Costa Mesa, California 92626
　　　　Telephone: (714) 540-1235
　　　　Facsimile: (714) 755-8290

　　　　Sarah A. Greenfield
　　　　(*pro hac* pending)
　　　　Latham & Watkins LLP
　　　　555 Eleventh Street, NW Ste. 1000
　　　　Washington, D.C. 20004
　　　　Telephone: (202) 637-2200
　　　　Facsimile: (202) 637-2201
　　　　*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 27, 2017, I electronically filed the foregoing Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Complaint with the Clerk of the Court using CM/ECF, which will deliver the document to all counsel of record who have appeared in the action.

By:  */s/ Michael J. McConnell*
       Michael J. McConnell
       Ga. Bar No. 485003
       Walter W. Davis
       Ga. Bar No. 213083
       Robert A. Watts
       Ga. Bar No. 793350