# EXHIBIT 31

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

þ    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal Year Ended December 31, 2012**

OR

¨    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Transition Period from          to**

| Commission File Number | Registrant, State of Incorporation, Address and Telephone Number | I.R.S. Employer Identification No. |
|---|---|---|
| 1-3526 | **The Southern Company**<br>(A Delaware Corporation)<br>30 Ivan Allen Jr. Boulevard, N.W.<br>Atlanta, Georgia 30308<br>(404) 506-5000 | 58-0690070 |
| 1-3164 | **Alabama Power Company**<br>(An Alabama Corporation)<br>600 North 18th Street<br>Birmingham, Alabama 35291<br>(205) 257-1000 | 63-0004250 |
| 1-6468 | **Georgia Power Company**<br>(A Georgia Corporation)<br>241 Ralph McGill Boulevard, N.E.<br>Atlanta, Georgia 30308<br>(404) 506-6526 | 58-0257110 |
| 001-31737 | **Gulf Power Company**<br>(A Florida Corporation)<br>One Energy Place<br>Pensacola, Florida 32520<br>(850) 444-6111 | 59-0276810 |
| 001-11229 | **Mississippi Power Company**<br>(A Mississippi Corporation)<br>2992 West Beach Boulevard<br>Gulfport, Mississippi 39501<br>(228) 864-1211 | 64-0205820 |
| 333-98553 | **Southern Power Company**<br>(A Delaware Corporation)<br>30 Ivan Allen Jr. Boulevard, N.W.<br>Atlanta, Georgia 30308 | 58-2598670 |

| Mississippi Power Company | Without Par Value | 1,121,000 |
| Southern Power Company | Par Value $0.01 Per Share | 1,000 |

Documents incorporated by reference: specified portions of The Southern Company's Definitive Proxy Statement on Schedule 14A relating to the 2013 Annual Meeting of Stockholders are incorporated by reference into PART III. In addition, specified portions of the Definitive Information Statements on Schedule 14C of Alabama Power Company, Georgia Power Company, and Mississippi Power Company relating to each of their respective 2013 Annual Meetings of Shareholders are incorporated by reference into PART III.

Southern Power Company meets the conditions set forth in General Instructions I(1)(a) and (b) of Form 10-K and is therefore filing this Form 10-K with the reduced disclosure format specified in General Instructions I(2)(b), (c), and (d) of Form 10-K.

This combined Form 10-K is separately filed by The Southern Company, Alabama Power Company, Georgia Power Company, Gulf Power Company, Mississippi Power Company, and Southern Power Company. Information contained herein relating to any individual company is filed by such company on its own behalf. Each company makes no representation as to information relating to the other companies.

Table of Contents          Index to Financial Statements

# Table of Contents

| | | Page |
|---|---|---|
| | **PART I** | |
| Item 1 | Business | I-1 |
| | The Southern Company System | I-1 |
| | Construction Programs | I-4 |
| | Financing Programs | I-5 |
| | Fuel Supply | I-5 |
| | Territory Served by the Traditional Operating Companies and Southern Power | I-5 |
| | Competition | I-7 |
| | Seasonality | I-8 |
| | Regulation | I-8 |
| | Rate Matters | I-10 |
| | Employee Relations | I-13 |
| Item 1A | Risk Factors | I-14 |
| Item 1B | Unresolved Staff Comments | I-28 |
| Item 2 | Properties | I-29 |
| Item 3 | Legal Proceedings | I-35 |
| Item 4 | Mine Safety Disclosures | I-35 |
| | Executive Officers of Southern Company | I-36 |
| | Executive Officers of Alabama Power | I-38 |
| | Executive Officers of Georgia Power | I-39 |
| | Executive Officers of Mississippi Power | I-40 |
| | **PART II** | |
| Item 5 | Market for Registrants' Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | II-1 |
| Item 6 | Selected Financial Data | II-3 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | II-4 |
| Item 7A | Quantitative and Qualitative Disclosures about Market Risk | II-4 |
| Item 8 | Financial Statements and Supplementary Data | II-5 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | II-7 |
| Item 9A | Controls and Procedures | II-7 |
| Item 9B | Other Information | II-7 |
| | **PART III** | |
| Item 10 | Directors, Executive Officers and Corporate Governance | III-1 |
| Item 11 | Executive Compensation | III-4 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | III-40 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | III-41 |
| Item 14 | Principal Accountant Fees and Services | III-43 |

**PART IV**

| Item 15 | Exhibits and Financial Statement Schedules | IV-1 |
| | Signatures | IV-2 |

Table of Contents          Index to Financial Statements

## DEFINITIONS

When used in Items 1 through 5 and Items 9A through 15, the following terms will have the meanings indicated.

| Term | Meaning |
|---|---|
| 2010 ARP | Alternative Rate Plan approved by the Georgia PSC for Georgia Power for the years 2011 through 2013 |
| Alabama Power | Alabama Power Company |
| Clean Air Act | Clean Air Act Amendments of 1990 |
| Code | Internal Revenue Code of 1986, as amended |
| CPCN | Certificate of Public Convenience and Necessity |
| CWIP | Construction Work in Progress |
| Dalton | Dalton Utilities |
| DOE | United States Department of Energy |
| EPA | United States Environmental Protection Agency |
| FERC | Federal Energy Regulatory Commission |
| FMPA | Florida Municipal Power Agency |
| Georgia Power | Georgia Power Company |
| Gulf Power | Gulf Power Company |
| IBEW | International Brotherhood of Electrical Workers |
| IGCC | Integrated Coal Gasification Combined Cycle |
| IIC | Intercompany Interchange Contract |
| IPP | Independent Power Producer |
| IRP | Integrated Resource Plan |
| Kemper IGCC | IGCC facility under construction in Kemper County, Mississippi |
| KUA | Kissimmee Utility Authority |
| KW | Kilowatt |
| KWH | Kilowatt-hour |
| MATS rule | Mercury and Air Toxics Standards rule |
| MEAG Power | Municipal Electric Authority of Georgia |
| Mississippi Power | Mississippi Power Company |
| MW | Megawatt |
| NRC | Nuclear Regulatory Commission |
| OPC | Oglethorpe Power Corporation |
| OUC | Orlando Utilities Commission |
| Plant Vogtle Units 3 and 4 | Two new nuclear generating units under construction at Plant Vogtle |
| power pool | The operating arrangement whereby the integrated generating resources of the traditional operating companies and Southern Power are subject to joint commitment and dispatch in order to serve their combined load obligations |
| PowerSouth | PowerSouth Energy Cooperative |
| PPA | Power Purchase Agreement |

Table of Contents          Index to Financial Statements

## DEFINITIONS
(continued)

| Term | Meaning |
|---|---|
| Progress Energy Florida | Florida Power Corporation, d/b/a Progress Energy Florida, Inc. |
| PSC | Public Service Commission |
| registrants | Southern Company, Alabama Power, Georgia Power, Gulf Power, Mississippi Power, and Southern Power |
| RUS | Rural Utilities Service (formerly Rural Electrification Administration) |
| SCS | Southern Company Services, Inc. (the system service company) |
| SEC | Securities and Exchange Commission |
| SEGCO | Southern Electric Generating Company |
| SEPA | Southeastern Power Administration |
| SERC | Southeastern Electric Reliability Council |
| SMEPA | South Mississippi Electric Power Association |
| Southern Company | The Southern Company |
| Southern Company system | Southern Company, the traditional operating companies, Southern Power, SEGCO, Southern Nuclear, SCS, SouthernLINC Wireless, and other subsidiaries |
| Southern Holdings | Southern Company Holdings, Inc. |
| SouthernLINC Wireless | Southern Communications Services, Inc. |
| Southern Nuclear | Southern Nuclear Operating Company, Inc. |
| Southern Power | Southern Power Company |
| traditional operating companies | Alabama Power, Georgia Power, Gulf Power, and Mississippi Power |

iii

Table of Contents          Index to Financial Statements

## CAUTIONARY STATEMENT REGARDING
## FORWARD-LOOKING INFORMATION

This Annual Report on Form 10-K contains forward-looking statements. Forward-looking statements include, among other things, statements concerning retail sales, retail rates, the strategic goals for the wholesale business, customer growth, economic recovery, fuel and environmental cost recovery and other rate actions, current and proposed environmental regulations and related estimated expenditures, access to sources of capital, dividend payout ratios, projections for the qualified pension plan, postretirement benefit plan, and nuclear decommissioning trust fund contributions, financing activities, start and completion dates of construction projects, plans and estimated costs for new generation resources, filings with state and federal regulatory authorities, impact of the Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010, impact of the American Taxpayer Relief Act of 2012, estimated sales and purchases under new power sale and purchase agreements, and estimated construction and other expenditures. In some cases, forward-looking statements can be identified by terminology such as "may," "will," "could," "should," "expects," "plans," "anticipates," "believes," "estimates," "projects," "predicts," "potential," or "continue" or the negative of these terms or other similar terminology. There are various factors that could cause actual results to differ materially from those suggested by the forward-looking statements; accordingly, there can be no assurance that such indicated results will be realized. These factors include:

- the impact of recent and future federal and state regulatory changes, including legislative and regulatory initiatives regarding deregulation and restructuring of the electric utility industry, environmental laws including regulation of water, coal combustion byproducts, and emissions of sulfur, nitrogen, carbon, soot, particulate matter, hazardous air pollutants, including mercury, and other substances, financial reform legislation, and also changes in tax and other laws and regulations to which Southern Company and its subsidiaries are subject, as well as changes in application of existing laws and regulations;

- current and future litigation, regulatory investigations, proceedings, or inquiries, including the pending EPA civil actions against certain Southern Company subsidiaries, FERC matters, and Internal Revenue Service and state tax audits;

- the effects, extent, and timing of the entry of additional competition in the markets in which Southern Company's subsidiaries operate;

- variations in demand for electricity, including those relating to weather, the general economy and recovery from the recent recession, population and business growth (and declines), the effects of energy conservation measures, and any potential economic impacts resulting from federal fiscal decisions;

- available sources and costs of fuels;

- effects of inflation;

- ability to control costs and avoid cost overruns during the development and construction of facilities, including the development and construction of facilities with designs that have not been finalized or previously constructed, to construct facilities in accordance with the requirements of permits and licenses, and to satisfy any operational and environmental performance standards, including the requirements of tax credits and other incentives;

- investment performance of Southern Company's employee benefit plans and nuclear decommissioning trust funds;

- advances in technology;

- state and federal rate regulations and the impact of pending and future rate cases and negotiations, including rate actions relating to fuel and other cost recovery mechanisms;

- regulatory approvals and actions related to Plant Vogtle Units 3 and 4, including Georgia PSC approvals, NRC actions, and potential DOE loan guarantees;

- regulatory approvals and legislative actions related to the Kemper IGCC, including Mississippi PSC approvals and legislation relating to cost recovery for the Kemper IGCC, the SMEPA purchase decision, satisfaction of requirements to utilize investment tax credits and grants, and the outcome of any proceedings regarding the Mississippi PSC's issuance of the CPCN for the Kemper IGCC;

- the inherent risks involved in operating and constructing nuclear generating facilities, including environmental, health, regulatory, natural disaster, terrorism, and financial risks;

- the performance of projects undertaken by the non-utility businesses and the success of efforts to invest in and develop new opportunities;

- internal restructuring or other restructuring options that may be pursued;

iv"

**Table of Contents**                    **Index to Financial Statements**

- potential business strategies, including acquisitions or dispositions of assets or businesses, which cannot be assured to be completed or beneficial to Southern Company or its subsidiaries;

- the ability of counterparties of Southern Company and its subsidiaries to make payments as and when due and to perform as required;

- the ability to obtain new short- and long-term contracts with wholesale customers;

- the direct or indirect effect on the Southern Company system's business resulting from terrorist incidents and the threat of terrorist incidents, including cyber intrusion;

- interest rate fluctuations and financial market conditions and the results of financing efforts, including Southern Company's and its subsidiaries' credit ratings;

- the impacts of any potential U.S. credit rating downgrade or other sovereign financial issues, including impacts on interest rates, access to capital markets, impacts on currency exchange rates, counterparty performance, and the economy in general, as well as potential impacts on the availability or benefits of proposed DOE loan guarantees;

- the ability of Southern Company and its subsidiaries to obtain additional generating capacity at competitive prices;

- catastrophic events such as fires, earthquakes, explosions, floods, hurricanes, droughts, pandemic health events such as influenzas, or other similar occurrences;

- the direct or indirect effects on the Southern Company system's business resulting from incidents affecting the U.S. electric grid or operation of generating resources;

- the effect of accounting pronouncements issued periodically by standard setting bodies; and

- other factors discussed elsewhere herein and in other reports filed by the registrants from time to time with the SEC.

**The registrants expressly disclaim any obligation to update any forward-looking statements.**

v"

**Table of Contents**                    **Index to Financial Statements**

**PART I**

**Item 1.   BUSINESS**

Southern Company was incorporated under the laws of Delaware on November 9, 1945. Southern Company is registered and qualified to do business under the laws of Georgia and is qualified to do business as a foreign corporation under the laws of Alabama. Southern Company owns all of the outstanding common stock of Alabama Power, Georgia Power, Gulf Power, and Mississippi Power, each of which is an operating public utility company. The traditional operating companies supply electric service in the states of Alabama, Georgia, Florida, and Mississippi. More particular information relating to each of the traditional operating companies is as follows:

*Alabama Power* is a corporation organized under the laws of the State of Alabama on November 10, 1927, by the consolidation of a predecessor Alabama Power Company, Gulf Electric Company, and Houston Power Company. The predecessor Alabama Power Company had been in continuous existence since its incorporation in 1906.

Table of Contents                                    Index to Financial Statements

challenges and cannot be determined at this time.

For information regarding Mississippi Power's construction of the Kemper IGCC, see MANAGEMENT'S DISCUSSION AND ANALYSIS – FUTURE EARNINGS POTENTIAL – "Integrated Coal Gasification Combined Cycle" of Mississippi Power in Item 7 herein and Note 3 to the financial statements of Southern Company and Mississippi Power under "Integrated Coal Gasification Combined Cycle" in Item 8 herein.

For information regarding certain legal challenges to the Baseload Act, see Note 3 to the financial statements of Southern Company and Mississippi Power under "Integrated Coal Gasification Combined Cycle – Baseload Act" in Item 8 herein.

The ultimate outcome of these matters cannot be determined at this time.

**Employee Relations**

The Southern Company system had a total of 26,439 employees on its payroll at December 31, 2012.

|  | Employees at December 31, 2012 |
|---|---|
| Alabama Power | 6,778 |
| Georgia Power | 8,094 |
| Gulf Power | 1,416 |
| Mississippi Power | 1,281 |
| SCS | 4,516 |
| Southern Nuclear | 4,077 |
| Southern Power* | 0 |
| Other | 277 |
| Total | 26,439 |

\*      Southern Power has no employees. Southern Power has agreements with SCS and the traditional operating companies whereby employee services are rendered at amounts in compliance with FERC regulations.

The traditional operating companies have separate agreements with local unions of the IBEW generally covering wages, working conditions, and procedures for handling grievances and arbitration. These agreements apply with certain exceptions to operating, maintenance, and construction employees.

Alabama Power has an agreement with the IBEW covering wages and working conditions, which is in effect through August 15, 2014.

Georgia Power has an agreement with the IBEW covering wages and working conditions, which is in effect through June 30, 2016.

Gulf Power has an agreement with the IBEW covering wages and working conditions, which is in effect through September 14, 2014.

Mississippi Power has an agreement with the IBEW covering wages and working conditions, which is in effect through August 15, 2014. On February 11, 2013, Mississippi Power signed an agreement with the IBEW related to the Kemper IGCC, which is in effect through March 15, 2016.

Southern Nuclear has an agreement with the IBEW covering certain employees at Plants Hatch and Vogtle which is in effect through June 30, 2016. A five-year agreement between Southern Nuclear and the IBEW representing certain employees at Plant Farley is in effect through August 15, 2014.

The agreements also make the terms of the pension plans for the companies discussed above subject to collective bargaining with the unions at either a five-year or a 10-year cycle, depending upon union and company actions.

