IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**MONROE COUNTY EMPLOYEES'
RETIREMENT SYSTEM, and
ROOFERS LOCAL 149 PENSION
FUND, Individually and on Behalf of
All Others Similarly Situated,**

     **Plaintiffs,**

**v.**

**THE SOUTHERN COMPANY,
THOMAS A. FANNING, ART P.
BEATTIE, EDWARD DAY, VI,
G. EDISON HOLLAND, JR., JOHN
C. HUGGINS, and THOMAS O.
ANDERSON,**

     **Defendants.**

**CIVIL ACTION FILE**

**NO. 1:17-CV-241-MHC**

## ORDER

This case comes before the Court on Defendants' Motion to Dismiss the

Consolidated Complaint [Doc. 37] ("Defs.' Mot.").

## I.     BACKGROUND

### A.     The Kemper Plant

In January 2009, the Mississippi Power Company ("Mississippi Power"), a

wholly owned subsidiary of Defendant The Southern Company ("Southern

Company"), announced its plans to construct a "clean coal" power plant in Kemper

County, Mississippi (the "Kemper Plant").  Consolidated Compl. [Doc. 28]

("Compl.") ¶ 33.  The Kemper Plant was to utilize an integrated coal gasification

combined cycle technology with carbon capture capabilities.  Id.  The technology

was designed to turn lignite coal into a synthetic gas that would then be used to

fuel the power plant.  Id. ¶ 3.  Mississippi Power received notice in 2009 that the

Internal Revenue Service certified the allocation of $133 million in tax credits to

Mississippi Power in conjunction with the construction of the Kemper Plant

contingent upon meeting certain certification requirements, including the

achievement of a commercial operation date ("COD") by May 2014.  Id. ¶¶ 4, 35.

The entity charged with regulating utilities in Mississippi, the Mississippi

Public Service Commission ("Mississippi PSC"), issued a certification of public

convenience and necessity in June 2010, which authorized the acquisition,

construction, and operation of the Kemper Plant.[1]  Id. ¶¶ 32, 36.  The authorization

from the Mississippi PSC approved a construction cost limit of $2.88 billion and a

ratepayer-funded allowance to cover financing of the construction costs through

---

[1] In accordance with an order from the Mississippi Supreme Court, the Mississippi
PSC issued a second order on April 24, 2012, again authorizing the acquisition,
construction, and operation of the Kemper Plant and requiring Mississippi Power
to provide monthly progress reports to the Mississippi PSC indicating if the
Kemper Project was on schedule and within budget.  Compl. ¶ 42; Mississippi PSC
Order dated April 24, 2012 [Doc. 37-9].

May 1, 2014. Id. ¶ 36. Any cost associated with the construction or financing beyond this amount or subsequent to May 1, 2014, would not be borne by Mississippi Power's rate-paying customers. Id. The Mississippi PSC also directed that an independent monitor be retained to monitor the Kemper Plant's progress.[2] Id. ¶ 37.

On July 28, 2010, during an earnings call, Southern Company announced that the Kemper Plant project had been approved by the Mississippi PSC, stated that the Kemper Plant's construction cost would be $2.4 billion, and that it would be operational by May 2014. Id. ¶ 38. Southern Company broke ground on the Kemper Plant on December 16, 2010. Id. ¶ 39. However, seven months before the May 2014 COD, Defendants disclosed that the Kemper Plant would miss the deadline and be forced to repay the $133 million in IRS tax credits. Id. ¶ 45. As recently as June 2017, Defendants announced that the Kemper Plant was not yet fully commercially operable and would cost nearly three times its original construction cost limit. Id. ¶ 47.

---

[2] Burns and Roe Enterprises, Inc. (the "Independent Monitor"), a power plant design, engineering, and construction company, was retained in February 2011 to monitor the Kemper Plant project. Id. ¶¶ 37, 79.

**B.     The New York Times Article**

On July 5, 2016, The New York Times published the results of its

investigation into the effort to bring the Kemper Plant into operation.  Ian Urbina,

Piles of Dirty Secrets Behind a Model 'Clean Coal' Project, N.Y. TIMES, July 5,

2016 [Doc. 37-50]; Compl. ¶¶ 48-55.  The article reported that the Kemper Plant

was $4 billion over budget and still not operational.  Compl. ¶ 49.  The

investigation that led to the article was based on a review of public records,

previously undisclosed documents, including emails, and hundreds of hours of

secretly recorded conversations.  Id.  As alleged in Plaintiffs' Complaint, The New

York Times article was the first revelation of any evidence of fraud related to the

Kemper Plant project.  Id. ¶ 55 ("The evidence and conclusions in The New York

Times publicly revealed for the first time that Defendants had engaged in

deliberate conduct to deceive the market and investors regarding the schedule

delays infecting the Kemper Plant.").

**C.     The Present Lawsuit**

Plaintiffs brought this class action on behalf of all persons who purchased or

otherwise acquired Southern Company common stock between April 25, 2012 and

October 30, 2013 (the "Class Period"), against Southern Company and certain

Southern Company executives for violations of the Securities Exchange Act of

4

1934 ("Exchange Act").  Id. ¶ 2.  The lawsuit is based upon thirty-seven purported

false and misleading statements and omissions Defendants allegedly made to

investors regarding the construction and completion of the Kemper Plant during

the Class Period.  Id. ¶¶ 3, 5, 43-44, 112-13, 116-20, 122-23, 125-28, 130, 132-41,

143, 145-47, 149-55, 157-58.[3]  In their two-count Complaint, Plaintiffs assert the

following federal securities claims against all Defendants: (1) violation of § 10(b)

of the Exchange Act and implementing Rule 10b-5; and (2) violation of § 20(a) of

the Exchange Act.

## II.   LEGAL STANDARDS

Defendants' Motion implicates three different pleading standards: (1) the

federal notice pleading requirements in Federal Rule of Civil Procedure 8(a)(2); (2)

the special fraud pleading requirements in Federal Rule of Civil Procedure 9(b);

and (3) the heightened pleading requirements of the Private Securities Litigation

Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 ("PSLRA").  See In re

Galectin Therapeutics, Inc. Secs. Litig., 843 F.3d 1257, 1269 (11th Cir. 2016)

---

[3] Defendants have submitted an index in which each statement is individually
numbered.  See Appendix A [Doc. 37-2].  For ease of reference and in a manner
consistent with the parties' practice in the briefing of Defendants' Motion, the
Court also will refer to the statements at issue as they are numbered in Defendants'
appendix.  See Pls.' Opp'n to Defs.' Mot. [Doc. 38] ("Pls.' Resp.") at 5 n.4
(indicating that Plaintiffs would refer to the statements at issue in this case by
number as indicated in Defendants' Appendix A).

("The PSLRA imposes additional heightened pleading requirements for Rule 10b–5(b) actions.").

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Under Federal Rule of Civil Procedure 12(b)(6), a claim will be dismissed for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The Supreme Court has explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citation omitted). Thus, a claim will survive a motion to dismiss only if the factual allegations in the pleading are "enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

At the motion to dismiss stage, the court accepts all well-pleaded facts in the plaintiff's complaint as true, as well as all reasonable inferences drawn from those facts. McGinley v. Houston, 361 F.3d 1328, 1330 (11th Cir. 2004); Lotierzo v.

Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002).  Not only

must the court accept the well-pleaded allegations as true, but these allegations

must also be construed in the light most favorable to the pleader.  Powell v.

Thomas, 643 F.3d 1300, 1302 (11th Cir. 2011).  However, the court need not

accept legal conclusions, nor must it accept as true legal conclusions couched as

factual allegations.  Iqbal, 556 U.S. at 678.  Thus, evaluation of a motion to dismiss

requires the court to assume the veracity of well-pleaded factual allegations and

"determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.

Under Federal Rule of Civil Procedure 9(b), a complaint alleging fraud

"must state with particularity the circumstances constituting fraud."

> Rule 9(b) is satisfied if the complaint sets forth (1) precisely what
> statements were made in what documents or oral representations or
> what omissions were made, and (2) the time and place of each such
> statement and the person responsible for making (or, in the case of
> omissions, not making) same, and (3) the content of such statements
> and the manner in which they misled the plaintiff, and (4) what the
> defendants obtained as a consequence of the fraud.

United States ex rel. Clausen v. Lab. Corp. of Am., 290 F.3d 1301, 1310 (11th Cir.

2002) (quoting Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir.

2001)).  "Failure to satisfy Rule 9(b) is a ground for dismissal of a complaint."

Corsello v. Lincare, Inc., 428 F.3d 1008, 1012 (11th Cir. 2005).

7

However, Rule 9(b) also provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). Thus, it "does not require a plaintiff to allege specific facts related to the defendant's state of mind when the allegedly fraudulent statements [or omissions] were made." Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1237 (11th Cir. 2008). Instead, it is sufficient to plead "the who, what, when, where, and how" of the allegedly fraudulent statements or omissions and then allege generally that those statements or omissions were made with the requisite intent. Id.

The PSLRA imposes the following additional heightened pleading requirements for Rule 10b-5(b) actions predicated on allegedly false or misleading statements or omissions:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant—
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1). Further, for all private Rule 10b-5(b) actions requiring proof of scienter, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter]." Id., § 78u-4(b)(2). To qualify as a "strong inference" of scienter, the inference must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007). Although factual allegations may be aggregated to create an inference of scienter, it must be alleged "with respect to each defendant and with respect to each alleged violation of the statute." Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1017-18 (11th Cir. 2004) (citing 15 U.S.C. §78u-4(b)(2)). If these heightened PSLRA pleading requirements are not satisfied, the court "shall" dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).

## III.   ANALYSIS

"Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security." Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2407 (2014). To state

9

a claim under § 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss [i.e., damages]; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'" FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1295 (11th Cir. 2011) (brackets in original).

Defendants argue that Plaintiffs' claims should be dismissed because (1) they are barred by the two-year statute of limitations; (2) they are based on forward-looking statements, which are protected by the PSLRA's safe harbor provision; (3) Defendants' statements of corporate optimism are not actionable; (4) Plaintiffs fail to plead with particularity that any of Defendants' statements was false or misleading; (5) Plaintiffs fail to plead the requisite level of scienter; and (6) Plaintiffs fail to state a claim for control liability under Section 20(a). The Court will consider Defendants' arguments *seriatim*.

### A.    Statute of Limitations

Federal securities fraud claims "may be brought not later than the earlier of: (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b). In applying the statute of limitations to

10

10b-5 claims, the Supreme Court held in <u>Merck & Co., Inc. v. Reynolds</u>, 559 U.S. 633, 653 (2010), that "'discovery' of facts that put a plaintiff on 'inquiry notice' does not automatically begin the running of the limitations period." Instead,

> the limitations period . . . begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have discovered the facts constituting the violation—whichever comes first. In determining the time at which "discovery" of those "facts" occurred, terms such as "inquiry notice" and "storm warnings" may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating. But the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered "the facts constituting the violation," including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation.

<u>Id.</u> (internal punctuation omitted). "In other words, the limitations period commences not when a reasonable investor would have begun investigating, but when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation." <u>City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.</u>, 637 F.3d 169, 174 (2d Cir. 2011).

Defendants contend that a "reasonably diligent plaintiff would have had sufficient information to plead the elements of a securities fraud claim as of the date the full 'truth' was allegedly revealed: October 30, 2013," which is more than two years before Plaintiffs filed this lawsuit. Defs.' Mot. at 15. Defendants aver that the November 2012 Report from the Independent Monitor received

11

widespread media coverage by October 2013. Id. (citing three business journal articles from November 2012 reporting that the Independent Monitor's report, which was filed with the Mississippi Public Utilities Staff on November 26, 2012, indicated that the Kemper project was running over budget and delayed six months); see also Matthew Bandyk, Report Estimates Cost of Plant Ratcliffe IGCC at More Than $3B, SNL POWER DAILY WITH MARKET REPORT, Nov. 29, 2012 [Doc. 37-25]; John Downey, Cost Overruns Remain Issue for Gasified-Coal Plants, CHARLOTTE BUSINESS JOURNAL, Nov. 29, 2012 [Doc. 37-26]; Chandler Clay, Monitors: November 2014 Most Likely Start Date for Kemper Plant, MISSISSIPPI BUSINESS JOURNAL, Nov. 30, 2012 [Doc. 37-27]. Defendants also argue that the Independent Monitor issued a second report in April 2014, which received widespread media attention seven months later in November 2014. Defs.' Mot. at 16, n.6 (citing Compl. ¶ 104). Defendants argue that by October 30, 2013, "the 'missed' May 2014 COD, the financial incentives that Plaintiffs claim motivated Defendants to lie, and the Monitor's November 2012 report on construction delays were known." Defs.' Reply in Supp. of Their Mot. to Dismiss [Doc. 39] ("Defs.' Reply") at 3.[4]

---

[4] Defendants also argue that Plaintiffs' position—that the fraud was not revealed until The New York Times article was published—is not tenable because The New York Times article does not reveal any fraud. Defs.' Reply at 3-5. Regardless of

In response, Plaintiffs maintain that they were not aware of any facts that would support the requisite allegations of scienter until The New York Times article was published on July 5, 2016. Pls.' Resp. at 29-34. Plaintiffs highlight the allegations in the Complaint detailing their contention that "The New York Times exposé was the first public revelation of the fraud as alleged herein" because the article "included details showing that the Defendants' conduct was deliberate and more than mere mismanagement or lack of prudency." Id. (quoting Compl. ¶ 48); see also Compl. ¶ 55 ("The evidence and conclusions in The New York Times publicly revealed for the first time that Defendants had engaged in deliberate conduct to deceive the market and investors regarding the schedule delays infecting the Kemper Plant."). Because the Complaint was filed within two years of the date this discovery was made, Plaintiffs argue that Defendants' statute of limitations argument fails. The Court agrees with Plaintiffs.