Table of Contents                                    Index to Financial Statements

# Item 1A. RISK FACTORS

**In addition to the other information in this Form 10-K, including MANAGEMENT'S DISCUSSION AND ANALYSIS – FUTURE EARNINGS POTENTIAL in Item 7 of each registrant, and other documents filed by Southern Company and/or its subsidiaries with the SEC from time to time, the following factors should be carefully considered in evaluating Southern Company and its subsidiaries. Such factors could affect actual results and cause results to differ materially from those expressed in any forward-looking statements made by, or on behalf of, Southern Company and/or its subsidiaries.**

has coal supply contracts in place; however, there can be no assurance that the counterparties to these agreements will fulfill their obligations to supply coal to the traditional operating companies. The suppliers under these agreements may experience financial or technical problems which inhibit their ability to fulfill their obligations to the traditional operating companies. In addition, the suppliers under these agreements may not be required to supply coal to the traditional operating companies under certain circumstances, such as in the event of a natural disaster. If the traditional operating companies are unable to obtain their coal requirements under these contracts, the traditional operating companies may be required to purchase their coal requirements at higher prices, which may not be fully recoverable through rates.

In addition, the traditional operating companies and Southern Power to a greater extent are dependent on natural gas for a portion of their electric generating capacity. In many instances, the cost of purchased power for the traditional operating companies and Southern Power is influenced by natural gas prices. Historically, natural gas prices have been more volatile than prices of other fuels. In recent years, domestic natural gas prices have been depressed by robust supplies, including production from shale gas, as well as lower demand. These market conditions, together with additional regulation of coal-fired generating units, have increased the traditional operating companies' reliance on natural gas-fired generating units.

Natural gas supplies can be subject to disruption in the event production or distribution is curtailed, such as in the event of a hurricane. The availability of shale gas and potential regulations affecting its accessibility may have a material impact on the supply and cost of natural gas.

I-18

Table of Contents                    Index to Financial Statements

In addition, world market conditions for fuels can impact the cost and availability of natural gas, coal, and uranium.

**The revenues of Southern Company, the traditional operating companies, and Southern Power depend in part on sales under PPAs. The failure of a counterparty to one of these PPAs to perform its obligations, or the failure to renew the PPAs, could have a negative impact on the net income and cash flows of the affected traditional operating company or Southern Power and of Southern Company.**

Most of Southern Power's generating capacity has been sold to purchasers under PPAs. In addition, the traditional operating companies enter into PPAs with non-affiliated parties. Revenues are dependent on the continued performance by the purchasers of their obligations under these PPAs. Even though Southern Power and the traditional operating companies have a rigorous credit evaluation process and contractual protections, the failure of one of the purchasers to perform its obligations could have a negative impact on the net income and cash flows of the affected traditional operating company or Southern Power and of Southern Company. Although these credit evaluations and contractual protections take into account the possibility of default by a purchaser, actual exposure to a default by a purchaser may be greater than predicted. Additionally, neither Southern Power nor any traditional operating company can predict whether the PPAs will be renewed at the end of their respective terms or on what terms any renewals may be made. If a PPA is not renewed, a replacement PPA cannot be assured.

**Changes in technology may make Southern Company's electric generating facilities owned by the traditional operating companies and Southern Power less competitive.**

A key element of the business models of Southern Company, the traditional operating companies, and Southern Power is that generating power at central station power plants achieves economies of scale and produces power at a competitive cost. There are distributed generation technologies that produce power, including fuel cells, microturbines, wind turbines, and solar cells. It is possible that advances in technology will reduce the cost of alternative methods of producing power to a level that is competitive with that of most central station power electric production. If these technologies became cost competitive and achieved economies of scale, the market share of the traditional operating companies and Southern Power could be eroded, and the value of their respective electric generating facilities could be reduced. It is also possible that rapid advances in central station power generation technology could reduce the value of the current electric generating facilities owned by the traditional operating companies and Southern Power. Changes in technology could also alter the channels through which electric customers buy or utilize power, which could reduce the revenues or increase the expenses of Southern Company, the traditional operating companies, or Southern Power.

**Failure to attract and retain an appropriately qualified workforce could negatively impact Southern Company's and its subsidiaries' results of operations.**

Events such as an aging workforce without appropriate replacements, mismatch of skill sets to future needs, or unavailability of contract resources may lead to operating challenges or increased costs. Such operating challenges include lack of resources, loss of knowledge, and a lengthy time period associated with skill development, especially with the workforce needs associated with new nuclear and IGCC construction. Failure to hire and adequately obtain replacement employees, including the ability to transfer significant internal historical knowledge and expertise to the new employees, or the future availability and cost of contract labor may adversely affect Southern Company and its subsidiaries' ability to manage and operate their businesses. If Southern Company and its subsidiaries, including the traditional operating companies, are unable to successfully attract and retain an appropriately qualified workforce, results of operations could be negatively impacted.

## CONSTRUCTION RISKS

**Southern Company, the traditional operating companies, and/or Southern Power may incur additional costs or delays in the construction of new**

**plants or other facilities and may not be able to recover their investments. Also, existing facilities of the traditional operating companies and Southern Power require ongoing capital expenditures, including those to meet environmental standards.**

The businesses of the registrants require substantial capital expenditures for investments in new facilities and capital improvements to transmission, distribution, and generation facilities, including those to meet environmental standards. Certain of the traditional operating companies and Southern Power are in the process of constructing new generating facilities and adding environmental controls equipment at existing generating facilities. The Southern Company system intends to continue its strategy of developing and constructing other new facilities, expanding existing facilities, and adding environmental control equipment. These types of projects are long-term in nature and in some cases involve facility designs that have not been

I-19

Table of Contents                    Index to Financial Statements

finalized or previously constructed. The completion of these types of projects without delays or significant cost overruns is subject to substantial risks, including:

- shortages and inconsistent quality of equipment, materials, and labor;

- work stoppages;

- contractor or supplier delay or non-performance under construction or other agreements or non-performance by other major participants in construction projects;

- delays in or failure to receive necessary permits, approvals, and other regulatory authorizations;

- impacts of new and existing laws and regulations, including environmental laws and regulations;

- the outcome of legal challenges to regulatory approvals;

- failure to construct in accordance with licensing requirements;

- continued public and policymaker support for such projects;

- adverse weather conditions;

- unforeseen engineering problems;

- changes in project design or scope;

- environmental and geological conditions;

- delays or increased costs to interconnect facilities to transmission grids; and

- unanticipated cost increases, including materials and labor, and increased financing costs as a result of changes in market interest rates or as a result of construction schedule delays.

In addition, with respect to the construction of new nuclear units and the operation of existing nuclear units, a major incident at a nuclear facility anywhere in the world could cause the NRC to delay or prohibit construction of new nuclear units or require additional safety measures at new and existing units. As a result of the major earthquake and tsunami that struck Japan in March 2011 and caused substantial damage to the nuclear generating units at the Fukushima Daiichi generating plant, the NRC is performing additional operational and safety reviews of nuclear facilities in the U.S., which could potentially impact future operations and capital requirements.

If a traditional operating company or Southern Power is unable to complete the development or construction of a facility or decides to delay or cancel construction of a facility, it may not be able to recover its investment in that facility and may incur substantial cancellation payments under equipment purchase orders or construction contracts. Even if a construction project is completed, the total costs may be higher than estimated and there is no assurance that the traditional operating company will be able to recover such expenditures through regulated rates. In addition, construction delays and contractor performance shortfalls can result in the loss of revenues and may, in turn, adversely affect the net income and financial position of a traditional operating company or Southern Power and of Southern Company.

Construction delays also may result in the loss of otherwise available investment tax credits, production tax credits, and other tax incentives. Furthermore, if construction projects are not completed according to specification, a traditional operating company or Southern Power and Southern Company may incur liabilities and suffer reduced plant efficiency, higher operating costs, and reduced net income.

Once facilities come into commercial operation, ongoing capital expenditures are required to maintain reliable levels of operation. Significant portions of the traditional operating companies' existing facilities were constructed many years ago. Older generation equipment, even if maintained in accordance with good engineering practices, may require significant capital expenditures to maintain efficiency, to comply with changing environmental requirements, or to provide reliable operations.

I-20

**Table of Contents**          **Index to Financial Statements**

The two largest construction projects currently underway in the Southern Company system are the construction of Plant Vogtle Units 3 and 4 and the construction of the Kemper IGCC. Southern Nuclear, on behalf of Georgia Power and the other co-owners, is overseeing the construction of and will operate Plant Vogtle Units 3 and 4 (each, an approximately 1,100 MW AP1000 nuclear generating unit). Georgia Power owns 45.7% of the new units. The NRC certified the Westinghouse Electric Company LLC's Design Certification Document, as amended (DCD), for the AP1000 reactor design, effective December 30, 2011, and issued combined COLs on February 10, 2012. Receipt of the COLs allowed full construction to begin. Separate groups of petitioners have filed petitions in the U.S. Court of Appeals for the District of Columbia Circuit seeking judicial review of the NRC's issuance of the COLs and certification of the DCD. Additional technical and procedural challenges to the construction and licensing of Plant Vogtle Units 3 and 4, at the federal and state level, are expected as construction proceeds.

Georgia Power is required to file semi-annual Vogtle Construction Monitoring (VCM) reports with the Georgia PSC by February 28 and August 31 of each year. Georgia Power's eighth VCM report requests approval for an additional $0.2 billion of construction capital costs incurred through December 31, 2012. If the projected certified construction capital costs are to be borne by Georgia Power increase by 5% or the projected in-service dates are significantly extended, Georgia Power is required to seek an amendment to the Plant Vogtle Units 3 and 4 certificate from the Georgia PSC. Accordingly, the eighth VCM also requests an amendment to the certificate to increase the estimated in-service capital cost of Plant Vogtle Units 3 and 4 to $4.8 billion and to extend the estimated in-service dates to fourth quarter 2017 and fourth quarter 2018 for Plant Vogtle Units 3 and 4, respectively. Associated financing costs during the construction period are estimated to total approximately $2.0 billion.

Georgia Power, OPC, MEAG Power, and the City of Dalton (collectively, the Owners) and Westinghouse Electric Company LLC (Westinghouse) and Stone & Webster, Inc. (Stone & Webster) (collectively, the Contractor) are involved in litigation regarding the costs associated with design changes to the DCD and delays in the timing of approval of the DCD and issuance of the COLs, including the assertion by the Contractor that the Owners are responsible for these costs and that the Contractor is entitled to further schedule extensions. Georgia Power has not agreed with either the proposed cost or schedule adjustments or that the Owners have any responsibility for costs related to these issues. While litigation has commenced and Georgia Power intends to vigorously defend its positions, Georgia Power expects negotiations with the Contractor to continue with respect to costs and schedule during which negotiations the parties may reach a mutually acceptable compromise of their positions.

In addition, there are processes in place that are designed to assure compliance with the requirements specified in the DCD and COLs, including rigorous inspections by Southern Nuclear and the NRC that occur throughout construction. License amendment requests are pending with the NRC to address a few non-safety significant deviations that were identified in the fourth quarter of 2012 with respect to the rebar design for the Plant Vogtle Unit 3 nuclear island. Various design and other issues are expected to arise as construction proceeds, which may result in additional license amendments or require other resolution. If any license amendment requests are not resolved in a timely manner, there may be delays in the project schedule that could result in increased costs either to the Owners, the Contractor, or both.

As construction continues, additional delays in the fabrication and assembly of structural modules or the failure of such modules to meet applicable standards, or other issues may further impact project schedule and costs. Additional claims by the Contractor or Georgia Power (on behalf of the Owners) are also likely to arise throughout construction. These claims may be resolved through formal and informal dispute resolution procedures under the Vogtle 3 and 4 Agreement, but also may be resolved through litigation.

In addition, Mississippi Power is constructing the Kemper IGCC. Mississippi Power and SMEPA are parties to an amended Asset Purchase Agreement whereby SMEPA agreed to purchase a 15% undivided interest in the Kemper IGCC. The closing of this transaction is conditioned upon execution of a joint ownership and operating agreement, receipt of all construction permits, appropriate regulatory approvals, financing, and other conditions.

The Mississippi PSC originally approved Mississippi Power's request for a CPCN for the construction of the Kemper IGCC in 2010. Following judicial proceedings relating to its original order, the Mississippi PSC issued a detailed order (2012 MPSC Order) confirming the CPCN for the Kemper IGCC. On April 26, 2012, the Sierra Club appealed the 2012 MPSC Order to the Chancery Court of Harrison County, Mississippi (Chancery Court). On December 17, 2012, the Chancery Court affirmed the 2012 MPSC Order which confirmed the issuance of the CPCN for the Kemper IGCC. On January 8, 2013, the Sierra Club filed an appeal of the Chancery Court's ruling with the Mississippi Supreme Court. Additional judicial challenges that may impact the Kemper IGCC are pending, including a challenge of the constitutionality of the Baseload Act that is pending before the Mississippi Supreme Court.

The certificated cost estimate of the Kemper IGCC included in the 2012 MPSC Order was $2.4 billion, net of $245.3 million of grants awarded to the project by the DOE under the Clean Coal Power Initiative Round 2 (CCPI2) and excluding the cost of the

I-21

**Table of Contents**          **Index to Financial Statements**

lignite mine and equipment, the cost of the $CO_2$ pipeline facilities, and financing costs related to the Kemper IGCC. The 2012 MPSC Order approved a construction cost cap of up to $2.88 billion, with recovery of prudently-incurred costs subject to approval by the Mississippi PSC. Exemptions from the cost cap included in the 2012 Mississippi PSC Order included the cost of the lignite mine and equipment, the cost of the $CO_2$ pipeline facilities, financing costs, and certain general exceptions, including change of law, force majeure, and beneficial capital (which exists when Mississippi Power demonstrates that the purpose and effect of the construction cost increase is to produce efficiencies that will result in a neutral or favorable effect on the ratepayers, relative to the original proposal for the CPCN).

Mississippi Power's current cost estimate for the Kemper IGCC (net of the $245.3 million CCPI2 grant, and excluding the cost of the lignite mine and equipment, the cost of the $CO_2$ pipeline facilities, financing costs, and certain general exceptions as contemplated in the 2012 Mississippi PSC Order and the settlement agreement between Mississippi Power and the Mississippi PSC entered into on January 24, 2013 (Settlement Agreement) that must be specifically approved by the Mississippi PSC) is approximately $2.88 billion. While Mississippi Power continues to believe its cost estimate and schedule projection remain appropriate based on the current status of the project, it is possible that Mississippi Power could experience further cost increases and/or schedule delays with respect to the Kemper IGCC. Certain factors have caused and may continue to cause the costs for the Kemper IGCC to increase and/or schedule delays to occur including, but not limited to, costs and productivity of labor, adverse weather conditions, shortages and inconsistent quality of equipment, materials, and labor, contractor or supplier delay or non-performance under construction or other agreements, and unforeseen engineering problems. To the extent it becomes probable that costs beyond any permitted exceptions to the cost cap will exceed $2.88 billion or it becomes probable that the Mississippi PSC will disallow a portion of the costs relating to the Kemper IGCC, including certain general exceptions as contemplated in the 2012 Mississippi PSC order and the Settlement Agreement, charges to expense may occur and these charges could be material.

The 2012 MPSC Order included provisions relating to both Mississippi Power's recovery of financing costs during the course of construction of the Kemper IGCC and Mississippi Power's recovery of costs following the in-service date of the Kemper IGCC. On June 22, 2012, the Mississippi PSC denied Mississippi Power's proposed Certificated New Plant-A (CNP-A) rate schedule and the 2012 rate recovery filings submitted by Mississippi Power which provided for recovery of financing costs during 2012, pending a final ruling from the Mississippi Supreme Court regarding the Sierra Club's appeal of the Mississippi PSC's issuance of the CPCN for the Kemper IGCC. On July 9, 2012, Mississippi Power appealed the Mississippi PSC's June 22, 2012 decision to the Mississippi Supreme Court and requested interim rates under bond of $55.3 million.

On January 24, 2013, Mississippi Power and the Mississippi PSC entered into a Settlement Agreement that (1) establishes the process for resolving matters regarding cost recovery related to the Kemper IGCC for the purpose of mitigating risks to Mississippi Power and its customers and expediting the regulatory process associated with future rate filings required under the Settlement Agreement and (2) resolves Mississippi Power's CNP-A rate appeal before the Mississippi Supreme Court.

On February 12, 2013, the Mississippi Supreme Court granted Mississippi Power and the Mississippi PSC's joint filing for dismissal of Mississippi Power's appeal of the Mississippi PSC's June 22, 2012 decision.