---

how The New York Times article is to be interpreted, this argument does not further Defendants' statute of limitations argument. Disproving Plaintiffs' evidence of fraud is not the equivalent of demonstrating that evidence of fraud was available to Plaintiffs more than two years prior to the filing of the present lawsuit. In other words, even if this Court accepted Defendants' factual assertions, the absence of evidence of fraud in The New York Times article does not demonstrate that such evidence was or should have been discovered by Plaintiffs prior to October 30, 2013.

The ultimate burden is on Defendants to demonstrate that a reasonably diligent plaintiff would have not just started an investigation, but would have actually discovered the facts constituting the violation.  See Merck & Co., 559 U.S. at 653-54; see also Strategic Diversity, Inc. v. Alchemix Corp., 666 F.3d 1197, 1206 (9th Cir. 2012) ("[T]he ultimate burden is on the defendant to demonstrate that a reasonably diligent plaintiff would have discovered the facts constituting the violation.") (emphasis in original) (citing Merck & Co., 559 U.S. at 653-54). Defendants have failed to identify any fact that indicates Plaintiffs discovered evidence of scienter prior to the publication of The New York Times article on July 5, 2016.  Additionally, although "'inquiry notice' and 'storm warnings' may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating," Defendants have not shown that a reasonably diligent plaintiff would have discovered any facts constituting scienter prior to July 5, 2016.  See Merck & Co., 559 U.S. at 654 ("But the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation.").  Accordingly, Defendants' Motion to Dismiss is **DENIED** to the extent they request dismissal

14

based on the statute of limitations.  See Nelson v. Pac. Life Ins. Co., No. Civ. A. CV203-131, 2004 WL 1592617, at *9 (S.D. Ga. July 12, 2004) (denying motion to dismiss a PSLRA lawsuit based on the statute of limitations, stating "[i]f the Court were to accept Defendants' reasoning in the case *sub judice*, it would simply be requiring the premature filing of lawsuits, which would invite complaints with particularity and scienter deficiencies, making them infirm under Rule 9(b) and the PSLRA.").

**B.**     **The PSLRA Safe Harbor Provision**

The PSLRA provides that certain "forward-looking statements" are not actionable.  See 15 U.S.C. § 78u-5(c).  Under this safe harbor provision, a defendant "shall not be liable with respect to any forward-looking statement" if:

(A) the forward-looking statement is—

> (i)   identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
>
> (ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

> (i)   if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
>
> (ii) if made by a business entity; was—

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

Id. § 78u-5(c)(1).  In other words, "[m]aterial forward-looking statements are not actionable if they meet either of two criteria: (1) the statement is identified as forward-looking and is accompanied by meaningful cautionary language or (2) the plaintiff fails to prove that the defendant had actual knowledge that the statement was false." In re Scientific Atlanta, Inc. Sec. Litig., 754 F. Supp. 2d 1339, 1349-50 (N.D. Ga. 2010), aff'd sub nom., Phillips v. Scientific-Atlanta, Inc., 489 F. App'x 339 (11th Cir. 2012).  A forward-looking statement includes, in pertinent part:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the [Securities and Exchange] Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C); [or]

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer[.]

15 U.S.C. § 78u-5(i)(1).

Defendants argue that the statements they characterize as "schedule estimates"[5] are protected under the PSLRA safe harbor provision. Defendants contend that these statements are predictive by nature and fall within the PSLRA's definition of forward-looking statements because they are "statement[s] of the plans and objectives of management for future operations" and "the assumptions underlying" those objectives. Defs.' Mot. at 18[6] (quoting 15 U.S.C. §§ 78u-

---

[5] The statements Defendants characterize as "schedule estimates" comprise thirty-three of the thirty-seven statements at issue in this case. These are statements numbers 1-14, 16, 18-32, and 34-36.

[6] Neither of the parties makes arguments which specifically address each of the schedule estimate statements at issue and instead choose to group the statements in categories and address those categories with broader generic arguments. See Defs.' Mot. at 18-24; Pls.' Resp. at 5-14. However, the Court must assess each statement individually. See Mogensen v. Body Cent. Corp., 15 F. Supp. 3d 1191, 1215 (M.D. Fla. 2014) ("To determine whether a company's statements are forward-looking, courts must separately analyze each statement found in a company communication.") (citing Harris v. Ivax Corp., 182 F.3d 799, 804 (11th Cir. 1999)). Therefore, the Court will assume that the parties' generic arguments apply equally to each individual statement within any particular category of statements they address.

5(i)(1)(B) & (D)).  Additionally, Defendants argue that these statements concern

the Kemper Plant's progress toward an expected objective, which is similarly

predictive by nature.  Id. at 18-19.  Because the veracity of such forecasts cannot

be discerned until some point in the future, Defendants maintain that these

statements are necessarily forward-looking.  Id. (citing Harris, 182 F.3d at 805

("[A] statement about the state of a company whose truth or falsity is discernible

only after it is made necessarily refers only to future performance.")).  The Court

will consider each of the schedule estimate statements in the context of the PSLRA

safe harbor provision.

**Statement No. 1 (Compl. ¶ 112).**

The first statement was made by Defendant Thomas A. Fanning ("Fanning")

during a conference call for investors and media on April 25, 2012:

> [Kemper Plant's] initial startup and testing are now only 14 months
> away.  And we remain confident that this project will provide the best
> value to customers over the long term.  Targets remain achievable for
> . . . the . . . Kemper County project[] with regard to construction
> schedule and cost to customers."

Compl. ¶ 112.

Statement No. 1 is actually comprised of two assertions concerning the

construction of the Kemper Plant.  The first assertion, that "initial startup and

testing are now only 14 months away," is a statement of present fact regarding the

18

plant's construction status, i.e., that as of April 25, 2012, (the date of the statement), the planned startup and initial testing dates were fourteen months away. This assertion is no different from the observation that April 2012 falls fourteen months before June 2013, and is neither predictive in nature, nor forward-looking.

The second assertion concerns Defendants' assessment of their ability to follow the schedule for the future: "Targets remain achievable for . . . the . . . Kemper County project[] with regard to construction schedule and cost to customers." This statement requires a present assessment of whether the outstanding work could be performed within the time left in the schedule. Statement No. 1 thus contains reference to both a present fact (initial startup and testing only 14 months away) and a prediction of a future event (targets remain achievable for the project). See Amalgamated Bank v. Coca-Cola Co., No. 1:05-CV-1226, 2006 WL 2818973, at *6 (N.D. Ga. Sept. 29, 2006), aff'd sub nom., Selbst v. Coca-Cola Co., 262 F. App'x 177 (11th Cir. 2008) (holding statement that defendant was "confident [it] would meet its 11%-12% annual EPS growth target" which was "realistic and achievable" was forward-looking and subject to the PSLRA safe harbor provision). Although there are cases in other circuits that indicate that safe harbor does not apply to a mixed present/future statement with

respect to the portion that refers to the present,[7] that is not the law in the Eleventh Circuit.

In Harris v. Ivax Corp., the court considered a press release that contained a list of factors, some of which were forward-looking and others of which were not.

> The mixed nature of this statement raises the question whether the safe harbor benefits the entire statement or only parts of it. Of course, if any of the individual sentences describing known facts (such as the customer's bankruptcy) were allegedly false, we could easily conclude that that smaller, non-forward-looking statement falls outside the safe harbor. But the allegation here is that the list as a whole misleads anyone reading it for an explanation of Ivax's projections, because the list omits the expectation of a goodwill writedown. If the allegation is that the whole list is misleading, then it makes no sense to slice the list into separate sentences. Rather, the list becomes a "statement" in the statutory sense, and a basis of liability, as a unit. It must therefore be either forward-looking or not forward-looking in its entirety. The next issue is what the character of the list is as a whole—forward-looking or not.

> We conclude that the entire list is due forward-looking treatment. . . . [W]hile the statute does not tell us exactly what to do with a mixed statement, extrinsic sources of congressional intent point strongly toward treating the entire list as forward-looking. . . .

> For these reasons, we hold that when the factors underlying a projection or economic forecast include both assumptions and statements of known fact, and a plaintiff alleges that a material factor is missing, the entire list of factors is treated as a forward-looking statement.

---

[7] See, e.g., Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 255 (3d Cir. 2009); Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 705 (7th Cir. 2008); In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 213 (1st Cir. 2005).

Id. at 806-07 (emphasis in original); see also Barr v. Matria Healthcare, Inc., 324 F. Supp. 2d 1369, 1381 (N.D. Ga. 2004) ("[T]he Court of Appeals for the Eleventh Circuit recognized that barring mixed statements of fact and projection from the safe harbor would inhibit corporate officers from fully explaining corporate outlooks to shareholders or to the public. Thus, statements of present or past observations regarding a company that are made in the context and furtherance of future projections may be protected by the safe harbor.") (citing Harris, 182 F.3d at 806-07).

In this case, Plaintiffs contend the entirety of Statement No. 1 is excluded from the safe harbor benefit. Pls.' Resp. at 8 (claiming that Statement No. 1 "misrepresented current facts regarding the status of construction"). Based upon Harris, this Court must hold that because the statement contains both present facts and future projections, it is treated as forward-looking. Because it is accompanied by meaningful cautionary language,[8] it is covered by the PSLRA safe harbor provision and not actionable in this case.

---

[8] This statement was preceded by the following cautionary language: "Let me remind you that we will make forward-looking statements today in addition to providing historical information. There are various important factors that could cause actual results to differ materially from those indicated in the forward-looking statements, including those discussed in our Form 10-K and subsequent filings." Tr. of Q1 2012 Earnings Call dated Apr. 25, 2012 [Doc. 37-10]. The Court finds

**Statement Nos. 2 and 13 (Compl. ¶¶ 113 and 128).**

Statement No. 2 is from Southern Company Form 10-Q for the first quarter of 2012, which states in relevant part: "The Kemper IGCC plant, expected to begin commercial operation in May 2014, will use locally mined lignite (an abundant, lower heating value coal) from a mine adjacent to the plant as fuel." Compl. ¶ 113. Statement No. 13 is also from a Southern Company Form 10-Q (third quarter of 2012 filed on November 7, 2012), and includes the following language regarding the Kemper Plant: "The Kemper IGCC, expected to be in service May 2014, will use locally mined lignite (an abundant, lower heating value coal) from a mine adjacent to the Kemper IGCC as fuel." Compl. ¶ 128.

The Court finds that these statements expressing Southern Company's "expectations" fall squarely within 15 U.S.C. § 78u-5(i)(1)(B), as they are clearly statements "of the plans and objectives of management for future operations."

---

this language to be sufficiently meaningful cautionary language. See In re Scientific Atlanta, 754 F. Supp. 2d at 1350 (citing 15 U.S.C. § 78u-5(c)(2)(B) ("For oral statements, the PSLRA does not require that the cautionary language physically accompany the statement. Rather, the statute explicitly allows for a forward-looking statement's incorporation by reference of cautionary language 'contained in a readily available written document, or portion thereof,' such as SEC filings or other 'generally disseminated documents.'"); see also Emp'rs Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co., 353 F.3d 1125, 1133 (9th Cir. 2004) (holding that the safe harbor provision applied where oral statement referred audience to defendant's 10-K filing).

Because the statements are accompanied by meaningful cautionary language,[9] they

are covered by the PSLRA safe harbor provision and not actionable in this case.

**Statement No. 3 (Compl. ¶ 116).**

Statement No. 3 was made by Defendant Art P. Beattie ("Beattie") during a

conference at the Deutsche Bank Clean Tech, Utilities, and Power Conference held

on May 15, 2012:

---

[9] Statement No. 2 was preceded by the following cautionary language:

> This Quarterly Report on Form 10-Q contains forward-looking statements.
> Forward-looking statements include, among other things, statements
> concerning . . . start and completion of construction projects, . . . and
> estimated construction and other expenditures. In some cases, forward-
> looking statements can be identified by terminology such as "may," "will,"
> "could," "should," "expects," "plans," "anticipates," "believes," "estimates,"
> "projects," "predicts," "potential," or "continue" or the negative of these
> terms or other similar terminology. There are various factors that could
> cause actual results to differ materially from those suggested by the forward-
> looking statements; accordingly, there can be no assurance that such
> indicated results will be realized. These factors include: . . . ability to
> control costs and avoid cost overruns during the development and
> construction of facilities, . . . regulatory approvals and actions related to the
> Kemper IGCC, including Mississippi PSC approvals, potential DOE loan
> guarantees, the SMEPA purchase decision, utilization of investment tax
> credits, and the outcome of any further proceedings regarding the
> Mississippi PSC's issuance of the CPCN. . .

Q1 2012 Form 10-Q [Doc. 37-11] at 7-8. Statement No. 13 had substantially
similar cautionary language, but listed additional specific factors that could cause
the actual results to differ from the stated projections. Q3 2012 Form 10-Q [Doc.
37-22] at 7-8.

> [P]rogress [at the Kemper Plant] is being made.  We'll have first gas
> to the CT, combustion turbines, in June of next year.  We'll have the
> first heat to the gasifier in October of next year and the first [syn]gas
> to the combustion turbines in December of next year.  So this plant is
> well on its way.  We're about . . . 72% of its costs are confirmed at
> this point.  90% of costs will be confirmed by the end of this year—
> so good progress at Kemper County.