Under the terms of the Settlement Agreement, Mississippi Power and the Mississippi PSC will follow certain agreed-upon regulatory procedures and schedules for resolving the cost recovery matters related to the Kemper IGCC. These procedures and schedules include the following: (1) Mississippi Power's filing within 30 days of the Settlement Agreement of a new request to increase rates in 2013 in an amount not to exceed a $172 million annual revenue requirement, based upon projected investment as of December 31, 2013, to be recorded to a regulatory liability to be used to mitigate rate impacts when the Kemper IGCC is placed in service (which filing for $172 million was made on January 25, 2013); (2) the Mississippi PSC's decision on that matter within 50 days of Mississippi Power's request; (3) Mississippi Power's collaboration with the Mississippi Public Utilities Staff to file with the Mississippi PSC within three months of the Settlement Agreement a rate recovery plan for the Kemper IGCC for the first seven years of its operation, along with a proposed revenue requirement under such plan for 2014 through 2020 (which filing was made on February 26, 2013 as described below); (4) the Mississippi PSC's decision on the rate recovery plan within four months of the filing; (5) Mississippi Power's agreement to limit the portion of prudently-incurred Kemper IGCC costs to be included in rate base to the $2.4 billion certificated cost estimate, plus costs related to the lignite mine and $CO_2$ pipeline as well as any other costs permitted or determined to be excluded from the cost cap, provided that this limitation will not prevent Mississippi Power from securing alternate financing to recover any prudently-incurred Kemper IGCC costs, including financing costs and plant costs above the $2.4 billion certificated cost estimate, not otherwise recovered in any Mississippi PSC rate proceeding contemplated by the Settlement Agreement; and (6) the Mississippi PSC's completion of its prudence review of the Kemper IGCC costs incurred through 2012 within six months of the Settlement Agreement, an additional prudence review upon considering the seven-year rate plan for costs incurred through the most recent reporting period, and a final prudence review of the remaining project costs within six months of the Kemper IGCC's in-service date.

I-22

**Table of Contents**          **Index to Financial Statements**

Legislation to authorize a multi-year rate plan and legislation to provide for alternate financing through securitization was passed in the Mississippi legislature and was signed by the Governor on February 26, 2013. Mississippi Power contemplates using securitization as provided in the legislation as its form of alternate financing for prudently-incurred Kemper IGCC costs, including financing costs and plant costs above the $2.4 billion certificated cost estimate, not otherwise recovered in any Mississippi PSC rate proceeding contemplated by the Settlement Agreement.

On February 26, 2013, Mississippi Power in compliance with the Settlement Agreement, filed with the Mississippi PSC a rate recovery plan for the Kemper IGCC for 2014 through 2020, the first seven years of operation of the Kemper IGCC. The rate recovery plan proposes recovery of an annual

revenue requirement of approximately $150 million of Kemper IGCC-related operational costs and rate base amounts, including plant costs equal to the $2.4 billion certificated cost estimate. Approval of Mississippi Power's request to increase rates in 2013 to mitigate the rate impacts of the Kemper IGCC filed on January 25, 2013 is integral to the rate recovery plan as the proposed filing contemplates amortization of the regulatory liability to be used to mitigate rate impacts from 2014 through 2020, based on a fixed amortization schedule that requires approval by the Mississippi PSC. Under the rate recovery plan filing, Mississippi Power proposes annual recovery to remain the same from 2014 through 2020 and, while it is the intent of Mississippi Power for the actual revenue requirement to equal the proposed revenue requirement for certain items, Mississippi Power proposes that the annual differences for those items through 2020 will be deferred, subject to accrual of carrying costs, and the cumulative balance will be reviewed at the end of the term of the Settlement Agreement by the Mississippi PSC for determination of the manner of the recovery. Mississippi Power proposes to secure recovery of prudently-incurred Kemper IGCC costs, including financing costs and plant costs above the $2.4 billion certificated cost estimate, not otherwise recovered in any Mississippi PSC rate proceeding contemplated by the Settlement Agreement to be provided for with alternate financing through securitization. The rate recovery necessary to recover the annual costs of securitization is proposed to be filed and begin after the Kemper IGCC is placed in service.

Under the terms of the Settlement Agreement, Mississippi Power has the right to terminate the Settlement Agreement if certain conditions, including the passage of multi-year rate plan legislation that is contemplated under the Settlement Agreement, are not met, if Mississippi Power is unable to secure alternate financing for any prudently-incurred Kemper IGCC costs not otherwise recovered in any Mississippi PSC rate proceeding contemplated by the Settlement Agreement, or if the Mississippi PSC fails to comply with the requirements of the Settlement Agreement.

The ultimate outcome of these matters, including the determinations of prudency and the specific manner of recovery of prudently-incurred costs, is subject to further legislative and regulatory actions and cannot be determined at this time.

## FINANCIAL, ECONOMIC, AND MARKET RISKS

**The generation operations and energy marketing operations of Southern Company, the traditional operating companies, and Southern Power are subject to risks, many of which are beyond their control, including changes in power prices and fuel costs, that may reduce Southern Company's, the traditional operating companies', and/or Southern Power's revenues and increase costs.**

The generation operations and energy marketing operations of the Southern Company system are subject to changes in power prices or fuel costs, which could increase the cost of producing power or decrease the amount received from the sale of power. The market prices for these commodities may fluctuate significantly over relatively short periods of time. In addition, the proportion of natural gas generation to the total fuel mix is likely to increase in the future. The Southern Company system attempts to mitigate risks associated with fluctuating fuel costs by passing these costs on to customers through the traditional operating companies' fuel cost recovery clauses or through PPAs. Among the factors that could influence power prices and fuel costs are:

- prevailing market prices for coal, natural gas, uranium, fuel oil, biomass, and other fuels used in the generation facilities of the traditional operating companies and Southern Power, including associated transportation costs, and supplies of such commodities;

- demand for energy and the extent of additional supplies of energy available from current or new competitors;

- liquidity in the general wholesale electricity market;

- weather conditions impacting demand for electricity;

- seasonality;

I-23

Table of Contents          Index to Financial Statements

- transmission or transportation constraints or inefficiencies;

- availability of competitively priced alternative energy sources;

- forced or unscheduled plant outages for the Southern Company system, its competitors, or third party providers;

- the financial condition of market participants;

- the economy in the service territory, the nation, and worldwide, including the impact of economic conditions on demand for electricity and the demand for fuels;

- natural disasters, wars, embargos, acts of terrorism, and other catastrophic events; and

- federal, state, and foreign energy and environmental regulation and legislation.

Company Generation, a business unit of Southern Company, and Executive Vice President of SCS from May 2007 through January 2008.

**W. Craig Barrs**
Executive Vice President
Age 55
Elected in 2008. Executive Vice President of External Affairs since January 2010. Previously served as Senior Vice President of External Affairs from January 2009 to January 2010, Vice President of Governmental and Regulatory Affairs from April 2008 to December 2008, and Vice President of the Coastal Region from August 2006 to March 2008.

**Ronnie R. Labrato**
Executive Vice President, Chief Financial Officer, and Treasurer (to retire effective March 31, 2013)
Age 59
Elected in 2009. Executive Vice President, Chief Financial Officer, and Treasurer since April 2009. Previously served as Vice President of Internal Auditing at SCS from April 2008 to March 2009 and Vice President and Chief Financial Officer of Gulf Power from July 2001 to March 2008.

**Joseph A. Miller**
Executive Vice President
Age 51
Elected in 2009. Executive Vice President of Nuclear Development since May 2009. He also has served as Executive Vice President of Nuclear Development at Southern Nuclear since February 2006.

**Anthony L. Wilson**
Executive Vice President
Age 48
Elected in 2011. Executive Vice President of Customer Service and Operations since January 1, 2012. Previously served as Vice President of Transmission from November 2009 to December 2011 and Vice President of Distribution from February 2007 to November 2009.

**Thomas P. Bishop**
Senior Vice President, Chief Compliance Officer, General Counsel, and Corporate Secretary
Age 52
Elected in 2008. Corporate Secretary since April 2011 and Senior Vice President, Chief Compliance Officer, and General Counsel since September 2008. Previously served as Vice President and Associate General Counsel for SCS from July 2004 to September 2008.

**John L. Pemberton**
Senior Vice President and Senior Production Officer
Age 42
Elected in 2012. Senior Vice President and Senior Production Officer since July 1, 2012. Previously served as Senior Vice President and General Counsel for SCS and Southern Nuclear from June 2010 to July 2012 and Vice President of Governmental Affairs for SCS from August 2006 to June 2010.

The officers of Georgia Power were elected for a term running from the meeting of the directors held on May 16, 2012 for one year or until their successors are elected and have qualified, except for Mr. Pemberton, whose election was effective July 1, 2012.

I-39
"

Table of Contents          Index to Financial Statements

## EXECUTIVE OFFICERS OF MISSISSIPPI POWER

*(Identification of executive officers of Mississippi Power is inserted in Part I in accordance with Regulation S-K, Item 401(b), Instruction 3.) The ages of the officers set forth below are as of December 31, 2012.*

**Edward Day, VI**
President, Chief Executive Officer, and Director
Age 52
Elected in 2010. President, Chief Executive Officer, and Director since August  2010. Previously served as Executive Vice President for Engineering and Construction Services at Southern Company Generation, a business unit of Southern Company, from May 2003 to August 2010.

**Thomas O. Anderson, IV**
Vice President
Age 53
Elected in 2009. Vice President of Generation Development since July 2009. Previously served as Project Director, Mississippi Power Generation Development from March 2008 to July 2009; Project Manager, Southern Power Generation from June 2007 to March 2008; and Generation Development Manager, SCS Generation Development from September 1998 to June 2007.

**John W. Atherton**
Vice President
Age 52

Elected in 2004. Vice President of Corporate Services and Community Relations since October 2012. Previously served as Vice President of External Affairs from January 2005 until October 2012.

**Moses H. Feagin**
Vice President, Treasurer, and Chief Financial Officer
Age 48
Elected in 2010. Vice President, Treasurer, and Chief Financial Officer since August 2010. Previously served as Vice President and Comptroller of Alabama Power from May 2008 to August 2010, and Comptroller of Mississippi Power from March 2005 to May 2008.

**Jeff G. Franklin**
Vice President
Age 45
Elected in 2011. Vice President of Customer Services Organization since August 2011. Previously served as Georgia Power's Vice President of Governmental and Legislative Affairs from January 2011 to July 2011, Vice President of Governmental and Regulatory Affairs from March 2009 to January 2011, Vice President of Sales from July 2008 to April 2009, and Vice President of the Northwest region from February 2005 to June 2008.

**R. Allen Reaves**
Vice President
Age 53

Elected in 2010. Vice President and Senior Production Officer since August 2010. Previously served as Manager of Mississippi Power's Plant Daniel from September 2007 through July 2010 and Site Manager for Southern Power's Plant Franklin from March 2006 to September 2007.

**Billy F. Thornton**
Vice President
Age 52
Elected in 2012. Vice President of Legislative and Regulatory Affairs since October 22, 2012. Previously served as Director of External Affairs from October 2011 until October 2012, Director of Marketing from March 2011 through October 2011, and Major Account Sales Manager from June 2006 to March 2011.

The officers of Mississippi Power were elected for a term running from the meeting of the directors held on April 24, 2012 for one year or until their successors are elected and have qualified, except for Mr. Thornton, whose election was effective October 22, 2012.

I-40

[Table of Contents]   [Index to Financial Statements]

**PART II**

**Item 5.  MARKET FOR REGISTRANTS' COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

(a)(1) The common stock of Southern Company is listed and traded on the New York Stock Exchange. The common stock is also traded on regional exchanges across the United States. The high and low stock prices as reported on the New York Stock Exchange for each quarter of the past two years were as follows:

|  | High | | Low | |
|---|---|---|---|---|
| **2012** | | | | |
| First Quarter | $ | 46.06 | $ | 43.71 |
| Second Quarter | | 48.45 | | 44.22 |
| Third Quarter | | 48.59 | | 44.64 |
| Fourth Quarter | | 47.09 | | 41.75 |
| **2011** | | | | |
| First Quarter | $ | 38.79 | $ | 36.51 |
| Second Quarter | | 40.87 | | 37.43 |
| Third Quarter | | 43.09 | | 35.73 |
| Fourth Quarter | | 46.69 | | 41.00 |

There is no market for the other registrants' common stock, all of which is owned by Southern Company.

(a)(2) Number of Southern Company's common stockholders of record at January 31, 2013: 149,136

Each of the other registrants have one common stockholder, Southern Company.

(a)(3) Dividends on each registrant's common stock are payable at the discretion of their respective board of directors. The dividends on common stock declared by Southern Company and the traditional operating companies to their stockholder(s) for the past two years were as follows:

years only.

(c)   For additional information, see Notes 1 and 11 to the financial statements.

(d)   The timing related to the realization of $65 million in unrecognized tax benefits in individual years beyond 12 months cannot be reasonably and reliably estimated due to uncertainties in the timing of the effective settlement of tax positions. See Note 5 to the financial statements under "Unrecognized Tax Benefits" for additional information.

(e)   The Southern Company system provides estimated capital expenditures for a three-year period, including capital expenditures and compliance costs associated with existing environmental regulations, including the MATS rule. These amounts exclude contractual purchase commitments for nuclear fuel and capital expenditures covered under long-term service agreements which are reflected separately. At December 31, 2012, significant purchase commitments were outstanding in connection with the construction program. See FUTURE EARNINGS POTENTIAL – "Environmental Matters – Environmental Statutes and Regulations" herein for additional information.

(f)   Primarily includes commitments to purchase coal, nuclear fuel, and natural gas, as well as the related transportation and storage. In most cases, these contracts contain provisions for price escalation, minimum purchase levels, and other financial commitments. Natural gas purchase commitments are based on various indices at the time of delivery. Amounts reflected for natural gas purchase commitments have been estimated based on the New York Mercantile Exchange future prices at December 31, 2012.

(g)   Estimated minimum long-term obligations for various long-term commitments for the purchase of capacity and energy. Amounts include PPAs which include MWs purchased from gas-fired and wind-powered facilities.

(h)   Includes long-term service agreements and contracts for the procurement of limestone. Long-term service agreements include price escalation based on inflation indices.

(i)   Projections of nuclear decommissioning trust fund contributions are based on the 2010 ARP for Georgia Power.

(j)   The Southern Company system forecasts contributions to the pension and other postretirement benefit plans over a three-year period. Southern Company anticipates no mandatory contributions to the qualified pension plan during the next three years. Amounts presented represent estimated benefit payments for the nonqualified pension plans, estimated non-trust benefit payments for the other postretirement benefit plans, and estimated contributions to the other postretirement benefit plan trusts, all of which will be made from corporate assets of Southern Company's subsidiaries. See Note 2 to the financial statements for additional information related to the pension and other postretirement benefit plans, including estimated benefit payments. Certain benefit payments will be made through the related benefit plans. Other benefit payments will be made from corporate assets of Southern Company's subsidiaries.