Compl. ¶ 116 (emphasis in Compl.).  Plaintiffs argue that Beattie's statement is a

statement regarding a current business condition rather than a forward-looking plan

of future operations.  Pls.' Resp. at 7-11.  The Court disagrees.

As with the previous statements, Statement No. 3 falls squarely within 15

U.S.C. § 78u-5(i)(1)(B) as a "statement of the plans and objectives of management

for future operations."  Beattie made this statement in the context of updating the

status of the Kemper Plant and his projection of the construction plan into the

future.  Moreover, because the veracity of this statement was discernible only after

it was made, it necessarily refers to future performance.  Harris, 182 F.3d at 805.

Beattie gave the following cautionary statement in conjunction with his

presentation: "I am going to give the Southern Company overview and as you

know, we'll be talking about some forward-looking information today and you're

cautioned not put undue reliance on all that's in those forward-looking statements,

as some of the issues are outside of our direct control."  Tr. of Art Beattie

presentation to Deutsche Bank Clean Tech, Utilities, and Power Conference dated

May 15, 2012 [Doc. 37-12].  The Court finds that this language does not include

sufficiently meaningful cautionary language.

"A disclaimer does not provide per se immunity, precisely because the

disclaimer must be meaningful and tailored to the risks the business faces." S.E.C.

v. Merch. Capital, LLC, 483 F.3d 747, 767 (11th Cir. 2007).  "The cautionary

language must be meaningful: boilerplate will not suffice." Id. (citing Saltzberg v.

TM Sterling/Austin Assocs., 45 F.3d 399, 399 (11th Cir. 1995)).

> To be "meaningful," cautionary language need not specify the factor
> that ultimately causes the forward-looking statement's projections to
> fail.  Nor must it specify all factors that could cause results to differ
> from a forward-looking statement's projections.     Rather, the
> requirement that a cautionary statement be "meaningful" is satisfied
> when an investor has been warned of risks of a significance similar to
> that actually realized, and the cautionary statement is tailored to the
> risks the business faces.  This is so because the investor is sufficiently
> on notice of the danger of the investment to make an intelligent
> decision about it according to her own preferences for risk and
> reward.  However, when a risk has already occurred and corporate
> officers have become aware of it, the inclusion of cautionary language
> that omits mention of the realized risk will not cure the non-
> disclosure. . . . To warn that the untoward may occur when the event
> is contingent is prudent, but to caution that it is only possible for the
> unfavorable events to happen when they have already occurred is
> deceit.

Mogensen, 15 F. Supp. 3d at 1215-16 (citations and internal punctuation omitted,

emphasis in original).

Here, the cautionary language recited does not include the identification of any important factors that could cause actual results to differ materially from those in the forward-looking statement.  See <u>FindWhat Inv'r Grp.</u>, 658 F.3d at 1299 ("The Form 10-K's cautionary language consisted only of general warnings about risks inherent to the Company's business model, and was not 'specifically tailored' to risks from click fraud.").

Although Statement No. 3 is forward-looking, because it is not accompanied by meaningful cautionary language, it is not protected by the PSLRA safe harbor provision.  <u>See</u> 15 U.S.C. § 78u-5(c)(1)(A)(i); <u>Merch. Capital</u>, 483 F.3d at 767; <u>Saltzberg</u>, 45 F.3d at 399.

**Statement No. 4 (Compl. ¶ 117).**

Statement No. 4 is found in a Southern Company news release issued on June 8, 2012, providing an update regarding the Kemper Project:  "[T]he Kemper Plant construction is progressing on schedule and continues to be the best generation option for customers.  The plant will be on line May 2014 . . . ."  Compl. ¶ 117.  This statement has two components; one a statement of present condition ("Kemper Plant construction is progressing on schedule . . ."), and the other a future projection ("The plant will be on line May 2014 . . .").

The Court finds that this statement combining historical or present facts with a forward-looking element is forward-looking. In re KLX, Inc. Sec. Litig., 232 F. Supp. 3d 1269, 1280 (S.D. Fla. 2017) (citing Harris, 182 F.3d at 807 ("[W]hen the factors underlying a projection or economic forecast include both assumptions and statements of known fact, and a plaintiff alleges that a material factor is missing, the entire list of factors is treated as a forward looking statement.")). "[S]tatements of present or past observations regarding a company that are made in the context and furtherance of future projections may be protected by the safe harbor." Barr, 324 F. Supp. 2d at 1381 (citing Harris, 182 F.3d at 806 ("Forward-looking conclusions often rest both on historical observations and assumptions about future events")).

Because this forward-looking statement is accompanied by meaningful cautionary language,[10] the Court finds that it is covered by the PSLRA safe harbor

---

[10] The press release contained the following cautionary language:

Certain information contained in this release is forward-looking information based on current expectations and plans that involve risks and uncertainties. Forward-looking information includes, among other things, statements concerning completion of the Kemper integrated coal gasification combined cycle ("Kemper IGCC") facility, estimated costs of construction of the Kemper IGCC facility and related customer price impacts. Mississippi Power cautions that there are certain factors that can cause actual results to differ materially from the forward-looking information that has been provided. The reader is cautioned not to put undue reliance on this forward-

provision and not actionable in this case.[11]  Barr, 324 F. Supp. 2d at 1381 ("These

are the types of mixed statements contemplated by the Court of Appeals in Harris

and fall within the ambit of the safe harbor provided by the Reform Act.").

---

> looking information, which is not a guarantee of future performance and is
> subject to a number of uncertainties and other factors, many of which are
> outside the control of Mississippi Power; accordingly, there can be no
> assurance that such suggested results will be realized.
>
> The following factors, in addition to those discussed in Mississippi Power's
> Annual Report on Form 10-K for the year ended December 31, 2011, and
> subsequent securities filings, could cause actual results to differ materially
> from management expectations as suggested by such forward-looking
> information: . . . ability to control costs and avoid cost overruns during the
> development and construction of facilities; advances in technology; . . .
> regulatory approvals and actions related to the Kemper IGCC facility,
> including Mississippi Public Service Commission approvals, potential U.S.
> Department of Energy loan guarantees, the South Mississippi Electric Power
> Association purchase decision, utilization of investment tax credits, and the
> outcome of any further proceedings regarding the Mississippi Public Service
> Commission's issuance of the certificate of public convenience and
> necessity. . . ."

Mississippi Power Press Release dated June 8, 2012 [Doc. 37-13].

[11] Plaintiffs also argue that, even if this Court found this statement to be forward-
looking, it is actionable because it is worded as a guarantee.  Pls.' Resp. at 11
(citing FindWhat Investor Grp., 658 F.3d at 1304).  The statement is not worded as
a guarantee, as it is accompanied by the following cautionary language
"Mississippi Power cautions that there are certain factors that can cause actual
results to differ materially from the forward-looking information,. . . which is not a
guarantee of future performance."

**Statement Nos. 5-6, 10, 25-26, 29-31 (Compl. ¶¶ 118-19, 125, 143, 145, 149-51).**

Statement Nos. 5-6, 10, 25-26, and 30-31 are all based on the same language—"Project is on schedule"—used in monthly Kemper Plant status update reports Mississippi Power filed with the Mississippi PSC . Compl. ¶¶ 118-19, 125, 143, 145, 149-51.

All of these statements necessarily represent current facts regarding the present status of the Kemper Plant's construction. Pls.' Resp. at 8-9. Moreover, this language is found in the "Project Status" section of the reports submitted to the Mississippi PSC. See, e.g., Monthly Project Status and Cost Report dated June 8, 2012 [Doc. 37-14], August 3, 2012 [Doc. 37-15] October 5, 2012 [Doc. 37-19] (collectively the "2012 Mississippi Power Reports"). The 2012 Mississippi Power Reports explain that the "Project Status" sections "provide a brief summary of material milestones and updates that have occurred since [Mississippi Power's] last filed report." 2012 Mississippi Power Reports at 2. This language necessarily limits the information provided to past and present facts.[12]

---

[12] In contrast, the "Schedule" section of the reports speaks to the events that are planned in the future, as it "provide[s] a list of the major Project milestones that are expected to occur within the next ninety days from the date of the report and an overall Project schedule." See 2012 Mississippi Power Reports at 4.

It appears that the format of the monthly status reports filed with the Mississippi PSC changed in 2013 to omit the definition of "Project Status" from the introductory language. Nevertheless, even without the prefatory definition of "Project Status," the Court finds that "on schedule" in this context is limited to past and present facts. The information in the reports immediately preceding this language clearly references historical facts (e.g. "Major Items and Milestones Achieved"), and there is a different section ("Schedule") appearing later in these reports which details events that are planned in the future.

Accordingly, none of the statements relied upon by Plaintiffs from the monthly status reports filed with the Mississippi PSC is predictive in nature or forward-looking. The statements do not depend on a future event to ascertain their veracity. Mulligan v. Impax Labs., Inc., 36 F. Supp. 3d 942, 964-655 (N.D. Cal. 2014) ("[S]tatements that a project is 'on-track,' 'on-budget,' or 'on-schedule,' are not forward-looking but statements relating to current conditions.") (emphasis in original, quotations omitted) (quoting In re MGM Mirage Sec. Litig., No. 2:09-CV-01558-GMN-VCF, 2013 WL 5435832, at *8 (D. Nev. Sept. 26, 2013)).

30

Because they are not forward-looking, they are not subject to the PSLRA safe harbor provision.[13]  See Harris, 182 F.3d at 806.

**Statement No. 7 (Compl. ¶ 120).**

Statement No. 7 is found in a consolidated form 10-Q for the second quarter of 2012 filed by Southern Company on August 6, 2012.  The Form 10-Q included the following information regarding the Kemper Plant:  "The Kemper IGCC, expected to begin commercial operation in May 2014, will use locally mined lignite (an abundant, lower heating value coal) from a mine adjacent to the Kemper IGCC as fuel."  Compl. ¶ 120.

The Court finds that this statement expressing Mississippi Power's "expectation" falls squarely within 15 U.S.C. § 78u-5(i)(1)(B) as it is clearly a "statement of the plans and objectives of management for future operations." Because it is accompanied by meaningful cautionary language,[14] it is covered by the PSLRA safe harbor provision and not actionable in this case.

---

[13] Only one of the Statements (Statement No. 31) is accompanied by cautionary language.  See 2012 Mississippi Power Reports; Monthly Project Status and Cost Report dated March 4, 2013 [Doc. 37-36], April 2, 2013 [Doc. 37-37], and May 15, 2013 [Doc. 37-40]; Monthly Project Status and Cost Report dated June 3, 2013 [Doc. 37-41].  Accordingly, even if Statements Nos. 5, 6, 10, 25-26, and 29-30 were found to be forward-looking, they would not be protected by the PSLRA safe harbor provision.

[14] This statement was preceded by the following cautionary language:

31

**Statement No. 8 (Compl. ¶ 122).**

Statement No. 8 is a news release issued by Southern Company on August 9, 2012, which included the following language: "With commercial operation of its Kemper County integrated gasification combined cycle plant less than two years away, Mississippi Power is well-positioned to execute the most critical next steps in the peak construction phase beginning later this year." Compl. ¶ 122.

This is a statement of present fact regarding the construction status, simply conveying the fact that the scheduled COD was less than two years away. The statement is not predictive in nature, nor forward-looking. The statement does not

---

This Quarterly Report on Form 10-Q contains forward-looking statements. Forward-looking statements include, among other things, statements concerning . . . start and completion of construction projects, . . . and estimated construction and other expenditures. In some cases, forward-looking statements can be identified by terminology such as "may," "will," "could," "should," "expects," "plans," "anticipates," "believes," "estimates," "projects," "predicts," "potential," or "continue" or the negative of these terms or other similar terminology. There are various factors that could cause actual results to differ materially from those suggested by the forward-looking statements; accordingly, there can be no assurance that such indicated results will be realized. These factors include: . . . ability to control costs and avoid cost overruns during the development and construction of facilities; regulatory approvals and actions related to the Kemper IGCC, including Mississippi PSC approvals, potential DOE loan guarantees, the SMEPA purchase decision, utilization of investment tax credits, and the outcome of any further proceedings regarding the Mississippi PSC's issuance of the CPCN. . .

Q2 2012 Form 10-Q [Doc. 37-16] at 7-8.

depend on a future event to ascertain its veracity. Because it is not forward-looking, it is not subject to the PSLRA safe harbor provision. See Harris, 182 F.3d at 806.

**Statement No. 9 (Compl. ¶ 123.)**

Statement No. 9 is found in a Southern Company news release dated September 13, 2012:

> Recently, Mississippi Power safely completed a major construction milestone at its Kemper County energy facility as plant construction nears the halfway mark. Installed was a section of the plant's gasifier
> ***
> Installation of the gasifier marks a pivotal point in the construction phase of our project and the advancement of 21st century coal technology," said Mississippi Power Vice President of Generation Development Tommy Anderson. . . .
> * * *
> Commercial operation of the 582-megawatt facility is expected to begin May 2014.

Compl. ¶ 123.

This is a statement of present fact detailing specific elements of the then-present construction status. The statement is not predictive in nature, is not forward-looking, and does not depend on a future event to ascertain its veracity. Because it is not forward-looking, it is not subject to the PSLRA safe harbor provision. See Harris, 182 F.3d at 806.

**Statement No. 11 (Compl. ¶ 126).**

Statement No. 11 is in a news release dated October 19, 2012, and issued by

Southern Company with the headline "Mississippi Power files updated

assumptions on Kemper project, confirms costs and scheduled remain on target."