II-44

Table of Contents   Index to Financial Statements

**MANAGEMENT'S DISCUSSION AND ANALYSIS (continued)**
**Southern Company and Subsidiary Companies 2012 Annual Report**

**Cautionary Statement Regarding Forward-Looking Statements**

Southern Company's 2012 Annual Report contains forward-looking statements. Forward-looking statements include, among other things, statements concerning retail sales, retail rates, the strategic goals for the wholesale business, customer growth, economic recovery, fuel and environmental cost recovery and other rate actions, current and proposed environmental regulations and related estimated expenditures, access to sources of capital, dividend payout ratios, projections for the qualified pension plan, postretirement benefit plan, and nuclear decommissioning trust fund contributions, financing activities, start and completion dates of construction projects, plans and estimated costs for new generation resources, filings with state and federal regulatory authorities, impact of the Tax Relief Act, impact of the ATRA, estimated sales and purchases under new power sale and purchase agreements, and estimated construction and other expenditures. In some cases, forward-looking statements can be identified by terminology such as "may," "will," "could," "should," "expects," "plans," "anticipates," "believes," "estimates," "projects," "predicts," "potential," or "continue" or the negative of these terms or other similar terminology. There are various factors that could cause actual results to differ materially from those suggested by the forward-looking statements; accordingly, there can be no assurance that such indicated results will be realized. These factors include:

- the impact of recent and future federal and state regulatory changes, including legislative and regulatory initiatives regarding deregulation and restructuring of the electric utility industry, environmental laws including regulation of water, coal combustion byproducts, and emissions of sulfur, nitrogen, carbon, soot, particulate matter, hazardous air pollutants, including mercury, and other substances, financial reform legislation, and also changes in tax and other laws and regulations to which Southern Company and its subsidiaries are subject, as well as changes in application of existing laws and regulations;
- current and future litigation, regulatory investigations, proceedings, or inquiries, including the pending EPA civil actions against certain Southern Company subsidiaries, FERC matters, and Internal Revenue Service and state tax audits;
- the effects, extent, and timing of the entry of additional competition in the markets in which Southern Company's subsidiaries operate;
- variations in demand for electricity, including those relating to weather, the general economy and recovery from the recent recession, population and business growth (and declines), the effects of energy conservation measures, and any potential economic impacts resulting from federal fiscal decisions;
- available sources and costs of fuels;
- effects of inflation;
- ability to control costs and avoid cost overruns during the development and construction of facilities, including the development and construction of facilities with designs that have not been finalized or previously constructed, to construct facilities in accordance with the requirements of permits and licenses, and to satisfy any operational and environmental performance standards, including the requirements of tax credits and other incentives;
- investment performance of Southern Company's employee benefit plans and nuclear decommissioning trust funds;
- advances in technology;
- state and federal rate regulations and the impact of pending and future rate cases and negotiations, including rate actions relating to fuel and other cost recovery mechanisms;

- regulatory approvals and actions related to Plant Vogtle Units 3 and 4, including Georgia PSC approvals, NRC actions, and potential DOE loan guarantees;
- regulatory approvals and legislative actions related to the Kemper IGCC, including Mississippi PSC approvals and legislation relating to cost recovery for the Kemper IGCC, the SMEPA purchase decision, satisfaction of requirements to utilize investment tax credits and grants, and the outcome of any proceedings regarding the Mississippi PSC's issuance of the certificate of public convenience and necessity for the Kemper IGCC;
- the inherent risks involved in operating and constructing nuclear generating facilities, including environmental, health, regulatory, natural disaster, terrorism, or financial risks;
- the performance of projects undertaken by the non-utility businesses and the success of efforts to invest in and develop new opportunities;
- internal restructuring or other restructuring options that may be pursued;
- potential business strategies, including acquisitions or dispositions of assets or businesses, which cannot be assured to be completed or beneficial to Southern Company or its subsidiaries;
- the ability of counterparties of Southern Company and its subsidiaries to make payments as and when due and to perform as required;
- the ability to obtain new short- and long-term contracts with wholesale customers;
- the direct or indirect effect on the Southern Company system's business resulting from terrorist incidents and the threat of terrorist incidents, including cyber intrusion;

II-45

Table of Contents   Index to Financial Statements

**MANAGEMENT'S DISCUSSION AND ANALYSIS (continued)**
**Southern Company and Subsidiary Companies 2012 Annual Report**

- interest rate fluctuations and financial market conditions and the results of financing efforts, including Southern Company's and its subsidiaries' credit ratings;
- the impacts of any potential U.S. credit rating downgrade or other sovereign financial issues, including impacts on interest rates, access to capital markets, impacts on currency exchange rates, counterparty performance, and the economy in general, as well as potential impacts on the availability or benefits of proposed DOE loan guarantees;
- the ability of Southern Company and its subsidiaries to obtain additional generating capacity at competitive prices;
- catastrophic events such as fires, earthquakes, explosions, floods, hurricanes, droughts, pandemic health events such as influenzas, or other similar occurrences;
- the direct or indirect effects on the Southern Company system's business resulting from incidents affecting the U.S. electric grid or operation of generating resources;
- the effect of accounting pronouncements issued periodically by standard setting bodies; and
- other factors discussed elsewhere herein and in other reports (including the Form 10-K) filed by Southern Company from time to time with the SEC.

**Southern Company expressly disclaims any obligation to update any forward-looking statements.**

II-46

Table of Contents                    Index to Financial Statements

**CONSOLIDATED STATEMENTS OF INCOME**
**For the Years Ended December 31, 2012, 2011, and 2010**
**Southern Company and Subsidiary Companies 2012 Annual Report**

| | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| | | | | *(in millions)* | | |
| **Operating Revenues:** | | | | | | |
| Retail revenues | $ | **14,187** | $ | 15,071 | $ | 14,791 |
| Wholesale revenues | | **1,675** | | 1,905 | | 1,994 |
| Other electric revenues | | **616** | | 611 | | 589 |
| Other revenues | | **59** | | 70 | | 82 |
| Total operating revenues | | **16,537** | | 17,657 | | 17,456 |
| **Operating Expenses:** | | | | | | |
| Fuel | | **5,057** | | 6,262 | | 6,699 |
| Purchased power | | **544** | | 608 | | 563 |
| Other operations and maintenance | | **3,791** | | 3,938 | | 4,010 |

**NOTES** (continued)
**Southern Company and Subsidiary Companies 2012 Annual Report**

The Georgia PSC approved increases to the NCCR tariff of approximately $223 million, $35 million, and $50 million, effective January 1, 2011, 2012, and 2013, respectively. Through the NCCR tariff, Georgia Power is collecting and amortizing to earnings approximately $91 million of financing costs, capitalized in 2009 and 2010, over the five-year period ending December 31, 2015, in addition to the ongoing financing costs. At December 31, 2012, approximately $55 million of these 2009 and 2010 costs remained unamortized in CWIP. At December 31, 2012, Georgia Power's CWIP balance for Plant Vogtle Units 3 and 4 totaled $2.3 billion.

In 2009, the NRC issued an Early Site Permit and Limited Work Authorization which allowed limited work to begin on Plant Vogtle Units 3 and 4. The NRC certified the Westinghouse Design Control Document, as amended (DCD), for the AP1000 nuclear reactor design, effective December 30, 2011, and issued combined construction and operating licenses (COLs) on February 10, 2012. Receipt of the COLs allowed full construction to begin.

On February 16, 2012, separate groups of petitioners filed petitions in the U.S. Court of Appeals for the District of Columbia Circuit seeking judicial review of the NRC's issuance of the COLs and certification of the DCD. These petitions were consolidated on April 3, 2012. On April 18, 2012, another group of petitioners filed a motion to stay the effectiveness of the COLs with the U.S. District Court for the District of Columbia. On July 11, 2012, the U.S. Court of Appeals for the District of Columbia Circuit denied the petitioners' motion to stay the effectiveness of the COLs. Georgia Power has intervened in, and intends to vigorously contest, these petitions. Additional technical and procedural challenges to the construction and licensing of Plant Vogtle Units 3 and 4, at the federal and state level, are expected as construction proceeds.

Georgia Power is required to file semi-annual Vogtle Construction Monitoring (VCM) reports with the Georgia PSC by February 28 and August 31 each year. On February 19, 2013, the Georgia PSC voted to approve Georgia Power's seventh VCM report, including construction capital costs incurred through June 30, 2012 of approximately $2.0 billion. Georgia Power's eighth VCM report requests approval for an additional $0.2 billion of construction capital costs incurred through December 31, 2012. If the projected certified construction capital costs to be borne by Georgia Power increase by 5% or the projected in-service dates are significantly extended, Georgia Power is required to seek an amendment to the Plant Vogtle Units 3 and 4 certificate from the Georgia PSC. Accordingly, the eighth VCM also requests an amendment to the certificate to increase the estimated in-service capital cost of Plant Vogtle Units 3 and 4 to $4.8 billion and to extend the estimated in-service dates to fourth quarter 2017 and fourth quarter 2018 for Plant Vogtle Units 3 and 4, respectively. Associated financing costs during the construction period are estimated to total approximately $2.0 billion.

In July 2012, the Owners and the Contractor began negotiations regarding the costs associated with design changes to the DCD and the delays in the timing of approval of the DCD and issuance of the COLs, including the assertion by the Contractor that the Owners are responsible for these costs under the terms of the Vogtle 3 and 4 Agreement. The Contractor has claimed that its estimated adjustment attributable to Georgia Power (based on Georgia Power's ownership interest) is approximately $425 million (in 2008 dollars) with respect to these issues. The Contractor also has asserted it is entitled to further schedule extensions. Georgia Power has not agreed with either the proposed cost or schedule adjustments or that the Owners have any responsibility for costs related to these issues. On November 1, 2012, Georgia Power and the other Owners filed suit against the Contractor in the U.S. District Court for the Southern District of Georgia seeking a declaratory judgment that the Owners are not responsible for these costs. Also on November 1, 2012, the Contractor filed suit against Georgia Power and the other Owners in the U.S. District Court for the District of Columbia alleging the Owners are responsible for these costs. While litigation has commenced and Georgia Power intends to vigorously defend its positions, Georgia Power expects negotiations with the Contractor to continue with respect to cost and schedule during which negotiations the parties may reach a mutually acceptable compromise of their positions.

In addition, there are processes in place that are designed to assure compliance with the requirements specified in the DCD and the COLs, including rigorous inspections by Southern Nuclear and the NRC that occur throughout construction. During the fourth quarter 2012, certain details of the rebar design for the Plant Vogtle Unit 3 nuclear island were evaluated for consistency with the DCD and a few non-safety-related deviations were identified. On January 15, 2013 and January 18, 2013, Southern Nuclear submitted two license amendment requests to conform the rebar design details to NRC requirements. On January 29, 2013, the NRC issued "no objection" letters in response to the related preliminary amendment requests, enabling completion of final work supporting the pouring of base mat concrete, which is expected to occur following approval of the license amendment requests in March 2013. Various design and other issues are expected to arise as construction proceeds, which may result in additional license amendments or require other resolution. If any license amendment requests are not resolved in a timely manner, there may be delays in the project schedule that could result in increased costs either to the Owners, the Contractor, or both.

Table of Contents   Index to Financial Statements

**NOTES** (continued)
**Southern Company and Subsidiary Companies 2012 Annual Report**

As construction continues, additional delays in the fabrication and assembly of structural modules, the failure of such modules to meet applicable standards, or other issues may further impact project schedule and cost. Additional claims by the Contractor or Georgia Power (on behalf of the Owners) are also likely to arise throughout construction. These claims may be resolved through formal and informal dispute resolution procedures under the Vogtle 3 and 4 Agreement, but also may be resolved through litigation.

The ultimate outcome of these matters cannot be determined at this time.

**Integrated Coal Gasification Combined Cycle**

Mississippi Power is constructing a new electric generating facility located in Kemper County, Mississippi which will utilize an integrated coal gasification combined cycle technology with an output capacity of 582 MWs (Kemper IGCC). The Kemper IGCC will use as fuel locally mined lignite (an abundant, lower heating value coal) from a mine owned by Mississippi Power and situated adjacent to the Kemper IGCC. In connection with the Kemper IGCC, Mississippi Power also plans to construct and operate approximately 61 miles of $CO_2$ pipeline infrastructure. The Kemper IGCC is scheduled to be placed in-service in May 2014.

In 2010, the Mississippi PSC issued a certificate of public convenience and necessity (CPCN) authorizing the acquisition, construction, and operation of the Kemper IGCC (2010 MPSC Order). The Sierra Club filed an appeal of the Mississippi PSC's issuance of the CPCN and, on March 15, 2012, the Mississippi Supreme Court reversed the decision of the Chancery Court of Harrison County, Mississippi (Chancery Court) upholding the 2010 MPSC Order and remanded the matter to the Mississippi PSC. The Mississippi Supreme Court concluded that the 2010 MPSC Order did not cite in sufficient detail substantial evidence upon which the Mississippi Supreme Court could determine the basis for the findings of the Mississippi PSC granting the CPCN. On March 30, 2012, the Mississippi PSC issued a temporary authorization which allowed Mississippi Power to continue construction and, on April 24, 2012, issued a detailed order (2012 MPSC Order) confirming the CPCN for the Kemper IGCC. On April 26, 2012, the Sierra Club appealed the 2012 MPSC Order to the Chancery Court. On December 17, 2012, the Chancery Court affirmed the 2012 MPSC Order which confirmed the issuance of the CPCN for the Kemper IGCC. On January 8, 2013, the Sierra Club filed an appeal of the Chancery Court's ruling with the Mississippi Supreme Court.

The certificated cost estimate of the Kemper IGCC included in the 2012 MPSC Order was $2.4 billion, net of $245 million of grants awarded to the project by the DOE under the Clean Coal Power Initiative Round 2 (CCPI2) and excluding the cost of the lignite mine and equipment, the cost of the $CO_2$ pipeline facilities, and financing costs related to the Kemper IGCC. The 2012 MPSC Order approved a construction cost cap of up to $2.88 billion, with recovery of prudently-incurred costs subject to approval by the Mississippi PSC. Exemptions from the cost cap included in the 2012 MPSC Order included the cost of the lignite mine and equipment, the cost of the $CO_2$ pipeline facilities, financing costs, and certain general exceptions, including change of law, force majeure, and beneficial capital (which exists when Mississippi Power demonstrates that the purpose and effect of the construction cost increase is to produce efficiencies that will result in a neutral or favorable effect on the ratepayers, relative to the original proposal for the CPCN).

Mississippi Power's current cost estimate for the Kemper IGCC (net of the $245 million CCPI2 grant, and excluding the cost of the lignite mine and equipment, the cost of the $CO_2$ pipeline facilities, financing costs, and certain general exceptions as contemplated in the 2012 MPSC Order and the settlement agreement between Mississippi Power and the Mississippi PSC entered into on January 24, 2013 (Settlement Agreement) that must be specifically approved by the Mississippi PSC) is approximately $2.88 billion. The Mississippi PSC and the Mississippi Public Utilities Staff (MPUS) have engaged their independent monitors to assess the current cost estimates and schedule projections for the Kemper IGCC. These consultants have issued reports with their own opinions as to the likelihood that costs for the Kemper IGCC will remain at or under the $2.88 billion cost cap and as to the expected in-service date. While Mississippi Power continues to believe its cost estimate and schedule projection remain appropriate based on the current status of the project, it is possible that Mississippi Power could experience further cost increases and/or schedule delays with respect to the Kemper IGCC. Certain factors have caused and may continue to cause the costs for the Kemper IGCC to increase and/or schedule delays to occur including, but not limited to, costs and productivity of labor, adverse weather conditions, shortages and inconsistent quality of equipment, materials, and labor, contractor or supplier delay or non-performance under construction or other agreements, and unforeseen engineering problems. To the extent it becomes probable that costs beyond any permitted exceptions to the cost cap will exceed $2.88 billion or it becomes probable that the Mississippi PSC will disallow a portion of the costs relating to the Kemper IGCC, including certain general exceptions as contemplated in the 2012 MPSC Order and the Settlement Agreement, charges to expense may occur and these charges could be material. See "Cost Recovery Plans" below for additional information relating to the Settlement Agreement that defines the process for resolving matters regarding cost recovery related to the Kemper IGCC.

Table of Contents  Index to Financial Statements

**NOTES (continued)**
**Southern Company and Subsidiary Companies 2012 Annual Report**

As of December 31, 2012, Mississippi Power had spent a total of $2.51 billion on the Kemper IGCC, including the cost of the lignite mine and equipment, the cost of the $CO_2$ pipeline facilities, and other deferred costs. Of this total, $2.47 billion was included in CWIP (which is net of $245 million of CCPI2 grant funds), $35 million was recorded in other regulatory assets, $4 million was recorded in other deferred charges and assets, and $1 million was previously expensed. Consistent with the treatment of non-capital costs incurred during the pre-construction period, the Mississippi PSC granted Mississippi Power the authority to defer all non-capital Kemper IGCC-related costs to a regulatory asset during the construction period. This includes deferred costs associated with the generation resource planning, evaluation, and screening activities. The amortization period for the regulatory asset will be determined by the Mississippi PSC at a later date.

In addition, Mississippi Power is authorized to accrue carrying costs on the unamortized balance of such regulatory assets at a rate and in a manner to be determined by the Mississippi PSC in future cost recovery mechanism proceedings.

The 2012 MPSC Order established periodic prudence reviews during the annual CWIP review process. Of the total costs of $51 million incurred through March 2009, $46 million has been reviewed and deemed prudent by the Mississippi PSC. Due to the decision of the Mississippi PSC to deny the Certificated New Plant-A (CNP-A) rate filing and a 2012 rate request related to the Kemper IGCC described below, prudence reviews for the construction costs of the Kemper IGCC incurred after March 2009 have not been made. The Settlement Agreement provides for completion of all prudence reviews within six months of the date the Kemper IGCC is placed in service. See "Cost Recovery Plans" herein for additional information.

The ultimate outcome of these matters, including the determinations of prudency and the specific manner of recovery of prudently-incurred costs relating to the Kemper IGCC, is subject to further regulatory actions and cannot be determined at this time.