The body of the news release states in relevant part:

> As part of its ongoing review process for the Kemper County energy
> facility project, Mississippi Power filed updated assumptions to both
> cost and schedule in its monthly construction report to the Mississippi
> Public Service Commission. The company confirmed that the project
> is on schedule to be completed in May 2014 and that cost projections
> remain on target to stay at or below $2.88 billion. . . .
>
> Overall, the project is more than 70 percent complete. The plant is
> scheduled to begin initial start-up next summer and commercial
> operation in 18 months.
>
> With engineering and procurement nearing completion, construction
> progressing on schedule and key startup milestones approaching
> quickly, Mississippi Power's projections are that cost and schedule
> targets are achievable," said Tommy Anderson, vice president of
> generation development for Mississippi Power.

Compl. ¶ 126.[15]

Statement No. 11 is a combination of multiple statements of present fact

detailing the status of specific elements of the Kemper Plant project (e.g., "project

is on schedule to be completed in May 2014 and that cost projections remain on

---

[15] This press release does not appear to include any cautionary language. See Press
Release dated Oct. 19, 2012 [Doc. 37-20].

target to stay at or below $2.88 billion. . .," "project is more than 70 percent complete. . . .") coupled with phrases which have forward-looking elements related to the same project ("Mississippi Power's projections are that cost and schedule targets are achievable. . ."). Statement No. 11 thus contains reference to both a present fact and a prediction of a future event. Because the statement contains both present facts and future projections, it is treated as forward-looking. See Harris, 182 F.3d at 806 ("Forward-looking conclusions often rest both on historical observations and assumptions about future events"); Amalgamated, 2006 WL 2818973, at *6; Barr, 324 F. Supp. 2d at 1381.

However, despite being forward-looking, there is no meaningful cautionary language accompanying this statement such that it falls within the protection of the PSLRA safe harbor provision.

**Statement No. 12 (Compl. ¶ 127).**

Statement No. 12 was made during a conference call for analysts, media representatives, and investors on November 5, 2012, during which Defendants represented that the Kemper Plant was on schedule. Fanning stated:

> At Plant Ratcliffe in Kemper County, Mississippi, construction remains on schedule to begin commercial operation in May of 2014. Cost projections remain on target to finish at or below $2.88 billion. We continue to actively manage ongoing pressures on costs and schedule which are typical for a project of this scale. Installation of

the gasifiers and assembly is proceeding exceptionally well and the carbon dioxide absorbers are all in place.

\* \* \*

Art [Beattie] and I met recently with Moses Feagin, he's the CFO of Mississippi Power; Ed Day; their regulatory people. We meet regularly on this project.

Compl. ¶ 127.

Statement No. 12 is a compilation of multiple statements of present-time assessments of the condition of the Kemper Plant (e.g., "construction remains on schedule to begin commercial operation in May of 2014. . . ." "assembly is proceeding exceptionally well . . .," and "[w]e meet regularly on this project.").

This compilation of current facts regarding the present condition of the Kemper Plant is not predictive in nature, but instead involves a present-time representation concerning the Kemper Plant. It is not a prediction that certain goals would be met; rather, it is an assessment of facts as they appeared at the time the statement was made. The statement does not depend on a future event to ascertain its veracity. It is not forward-looking and therefore not subject to the PSLRA safe harbor provision. See Harris, 182 F.3d at 806.

**Statement No. 14 (Compl. ¶ 130).**

Statement No. 14 is from a news release issued from Southern Company on November 13, 2012, with the headline: "Mississippi Power's Kemper County

energy facility achieves major milestones toward completion." In relevant part, the

news release stated:

> With the project now more than 70 percent complete, Mississippi Power's Kemper County energy facility has achieved several major milestones in recent weeks.
> * * *
> These milestones are indicators of the tremendous progress being made every day to deliver 21st century coal technology to our customers," said Tommy Anderson, vice president of generation development at Mississippi Power.

Compl. ¶ 130.

This statement is not predictive in nature, but instead involves a present-time

representation concerning the amount of work that had been completed as of the

November 13, 2012. It is not a prediction that certain goals would be met; rather,

it is an assessment of facts as they appeared at the time the statement was made.

The statement does not depend on a future event to ascertain its veracity. It is not

forward-looking and therefore not subject to the PSLRA safe harbor provision.

See Harris, 182 F.3d at 806.

**Statement No. 16 (Compl. ¶ 133).**

Statement No. 16 is found in a news release issued by Southern Company on

December 18, 2012, which stated in relevant part: "As we enter 2013, the project is

nearly 75 percent complete and scheduled to begin commercial operation in May

2014. In six months, the facility will begin initial start-up activities for the

combined cycle portion of the plant, which will generate the electricity." Compl. ¶ 133.

As with the previous two statements, this statement is not predictive in nature, but instead involves a present-time representation concerning the amount of work that had been completed as of the December 18, 2012. It is an assessment of facts as they appeared at the time the statement was made. It also states as a matter of present fact that commercial operation was scheduled to begin in May 2014. The statement does not depend on a future event to ascertain its veracity. It is not forward-looking and therefore not subject to the PSLRA safe harbor provision. See Harris, 182 F.3d at 806.

**Statement Nos. 18-20, 23-24, 28, 35 (Compl. ¶¶ 135-37, 140-41, 147, 155).**

Statement No. 18 is from a Southern Company news release dated January 9, 2013, which stated: "We're less than 16 months from commercial operation and this facility will utilize the cleanest technology available" . . . said Tommy Anderson, vice president of generation development. . . . The project, which is nearly 75 percent complete, is on schedule to be completed by May 2014." Compl. ¶ 135. Statement No. 19 is from a news release issued by Southern Company on January 24, 2013, that stated: "The [Kemper] project is on schedule for completion in May 2014 . . . ." Compl. ¶ 136. Statement No. 20 is from a January

25, 2013, conference call during which Defendant Beattie stated: "the project remains on track for a May 2014 in-service date when it is scheduled to begin providing clean, safe, reliable energy to the citizens of Mississippi." Compl. ¶ 137. Statement No. 23 is found in a Southern Company news release dated February 26, 2013, which stated: "The project is scheduled to begin operation in May 2014." Compl. ¶ 140. Statement No. 24 is comprised of the following language from the Form 10-K for fiscal year 2012: "The Kemper IGCC is scheduled to be placed in-service in May 2014." Compl. ¶ 141. Statement No. 28 is found in the May 10, 2013, Southern Compnay Form 10-Q, which stated: "The Kemper IGCC [is] scheduled to be placed in service in May 2014." Compl. ¶ 147. Statement No. 35 is from the Southern Company August 6, 2013, Form 10-Q: "The Kemper IGCC . . . [is] scheduled to be placed in-service in May 2014." Compl. ¶ 155.

Statement Nos. 18-20, 23-24, 28, and 35 are all statements of present fact regarding the construction schedule, simply conveying the fact that the Kemper Plant was scheduled to be operational in May 2014. These statements do not depend on a future event to ascertain their veracity. These statements are neither predictive in nature nor forward-looking and therefore are not subject to the PSLRA safe harbor provision. See Harris, 182 F.3d at 806.

**Statement No. 21 (Compl. ¶ 138).**

Statement No. 21 was made by Defendant Fanning on January 30, 2013,

during a conference call for analysts, media representatives and investors:

> The second priority is achieving success with our major construction projects, specifically Plant Vogtle Units 3 and 4 and the Kemper project, both of which are continuing to progress in an outstanding manner.
>
> * * *
>
> Meanwhile, the Kemper project is now 75% complete and remains on track for its May, 2014 commercial operation date.   To date, approximately $2.5 billion has been spent on the project.   The plant is scheduled to begin start-up activities this summer, with first fire going to the CTs in June, and the first gasifier heat-up taking place in December.   Reliable syn gas is expected to begin flowing to the CTs in February, 2014.

Compl. ¶ 138.

Statement No. 21 is a combination of observations of present fact (e.g.,

"[T]he Kemper Project . . . [is] continuing to progress . . .," and "Kemper project is

now 75% complete and remains on track for its May, 2014 commercial operation

date") and a forward-looking expectation ("Reliable syn gas is expected to begin

flowing to the CTs in February, 2014."").   Because Statement No. 21 combines

present or historical facts with a forward-looking element, it is forward-looking.

See In re KLX, 232 F. Supp. 3d at 1280; Barr, 324 F. Supp. 2d at 1381.   And,

given the meaningful cautionary language[16] that accompanies this statement, the

Court finds that it is covered by the PSLRA safe harbor provision and not

actionable in this case.

**Statement No. 22 (Compl. ¶ 139).**

Statement No. 22 was made by Beattie during the same January 30, 2013,

conference call: "We've got specific work on the gasifiers going on. That's going

to be completed sometime within the next quarter. And that is a critical piece of it.

We still have piping that is being installed, as well. So those are kind of the critical

elements, at this point." Compl. ¶ 139.

The Court finds that this statement expressing Mississippi Power's plan to

complete the gasifier in the following quarter falls squarely within 15 U.S.C.

§ 78u-5(i)(1)(B) as it is clearly a "statement of the plans and objectives of

management for future operations." Moreover, because the veracity of this

statement was discernible only after it was made, it necessarily refers to future

---

[16] This statement was preceded by the following cautionary language: "Let me remind you that we will make forward-looking statements today in addition to providing historical information. Various important factors could cause actual results to differ materially from those indicated in the forward-looking statements, including those discussed in our Form 10-K and subsequent filings." Tr. of Q4 2012 Earnings Call dated Jan. 30, 2012 [Doc. 37-33]. The Court finds that this oral cautionary language referencing other cautionary language in a readily available SEC filing is sufficiently meaningful. See In re Scientific Atlanta, 754 F. Supp. 2d at 1350.

performance.  See Harris, 182 F.3d at 805 ("[A] statement about the state of a

company whose truth or falsity is discernible only after it is made necessarily

refers only to future performance.").  Because this statement is accompanied by

meaningful cautionary language,[17] it is covered by the PSLRA safe harbor

provision and not actionable in this case.

**Statement No. 27 (Compl. ¶ 146).**

On April 24, 2013, Defendants held a conference call in which Fannin

stated:

> We continue to make tremendous progress at the Kemper site with
> most of the major components in place, the combined cycles,
> gasifiers, massive gas absorbers and lignite dome as well as a 75-acre
> reservoir, the facility's appearance reflects our progress with start-up
> activities which are now 40% complete.
> * * *
> We continue to believe that the scheduled in-service date is
> achievable.

Compl. ¶ 146.

This statement is a combination of multiple statements of present fact ("We

continue to make tremendous progress. . .," and "the facility's appearance reflects

our progress with start-up activities which are now 40% complete.") coupled with

a phrase with a forward-looking element ("We continue to believe that the

---

[17] See n.16 supra.

42

scheduled in-service date is achievable."). Statement No. 27 thus contains

reference to both a present fact and a prediction of a future event. Because the

statement contains both present facts and future projections, it is treated as

forward-looking. See Harris, 182 F.3d at 806 ("Forward-looking conclusions often

rest both on historical observations and assumptions about future events");

Amalgamated, 2006 WL 2818973, at *6; Barr, 324 F. Supp. 2d at 1381.

Because this forward-looking statement is accompanied by meaningful

cautionary language,[18] it is covered by the PSLRA safe harbor provision and not

actionable in this case.

**Statement No. 32 (Compl. ¶ 152).**

Statement No. 32 is found in a Form 8-K attached to the monthly report

submitted to the Mississippi PSC on July 30, 2013, in which Southern Company

stated: "Mississippi Power plans to meet the May 2014 in-service date, however,

---

[18] This statement was preceded by the following cautionary language: "Let me
remind you that we will make forward-looking statements today, in addition to
providing historical information. Various important factors could cause actual
results to differ materially from those indicated in the forward-looking statements,
including those discussed in our Form 10-K and subsequent filings." Tr. of Q1
2013 Earnings Call dated Apr. 24, 2013 [Doc. 37-38]. The Court finds that this
oral cautionary language referencing other cautionary language in a readily
available SEC filing is sufficiently meaningful. See In re Scientific Atlanta, 754 F.
Supp. 2d at 1350.

the Company could experience schedule delays associated with construction and startup activities for this first-of-a-kind technology." Compl. ¶ 152.

The Court finds that this statement expressing Mississippi Power's "plans" falls squarely within 15 U.S.C. § 78u-5(i)(1)(B) as it is clearly a "statement of the plans and objectives of management for future operations." Because this statement is accompanied by meaningful cautionary language,[19] it is covered by the PSLRA safe harbor provision and not actionable in this case.