*Cost Recovery Plans*

The 2012 MPSC Order included provisions relating to both Mississippi Power's recovery of financing costs during the course of construction of the Kemper IGCC and Mississippi Power's recovery of costs following the date the Kemper IGCC is placed in service. In the 2012 MPSC Order, the Mississippi PSC approved financing cost recovery on CWIP balances not to exceed the $2.4 billion certificated cost estimate for the Kemper IGCC. The 2012 MPSC Order provided for the accrual of AFUDC in 2010 and 2011 and for the current recovery of financing costs on 100% of CWIP in 2012, 2013, and through May 1, 2014 (provided that the amount of financing cost recovery allowed is to be reduced by the amount of certain state and federal government construction cost incentives received by Mississippi Power and must be justified by a showing that such recovery will benefit customers over the life of the Kemper IGCC). With respect to recovery of costs following the in-service date of the Kemper IGCC, the 2012 MPSC Order provided for the establishment of operational cost and revenue parameters based upon assumptions in Mississippi Power's petition for the CPCN.

On June 1, 2012, the MPUS signed a joint stipulation with Mississippi Power to establish a proposed rate schedule detailing CNP-A and, on June 14, 2012, Mississippi Power submitted to the Mississippi PSC a filing to establish the new CNP-A rate schedule and a stipulated rate increase based upon the revenue request of between $55 million and $59 million to recover financing costs over the remainder of 2012. On June 22, 2012, the Mississippi PSC denied the proposed CNP-A rate schedule and the 2012 rate recovery filings submitted by Mississippi Power, pending a final ruling from the Mississippi Supreme Court regarding the Sierra Club's appeal of the Mississippi PSC's issuance of the CPCN for the Kemper IGCC.

On July 9, 2012, Mississippi Power appealed the Mississippi PSC's June 22, 2012 decision to the Mississippi Supreme Court and requested interim rates under bond of $55 million. On July 31, 2012, the Mississippi Supreme Court denied Mississippi Power's request for interim rates under bond until the Mississippi Supreme Court decides Mississippi Power's appeal of the Mississippi PSC's June 22, 2012 decision.

On January 24, 2013, Mississippi Power and the Mississippi PSC entered into the Settlement Agreement that (1) establishes the process for resolving matters regarding cost recovery related to the Kemper IGCC for the purpose of mitigating risks to Mississippi Power and its customers and expediting the regulatory process associated with future rate filings required under the Settlement Agreement and (2) resolves Mississippi Power's CNP-A rate appeal before the Mississippi Supreme Court.

On February 12, 2013, the Mississippi Supreme Court granted Mississippi Power and the Mississippi PSC's joint filing for dismissal of Mississippi Power's appeal of the Mississippi PSC's June 22, 2012 decision.

Under the terms of the Settlement Agreement, Mississippi Power and the Mississippi PSC will follow certain agreed-upon regulatory procedures and schedules for resolving the cost recovery matters related to the Kemper IGCC. These procedures and schedules include the following: (1) Mississippi Power's filing within 30 days of the Settlement Agreement of a new request to increase rates in 2013 in an amount not to exceed a $172 million annual revenue requirement, based upon projected investment as December 31, 2013, to be recorded to a regulatory liability to be used to mitigate rate impacts when the Kemper IGCC is placed

Table of Contents  Index to Financial Statements

**NOTES (continued)**
**Southern Company and Subsidiary Companies 2012 Annual Report**

in service (which filing for $172 million was made on January 25, 2013); (2) the Mississippi PSC's decision on that matter within 50 days of Mississippi Power's request; (3) Mississippi Power's collaboration with the MPUS to file with the Mississippi PSC within three months of the Settlement Agreement a rate recovery plan for the Kemper IGCC for the first seven years of its operation, along with a proposed revenue requirement under such plan for 2014 through 2020 (which filing was made on February 26, 2013 as described below); (4) the Mississippi PSC's decision on the rate recovery plan within four months of that filing; (5) Mississippi Power's agreement to limit the portion of prudently-incurred Kemper IGCC costs to be included in rate base to the $2.4 billion certificated cost estimate, plus costs related to the lignite mine and $CO_2$ pipeline as well as any other costs permitted or determined to be excluded from the cost cap, provided that this limitation will not prevent Mississippi Power from securing alternate financing to recover any prudently-incurred Kemper IGCC costs, including financing costs and plant costs above the $2.4 billion certificated cost estimate, not otherwise recovered in any Mississippi PSC rate proceeding contemplated by the Settlement Agreement; and (6) the Mississippi PSC's completion of its prudence review of the Kemper IGCC costs incurred through 2012 within six months of the Settlement Agreement, an additional prudence review upon considering the seven-year rate plan for costs incurred through the most recent reporting period, and a final prudence review of the remaining project costs within six months of the Kemper IGCC's in-service date.

Legislation to authorize a multi-year rate plan and legislation to provide for alternate financing through securitization was passed in the Mississippi legislature and was signed by the Governor on February 26, 2013. Mississippi Power contemplates using securitization as provided in the legislation as its form of alternate financing for prudently-incurred Kemper IGCC costs, including financing costs and plant costs above the $2.4 billion certificated cost estimate, not otherwise recovered in any Mississippi PSC rate proceeding contemplated by the Settlement Agreement.

On February 26, 2013, Mississippi Power, in compliance with the Settlement Agreement, filed with the Mississippi PSC a rate recovery plan for the Kemper IGCC for 2014 through 2020, the first seven years of operation of the Kemper IGCC. The rate recovery plan proposes recovery of an annual revenue requirement of approximately $150 million of Kemper IGCC-related operational costs and rate base amounts, including plant costs equal to the $2.4 billion certificated cost estimate. Approval of Mississippi Power's request to increase rates in 2013 to mitigate the rate impacts of the Kemper IGCC filed on January 25, 2013 is integral to the rate recovery plan as the proposed filing contemplates amortization of the regulatory liability to be used to mitigate rate impacts from 2014 through 2020, based on a fixed amortization schedule that requires approval by the Mississippi PSC. Under the rate recovery plan filing, Mississippi Power proposes annual recovery to remain the same from 2014 through 2020 and, while it is the

million.

On February 12, 2013, the Company submitted its 2013 ECO Plan filing, which proposed no change in rates.

The ultimate outcome of these matters cannot be determined at this time.

### Certificated New Plant

See "Integrated Coal Gasification Combined Cycle" for information on certificated new plant and the Company's cost recovery plans.

### Fuel Cost Recovery

The Company establishes, annually, a retail fuel cost recovery factor that is approved by the Mississippi PSC. On January 18, 2013, in compliance with the Company's filing requirement, the Company requested an annual adjustment of the retail fuel cost recovery factor in an amount equal to a decrease of 4.7% of total 2012 retail revenue. At December 31, 2012, the amount of over recovered retail fuel costs included in the balance sheets was $56.6 million compared to $42.4 million at December 31, 2011. The Company also has a wholesale Municipal and Rural Associations (MRA) and a Market Based (MB) fuel cost recovery factor. Effective January 1, 2013, the wholesale MRA fuel rate decreased resulting in an annual decrease in an amount equal to 3.3% of total 2012 MRA revenue. Effective February 1, 2013, the wholesale MB fuel rate decreased, resulting in an annual decrease in an amount equal to 5.5% of total 2012 MB revenue. At December 31, 2012, the amount of over recovered wholesale MRA and MB fuel costs included in the balance sheets was $19.0 million and $2.1 million compared to $14.3 million and $2.2 million, respectively, at December 31, 2011. In addition, at December 31, 2012, the amount of over recovered MRA emissions allowance cost included in the balance sheets was $0.4 million compared to $1.7 million at December 31, 2011. The Company's operating revenues are adjusted for differences in actual recoverable fuel cost and amounts billed in accordance with the currently approved cost recovery rate. Accordingly, changes in the billing factor have no significant effect on the Company's revenues or net income, but will affect annual cash flow.

In March 2011, a portion of the Company's territorial wholesale loads that was formerly served under the MB tariff terminated service. Beginning in April 2011, a new power purchase agreement (PPA) went into effect to cover these MB customers as non-territorial load. In June 2011, the Company and SMEPA reached an agreement to allocate $3.7 million of the over recovered fuel balance at March 31, 2011 to the PPA. This amount was subsequently refunded to SMEPA in June 2011. See "Other Matters" herein for additional information.

The Mississippi PSC engaged an independent professional audit firm to conduct an audit of the Company's fuel-related expenditures included in the retail fuel adjustment clause and energy cost management clause (ECM). The 2012 audit of fuel-related expenditures began in the second quarter 2012 and was completed in the fourth quarter 2012 with no audit findings.

### Storm Damage Cost Recovery

In August 2012, Hurricane Isaac hit the Gulf Coast of the United States and caused damage within the Company's service area. The estimated total storm restoration costs relating to Hurricane Isaac through December 31, 2012 were $10.5 million. The Company maintains a reserve to cover the cost of damage from major storms to its transmission and distribution facilities and generally the cost of uninsured damage to its generation facilities and other property. At December 31, 2012, the balance in the storm reserve was $58.8 million.

### Income Tax Matters

### Bonus Depreciation

In 2010, the Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010 (Tax Relief Act) was signed into law. Major tax incentives in the Tax Relief Act include 100% bonus depreciation for property placed in service after September 8, 2010 and through 2011 (and for certain long-term production-period projects placed in service in 2012) and 50% bonus depreciation for property placed in service in 2012 (and for certain long-term production-period projects to be placed in service in 2013), which will have a positive impact on the future cash flows of the Company through 2013.

On January 2, 2013, the American Taxpayer Relief Act of 2012 (ATRA) was signed into law. The ATRA retroactively extended several tax credits through 2013 and extended 50% bonus depreciation for property to be placed in service in 2013 (and for certain long-term production-period projects to be placed in service in 2014), which is expected to apply to the Kemper IGCC scheduled to be placed in service in May 2014.

II-372

Table of Contents          Index to Financial Statements

**MANAGEMENT'S DISCUSSION AND ANALYSIS (continued)**
**Mississippi Power Company 2012 Annual Report**

Due to the significant amount of estimated bonus depreciation for 2013, the utilization of a portion of the Company's tax credits has been delayed. See "Integrated Coal Gasification Combined Cycle – Tax Incentives" for additional information.

### Integrated Coal Gasification Combined Cycle

### General

The Company is constructing the Kemper IGCC which will utilize an IGCC technology with an output capacity of 582 MWs. The Kemper IGCC will use as fuel locally mined lignite (an abundant, lower heating value coal) from a mine owned by the Company and situated adjacent to the Kemper IGCC. In connection with the Kemper IGCC, the Company also plans to construct and operate approximately 61 miles of carbon dioxide ($CO_2$) pipeline infrastructure. The Kemper IGCC is scheduled to be placed in-service in May 2014.

In 2010, the Mississippi PSC issued a CPCN authorizing the acquisition, construction, and operation of the Kemper IGCC (2010 MPSC Order). The Sierra Club filed an appeal of the Mississippi PSC's issuance of the CPCN and, on March 15, 2012, the Mississippi Supreme Court reversed the decision of the Chancery Court of Harrison County Mississippi (Chancery Court) upholding the 2010 MPSC Order and remanded the matter to the Mississippi PSC. The Mississippi Supreme Court concluded that the 2010 MPSC Order did not cite in sufficient detail substantial evidence upon which the Mississippi Supreme Court could determine the basis for the findings of the Mississippi PSC granting the CPCN. On March 30, 2012, the Mississippi PSC issued a temporary authorization which allowed the Company to continue construction and, on April 24, 2012, issued a detailed order (2012 MPSC Order) confirming the CPCN for the Kemper IGCC. On April 26, 2012, the Sierra Club appealed the 2012 MPSC Order to the Chancery Court. On December 17, 2012, the Chancery Court affirmed the 2012 MPSC Order which confirmed the issuance of the CPCN for the Kemper IGCC. On January 8, 2013, the Sierra Club filed an appeal of the Chancery Court's ruling with the Mississippi Supreme Court.

The certificated cost estimate of the Kemper IGCC included in the 2012 MPSC Order was $2.4 billion, net of $245.3 million of grants awarded to the project by the United States Department of Energy (DOE) under the Clean Coal Power Initiative Round 2 (CCPI2) and excluding the cost of the lignite mine and equipment, the cost of the $CO_2$ pipeline facilities, and financing costs related to the Kemper IGCC. The 2012 MPSC Order approved a construction cost cap of up to $2.88 billion, with recovery of prudently-incurred costs subject to approval by the Mississippi PSC. Exemptions from the cost cap included in the 2012 MPSC Order included the cost of the lignite mine and equipment, the cost of the $CO_2$ pipeline facilities, financing costs, and certain general exceptions, including change of law, force majeure, and beneficial capital (which exists when the Company demonstrates that the purpose and effect of the construction cost increase is to produce efficiencies that will result in a neutral or favorable effect on the ratepayers, relative to the original proposal for the CPCN).

The Company's current cost estimate for the Kemper IGCC (net of the $245.3 million CCPI2 grant, and excluding the cost of the lignite mine and equipment, the cost of the $CO_2$ pipeline facilities, financing costs, and certain general exceptions as contemplated in the 2012 MPSC Order and the Settlement Agreement that must be specifically approved by the Mississippi PSC) is approximately $2.88 billion. The Mississippi PSC and the MPUS have engaged their independent monitors to assess the current cost estimates and schedule projections for the Kemper IGCC. These consultants have issued reports with their own opinions as to the likelihood that costs for the Kemper IGCC will remain at or under the $2.88 billion cost cap and as to the expected in-service date. While the Company continues to believe its cost estimate and schedule projection remain appropriate based on the current status of the project, it is possible that the Company could experience further cost increases and/or schedule delays with respect to the Kemper IGCC. Certain factors have caused and may continue to cause the costs for the Kemper IGCC to increase and/or schedule delays to occur including, but not limited to, costs and productivity of labor, adverse weather conditions, shortages and inconsistent quality of equipment, materials, and labor, contractor or supplier delay or non-performance under construction or other agreements, and unforeseen engineering problems. To the extent it becomes probable that costs beyond any permitted exceptions to the cost cap will exceed $2.88 billion or it becomes probable that the Mississippi PSC will disallow a portion of the costs relating to the Kemper IGCC, including certain general exceptions as contemplated in the 2012 MPSC Order and the Settlement Agreement, charges to expense may occur and these charges could be material. See "Cost Recovery Plans" below for additional information relating to the Settlement Agreement that defines the process for resolving matters regarding cost recovery related to the Kemper IGCC.

As of December 31, 2012, the Company had spent a total of $2.51 billion on the Kemper IGCC, including the cost of the lignite mine and equipment, the cost of the $CO_2$ pipeline facilities, and other deferred costs. Of this total, $2.47 billion was included in CWIP (which is net of $245.3 million of CCPI2 grant funds), $34.9 million was recorded in other regulatory assets, $3.8 million was recorded in other deferred charges and assets, and $1.0 million was previously expensed. Consistent with the treatment of non-capital costs incurred during the pre-construction period, the Mississippi PSC granted the Company the authority to defer all non-capital Kemper IGCC-related costs to a regulatory asset during the construction period. This includes deferred costs

II-373

**Table of Contents**                **Index to Financial Statements**

**MANAGEMENT'S DISCUSSION AND ANALYSIS (continued)**
**Mississippi Power Company 2012 Annual Report**

associated with the generation resource planning, evaluation, and screening activities. The amortization period for the regulatory asset will be determined by the Mississippi PSC at a later date.

In addition, the Company is authorized to accrue carrying costs on the unamortized balance of such regulatory assets at a rate and in a manner to be determined by the Mississippi PSC in future cost recovery mechanism proceedings.

The 2012 MPSC Order established periodic prudence reviews during the annual CWIP review process. Of the total costs of $51 million incurred through March 2009, $46 million has been reviewed and deemed prudent by the Mississippi PSC. Due to the decision of the Mississippi PSC to deny the CNP-A rate filing and a 2012 rate request related to the Kemper IGCC described below, prudence reviews for the construction costs of the Kemper IGCC incurred after March 2009 have not been made. The Settlement Agreement provides for completion of all prudence reviews within six months of the date the Kemper IGCC is placed in service. See "Cost Recovery Plans" herein for additional information.

The ultimate outcome of these matters, including the determinations of prudency and the specific manner of recovery of prudently-incurred costs relating to the Kemper IGCC, is subject to further regulatory actions and cannot be determined at this time.