---

[19] This report contains the following cautionary language:

> Certain information contained in this Current Report on Form 8-K and in the PSC Report is forward-looking information based on current expectations and plans that involve risks and uncertainties. Forward-looking information includes, among other things, statements concerning the projected cost and schedule for the completion of construction of the Kemper IGCC and recovery of costs associated with the Kemper IGCC. Southern Company and Mississippi Power caution that there are certain factors that could cause actual results to differ materially from the forward-looking information that has been provided. The reader is cautioned not to put undue reliance on this forward-looking information, which is not a guarantee of future performance and is subject to a number of uncertainties and other factors, many of which are outside the control of Southern Company and Mississippi Power; accordingly, there can be no assurance that such suggested results will be realized. The following factors, in addition to those discussed in Southern Company's Form 10-K and Mississippi Power's Form 10-K/A, and subsequent securities filings, could cause actual results to differ materially from management expectations as suggested by such forward-looking information: the impact of recent and future federal and state regulatory changes, as well as changes in application of existing laws and regulations; current and future litigation, regulatory investigations, proceedings, or inquiries; available sources and costs of fuels; state and federal regulations

**Statement No. 34 (Compl. ¶ 154).**

During a July 31, 2013, conference call for analysts, media representatives

and investors, Fanning stated:

---

and the impact of pending and future rate cases and negotiations, including rate actions relating to fuel and other cost recovery mechanisms; ability to control costs and avoid cost overruns during the development and construction of facilities, which include the development and construction of facilities with designs that have not been finalized or previously constructed, including those risks identified above that have caused and may continue to cause cost increases and/or schedule delays; ability to construct facilities in accordance with the requirements of permits and licenses and to satisfy any operational and environmental performance standards, including the requirements of tax credits and other incentives; advances in technology; state and federal rate regulations and the impact of pending and future rate cases and negotiations, including rate actions relating to fuel and other cost recovery mechanisms; regulatory approvals and actions related to cost recovery for the Kemper IGCC, including Mississippi PSC review of Mississippi Power's proposed rate recovery plan and the prudence of Kemper IGCC costs and actions relating to proposed securitization; the ability to complete the proposed sale of an interest in the Kemper IGCC to SMEPA as contemplated by Mississippi Power's proposed rate recovery plan; satisfaction of requirements to utilize investment tax credits and grants; and the outcome of any legal or regulatory proceedings regarding the Mississippi PSC's issuance of the Certificate of Public Convenience and Necessity for the Kemper IGCC, the settlement agreement between Mississippi Power and the Mississippi PSC, or the State of Mississippi legislation designed to enhance the Mississippi PSC's authority to facilitate development and construction of baseload generation in the State of Mississippi; and the ability of counterparties of Mississippi Power to make payments as and when due and to perform as required. Southern Company and Mississippi Power expressly disclaim any obligation to update any forward-looking information.

Form 8-K [Doc. 37-43].

> [C]onstruction at the Kemper County energy facility is also
> progressing well. Since our last earnings call, the lignite mine has
> been placed into service and the final heavy lift, as well as a
> significant portion of the startup activities for the combined cycling
> unit, has been completed. Recognizing that piping is a key area of
> focus at this stage of the project, it's important to note that 90% of the
> piping has been fabricated and almost half is installed. And that we
> have been achieving our key installation targets for steel and pipe.

> Looking ahead for the remainder of 2013, startup activities include the
> first fire of the first combustion turbine in late August, [synching] the
> steam turbine to the grid in October, and heating up the first gasifier
> by year end. Our May 14 in-service date, to which our construction
> and startup plans are tied, remains achievable.

Compl. ¶ 154.

Statement No. 34 is comprised of multiple assertions explaining how the

construction of the Kemper Plant was proceeding. The assertions detail the work

that had been performed to date, noting that "a significant portion of the startup

activities" were completed, 90% of the piping was fabricated and half of that

installed, and that Defendants' had "been achieving [their] key installation targets

for steel and pipe." These statements are not predictive in nature, nor forward-

looking. The second portion of this statement ("Our May 14 in-service date, to

which our construction and startup plans are tied, remains achievable.") is forward-

looking.

Statement No. 34 thus contains reference to both a present fact and a

prediction of a future event. Because the statement contains both present facts and

46

future projections, it is treated as forward-looking.  See Harris, 182 F.3d at 806

("Forward-looking conclusions often rest both on historical observations and

assumptions about future events"); Amalgamated, 2006 WL 2818973, at *6; Barr,

324 F. Supp. 2d at 1381.  Because this forward-looking statement is accompanied

by meaningful cautionary language,[20] it is covered by the PSLRA safe harbor

provision and not actionable in this case.

**Statement No. 36 (Compl. ¶ 157).**

On August 30, 2013, Mississippi Power issued a Form 8-K which attached

the Kemper Plant Monthly Status and Cost Report filed with the PSC.  The report

stated: "Mississippi Power plans to meet the May 2014 in-service date; however,

the Company could experience schedule delays associated with construction and

startup activities for this first-of-a-kind technology."  Compl. ¶ 157.

The Court finds that this statement describing Mississippi Power's "plans"

falls squarely within 15 U.S.C. § 78u-5(i)(1)(B) as it is clearly a "statement of the

---

[20] The following cautionary language was recited at the outset of the call: "Let me remind you that we will make forward-looking statements today, in addition to providing historical information.  Various important factors could cause actual results to differ materially from those indicated in the forward-looking statements, including those discussed in our Form 10-K and subsequent filings."  Tr. of Q2 2013 Earnings Call dated July 31, 2013 [Doc. 37-45].  The Court finds that this oral cautionary language referencing other cautionary language in a readily available SEC filing is sufficiently meaningful.  See In re Scientific Atlanta, 754 F. Supp. 2d at 1350.

plans and objectives of management for future operations." Because it is

accompanied by meaningful cautionary language,[21] it is covered by the PSLRA

safe harbor provision and not actionable in this case.

---

[21] This report contained the following cautionary language:

> Certain information contained in Exhibit 99.01 of this Current Report on Form 8-K is forward-looking information based on current expectations and plans that involve risks and uncertainties. Forward-looking information includes, among other things, statements concerning the projected cost and schedule for the completion of construction of the integrated coal gasification combined cycle project in Kemper County, Mississippi (the "Kemper IGCC"). Mississippi Power cautions that there are certain factors that could cause actual results to differ materially from the forward-looking information that has been provided. The reader is cautioned not to put undue reliance on this forward-looking information, which is not a guarantee of future performance and is subject to a number of uncertainties and other factors, many of which are outside the control of Mississippi Power; accordingly, there can be no assurance that such suggested results will be realized. The following factors, in addition to those discussed in Mississippi Power's Annual Report on Form 10-K for the fiscal year ended December 31, 2012, as amended by Amendment No. 1, and subsequent securities filings, could cause actual results to differ materially from management expectations as suggested by such forward-looking information: the impact of recent and future federal and state regulatory changes, as well as changes in application of existing laws and regulations; current and future litigation, regulatory investigations, proceedings, or inquiries; available sources and costs of fuels; state and federal regulations and the impact of pending and future rate cases and negotiations, including rate actions relating to fuel and other cost recovery mechanisms; ability to control costs and avoid cost overruns during the development and construction of facilities, which include the development and construction of facilities with designs that have not been finalized or previously constructed, including the impact of factors such as labor costs and productivity, adverse weather conditions, shortages and inconsistent quality of equipment, materials, and labor, or contractor or

Accordingly, to the extent Defendants' Motion relies upon the argument that the statements Plaintiffs relied upon are protected by the PSLRA safe harbor provision, the Motion to Dismiss is **GRANTED IN PART and DENIED IN PART**. Defendants' Motion is **GRANTED** with respect to Statement Nos. 1-2, 4, 7, 13, 21-22, 27, 32, 34, and 36, which the Court finds are forward-looking

---

supplier delay or non-performance under construction or other agreements, delays associated with start-up activities, including major equipment failure, system integration and operations, and/or unforeseen engineering problems; ability to construct facilities in accordance with the requirements of permits and licenses and to satisfy any operational and environmental performance standards, including the requirements of tax credits and other incentives; advances in technology; regulatory approvals and actions related to cost recovery for the Kemper IGCC, including Mississippi PSC review of Mississippi Power's proposed rate recovery plan and the prudence of Kemper IGCC costs, and actions relating to proposed securitization; the ability to complete the proposed sale of an interest in the Kemper IGCC to South Mississippi Electric Power Association as contemplated by Mississippi Power's proposed rate recovery plan; satisfaction of requirements to utilize investment tax credits and grants; and the outcome of any legal or regulatory proceedings regarding the Mississippi PSC's issuance of the Certificate of Public Convenience and Necessity for the Kemper IGCC, the settlement agreement between Mississippi Power and the Mississippi PSC, or the State of Mississippi legislation designed to enhance the Mississippi PSC's authority to facilitate development and construction of baseload generation in the State of Mississippi; and the ability of counterparties of Mississippi Power to make payments as and when due and to perform as required. Mississippi Power expressly disclaims any obligation to update any forward-looking information.

Form 8-K [Doc. 37-47].

statements protected by the PSLRA safe harbor provision and not actionable in this case.[22] Defendants' Motion is otherwise **DENIED**.

## C.  Statements of Corporate Optimism

A securities fraud claim must be premised on misrepresentation or omission of a material fact. See FindWhat Investor Grp., 658 F.3d at 1295. In other words, it must be based upon a statement that is "empirically verifiable" and can be affirmatively disproven as opposed to a "mere statement of opinion or expectation." Next Century Commc'ns Corp. v. Ellis, 318 F.3d 1023, 1028 (11th

---

[22] Defendants argue that the "schedule estimate" statements are protected under both prongs of the PSLRA safe harbor provision. Defs.' Br. at 18. Defendants make only one generic argument in support of their contention that the second prong applies: that "Plaintiffs point to no facts known by any Defendant prior to October 2013 suggesting that any Defendant actually knew it was impossible to meet the May 2014, COD." Defs.' Br. at 21-23. However, the Court does not need to consider this argument for those statements which it has already found to be protected under the PSLRA safe harbor provision (Statement Nos. 1-2, 4, 7, 13, 21-22, 27, 32, 34, and 36). With regard to the only two forward-looking statements (Statement Nos. 3 and 11), that do not otherwise fall under the first prong of the safe harbor, the Court concludes that Defendants' argument fails. See Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc., 594 F.3d 783, 795 (11th Cir. 2010) ("[T]he plaintiff's inability to show knowledge of falsity is only relevant if the defendant is unable to produce meaningful cautionary statements or evidence of immateriality."). Defendants' argument does address the information conveyed in Statement No. 3 and does not address most of the information conveyed in Statement No. 11. Moreover, Plaintiffs have adequately pled that Defendants knew that Statement Nos. 3 and 11 were false when they were made. See Compl. ¶¶ 124, 131. Accordingly, the Court finds that Defendants' argument regarding the second prong of the PSLRA safe harbor provision is without merit.

Cir. 2003).  A misstatement is considered "material" only if its disclosure would

alter the total mix of information available to a reasonable investor and "if there is

a substantial likelihood that a reasonable shareholder would consider it important"

to an investment decision.  Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)

(citation omitted).  Thus, "materiality depends on the significance the reasonable

investor would place on the withheld or misrepresented information."  Id. at 240.

"Statements classified as 'corporate optimism' or 'mere puffing' are

typically forward-looking statements, or are generalized statements of optimism

that are not capable of objective verification.  Vague, optimistic statements are not

actionable because reasonable investors do not rely on them in making investment

decisions."  In re S1 Corp. Sec. Litig., 173 F. Supp. 2d 1334, 1350 (N.D. Ga. 2001)

(quotations and citations omitted).  A court may not dismiss a complaint at the

motion to dismiss stage unless the alleged misstatements are "so obviously

unimportant to a reasonable investor that reasonable minds could not differ on the

question of their importance."  Id.; see also Amalgamated Bank, 2006 WL

2818973, at *6  ("[S]tatements of 'corporate optimism' or 'puffery,' in addition to

lacking a underlying factual basis, also fail the materiality requirement of Rule

10b-5.");  Grossman v. Novell, Inc., 120 F.3d 1112, 1119 (10th Cir. 1997)

("Statements classified as "corporate optimism" or "mere puffing" are typically

forward-looking statements, or are generalized statements of optimism that are not capable of objective verification.  Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions.").

Defendants argue that many of the statements Plaintiffs rely upon in this case merely reflect corporate optimism and are not actionable.  Defs.' Mot. at 23-24 (referencing Statement Nos. 1, 3-4, 8, 12, 14-15, 17, 21, 27, and 33).  Stated another way, Defendants argue that to the extent Plaintiffs rely upon these statements, which are mere puffery and immaterial, Plaintiffs fail to state a claim because reasonable investors do not rely on such statements.  Although Defendants contend eleven statements are immaterial corporate puffery, they only specifically discuss the language in three of those statements.  Id. at 23 (quoting Statement No. 1 ("we remain confident that this project will provide the best value to customers over the long term"), Statement No. 4 ("[Kemper] continues to be the best generation option for customers"), and Statement No. 27 ("We continue to make tremendous progress")).[23]

---

[23] As detailed in the previous section of this order, the Court has found that the three statements mentioned specifically by Defendants in the context of the corporate puffery argument (Statement Nos. 1, 4, and 27) are not actionable because they are protected by the PSLRA safe harbor provision.  Nevertheless, the

The Court finds Defendants' argument to be without merit. A cursory examination of the three statements singled-out by Defendants reveals that the quoted portions are selective phrases within larger statements that, when read in their entirety and in context,[24] are not mere corporate puffery. They are not vague optimistic statements, but are capable of objective verification. For example, Statement No. 27 in its entirety includes the following language:

> We continue to make tremendous progress at the Kemper site with most of the major components in place, the combined cycles, gasifiers, massive gas absorbers and lignite dome as well as a 75-acre reservoir, the facility's appearance reflects our progress with start-up activities which are now 40% complete.
> * * *
> We continue to believe that the scheduled in-service date is achievable.

Compl. ¶ 146. Whether most of the major components were in place, and whether the start-up activities were 40% complete, are both statements of fact capable of objective verification. Moreover, this is the type of information upon which reasonable investors might rely in making investment decisions. The statements

---

Court will examine Defendants' argument to the extent it could potentially affect statements that are not protected by the PSLRA safe harbor provision.

[24] See Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 200-01 (3rd Cir. 1990) (holding that a statement can be dismissed as puffery as a matter of law only if it is immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on it in considering the "total mix" of facts available) (citation omitted).