*Cost Recovery Plans*

The 2012 MPSC Order included provisions relating to both the Company's recovery of financing costs during the course of construction of the Kemper IGCC and the Company's recovery of costs following the date the Kemper IGCC is placed in service. In the 2012 MPSC Order, the Mississippi PSC approved financing cost recovery on CWIP balances not to exceed the $2.4 billion certificated cost estimate for the Kemper IGCC. The 2012 MPSC Order provided for the accrual of AFUDC in 2010 and 2011 and for the current recovery of financing costs on 100% of CWIP in

2012, 2013, and through May 1, 2014 (provided that the amount of financing cost recovery allowed is to be reduced by the amount of certain state and federal government construction cost incentives received by the Company and must be justified by a showing that such recovery will benefit customers over the life of the Kemper IGCC). With respect to recovery of costs following the in-service date of the Kemper IGCC, the 2012 MPSC Order provided for the establishment of operational cost and revenue parameters based upon assumptions in the Company's petition for the CPCN.

On June 1, 2012, the MPUS signed a joint stipulation with the Company to establish a proposed rate schedule detailing CNP-A and, on June 14, 2012, the Company submitted to the Mississippi PSC a filing to establish the new CNP-A rate schedule and a stipulated rate increase based upon the revenue request of between $55.3 million and $58.6 million to recover financing costs over the remainder of 2012. On June 22, 2012, the Mississippi PSC denied the proposed CNP-A rate schedule and the 2012 rate recovery filings submitted by the Company, pending a final ruling from the Mississippi Supreme Court regarding the Sierra Club's appeal of the Mississippi PSC's issuance of the CPCN for the Kemper IGCC.

On July 9, 2012, the Company appealed the Mississippi PSC's June 22, 2012 decision to the Mississippi Supreme Court and requested interim rates under bond of $55.3 million. On July 31, 2012, the Mississippi Supreme Court denied the Company's request for interim rates under bond until the Mississippi Supreme Court decides the Company's appeal of the Mississippi PSC's June 22, 2012 decision.

On January 24, 2013, the Company and Mississippi PSC entered into the Settlement Agreement that (1) establishes the process for resolving matters regarding cost recovery related to the Kemper IGCC for the purpose of mitigating risks to the Company and its customers and expediting the regulatory process associated with future rate filings required under the Settlement Agreement and (2) resolves the Company's CNP-A rate appeal before the Mississippi Supreme Court.

On February 12, 2013, the Mississippi Supreme Court granted the Company and the Mississippi PSC's joint filing for dismissal of the Company's appeal of the Mississippi PSC's June 22, 2012 decision.

Under the terms of the Settlement Agreement, the Company and the Mississippi PSC will follow certain agreed-upon regulatory procedures and schedules for resolving the cost recovery matters related to the Kemper IGCC. These procedures and schedules include the following:  (1) the Company's filing within 30 days of the Settlement Agreement of a new request to increase rates in 2013 in an amount not to exceed a $172 million annual revenue requirement, based upon projected investment as of December 31, 2013, to be recorded to a regulatory liability to be used to mitigate rate impacts when the Kemper IGCC is placed in service (which filing for $172 million was made on January 25, 2013); (2) the Mississippi PSC's decision on that matter within 50 days of the Company's request; (3) the Company's collaboration with the MPUS to file with the Mississippi PSC within three months of the Settlement Agreement a rate recovery plan for the Kemper IGCC for the first seven years of its operation, along with a proposed revenue requirement under such plan for 2014 through 2020 (which filing was made on February 26, 2013 as described below); (4) the Mississippi PSC's decision on the rate recovery plan within four months of that filing; (5) the Company's agreement to limit the portion of prudently -incurred Kemper IGCC costs to be included in rate base to the $2.4 billion certificated

II-374

**Table of Contents**          **Index to Financial Statements**

**MANAGEMENT'S DISCUSSION AND ANALYSIS (continued)**
**Mississippi Power Company 2012 Annual Report**

cost estimate, plus costs related to the lignite mine and $CO_2$ pipeline as well as any other costs permitted or determined to be excluded from the cost cap, provided that this limitation will not prevent the Company from securing alternate financing to recover any prudently-incurred Kemper IGCC costs, including financing costs and plant costs above the $2.4 billion certificated cost estimate, not otherwise recovered in any Mississippi PSC rate proceeding contemplated by the Settlement Agreement; and (6) the Mississippi PSC's completion of its prudence review of the Kemper IGCC costs incurred through 2012 within six months of the Settlement Agreement, an additional prudence review upon considering the seven-year rate plan for costs incurred through the most recent reporting period, and a final prudence review of the remaining project costs within six months of the Kemper IGCC's in-service date.

Legislation to authorize a multi-year rate plan and legislation to provide for alternate financing through securitization was passed in the Mississippi legislature and was signed by the Governor on February 26, 2013. The Company contemplates using securitization as provided in the legislation as its form of alternate financing for prudently-incurred Kemper IGCC costs, including financing costs and plant costs above the $2.4 billion certificated cost estimate, not otherwise recovered in any Mississippi PSC rate proceeding contemplated by the Settlement Agreement.

On February 26, 2013, the Company, in compliance with the Settlement Agreement, filed with the Mississippi PSC a rate recovery plan for the Kemper IGCC for 2014 through 2020, the first seven years of operation of the Kemper IGCC. The rate recovery plan proposes recovery of an annual revenue requirement of approximately $150 million of Kemper IGCC-related operational costs and rate base amounts, including plant costs equal to the $2.4 billion certificated cost estimate. Approval of the Company's request to increase rates in 2013 to mitigate the rate impacts of the Kemper IGCC filed on January 25, 2013 is integral to the rate recovery plan as the proposed filing contemplates amortization of the regulatory liability to be used to mitigate rate impacts from 2014 through 2020, based on a fixed amortization schedule that requires approval by the Mississippi PSC. Under the rate recovery plan filing, the Company proposes annual recovery to remain the same from 2014 through 2020 and while it is the intent of the Company for the actual revenue requirement to equal the proposed revenue requirement for certain items, the Company proposes that the annual differences for those items through 2020 will be deferred, subject to accrual of carrying costs, and the cumulative balance will be reviewed at the end of the term of the Settlement Agreement by the Mississippi PSC for determination of the manner of recovery. The Company proposes to secure recovery of prudently-incurred Kemper IGCC costs, including financing costs and plant costs above the $2.4 billion certificated cost estimate, not otherwise recovered in any Mississippi PSC rate proceeding contemplated by the Settlement Agreement to be provided for with alternate financing through securitization. The rate recovery necessary to recover the annual costs of securitization is proposed to be filed and begin after the Kemper IGCC is placed in service.

Under the terms of the Settlement Agreement, the Company has the right to terminate the Settlement Agreement if certain conditions, including the passage of multi-year rate plan legislation that is contemplated under the Settlement Agreement, are not met, if the Company is unable to secure

alternate financing for any prudently-incurred Kemper IGCC costs not otherwise recovered in any Mississippi PSC rate proceeding contemplated by the Settlement Agreement, or if the Mississippi PSC fails to comply with the requirements of the Settlement Agreement.

The ultimate outcome of these matters, including the determinations of prudency and the specific manner of recovery of prudently-incurred costs relating to the Kemper IGCC, is subject to further regulatory actions and cannot be determined at this time.

*Tax Incentives*

The Internal Revenue Service (IRS) has allocated $133 million (Phase I) and $279 million (Phase II) of Internal Revenue Code Section 48A tax credits to the Company in connection with the Kemper IGCC. The Company's utilization of Phase I and Phase II credits is dependent upon meeting the IRS certification requirements, including an in-service date no later than May 11, 2014 for the Phase I credits and April 19, 2016 for the Phase II credits. In order to remain eligible for the Phase I credits, the Company plans to capture and sequester (via enhanced oil recovery) at least 65% of the $CO_2$ produced by the Kemper IGCC during operations in accordance with the rules for Section 48A investment tax credits. Through December 31, 2012, the Company received or accrued tax benefits totaling $361.6 million for these tax credits, which will be amortized as a reduction to depreciation and amortization over the life of the Kemper IGCC. As a result of bonus tax depreciation on certain assets placed, or to be placed, in service in 2012 and 2013, and the subsequent reduction in federal taxable income, the Company estimates that it will not be able to utilize $170.9 million of these tax credits until after 2013. IRS guidelines allow these unused tax credits to be carried forward for 20 years, expiring at the end of 2031, if not utilized before then. On October 15, 2012, the Company filed an application with the DOE for certification of the Kemper IGCC for additional tax credits under the Internal Revenue Code Section 48A (Phase III). A portion of the tax credits realized by the Company may be subject to recapture upon successful completion of SMEPA's purchase of an undivided interest in the Kemper IGCC as described below. In addition, all or a portion of

II-375

Table of Contents                    Index to Financial Statements

**MANAGEMENT'S DISCUSSION AND ANALYSIS (continued)**
**Mississippi Power Company 2012 Annual Report**

the tax credits will be subject to recapture if the Company fails to satisfy the in-service date requirements and carbon capture requirements described above. See "Income Tax Matters" herein for additional information.

The ultimate outcome of these matters cannot be determined at this time.

*Lignite Mine and $CO_2$ Pipeline Facilities*

In conjunction with the Kemper IGCC, the Company will own the lignite mine and equipment and has acquired and will continue to acquire mineral reserves located around the Kemper IGCC site in Kemper County. The mine is scheduled to be placed in-service in June 2013. The estimated capital cost of the mine is approximately $245 million, of which $163.3 million has been incurred through December 31, 2012.

In 2010, the Company executed a 40-year management fee contract with Liberty Fuels Company, LLC, a wholly-owned subsidiary of The North American Coal Corporation (Liberty Fuels), which will develop, construct, and manage the mining operations. The contract with Liberty Fuels is effective through the end of the mine reclamation. As the mining permit holder, Liberty Fuels has a legal obligation to perform mine reclamation and the Company has a contractual obligation to fund all reclamation activities. In addition to the obligation to fund the reclamation activities, the Company currently provides working capital support to Liberty Fuels through cash advances for capital purchases, payroll, and other operating expenses.

In addition, the Company will acquire, construct, and operate the $CO_2$ pipeline for the planned transport of captured $CO_2$ for use in enhanced oil recovery. The Company has entered into agreements with Denbury Onshore (Denbury), a subsidiary of Denbury Resources Inc., and Treetop Midstream Services, LLC (Treetop), an affiliate of Tellus Operating Group, LLC and a subsidiary of Tengrys, LLC, pursuant to which Denbury will purchase 70% of the $CO_2$ captured from the Kemper IGCC and Treetop will purchase 30% of the $CO_2$ captured from the Kemper IGCC. The estimated capital cost of the $CO_2$ pipeline facilities is approximately $132 million, of which $78.4 million has been incurred through December 31, 2012.

The ultimate outcome of these matters, including the determinations of prudency and the specific manner of recovery of prudently-incurred costs relating to the Kemper IGCC, is subject to further regulatory actions and cannot be determined at this time.

*Proposed Sale of Undivided Interest to SMEPA*

In 2010, the Company and SMEPA entered into an asset purchase agreement whereby SMEPA agreed to purchase a 17.5% undivided interest in the Kemper IGCC. On February 28, 2012, the Mississippi PSC approved the sale and transfer of 17.5% of the Kemper IGCC to SMEPA. On June 29, 2012, the Company and SMEPA signed an amendment to the asset purchase agreement whereby SMEPA extended its option to purchase until December 31, 2012 and reduced its purchase commitment percentage from a 17.5% to a 15% undivided interest in the Kemper IGCC, subject to approval by the Mississippi PSC. On December 31, 2012, the Company and SMEPA agreed to extend SMEPA's option to purchase through December 31, 2013.

The closing of this transaction is conditioned upon execution of a joint ownership and operating agreement, receipt of all construction permits, appropriate regulatory approvals, financing, and other conditions. On September 27, 2012, SMEPA received a conditional loan commitment from Rural Utilities Service to provide funding for SMEPA's undivided interest in the Kemper IGCC.

On March 6, 2012, the Company received a $150 million interest-bearing refundable deposit from SMEPA to be applied to the purchase. While the expectation is that the amount will be applied to the purchase price at closing, the Company would be required to refund the deposit upon the termination of the asset purchase agreement, within 60 days of a request by SMEPA for a full or partial refund, or within 15 days at SMEPA's discretion in the event that the Company is assigned a senior unsecured credit rating of BBB+ or lower by Standard and Poor's Ratings Services, a division of The McGraw Hill Companies, Inc. (S&P) or Baa1 or lower by Moody's Investors Services, Inc. (Moody's) or ceases to be rated by either

**Mississippi Power Company 2012 Annual Report**

**Contractual Obligations**

| | 2013 | 2014-2015 | 2016-2017 | After 2017 | Uncertain Timing [d] | Total |
|---|---|---|---|---|---|---|
| | | | *(in thousands)* | | | |
| Long-term debt [a] — | | | | | | |
| Principal | $ 276,471 | $ — | $ 335,000 | $ 1,157,695 | $ — | $ 1,769,166 |
| Interest | 71,290 | 132,879 | 125,829 | 819,619 | — | 1,149,617 |
| Preferred stock dividends [b] | 1,733 | 3,465 | 3,465 | — | — | 8,663 |
| Financial derivative obligations [c] | 13,116 | 6,202 | 165 | — | — | 19,483 |
| Unrecognized tax benefits [d] | 3,562 | — | — | — | 3,997 | 7,559 |
| Operating leases [e] | 11,232 | 11,648 | 1,920 | — | — | 24,800 |
| Purchase commitments — | | | | | | |
| Capital [f] | 757,037 | 752,522 | — | — | — | 1,509,559 |
| Fuel [g] | 349,197 | 378,355 | 176,500 | 159,221 | — | 1,063,273 |
| Long-term service agreements [h] | 21,032 | 43,893 | 17,148 | — | — | 82,073 |
| Pension and other postretirement benefits plans [i] | 5,602 | 12,172 | — | — | — | 17,774 |
| Total | $ 1,510,272 | $ 1,341,136 | $ 660,027 | $ 2,136,535 | $ 3,997 | $ 5,651,967 |

(a)    All amounts are reflected based on final maturity dates. The Company plans to continue to retire higher-cost securities and replace these obligations with lower-cost capital if market conditions permit. Variable rate interest obligations are estimated based on rates as of January 1, 2013, as reflected in the statements of capitalization. Fixed rates include, where applicable, the effects of interest rate derivatives employed to manage interest rate risk. Long-term debt excludes capital lease amounts.

(b)    Preferred stock does not mature; therefore, amounts are provided for the next five years only.

(c)    For additional information, see Notes 1 and 10 to the financial statements.

(d)    The timing related to the realization of $4.0 million in unrecognized tax benefits in individual years beyond 12 months cannot be reasonably and reliably estimated due to uncertainties in the timing of the effective settlement of tax positions. See Note 5 to the financial statements under "Unrecognized Tax Benefits" for additional information.

(e)    See Note 7 to the financial statements for additional information.

(f)    The Company provides estimated capital expenditures for a three-year period, including capital expenditures and compliance costs associated with existing environmental regulations, including the MATS rule. Such amounts exclude the Company's estimates of potential incremental environmental compliance investment to comply with proposed water and coal combustion byproducts rules, which are approximately $6 million and $28 million for years 2014 and 2015, respectively. Estimates reflect the proposed sale of 15% of the Kemper IGCC to SMEPA. At December 31, 2012, significant purchase commitments were outstanding in connection with the construction program. These amounts exclude capital expenditures covered under long-term service agreements, which are reflected separately. See FUTURE EARNINGS POTENTIAL – "Environmental Matters – Environmental Statutes and Regulations" for additional information. See Note 3 to the financial statements under "Integrated Coal Gasification Combined Cycle" for additional information.

(g)    Includes commitments to purchase coal and natural gas, as well as the related transportation and storage. In most cases, these contracts contain provisions for price escalation, minimum purchase levels, and other financial commitments. Natural gas purchase commitments are based on various indices at the time of delivery. Amounts reflected for natural gas purchase commitments have been estimated based on the New York Mercantile Exchange future prices at December 31, 2012.

(h)    Long-term service agreements include price escalation based on inflation indices.

(i)    The Company forecasts contributions to the pension and other postretirement benefit plans over a three-year period. The Company anticipates no mandatory contributions to the qualified pension plan during the next three years. Amounts presented represent estimated benefit payments for the nonqualified pension plans, estimated non-trust benefit payments for the other postretirement benefit plans, and estimated contributions to the other postretirement benefit plan trusts, all of which will be made from the Company's corporate assets. See Note 2 to the financial statements for additional information related to the pension and other postretirement benefit plans, including estimated benefit payments. Certain benefit payments will be made through the related benefit plans. Other benefit payments will be made from the Company's corporate assets.