Defendants complain of are not so exaggerated or vague that the Court can find as a matter of law that the statements were not material. Additionally, Plaintiffs have alleged that Defendants knew that the statements were false at the time they were made and have alleged facts that, if proven, could support that conclusion. Accordingly, to the extent Defendants' Motion relies upon the argument that the statements in Plaintiffs' Complaint are merely corporate optimism or puffery, the Motion to Dismiss is **DENIED**.

### D.    Allegations of Falsity

Defendants argue that Plaintiffs' claims should be dismissed because they have failed to allege particularized facts demonstrating why the statements were false or misleading. Defs.' Mot. at 24-25 (citing 15 U.S.C.A. § 78u-4).[25] The PSLRA heightened pleading standard relied upon by Defendants in making this argument provides as follows:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant—
>
> (A) made an untrue statement of a material fact; or

---

[25] The Court will consider this argument as to all thirty-seven statements relied upon by Plaintiffs despite the Court's ruling that eleven of those statements are no actionable because they are protected by the PSLRA's safe harbor.

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the <u>complaint shall specify</u> each statement alleged to have been misleading, <u>the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed</u>.

15 U.S.C.A. § 78u-4(b)(1) (emphasis added).

Although Defendants' initial brief in support of their Motion to Dismiss argues that none of the statements relied upon by Plaintiffs are supported by allegations of facts that show the statements are false or misleading, Defendants did not make an argument as to any specific statement. Defs.' Br. at 24-25. However, Defendants reply brief contains several examples. See Defs.' Reply at 10-12 (arguing that Plaintiffs failed to allege facts showing falsity to support Statements Nos. 9 and 34, among others).

Defendants' argument is without merit.[26]  Plaintiffs need only plead a false or misleading statement with the requisite detail as required by Rule 9(b) and

---

[26] The lone case cited by Defendants is inapposite as it dealt with the second prong under the PSLRA safe harbor provision—whether the plaintiff adequately demonstrated that the defendants had actual knowledge of the falsity—and not whether the plaintiff adequately alleged falsity. See In re Royal Caribbean Cruises Ltd. Sec. Litig., No. 1:11-22855-CIV, 2013 WL 3295951, at *16 (S.D. Fla. Apr. 19, 2013) (explaining that the plaintiffs made no allegations that tended "to demonstrate that Defendants made these statements knowing them to be false," and

allege facts that, if taken as true, make it plausible that the statement was false or

misleading when made.  See Twombly, 550 U.S. at 556.  Plaintiffs' Complaint is

replete with allegations of facts which, if found to be true, demonstrate that the

statements were false or misleading.[27]  See e.g., Compl. ¶¶ 115, 124, 131, 144, 159

(explaining why Statement Nos. 1-37 were false or made with reckless disregard

for the truth).  Specifically, with regard to the few examples Defendants have

identified in their reply brief, Defendants' argument fails because Plaintiffs have

alleged sufficient facts to demonstrate falsity.  See, e.g., Compl. ¶ 124(a)

(indicating that the first gasifier was not delivered until January of 2013, which

would render Statement No. 9—that the gasifier was installed as of September 13,

2012—false), 159(e) (indicating that, in July 2013, Brett Wingo[28] was asked to

---

that plaintiffs therefore failed to carry their burden of "demonstrating actual
knowledge and the forward looking statements are protected by the second safe
harbor provision.").

[27] See Damian v. Montgomery Cty. Bankshares, Inc., 981 F. Supp. 2d 1368, 1378
(N.D. Ga. 2013) (holding that, irrespective of the use of the word "all," § 78u-
4(b)(1) does not require plaintiffs to plead with particularity every single fact upon
which their beliefs concerning false or misleading statements are based—plaintiffs
need only plead with particularity sufficient facts to support those beliefs).

[28] Brett Wingo ("Wingo") is a former Southern Company employee and a
whistleblower witness in this case. He was hired by Southern Company in June
2009 as a senior engineer. Compl. ¶ 57. Wingo was given a schedule-intensive
procurement role with the Kemper Plant project, "requisitioning equipment that
was eventually installed in the plant." Id. He was promoted in August 2011, "to

create a schedule for the gasification startup, which would seem to show that Statement No. 34—that a significant portion of the startup activities have been completed—was false when made on July 31, 2013).

The Court finds that Plaintiffs have sufficiently alleged facts demonstrating why the statements at issue in this case were false or misleading. To the extent Defendants' Motion claims they have not done so, the Motion to Dismiss is **DENIED**.

### E.    Scienter

While Rule 9(b) permits scienter to be plead generally, the PSLRA imposes a higher standard: the plaintiff in a securities fraud case must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The plaintiff must allege facts that create a strong inference of scienter for each defendant. Mizzaro, 544 F.3d at 1238. To plead corporate scienter, the plaintiff must allege facts that engender a strong inference "that somebody responsible for the allegedly

---

Project Manager over the gasifier island—the part of the plant that converts the lignite coal into syngas." Id. As Project Manager, he was responsible for managing the engineering contract with a third-party contractor, "and for ensuring that the engineering and procurement for the coal gasification and cleanup systems, which Wingo described as constituting the majority of the Kemper Plant, were on time and met the construction schedule." Id.

misleading statements must have known about the fraud." Id. at 1254

("Corporations, of course, have no state of mind of their own.  Instead, the scienter

of their agents must be imputed to them.") (citations omitted).  "In this Circuit,

§ 10(b) and Rule 10b-5 require a showing of either an 'intent to deceive,

manipulate, or defraud,' or 'severe recklessness.'"  Thompson v. RelationServe

Media, Inc., 610 F.3d 628, 634 (11th Cir. 2010) (quoting Bryant v. Avado Brands,

Inc., 187 F.3d 1271, 1282 (11th Cir. 1999)).  The Eleventh Circuit describes

"severe recklessness" as follows:

> [s]evere recklessness is limited to those highly unreasonable
> omissions or misrepresentations that involve not merely simple or
> even inexcusable negligence, but an extreme departure from the
> standards of ordinary care, and that present a danger of misleading
> buyers or sellers which is either known to the defendant or is so
> obvious that the defendant must have been aware of it.

Mizzaro, 544 F.3d at 1238 (quoting Bryant, 187 F.3d at 1282 n.18).

In other words, to adequately plead scienter and survive a motion to dismiss,

Plaintiffs must plead "with particularity facts giving rise to a strong inference that

the defendants either intended to defraud investors or were seriously reckless when

they made the allegedly materially false or incomplete statements."  Id. (internal

quotations omitted).  An inference of scienter is "strong" when the inference is

> more than merely "reasonable" or "permissible"—it must be cogent
> and compelling, thus strong in light of other explanations.  A
> complaint will survive . . . only if a reasonable person would deem the

inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

Tellabs, 551 U.S. at 324.

This inquiry asks "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 322-23.  In making this inquiry, "courts must consider the complaint in its entirety," and "omissions and ambiguities count against inferring scienter." Id. at 322, 326.  "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" Id. at 326; see also Mizzaro, 544 F.3d at 1239 (contrasting this inquiry with the summary judgment inquiry of whether reasonable jurors could find that the plaintiff is entitled to a verdict); compare Tellabs, 551 U.S. at 324 ("A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.") (emphasis added) with Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ("The judge's inquiry [at the summary judgment stage] . . . asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict[.]") (emphasis added).

59

Defendants argue that Plaintiffs have failed to adequately plead scienter because (1) the motive allegations are implausible, (2) there is no allegation that any Defendant made an insider stock sale, and (3) Plaintiffs fail to adequately plead severe recklessness.

### 1.    Plaintiffs' Motive Allegations

Plaintiffs allege that Defendants had financial incentives to maintain the appearance that the Kemper Plant project was going to meet the May 2014 COD, or otherwise conceal any delays in the project. See Compl. ¶¶ 169-75. Specifically, Plaintiffs allege five discrete motivating factors. First, Plaintiffs point out that Mississippi Power received a $133 million tax credit which was contingent upon meeting the May 2014 COD. If Defendants did not meet that contingency deadline, they would lose the $133 million tax credit. Plaintiffs allege that this was a motivating factor because if Defendants failed to maintain the appearance that they were going to meet the deadline, they might "spook" investors who saw the tax credit as an incentive to invest and/or receive criticism from news media, regulators, and lawmakers.[29]  Compl. ¶ 170.

---

[29] Specifically, Plaintiffs allege that "Defendants understood the importance of the 48A Tax Credit deadlines. For example, Defendant Huggins acknowledged that missing the COD associated with the Phase II 48A Tax Credits would constitute 'financial Armageddon.' Huggins also acknowledged that the missed deadline

The second alleged financial incentive was the Mississippi PSC's authorization of ratepayer-funded financing of the Kemper Plant project costs incurred prior to May 2014. Id. ¶ 171. Any financing costs incurred after this date would be paid by Southern Company and Mississippi Power. Id. Therefore, if the deadline was met, or it appeared as though it was going to be met, there would be an incentive to invest; conversely, if it appeared as though there were going to be constructions costs after May 2014 (i.e., if Defendants weren't going to meet the deadline) then that would be a disincentive to invest.

The third alleged financial incentive relates to an agreement Southern Company and Mississippi Power had with the "South Mississippi Electric Power Association ('SMEPA'), whereby SMEPA paid a $150 million deposit toward a 15% ownership interest in the Kemper Plant, which was repayable with interest in the event SMEPA canceled the deal if the plant was not timely completed." Compl. ¶¶ 12, 172. The existence of this investment in the Kemper Plant project obviously provided an incentive for others to invest. Plaintiffs maintain that if Defendants failed to maintain the appearance that the Kemper project would be completed on schedule, it raised the possibility that SMEPA would cancel its

---

would spook investors, garner harsh criticism from the news media and regulators and could lead to bankruptcy." Compl. ¶¶ 44, 170.

investment and demand repayment of the $150 million, plus interest, thus disincentivizing other investors.

The fourth alleged financial incentive relates to a contract with Treetop Midstream Services LLC ("Treetop"), whereby Mississippi Power agreed to sell $CO_2$ captured by the Kemper Plant once it was operational. Id. ¶ 173. In March 2013, in reliance on this agreement, Treetop began building infrastructure to accept the $CO_2$. Id. Plaintiffs allege that Defendants were aware that any delay beyond the May 2014 COD jeopardized this agreement. Id. This agreement was an incentive to investors. The cancelation of the agreement would make Southern Company a less appealing investment.

The fifth alleged financial incentive involves a customer rate increase that the Mississippi PSC authorized during the Class Period to help fund the Kemper Plant construction costs. Id. ¶ 174. The rate increase was approved by the Mississippi PSC in March 2013, during the Class Period. Id. Plaintiffs allege that Defendants were aware that the revelation that there were significant delays in the Kemper Plant construction could have endangered Defendants' request for the increase. Further, such revelations after the rate increase was granted by the Mississippi PSC potentially could have led to cancellation of the Kemper Plant's construction. Id.

Defendants argue that these alleged motives are illogical because these financial incentives already existed at the beginning of the Class Period and the Mississippi PSC had already approved a ratepayer-funded allowance to cover construction financing. Defs.' Br. at 25-27.[30] Defendants argue that the supposed fraud alleged in this case—misrepresentations made during the Class Period regarding the lack of progress of the Kemper Plant—would not enable the fraud's alleged goals. Id. In other words, according to Defendants, the financial incentives either were going to happen or not by May 2014 and nothing Defendants said during the Class Period could affect that outcome.

Defendants mischaracterize Plaintiffs' alleged financial incentives that constitute motive for the alleged misrepresentations. Plaintiffs do not allege that Defendants made misrepresentations to enable them to retain the financial incentives. Instead, Plaintiffs allege that these financial incentives would have saved Mississippi Power and Southern Company a considerable amount of money, which made Southern Company a more attractive investment. To the extent Defendants lost one or all of these incentives, Southern Company became a less attractive investment; indeed, the elimination of such incentives could have

---

[30] Defendants' argument omits any reference to the Mississippi PSC rate increase, which is alleged to have occurred after the beginning of the Class Period. Defs.' Br. at 25-27; Defs.' Reply at 12-14; Compl. ¶ 62.

alienated project partners, drawn regulatory scrutiny, and resulted in less favorable treatment from regulators, all of which could have resulted in a decline in the price of Southern Company stock.  For example, without the benefit of the IRS tax credits or other financial incentives (i.e., the Mississippi PSC ratepayer-funded financing of construction costs, the asset purchase agreement with SMEPA, and the contract with Treetop), the Mississippi PSC may have been unwilling to authorize a rate hike in order to help fund the Kemper Plant project.

The Court finds that Plaintiffs' motive allegations are logical, plausible, and support an inference of scienter in this case.

### 2.    Absence of Evidence of Inside Stock Sales

Defendants allege that Plaintiffs' Complaint does not include any allegation that Defendants took advantage of the allegedly inflated stock price and sold stock before revealing the "truth."  Defs.' Br. at 27 (citing In re HomeBanc Corp. Sec. Litig., 706 F. Supp. 2d 1336, 1359 (N.D. Ga. 2010)).  Defendants argue that the "Eleventh Circuit has expressly noted that any inference of scienter is particularly weak where, as here, the complaint fails to allege inside stock sales intended to take advantage of the company's purportedly inflated stock prices."  In re HomeBanc, 706 F. Supp. 2d at 1359 (citing Mizzaro, 544 F.3d at 1253).  Plaintiffs do not contest the fact that there are no allegations of suspicious trading, but argue

that the lack of such allegations does not necessarily negate the strong inference of scienter.