II-386

Table of Contents                    Index to Financial Statements

**MANAGEMENT'S DISCUSSION AND ANALYSIS (continued)**
**Mississippi Power Company 2012 Annual Report**

**Cautionary Statement Regarding Forward-Looking Statements**

The Company's 2012 Annual Report contains forward-looking statements. Forward-looking statements include, among other things, statements concerning retail sales, retail sales, customer growth, fuel and environmental cost recovery and other rate actions, current and proposed environmental regulations and related estimated expenditures, access to sources of capital, projections for the qualified pension plan and postretirement benefit plan, financing activities, start and completion of construction projects, plans and estimated costs for new generation

resources, filings with state and federal regulatory authorities, impact of the Tax Relief Act, impact of the ATRA, estimated sales and purchases under new power sale and purchase agreements, storm damage cost recovery and repairs, economic recovery, and estimated construction and other expenditures. In some cases, forward-looking statements can be identified by terminology such as "may," "will," "could," "should," "expects," "plans," "anticipates," "believes," "estimates," "projects," "predicts," "potential," or "continue" or the negative of these terms or other similar terminology. There are various factors that could cause actual results to differ materially from those suggested by the forward-looking statements; accordingly, there can be no assurance that such indicated results will be realized. These factors include:

- the impact of recent and future federal and state regulatory changes, including legislative and regulatory initiatives regarding deregulation and restructuring of the electric utility industry, environmental laws including regulation of water, coal combustion byproducts, and emissions of sulfur, nitrogen, carbon, soot, particulate matter, hazardous air pollutants, including mercury, and other substances, financial reform legislation, and also changes in tax and other laws and regulations to which the Company is subject, as well as changes in application of existing laws and regulations;

- current and future litigation, regulatory investigations, proceedings, or inquiries, including FERC matters, the pending EPA civil action, and IRS and state tax audits;

- the effects, extent, and timing of the entry of additional competition in the markets in which the Company operates;

- variations in demand for electricity, including those relating to weather, the general economy and recovery from the recent recession, population and business growth (and declines), the effects of energy conservation measures, and any potential economic impacts resulting from federal fiscal decisions;

- available sources and costs of fuels;

- effects of inflation;

- ability to control costs and avoid cost overruns during the development and construction of facilities, including the development and construction of facilities with designs that have not been finalized or previously constructed, to construct facilities in accordance with the requirements of permits and licenses, and to satisfy any operational and environmental performance standards, including the requirements of tax credits and other incentives;

- investment performance of the Company's employee benefit plans;

- advances in technology;

- state and federal rate regulations and the impact of pending and future rate cases and negotiations, including rate actions relating to fuel and other cost recovery mechanisms;

- regulatory approvals and legislative actions related to the Kemper IGCC, including Mississippi PSC approvals and legislation relating to cost recovery for the Kemper IGCC, the SMEPA purchase decision, satisfaction of requirements to utilize investment tax credits and grants, and the outcome of any proceedings regarding the Mississippi PSC's issuance of the CPCN for the Kemper IGCC;

- internal restructuring or other restructuring options that may be pursued;

- potential business strategies, including acquisitions or dispositions of assets or businesses, which cannot be assured to be completed or beneficial to the Company;

- the ability of counterparties of the Company to make payments as and when due and to perform as required;

- the ability to obtain new short- and long-term contracts with wholesale customers;

- the direct or indirect effect on the Company's business resulting from terrorist incidents and the threat of terrorist incidents, including cyber intrusion;

- interest rate fluctuations and financial market conditions and the results of financing efforts, including the Company's credit ratings;

- the impacts of any potential U.S. credit rating downgrade or other sovereign financial issues, including impacts on interest rates, access to capital markets, impacts on currency exchange rates, counterparty performance, and the economy in general, as well as potential impacts on the availability or benefits of proposed DOE loan guarantees;

II-387

Table of Contents                    Index to Financial Statements

**MANAGEMENT'S DISCUSSION AND ANALYSIS (continued)**
**Mississippi Power Company 2012 Annual Report**

- the ability of the Company to obtain additional generating capacity at competitive prices;

- catastrophic events such as fires, earthquakes, explosions, floods, hurricanes, droughts, pandemic health events such as influenzas, or other similar occurrences;

- the direct or indirect effects on the Company's business resulting from incidents affecting the U.S. electric grid or operation of generating resources;

- the effect of accounting pronouncements issued periodically by standard setting bodies; and

- other factors discussed elsewhere herein and in other reports (including the Form 10-K) filed by the Company from time to time with the SEC.

**The Company expressly disclaims any obligation to update any forward-looking statements.**

II-388
"

Table of Contents                    Index to Financial Statements

**STATEMENTS OF INCOME**
**For the Years Ended December 31, 2012, 2011, and 2010**
**Mississippi Power Company 2012 Annual Report**

| | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| | | | | *(in thousands)* | | |
| **Operating Revenues:** | | | | | | |
| Retail revenues | $ | 747,453 | $ | 792,463 | $ | 797,912 |
| Wholesale revenues, non-affiliates | | 255,557 | | 273,178 | | 287,917 |
| Wholesale revenues, affiliates | | 16,403 | | 30,417 | | 41,614 |
| Other revenues | | 16,583 | | 16,819 | | 15,625 |
| Total operating revenues | | 1,035,996 | | 1,112,877 | | 1,143,068 |
| **Operating Expenses:** | | | | | | |
| Fuel | | 411,226 | | 490,415 | | 501,830 |
| Purchased power, non-affiliates | | 5,221 | | 6,239 | | 8,426 |
| Purchased power, affiliates | | 49,907 | | 65,574 | | 75,230 |
| Other operations and maintenance | | 228,675 | | 266,395 | | 268,063 |
| Depreciation and amortization | | 86,510 | | 80,337 | | 76,891 |
| Taxes other than income taxes | | 79,445 | | 70,127 | | 69,810 |
| Total operating expenses | | 860,984 | | 979,087 | | 1,000,250 |
| **Operating Income** | | 175,012 | | 133,790 | | 142,818 |
| **Other Income and (Expense):** | | | | | | |
| Allowance for equity funds used during construction | | 64,793 | | 24,707 | | 3,795 |
| Interest income | | 745 | | 1,347 | | 215 |
| Interest expense, net of amounts capitalized | | (40,838) | | (21,691) | | (22,341) |
| Other income (expense), net | | 519 | | (45) | | 3,738 |
| Total other income and (expense) | | 25,219 | | 4,318 | | (14,593) |
| **Earnings Before Income Taxes** | | 200,231 | | 138,108 | | 128,225 |
| Income taxes | | 50,391 | | 42,193 | | 46,275 |
| **Net Income** | | 149,840 | | 95,915 | | 81,950 |
| **Dividends on Preferred Stock** | | 1,733 | | 1,733 | | 1,733 |
| **Net Income After Dividends on Preferred Stock** | $ | 148,107 | $ | 94,182 | $ | 80,217 |

The accompanying notes are an integral part of these financial statements.

II-389
"

Table of Contents                    Index to Financial Statements

**STATEMENTS OF COMPREHENSIVE INCOME**
**For the Years Ended December 31, 2012, 2011, and 2010**
**Mississippi Power Company 2012 Annual Report**

| | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| | | | | *(in thousands)* | | |
| **Net Income** | $ | 149,840 | $ | 95,915 | $ | 81,950 |
| Other comprehensive income (loss): | | | | | | |

an amount equal to 3.3% of total 2012 MRA revenue. Effective February 1, 2013, the wholesale MB fuel rate decreased, resulting in an annual decrease in an amount equal to 5.5% of total 2012 MB revenue. At December 31, 2012, the amount of over recovered wholesale MRA and MB fuel costs included in the balance sheets was $19.0 million and $2.1 million compared to $14.3 million and $2.2 million, respectively, at December 31, 2011. In addition, at December 31, 2012, the amount of over recovered MRA emissions allowance cost included in the balance sheets was $0.4 million compared to $1.7 million at December 31, 2011. The Company's operating revenues are adjusted for differences in actual recoverable fuel cost and amounts billed in accordance with the currently approved cost recovery rate. Accordingly, changes in the billing factor have no significant effect on the Company's revenues or net income, but will affect annual cash flow.

In March 2011, a portion of the Company's territorial wholesale loads that was formerly served under the MB tariff terminated service. Beginning in April 2011, a new power purchase agreement (PPA) went into effect to cover these MB customers as non-territorial load. In June 2011, the Company and South Mississippi Electric Power Association (SMEPA) reached an agreement to allocate $3.7 million of the over recovered fuel balance at March 31, 2011 to the PPA. This amount was subsequently refunded to SMEPA in June 2011.

The Mississippi PSC engaged an independent professional audit firm to conduct an audit of the Company's fuel-related expenditures included in the retail fuel adjustment clause and ECM. The 2012 audit of fuel-related expenditures began in the second quarter 2012 and was completed in the fourth quarter 2012 with no audit findings.

### System Restoration Rider

The Company is required to make annual SRR filings to review charges to the property damage reserve and to determine the revenue requirement associated with property damage. The purpose of the SRR is to provide for recovery of costs associated with property damage (including certain property insurance and the costs of self insurance) and to facilitate the Mississippi PSC's review of these costs. The Mississippi PSC periodically agrees on SRR revenue levels that are developed based on historical data, expected exposure, type and amount of insurance coverage excluding insurance costs, and other relevant information. The applicable SRR rate level will be adjusted every three years, unless a significant change in circumstances occurs such that the Company and the MPUS or the Mississippi PSC deems that a more frequent change would be appropriate. The Company will submit annual filings setting forth SRR-related revenues, expenses, and investment for the projected filing period, as well as the true-up for the prior period.

In January 2011, the Company submitted its 2011 SRR rate filing with the Mississippi PSC, which proposed that the 2011 SRR rate level remain at zero and the Company be allowed to accrue $3.6 million to the property damage reserve in 2011. On May 5, 2011, the filing was approved by the Mississippi PSC. On February 2, 2012, the Company submitted its 2012 SRR rate filing with the Mississippi PSC, which proposed that the 2012 SRR rate level remain at zero and the Company be allowed to accrue $3.8 million to the property damage reserve in 2012. On April 3, 2012, the filing was approved by the Mississippi PSC. On February 1, 2013, the Company submitted its 2013 SRR rate filing with the Mississippi PSC, which proposed that the 2013 SRR rate level remain at zero and the Company be allowed to accrue $3.2 million to the property damage reserve in 2013. The ultimate outcome of this matter cannot be determined at this time.

### Storm Damage Cost Recovery

In August 2012, Hurricane Isaac hit the Gulf Coast of the United States and caused damage within the Company's service area. The estimated total storm restoration costs relating to Hurricane Isaac through December 31, 2012 were $10.5 million. The Company maintains a reserve to cover the cost of damage from major storms to its transmission and distribution facilities and generally the cost of uninsured damage to its generation facilities and other property. At December 31, 2012, the balance in the storm reserve was $58.8 million.

II-417

Table of Contents  Index to Financial Statements

**NOTES (continued)**
**Mississippi Power Company 2012 Annual Report**

### Integrated Coal Gasification Combined Cycle
#### General

The Company is constructing the Kemper IGCC which will utilize an IGCC technology with an output capacity of 582 MWs. The Kemper IGCC will use as fuel locally mined lignite (an abundant, lower heating value coal) from a mine owned by the Company and situated adjacent to the Kemper IGCC. In connection with the Kemper IGCC, the Company also plans to construct and operate approximately 61 miles of $CO_2$ pipeline infrastructure. The Kemper IGCC is scheduled to be placed in-service in May 2014.

In 2010, the Mississippi PSC issued a CPCN authorizing the acquisition, construction, and operation of the Kemper IGCC (2010 MPSC Order). The Sierra Club filed an appeal of the Mississippi PSC's issuance of the CPCN and, on March 15, 2012, the Mississippi Supreme Court reversed the decision of the Chancery Court of Harrison County, Mississippi (Chancery Court) upholding the 2010 MPSC Order and remanded the matter to the Mississippi PSC. The Mississippi Supreme Court concluded that the 2010 MPSC Order did not cite in sufficient detail substantial evidence upon which the Mississippi Supreme Court could determine the basis for the findings of the Mississippi PSC granting the CPCN. On March 30, 2012, the Mississippi PSC issued a temporary authorization which allowed the Company to continue construction and, on April 24, 2012, issued a detailed order (2012 MPSC Order) confirming the CPCN for the Kemper IGCC. On April 26, 2012, the Sierra Club appealed the 2012 MPSC Order to the Chancery Court. On December 17, 2012, the Chancery Court affirmed the 2012 MPSC Order which confirmed the issuance of the CPCN for the Kemper IGCC. On January 8, 2013, the Sierra Club filed an appeal of the Chancery Court's ruling with the Mississippi Supreme Court.

The certificated cost estimate of the Kemper IGCC included in the 2012 MPSC Order was $2.4 billion, net of $245.3 million of grants awarded to the project by the DOE under the CCPI2 and excluding the cost of the lignite mine and equipment, the cost of the $CO_2$ pipeline facilities, and financing

costs related to the Kemper IGCC. The 2012 MPSC Order approved a construction cost cap of up to $2.88 billion, with recovery of prudently-incurred costs subject to approval by the Mississippi PSC. Exemptions from the cost cap included in the 2012 MPSC Order included the cost of the lignite mine and equipment, the cost of the $CO_2$ pipeline facilities, financing costs, and certain general exceptions, including change of law, force majeure, and beneficial capital (which exists when the Company demonstrates that the purpose and effect of the construction cost increase is to produce efficiencies that will result in a neutral or favorable effect on the ratepayers, relative to the original proposal for the CPCN).

The Company's current cost estimate for the Kemper IGCC (net of the $245.3 million CCPI2 grant, and excluding the cost of the lignite mine and equipment, the cost of the $CO_2$ pipeline facilities, financing costs, and certain general exceptions as contemplated in the 2012 MPSC Order and the settlement agreement between the Company and the Mississippi PSC entered into on January 24, 2013 (Settlement Agreement) that must be specifically approved by the Mississippi PSC) is approximately $2.88 billion. The Mississippi PSC and the MPUS have engaged their independent monitors to assess the current cost estimates and schedule projections for the Kemper IGCC. These consultants have issued reports with their own opinions as to the likelihood that costs for the Kemper IGCC will remain at or under the $2.88 billion cost cap and as to the expected in-service date. While the Company continues to believe its cost estimate and schedule projection remain appropriate based on the current status of the project, it is possible that the Company could experience further cost increases and/or schedule delays with respect to the Kemper IGCC. Certain factors have caused and may continue to cause the costs for the Kemper IGCC to increase and/or schedule delays to occur including, but not limited to, costs and productivity of labor, adverse weather conditions, shortages and inconsistent quality of equipment, materials and labor, contractor or supplier delay or non-performance under construction or other agreements, and unforeseen engineering problems. To the extent it becomes probable that costs beyond any permitted exceptions to the cost cap will exceed $2.88 billion or it becomes probable that the Mississippi PSC will disallow a portion of the costs relating to the Kemper IGCC, including certain general exceptions as contemplated in the 2012 MPSC Order and the Settlement Agreement, charges to expense may occur and these charges could be material. See "Cost Recovery Plans" below for additional information relating to the Settlement Agreement that defines the process for resolving matters regarding cost recovery related to the Kemper IGCC.

As of December 31, 2012, the Company had spent a total of $2.51 billion on the Kemper IGCC, including the cost of the lignite mine and equipment, the cost of the $CO_2$ pipeline facilities, and other deferred costs. Of this total, $2.47 billion was included in CWIP (which is net of $245.3 million of CCPI2 grant funds), $34.9 million was recorded in other regulatory assets, $3.8 million was recorded in other deferred charges and assets, and $1.0 million was previously expensed. Consistent with the treatment of non-capital costs incurred during the pre-construction period, the Mississippi PSC granted the Company the authority to defer all non-capital Kemper IGCC-related costs to a regulatory asset during the construction period. This includes deferred costs associated with the generation resource planning, evaluation, and screening activities. The amortization period for the regulatory asset will be determined by the Mississippi PSC at a later date.

II-418

Table of Contents   Index to Financial Statements

**NOTES (continued)**
**Mississippi Power Company 2012 Annual Report**

In addition, the Company is authorized to accrue carrying costs on the unamortized balance of such regulatory assets at a rate and in a manner to be determined by the Mississippi PSC in future cost recovery mechanism proceedings.

The 2012 MPSC Order established periodic prudence reviews during the annual CWIP review process. Of the total costs of $51 million incurred through March 2009, $46 million has been reviewed and deemed prudent by the Mississippi PSC. Due to the decision of the Mississippi PSC to deny the Certificated New Plant-A (CNP-A) rate filing and a 2012 rate request related to the Kemper IGCC described below, prudence reviews for the construction costs of the Kemper IGCC incurred after March 2009 have not been made. The Settlement Agreement provides for completion of all prudence reviews within six months of the date the Kemper IGCC is placed in service. See "Cost Recovery Plans" herein for additional information.