The Court agrees with Plaintiffs. The Eleventh Circuit opinion in <u>Mizzaro</u> upon which the <u>In re HomeBanc</u> court relies specifically states that this issue is not necessarily dispositive:

> [A]s many courts have held, the timing of stock trades by insiders also may be relevant to inferring scienter. . . . We emphasize that suspicious stock sales are not <u>necessary</u> to create a strong inference of scienter. Instead, the presence or absence of such allegations must be assessed in light of all of the allegations found in the complaint.

<u>Mizzaro</u>, 544 F.3d 1253, n.3 (citations omitted) (emphasis in original). Moreover, unlike <u>In re HomeBanc</u>, there are sufficient allegations in the Complaint which, if true, would rise to an intent to defraud or severe recklessness. <u>In re HomeBanc</u>, 706 F. Supp. 2d at 1358 ("Plaintiff has alleged no facts that would establish that Defendants' conduct rose to the level of recklessness or an intent to defraud."). In addition, the nature of the allegations here are not the type in which one would expect to see allegations of insider trading. Viewing the Complaint in its entirety, and all of the facts alleged collectively, the Court finds that the absence of an allegation of suspicious trading is not dispositive as to a finding of scienter. <u>See</u> <u>Tellabs</u>, 551 U.S. at 325 (holding that an allegation of personal financial gain is not required to show scienter); <u>In re Thornburg Mortgage, Inc. Sec. Litig.</u>, 695 F.

Supp. 2d 1165, 1196 (D.N.M. 2010) ("Not every case of securities fraud must have

an allegation of profitable insider trading to be actionable."), on reconsideration in

part, 824 F. Supp. 2d 1214 (D.N.M. 2011), aff'd sub nom. Slater v. A.G. Edwards

& Sons, Inc., 719 F.3d 1190 (10th Cir. 2013); In re Ibis Tech. Sec. Litig., 422 F.

Supp. 2d 294, 317 (D. Mass. 2006) ("The absence of insider trading does not

preclude an inference of scienter, especially where the plaintiff alleges that the

defendant stood to benefit from the alleged fraud.").

### 3.    Plaintiffs' Allegations of Severe Recklessness

Defendants next argue that Plaintiffs' Complaint "contains no facts from

which the Court can infer that Defendants acted with severe recklessness as to the

truth or falsity of their statements." Defs.' Br. at 28.  Specifically, Defendants

contend that the allegations do not support a strong inference of scienter because:

(1) Plaintiffs' allegations of the individual defendants' positions, responsibilities,

and access to material non-public information are insufficient to establish scienter,

(2) Plaintiffs' witness allegations are not credible and are insufficient to establish

scienter, and (3) the allegations of alleged directives from Defendants to limit

public communications do not show severe recklessness. Defs.' Br. at 28-35.

a.   **Allegations of the Individual Defendants' Positions, Responsibilities, and Access to Information**

Plaintiffs allege that the individual Defendants' corporate positions provided them with access to material non-public information which led them to act with reckless disregard in making statements that were false or misleading.

> The Individual Defendants, because of their positions, possessed the power and authority to control the contents of the Company's quarterly reports, shareholder letters, press releases, securities offering materials and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. They were provided with copies of and/or contributed to the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions, and their access to material non-public information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

Compl. ¶ 28; see also Compl. ¶¶ 176-183.

Defendants argue that Plaintiffs' general allegations of positions and access to material non-public information are insufficient as a matter of law, particularly where Plaintiffs do not identify the specific information available to each individual Defendant. Defs.' Br. at 28 (citing Patel v. Patel, 761 F. Supp. 2d 1375, 1380-81 (N.D. Ga. 2011) ("[R]eliance on the defendants' positions as directors and

officers, their attendance at meetings, and access to internal documents and reports is insufficient to allege a strong inference of scienter.")).  Plaintiffs respond that the individual Defendants admit that they actively managed and closely monitored the construction at the Kemper Plant and spoke about the Kemper Plant on every quarterly call during the Class Period.  Pls.' Resp. at 24 (citing Compl. ¶¶ 112-59, 176-83).

The Eleventh Circuit dealt with a similar issue in Garfield v. NDC Health Corp., 466 F.3d 1255, 1264-65 (11th Cir. 2006).  In that case, the plaintiff attempted to demonstrate scienter by alleging that the defendant executives attended monthly operational meetings to discuss every aspect of the business "in detail, including the aggressive channel stuffing and mounting problems with accounts receivable (sic)."  Id. at 1264.  The court declined to find a strong inference of scienter based on this evidence because the plaintiff failed to allege "what was said at the meeting, to whom it was said, or in what context."  Id. at 1265 ("A general allegation that Individual Defendants promoted channel stuffing at a series of meetings does not establish scienter."); but see Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp., No. CV:10-2847-IPJ, 2011 WL 12855820, at *8 (N.D. Ala. June 7, 2011) (internal punctuation omitted) ("[D]uring every single quarterly conversation with the analysts, someone

from the financial world asked Dowd [Ritter] about loans in Florida and bad commercial real estate. These allegations clearly show that defendants had access to and were aware of a financial situation that was not as strong as they were suggesting to the public.").

In this context, the Court will analyze Plaintiffs' allegations regarding the positions, responsibilities, and access to information as they relate to each individual Defendant. See Phillips, 374 F.3d at 1016 ("We conclude that factual allegations may be aggregated to infer scienter and must be inferred for each defendant with respect to each violation.").

### i.  Defendant Holland

Holland was the Executive Vice President, General Counsel, and Corporate Secretary of Southern Company through May 2013, when he became the Executive Vice President and Chairman, President, and Chief Executive Officer of Mississippi Power. Compl. ¶ 180. He remained in the latter position through the end of the Class Period. Id. Plaintiffs allege that "Defendant Holland was actively involved in the Kemper Plant project given that it was the largest project in the history of Mississippi Power." Id. Plaintiffs also allege that Holland signed the signed Sarbanes-Oxley certifications and the consolidated Form 10-Q for the second quarter of 2013. Id. ¶¶ 156, 180.

Other than generally alleging the individual Defendants "actively monitored or managed the construction of the Kemper Plant," (Compl. ¶ 176), there is no allegation in the Complaint explaining what Holland's specific role was in the active management or monitoring the Kemper Plant. There is no allegation that he participated in any of the quarterly calls or that he visited the Kemper Plant with any frequency. Moreover, there are no allegations attributing any of the thirty-seven statements at issue to Holland. Most importantly, in the context of Holland's alleged position, responsibilities, and access to information, Plaintiffs have not alleged that he was a part of any discussion in which the details of the lack of progress on the Kemper Plant was discussed. There are no allegations in the Complaint concerning of what, if any, information regarding the lack of progress on the Kemper Plant project was provided to Holland. In short, Plaintiffs appear to rely upon Holland's position and the general allegation that he was an active manager to support scienter in their case against him. The Court finds that Plaintiffs' allegations regarding Holland's position, responsibilities, and access to information do not support an inference of scienter as to Defendant Holland. See Mogensen, 15 F. Supp. 3d at 1220 ("The Amended Complaint does, of course, allege that the individual defendants were hands-on, active managers who regularly received and reviewed information about the company. But without any detail of

70

what these reports contained, this cannot support an inference of scienter.

Otherwise, any executives working at a company with an internal reporting system

would work at their peril.  To impute knowledge of or extremely reckless disregard

for the truth from the mere existence of an internal reporting system, and the mere

active engagement of management, would allow almost any securities fraud case to

proceed into discovery."); In re Coca-Cola Enters. Inc. Sec. Litig., 510 F. Supp. 2d

1187, 1201 (N.D. Ga. 2007) ("The essence of their allegations is that because of

the Defendants' positions and their general duty to monitor the information on

Margin Minder, the Defendants must have known about the channel stuffing.  The

Amended Complaint fails to provide any specific allegations regarding a time,

place or manner in which any of the Individual Defendants was specifically

informed or indicated special knowledge as to CCE's channel stuffing activities.

These pleadings are thus insufficient to demonstrate an inference of scienter.").

Furthermore, because there is no allegation that Holland was aware or

should have been aware of information that would render any of the statements at

issue false, the fact that he signed the Sarbanes-Oxley certifications and a

consolidated Form 10-Q is not probative of scienter in this case.  See Garfield, 466

F.3d at 1266-67 ("[W]e hold that a Sarbanes-Oxley certification is only probative

of scienter if the person signing the certification was severely reckless in certifying

the accuracy of the financial statements.  This requirement is satisfied if the person

signing the certification had reason to know, or should have suspected, due to the

presence of glaring accounting irregularities or other "red flags," that the financial

statements contained material misstatements or omissions.  In the instant case,

there are no allegations in the Second Amended Complaint that indicate the

presence of such "red flags" in the company's financial statements.").

The Court finds that Plaintiffs' allegations regarding Holland's positions,

responsibilities, and access to information do not support an inference of scienter.

### ii.    Defendants Huggins and Anderson

Defendant John C. Huggins ("Huggins") was the Southern Company general

manager responsible for overseeing the Kemper Plant startup, engineering, and

construction services from 2010 through May 20, 2013.  Compl. ¶¶ 25, 181.  He

was promoted to Vice President of Generation Development for Mississippi Power

on May 20, 2013, and remained in that role for the duration of the Class Period.

Id. ¶ 25.  Defendant Thomas O. Anderson ("Anderson") was Vice President of

Generation Development for Mississippi Power from July 2009 through May 2013.

Id. ¶ 26.

Unlike the amorphous allegations against Holland, there are numerous

specific allegations explaining the role Huggins and Anderson had in managing the

72

Kemper Plant project. Plaintiffs allege that in Huggins's role as general manager overseeing the Kemper Plant project, he "had ultimate management responsibilities for the Kemper Plant,[31] was actively involved in managing construction and attended monthly production meetings where delays to critical path items, such as the gasifier, were discussed." Id. ¶¶ 11, 25, 181. Similarly, Plaintiffs allege that Anderson testified that he had "primary responsibility for managing the Company's effort to develop the Kemper Project. In this role, [he] overs[aw] the work being conducted and ha[d] access to the resources and information necessary and sufficient to make a determination concerning the Company's efforts to date." Id. ¶¶ 26, 182; see also id. ¶¶ 11 (alleging that Anderson "was primarily responsible for managing the Kemper Plant construction effort."), 182 ("Wingo said that Anderson was very 'hands on' and would 'manage it down to the weeds'

---

[31] Huggins was questioned under oath on August 9, 2013, and was asked who had "primary responsibility for the Kemper Project and the decision making process." Testifying on behalf of Mississippi Power, Huggins responded:

> Mississippi Power and the Generation Development team, which I manage, have responsibility for the Kemper Project. We utilize existing departments and their process and controls to manage the Project, including but not limited to, [Mississippi Power] Accounting, Finance and Treasury, [Mississippi Power] Transmission, [Mississippi Power] Supply Chain, [Mississippi Power] Environmental, and [Southern Company Services] Engineering and Construction Services.

Id. ¶ 25.

by micromanaging the design and procurement process."). Both of their roles included being a spokesperson for the Kemper Plant project, specifically with regard to the construction schedule. See Compl. ¶¶ 126, 130, 135, 158.

Both Huggins and Anderson are alleged to have been present at meetings that took place on a regular basis at which the significant delays in the Kemper Plant project were discussed, or were otherwise informed of the significant delays on a regular basis:

> Wingo also discussed the gasifier delays and their overall impact on the plant's COD at monthly production meetings, which defendants John Huggins and Tommy Anderson attended. Wingo stated that management "threw together these half-assed schedules that made no sense"; once the plant was put on a legitimate schedule showing that the plant could not be completed by May 2014, defendants simply 'broke logic ties' to claim that they could meet the prescribed deadline. Wingo concluded: "Through lies, deceptions and half-truths and an unwillingness to confront that, I believe they've damaged [their credibility]. We chose not to [be truthful] and we did it multiple times."

Id. ¶ 7.

> Wingo said that the gasifier delays and their impact on the overall schedule were discussed during this time during monthly production meetings, which Wingo usually attended. John Huggins, who was in charge of Startup at the time, attended these production meetings and would have been aware of the gasifier delays. . . . Wingo said that Mississippi Power Vice President Tommy Anderson occasionally attended these monthly production meetings. Wingo also spoke with Anderson on an almost weekly basis, either over the phone or in person, because Anderson needed to approve all procurement purchases during the late 2011 through 2012 timeframe. Therefore,

> Anderson would have been well aware of the implications of the gasifier delay. Wingo concluded: "[W]e lost somewhere between three and six months on the overall schedule and yet even through 2012 when we had a three to six month delay on the gasifier, we did not report a slip in our May 1, 2014 COD. That's when I was pretty certain that we had something terribly wrong with our scheduling."

Id. ¶ 61. Additionally, Plaintiffs allege Huggins was a part of a three-day team meeting with the Kemper Plant engineers in July 2013, at which Wingo demanded a new and accurate schedule be created so that he and the engineers would not be blamed for missing the May 2014 COD. Id. ¶¶ 67, 159(e). During this July meeting, Huggins was part of a group of people who appointed Wingo as the engineer responsible for providing a new schedule, which he completed in September 2013. Id. ¶¶ 67-68, 159(e). Wingo determined that May 1, 2014, was "impossible" and that the Kemper Plant would not be completed until March or April 2015. Id. ¶¶ 68, 159(e).