The ultimate outcome of these matters, including the determinations of prudency and the specific manner of recovery of prudently-incurred costs relating to the Kemper IGCC, is subject to further regulatory actions and cannot be determined at this time.

*Cost Recovery Plans*

The 2012 MPSC Order included provisions relating to both the Company's recovery of financing costs during the course of construction of the Kemper IGCC and the Company's recovery of costs following the date the Kemper IGCC is placed in service. In the 2012 MPSC Order, the Mississippi PSC approved financing cost recovery on CWIP balances not to exceed the $2.4 billion certificated cost estimate for the Kemper IGCC. The 2012 MPSC Order provided for the accrual of AFUDC in 2010 and 2011 and for the current recovery of financing costs on 100% of CWIP in 2012, 2013, and through May 1, 2014 (provided that the amount of financing cost recovery allowed is to be reduced by the amount of certain state and federal government construction cost incentives received by the Company and must be justified by a showing that such recovery will benefit customers over the life of the Kemper IGCC). With respect to recovery of costs following the in-service date of the Kemper IGCC, the 2012 MPSC Order provided for the establishment of operational cost and revenue parameters based upon assumptions in the Company's petition for the CPCN.

On June 1, 2012, the MPUS signed a joint stipulation with the Company to establish a proposed rate schedule detailing CNP-A and, on June 14, 2012, the Company submitted to the Mississippi PSC a filing to establish the new CNP-A rate schedule and a stipulated rate increase based upon the revenue request of between $55.3 million and $58.6 million to recover financing costs over the remainder of 2012. On June 22, 2012, the Mississippi PSC denied the proposed CNP-A rate schedule and the 2012 rate recovery filings submitted by the Company, pending a final ruling from the Mississippi Supreme Court regarding the Sierra Club's appeal of the Mississippi PSC's issuance of the CPCN for the Kemper IGCC.

On July 9, 2012, the Company appealed the Mississippi PSC's June 22, 2012 decision to the Mississippi Supreme Court and requested interim rates under bond of $55.3 million. On July 31, 2012, the Mississippi Supreme Court denied the Company's request for interim rates under bond until the Mississippi Supreme Court decides the Company's appeal of the Mississippi PSC's June 22, 2012 decision.

On January 24, 2013, the Company and the Mississippi PSC entered into the Settlement Agreement that (1) establishes the process for resolving matters regarding cost recovery related to the Kemper IGCC for the purpose of mitigating risks to the Company and its customers and expediting the regulatory process associated with future rate filings required under the Settlement Agreement and (2) resolves the Company's CNP-A rate appeal before the Mississippi Supreme Court.

On February 12, 2013, the Mississippi Supreme Court granted the Company and the Mississippi PSC's joint filing for dismissal of the Company's appeal of the Mississippi PSC's June 22, 2012 decision.

Under the terms of the Settlement Agreement, the Company and the Mississippi PSC will follow certain agreed-upon regulatory procedures and schedules for resolving the cost recovery matters related to the Kemper IGCC. These procedures and schedules include the following:  (1) the Company's filing within 30 days of the Settlement Agreement of a new request to increase rates in 2013 in an amount not to exceed a $172 million annual revenue requirement, based upon projected investment as of December 31, 2013, to be recorded to a regulatory liability to be used to mitigate rate impacts when the Kemper IGCC is placed in service (which filing for $172 million was made on January 25, 2013); (2) the Mississippi PSC's decision on that matter within 50 days of the Company's request; (3) the Company's collaboration with the MPUS to file with the Mississippi PSC within three months of the Settlement Agreement a rate recovery plan for the Kemper IGCC for the first seven years of its operation, along with a proposed revenue requirement under such plan for 2014 through 2020 (which filing was made on February 26, 2013 as described below); (4) the Mississippi PSC's decision on the rate recovery plan within four months of that filing; (5) the Company's agreement to limit the portion of prudently -incurred Kemper IGCC costs to be included in rate base to the $2.4 billion certificated cost estimate, plus costs related to the lignite mine and $CO_2$ pipeline as well as any other costs permitted or determined to be excluded from the cost cap, provided that this limitation will not prevent the Company from securing alternate financing to recover any prudently-incurred Kemper IGCC costs, including financing costs and plant costs above the $2.4 billion certificated

Table of Contents Index to Financial Statements

**NOTES (continued)**
**Mississippi Power Company 2012 Annual Report**

cost estimate, not otherwise recovered in any Mississippi PSC rate proceeding contemplated by the Settlement Agreement; and (6) the Mississippi PSC's completion of its prudence review of the Kemper IGCC costs incurred through 2012 within six months of the Settlement Agreement, an additional prudence review upon considering the seven-year rate plan for costs incurred through the most recent reporting period, and a final prudence review of the remaining project costs within six months of the Kemper IGCC's in-service date.

Legislation to authorize a multi-year rate plan and legislation to provide for alternate financing through securitization was passed in the Mississippi legislature and was signed by the Governor on February 26, 2013. The Company contemplates using securitization as provided in the legislation as its form of alternate financing for prudently-incurred Kemper IGCC costs, including financing costs and plant costs above the $2.4 billion certificated cost estimate, not otherwise recovered in any Mississippi PSC rate proceeding contemplated by the Settlement Agreement.

On February 26, 2013, the Company, in compliance with the Settlement Agreement, filed with the Mississippi PSC a rate recovery plan for the Kemper IGCC for 2014 through 2020, the first seven years of operation of the Kemper IGCC. The rate recovery plan proposes recovery of an annual revenue requirement of approximately $150 million of Kemper IGCC-related operational costs and rate base amounts, including plant costs equal to the $2.4 billion certificated cost estimate. Approval of the Company's request to increase rates in 2013 to mitigate the rate impacts of the Kemper IGCC filed on January 25, 2013 is integral to the rate recovery plan as the proposed filing contemplates amortization of the regulatory liability to be used to mitigate rate impacts from 2014 through 2020, based on a fixed amortization schedule that requires approval by the Mississippi PSC. Under the rate recovery plan filing, the Company proposes annual recovery to remain the same from 2014 through 2020 and while it is the intent of the Company for the actual revenue requirement to equal the proposed revenue requirement for certain items, the Company proposes that the annual differences for those items through 2020 will be deferred, subject to accrual of carrying costs, and the cumulative balance will be reviewed at the end of the term of the Settlement Agreement by the Mississippi PSC for determination of the manner of recovery. The Company proposes to secure recovery of prudently-incurred Kemper IGCC costs, including financing costs and plant costs above the $2.4 billion certificated cost estimate, not otherwise recovered in any Mississippi PSC rate proceeding contemplated by the Settlement Agreement to be provided for with alternate financing through securitization. The rate recovery necessary to recover the annual costs of securitization is proposed to be filed and begin after the Kemper IGCC is placed in service.

Under the terms of the Settlement Agreement, the Company has the right to terminate the Settlement Agreement if certain conditions, including the passage of multi-year rate plan legislation that is contemplated under the Settlement Agreement, are not met, if the Company is unable to secure alternate financing for any prudently-incurred Kemper IGCC costs not otherwise recovered in any Mississippi PSC rate proceeding contemplated by the Settlement Agreement, or if the Mississippi PSC fails to comply with the requirements of the Settlement Agreement.

The ultimate outcome of these matters, including the determinations of prudency and the specific manner of recovery of prudently-incurred costs relating to the Kemper IGCC, is subject to further regulatory actions and cannot be determined at this time.

*Tax Incentives*

The Internal Revenue Service (IRS) has allocated $133 million (Phase I) and $279 million (Phase II) of Internal Revenue Code Section 48A tax credits to the Company in connection with the Kemper IGCC. The Company's utilization of Phase I and Phase II credits is dependent upon meeting the IRS certification requirements, including an in-service date no later than May 11, 2014 for the Phase I credits and April 19, 2016 for the Phase II credits. In order to remain eligible for the Phase II credits, the Company plans to capture and sequester (via enhanced oil recovery) at least 65% of the $CO_2$ produced by the Kemper IGCC during operations in accordance with the rules for Section 48A investment tax credits. Through December 31, 2012, the Company received or accrued tax benefits totaling $361.6 million for these tax credits, which will be amortized as a reduction to depreciation and amortization over the life of the Kemper IGCC. As a result of bonus tax depreciation on certain assets placed, or to be placed, in service in 2012 and

The capital program of the Company is currently estimated to be $909.6 million for 2013, $751.8 million for 2014, and $735.7 million for 2015. These amounts include estimates for potential plant acquisitions and new construction as well as ongoing capital improvements and work to be performed under long-term service agreements. Planned expenditures for plant acquisitions may vary due to market opportunities and the Company's ability to execute its growth strategy. Actual construction costs may vary from these estimates because of changes in factors such as: business conditions; environmental statutes and regulations; FERC rules and regulations; load projections; legislation; the cost and efficiency of construction labor, equipment, and materials; project scope and design changes; and the cost of capital.

In addition, pursuant to an agreement with TRE, on or after November 25, 2015, TRE may require the Company to purchase its noncontrolling interest in STR at fair market value.

Other funding requirements related to obligations associated with scheduled maturities of long-term debt, as well as the related interest, leases, derivative obligations, and other purchase commitments are detailed in the contractual obligations table that follows. See Notes 1, 5, 6, 7, and 9 to the financial statements for additional information.

II-462

Table of Contents          Index to Financial Statements

**MANAGEMENT'S DISCUSSION AND ANALYSIS (continued)**
**Southern Power Company and Subsidiary Companies 2012 Annual Report**

**Contractual Obligations**

| | 2013 | 2014-2015 | 2016-2017 | After 2017 | Uncertain Timing [c] | Total |
|---|---|---|---|---|---|---|
| | *(in millions)* | | | | | |
| Long-term debt[a] — | | | | | | |
|   Principal | $ — | $ 525.0 | $ — | $ 779.1 | $ — | $ 1,304.1 |
|   Interest | 68.1 | 124.5 | 85.0 | 944.6 | — | 1,222.2 |
| Financial derivative obligations[b] | 0.7 | 0.6 | — | — | — | 1.3 |
| Operating leases[c] | 1.3 | 3.0 | 2.6 | 40.3 | — | 47.2 |
| Unrecognized tax benefits[d] | — | — | — | — | 2.9 | 2.9 |
| Purchase commitments — | | | | | | |
|   Capital[e] | 799.7 | 1,374.4 | — | — | — | 2,174.1 |
|   Fuel[f] | 469.4 | 688.4 | 345.5 | 277.4 | — | 1,780.7 |
|   Purchased power[g] | 50.4 | 105.1 | 77.4 | 164.3 | — | 397.2 |
|   Other[h] | 51.7 | 184.9 | 142.0 | 534.1 | — | 912.7 |
|   Transmission agreements[i] | 0.9 | 1.8 | 3.6 | 3.6 | — | 9.9 |
| Total | $ 1,442.2 | $ 3,007.7 | $ 656.1 | $ 2,743.4 | $ 2.9 | $ 7,852.3 |

(a)    All amounts are reflected based on final maturity dates. The Company plans to retire higher-cost securities and replace these obligations with lower-cost capital if market conditions permit.

(b)    For additional information, see Notes 1 and 9 to the financial statements.

(c)    Operating lease commitments are subject to price escalation based on the Consumer Price Index for All Urban Consumers for the Plant Stanton Unit A land lease.

(d)    The timing related to the realization of $2.9 million in unrecognized tax benefits in individual years beyond 12 months cannot be reasonably and reliably estimated due to uncertainties in the timing of the effective settlement of tax positions. See Note 5 to the financial statements under "Unrecognized Tax Benefits" for additional information.

(e)    The Company provides estimated capital expenditures for a three-year period. Amounts represent current estimates of total expenditures, excluding capital expenditures covered under long-term service agreements.

(f)    Primarily commitments to purchase, transport, and store natural gas fuel. Amounts reflected are based on contracted cost and may contain provisions for price escalation. Amounts reflected for natural gas purchase commitments are based on various indices at the time of delivery and have been estimated based on the New York Mercantile Exchange future prices at December 31, 2012.

(g)    Purchased power commitments of $36.1 million in 2013, $74.4 million in 2014-2015, $77.4 million in 2016-2017, and $164.3 million after 2017 will be resold under a third party agreement to EnergyUnited EMC. The purchases will be resold at cost.

(h)    Includes long-term service agreements and operation and maintenance agreements. Long-term service agreements include price escalation based on inflation indices.

(i)    Transmission commitments are based on Southern Company's current tariff rate for point-to-point transmission.

II-463

Table of Contents          Index to Financial Statements

**MANAGEMENT'S DISCUSSION AND ANALYSIS (continued)**

**Southern Power Company and Subsidiary Companies 2012 Annual Report**

**Cautionary Statement Regarding Forward-Looking Statements**

The Company's 2012 Annual Report contains forward-looking statements. Forward-looking statements include, among other things, statements concerning the strategic goals for the Company's business, customer growth, economic recovery, fuel and environmental cost recovery, current and proposed environmental regulations and related estimated expenditures, access to sources of capital, financing activities, impact of the Tax Relief Act, impact of the ATRA, estimated sales and purchases under new power sale and purchase agreements, timing of expected future capacity need in existing markets, completion of construction projects, filings with federal regulatory authorities, plans and estimated costs for new generation resources, and estimated construction and other expenditures. In some cases, forward-looking statements can be identified by terminology such as "may," "will," "could," "should," "expects," "plans," "anticipates," "believes," "estimates," "projects," "predicts," "potential," or "continue" or the negative of these terms or other similar terminology. There are various factors that could cause actual results to differ materially from those suggested by the forward-looking statements; accordingly, there can be no assurance that such indicated results will be realized. These factors include:

- the impact of recent and future federal and state regulatory changes, including legislative and regulatory initiatives regarding deregulation and restructuring of the electric utility industry, environmental laws including regulation of water and emissions of sulfur, nitrogen, carbon, soot, particulate matter, hazardous air pollutants, including mercury, and other substances, financial reform legislation, and also changes in tax and other laws and regulations to which the Company is subject, as well as changes in application of existing laws and regulations;
- current and future litigation, regulatory investigations, proceedings, or inquiries, including Internal Revenue Service and state tax audits;
- the effects, extent, and timing of the entry of additional competition in the markets in which the Company operates;
- variations in demand for electricity, including those relating to weather, the general economy and recovery from the recent recession, population and business growth (and declines), the effects of energy conservation measures, and any potential economic impacts resulting from federal fiscal decisions;
- available sources and costs of fuels;
- effects of inflation;
- ability to control costs and avoid cost overruns during the development and construction of facilities and to construct facilities in accordance with the requirements of permits and licenses, and to satisfy any operational and environmental performance standards, including the requirements of tax credits and other incentives;
- advances in technology;
- state and federal rate regulations;
- internal restructuring or other restructuring options that may be pursued;
- potential business strategies, including acquisitions or dispositions of assets or businesses, which cannot be assured to be completed or beneficial to the Company;
- the ability of counterparties of the Company to make payments as and when due and to perform as required;
- the ability to obtain new short- and long-term contracts with wholesale customers;
- the direct or indirect effect on the Company's business resulting from terrorist incidents and the threat of terrorist incidents, including cyber intrusion;
- interest rate fluctuations and financial market conditions and the results of financing efforts, including the Company's credit ratings;
- the impacts of any potential U.S. credit rating downgrade or other sovereign financial issues, including impacts on interest rates, access to capital markets, impacts on currency exchange rates, counterparty performance, and the economy in general;
- the ability of the Company to obtain additional generating capacity at competitive prices;
- catastrophic events such as fires, earthquakes, explosions, floods, hurricanes, droughts, pandemic health events such as influenzas, or other similar occurrences;
- the direct or indirect effects on the Company's business resulting from incidents affecting the U.S. electric grid or operation of generating resources;
- the effect of accounting pronouncements issued periodically by standard setting bodies; and
- other factors discussed elsewhere herein and in other reports (including the Form 10-K) filed by the Company from time to time with the SEC.

**The Company expressly disclaims any obligation to update any forward-looking statements.**

II-464

Table of Contents                    Index to Financial Statements

**CONSOLIDATED STATEMENTS OF INCOME**
**For the Years Ended December 31, 2012, 2011, and 2010**
**Southern Power Company and Subsidiary Companies 2012 Annual Report**

| | 2012 | 2011 | 2010 |
|---|---|---|---|