In addition to the regular meetings and other updates, Plaintiffs allege that Huggins and Anderson regularly visited the Kemper Plant site which, Plaintiffs contend, would have put them on notice of the delays. See id. ¶¶ 11 (alleging that Anderson was "regularly" on-site), 75 ("John Huggins was at the Kemper Plant 'all the time.' Tommy Anderson was 'regularly' at the site, at least every two weeks and he would often remain at the Kemper Plant for a week at a time."). For example, Plaintiffs allege that Holland admitted that the absence of piping at the

75

Kemper Plant was obvious upon a visual inspection. Compl. ¶¶ 115(f) n.23, 189 ("Defendant Holland admitted that the piping was visibly incomplete as late as April 2015: 'If you had gone [to the Kemper site] in [February-April 2015] and stood up in the top of the facility and looked down, you would have seen pipe and other equipment out in the laydown yards. Go up there today, and it's virtually cleared—all that's been installed.'"). Wingo stated that a visible inspection in 2012 revealed that many of the pipes were "jerry rigged" with cables and ropes:

> Well right off the bat, the first thing people noticed was that a lot of the pipe that we were hanging, when you build a multiple story structure and you run pipe through it at different levels, you have to support it, you don't just lay it on the ground. It is usually over your head. So it has to be supported by something called a pipe hanger. We saw pipe in the gasifier structure that was being held up by cables and ropes, I mean it was not a good look and when you talk to construction about what was going on, which you didn't have to talk to them, they were actively complaining, they said they weren't getting enough pipe or pipe hangers to build the plant. This was happening in 2012, so that was the first visible sign of something at the site.

Id. ¶ 62.

The Court finds that Plaintiffs' allegations regarding Huggins's and Anderson's positions, responsibilities, and access to information support an inference of scienter.

### iii.    Defendants Fanning and Beattie

Fanning was CEO and Beattie was the CFO of Southern Company. Id.
¶¶ 177-78.  Plaintiffs generally allege that Fanning and Beattie "actively monitored
or managed the construction of the Kemper Plant." Id. ¶ 176.  However, neither
Fanning's nor Beattie's level of management is clear from the allegations in the
Complaint.  See, e.g., id. ¶ 177 (alleging that Fanning and company executives
"meet regularly on this project" and they "continue to actively manage ongoing
pressures on costs and schedule" associated with the Kemper Plant).  Fanning is
alleged to have participated in the Executive Review Committee for the Kemper
Plant, which was tasked with assessing the Kemper Plant's progress to ensure it
remained "on time, on budget, and in full compliance with all pertinent safety and
quality requirements." Id.  Similarly, Beattie is alleged to have met regularly with
Fanning and Day on the Kemper Project and "with senior executives at the
Engineering & Construction Services division who were in charge of building the
plant, as well as with Mississippi Power executives like Ed Day, to receive updates
on the project." Id. ¶ 178.

Although Plaintiffs allege that Fanning visited the Kemper Plant
approximately every two to three months, (id. ¶¶ 74-75), this allegation alone is
insufficient to show that Fanning's position, responsibilities, and access to

information support an inference of scienter.  Taking the allegation as true, the

alleged in-person visit every two to three months is too infrequent to infer that

Fanning gained knowledge of the lack of progress at the Kemper Plant that would

allow him to recognize that achieving the May 2014 COD was impossible.

With regard to Beattie, Plaintiffs allege only that he "actively monitored or

managed the construction of the Kemper Plant," (id. ¶ 176), and make generic

allegations regarding the meetings he attended with other executives, including

Fanning.  However, there is no allegation that Beattie visited the Kemper Plant

with any frequency.  Most importantly, in the context of the position,

responsibilities, and access to information allegations made against both Fanning

and Beattie, Plaintiffs have not alleged that either individual was part of any

discussion in which the details of the delay in the Kemper Plant construction was

discussed.  Moreover, there are no allegations concerning what, if any, information

regarding the lack of progress on the Kemper Plant project was provided to

Fanning and Beattie.

The Court finds that Plaintiffs' allegations regarding Fanning's and Beattie's

position, responsibilities, and access to information do not support an inference of

scienter as to them.  See Mogensen, 15 F. Supp. 3d at 1220; In re Coca-Cola, 510

F. Supp. 2d at 1201.  Furthermore, the fact that Fanning and Beattie signed the

Sarbanes-Oxley certifications and a consolidated Form 10-Q, is not probative of scienter in this case. See Garfield, 466 F.3d at 1266-67.

### iv.   Defendant Day

The allegations against Day are more substantive than those against Holland, Fanning and Beattie, but less than those against Defendants Huggins and Anderson. Defendant Day was the CEO of Mississippi Power. Id. ¶ 179. Specifically, he is alleged to have "actively monitored and managed the Kemper Plant project given that it was the largest project in the history of Mississippi Power." Id. Consistent with this allegation is the claim from CW-2 (confidential witnesses-2) that Day was "always" at the Kemper plant. Id. ¶¶ 75, 179. Based on the alleged admission by Holland, discussed above, and the first-hand account from Wingo, Plaintiffs allege that Day could have seen the progress (or lack thereof) of the Kemper Plant construction from first-hand observation. Because he was "always" at the Kemper plant, it follows, Day would have been aware of the problems or lack of progress such that the achievement of the May 2014 COD would have been impossible.

Day is also alleged to have met "regularly" with Fanning and Beattie and other senior managers about the Kemper Plant project. Id. ¶¶ 76, 127, 179. However, unlike the meetings in which Huggins and Anderson participated, it is

not clear from the Complaint what was discussed at these meetings with Day, or

whether the delays in construction were specifically discussed.  There is no

allegation that Fanning or Beattie had any knowledge of delays or problems which

they could have imparted to Day.  Given the general nature of the factual assertions

regarding the meetings Day attended, the Court is not inclined to assign them much

probative value in terms of establishing the appropriate level of scienter.  See

Garfield, 466 F.3d at 1265 (declining to find a strong inference of scienter where

the allegations regarding meetings failed to allege "what was said at the meeting,

to whom it was said, or in what context.").

The allegations regarding Day's positions, responsibilities, and access to

information present a close call in terms of the Court's assessment of whether they

support an inference of scienter.  Given that this question is presented on a motion

to dismiss and the Court is to accept all of the well-pleaded allegations as true, as

well as all of the reasonable inferences drawn from those facts, the Court finds that

Plaintiffs' allegations regarding Day's position, responsibilities, and access to

information support an inference of scienter.  This is based primarily upon

Plaintiffs' allegations that eye-witness observation of the Kemper Plant would

reveal the lack of progress and the impossibility of achieving the May 2014 COD,

coupled with their allegation that Day was "always" on the Kemper Plant

construction site. This finding is further supported by the allegation that Day signed the Form 10-Q statements from the first three quarters of 2012 and the first two quarters of 2013 as well as the Form 10-K for 2012, all of which contained the Sarbanes-Oxley certifications pursuant to which Day attested that the filing did "not contain any untrue statement of material fact or omit to state a material necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." See Compl. ¶¶ 114, 121, 129, 142, 148, 156.

Additionally, the Sarbanes-Oxley certifications are probative of scienter in the case of Day because, given his constant presence at the Kemper Plant, he had to have been aware of the scheduling delays and lack of progress. See Garfield, 466 F.3d at 1266-67 (holding that the Sarbanes-Oxley certifications are probative of scienter "if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other "red flags," that the financial statements contained material misstatements or omissions.").

### b.    Witness Allegations

Defendants argue that that the allegations based on statements from the five confidential witnesses ("CW") and Wingo are insufficient to establish scienter.

Defs.' Br. at 29-33.  They contend that the allegations do not indicate that the CWs

had interactions with any individual Defendant or had personal knowledge of

alleged wrongdoing on the part of any individual Defendants.  Id. at 30-31.

Additionally, Defendants argue that, to the extent the allegations indicate that

Wingo informed Anderson and Huggins about alleged delays, the Complaint does

not "describe any specifics of their alleged conversations."  Id. at 32.

The Court finds that Plaintiffs have adequately alleged that Wingo and each

of the confidential witnesses were privy to the scheduling delays experienced at the

Kemper Plant by identifying the positions held by each of the witnesses, the time

periods in which they were employed, and the basis for their knowledge.  The

Court has attributed the appropriate amount of weight to these allegations based on

statements proffered by Wingo and the confidential sources depending on the

particularity of the allegations.  To the extent the factual allegations in the

Complaint attributed to information derived from any of these witnesses do not

include facts that indicate that the witness imparted information about schedule

delays to the individual Defendants, the Court has not considered those allegations

in its analysis of scienter as to that individual Defendant.

For example, as a procurement engineer and later Project Manager

responsible "for ensuring that the engineering and procurement for the coal

gasification and cleanup systems, which Wingo described as constituting the majority of the Kemper Plant, were on time and met the construction schedule," it is clear that Wingo was particularly well-placed to be in a position to know a great deal about the Kemper Plant project schedule and delays. Furthermore, from the breadth and detail of Wingo's allegations regarding Kemper Plant project schedule and delays, it is clear why Huggins and Anderson were aware of those delays. In this instance, the Court does not find that the omission of those same details as they were conveyed during the regularly-held meetings is fatal to Wingo's account.

The Court rejects Defendants' contention that the witness accounts are not credible and not otherwise sufficient to support a finding of severe recklessness. In its analysis of scienter herein, the Court has considered the allegations derived from statements made by Wingo where those factual allegations are particularized enough to indicate scienter on the part of the individual Defendants.

### c.     Directives From Defendants

Plaintiffs allege that Day sent the following e-mail on August 8, 2012, instructing employees not to discuss Kemper Plant schedule information with the public: "I would like to remind everyone 'again', no numbers, schedules, or information in general should be communicated to external parties until I review it/them first. . . .  No speculation, no estimates, no forecast, etc." Compl. ¶ 167.

The e-mail was sent to Huggins and Anderson, among others. Id. Defendants argue that Plaintiffs' contention that this e-mail was evidence of a directive from Day to conceal fraud is not supported by the e-mail. Defs.' Br. at 33. Stopping short of arguing that this e-mail was merely a restatement of public policy, Defendants state that, "instructions regarding external communications are standard in any public company and do not support scienter." Id. At this stage of the litigation, viewing the factual allegations in their totality, the Court finds that it is at least as likely that this communication was a directive to not reveal the scheduling delays as it was a simple restatement of company policy. This e-mail, therefore, supports an inference of scienter.

### 4.    **Strong Inference of Scienter**

As the Eleventh Circuit has stated, "the question . . . boils down to whether a reasonable person would infer that there was at least a fifty-fifty chance that the individual defendants knew about the alleged fraud (or were severely reckless in not knowing about it)." Mizzaro, 544 F.3d at 1249. This Court concludes that the allegations in Plaintiffs' Complaint create a strong inference (i.e. a cogent and compelling one) that the certain individual Defendants orchestrated the fraud, knew about it, or were severely reckless in not knowing about it. Taking the well-pleaded allegations and reasonable inferences drawn from those allegations as true,

and viewing them collectively, this Court concludes that Plaintiffs have adequately

pleaded a strong inference of scienter as to Defendants Day, Huggins, and

Anderson.  The allegations in the Complaint do not support a strong inference of

scienter as to Defendants Fanning, Beattie, and Holland, who are **DISMISSED** as

individual Defendants.

> **F.     Section 20(a) Claim**
>
> Section 20(a) of the Exchange Act imposes joint and several liability on
>
> > [e]very person who, directly or indirectly, controls any person liable
> > under any provision of this chapter or of any rule or regulation
> > thereunder shall also be liable jointly and severally with and to the
> > same extent as such controlled person to any person to whom such
> > controlled person is liable (including to the Commission in any action
> > brought under paragraph (1) or (3) of section 78u(d) of this title),
> > unless the controlling person acted in good faith and did not directly
> > or indirectly induce the act or acts constituting the violation or cause
> > of action.

15 U.S.C. § 78t(a).  The elements of a § 20(a) claim are: (1) a primary violation of

federal securities laws, and; (2) the defendant's exercise of actual power or control

over the primary violator.  See In re Galectin, 843 F.3d at 1276 (quotation and

citation omitted).  If Plaintiffs cannot state a securities fraud claim under Section

10(b) and Rule 10b-5, the control person liability claim would be subject to

dismissal.  Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc., 594 F.3d

783, 797 (11th Cir. 2010); Mizzaro, 544 F.3d at 1237 ("Because a primary

violation of the securities laws is an essential element of a § 20(a) derivative claim, we have held that a plaintiff adequately pleads a § 20(a) claim only if the primary violation is adequately pleaded.").

Defendants argue that because Plaintiffs have failed to allege a primary violation of Section 10(b) and Rule 10b-5, the derivative control person claim under Section 20(a) fails as a matter of law. Defs.' Br. at 35. The Court rejects Defendants' argument. Because Plaintiffs have stated a claim under Section 10(b) and Rule 10b-5, their claim under Section 20(a) cannot be dismissed for failure to adequately allege a primary violation of federal securities laws. To the extent Defendants' Motion relies upon this argument, the Motion to Dismiss is **DENIED**.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Consolidated Complaint [Doc. 37] is **GRANTED IN PART and DENIED IN PART**. Specifically, Defendants' Motion to Dismiss is **GRANTED** to the extent that the claims in Plaintiffs' Complaint are based on Statement Nos. 1-2, 4, 7, 13, 21-22, 27, 32, 34, and 36, which are forward-looking statements protected by the PSLRA safe harbor provision and not actionable in this case. Further, Defendants' Motion to Dismiss is **GRANTED** as to Defendants Fanning, Beattie, and Holland, who are **DISMISSED** as individual Defendants in this case because the allegations in the

Complaint fail to raise a strong inference of scienter as to them.  Defendants'

Motion to Dismiss is otherwise **DENIED**.

     **IT IS SO ORDERED** this 29th day of March, 2018.

MARK H. COHEN
United States District Judge