1          UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION

3

4   MONROE COUNTY EMPLOYEES'      )
    RETIREMENT SYSTEM, ET AL.,    )
5                                 )
         PLAINTIFFS,              )
6                                 ) DOCKET NO. 1:17-CV-00241-WMR
         -VS-                     ) EVIDENTIARY HEARING
7                                 )
    THE SOUTHERN COMPANY, ET AL., )
8                                 )
         DEFENDANTS.              )
9

10              TRANSCRIPT OF PROCEEDINGS

11         BEFORE THE HONORABLE WILLIAM M. RAY, II

12             UNITED STATES DISTRICT JUDGE

13                 MAY 22, 2019

14

15   _____

16

17

18

19

20

21

22          PENNY PRITTY COUDRIET, CCR, RMR, CRR
               OFFICIAL COURT REPORTER
23           UNITED STATES DISTRICT COURT
                 ATLANTA, GEORGIA
24

25

```
 1   APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFF:

 3            DARRYL J. ALVARADO, ESQ.
             DANIEL S. DROSMAN, ESQ.
 4            RACHEL A. COCALIS, ESQ.
             HILLARY B. STAKEM, ESQ.
 5
             Attorneys At Law
 6            Robbins Geller Rudman & Dowd, LLP
             655 W. Broadway
 7            Suite 1900
             San Diego, California 92101
 8

 9   ON BEHALF OF THE DEFENDANT:
10
             ASHLEY F. HEINTZ, ESQ.
11            WALTER W. DAVIS, ESQ.
             MICHAEL J. McCONNELL, ESQ.
12            ROBERT WATTS, ESQ.

13            ATTORNEYS AT LAW
             Jones Day
14            1420 Peachtree Street, NE
             Suite 800
15            Atlanta, Georgia 30309

16

17

18

19

20

21

22

23

24

25
```

```
 1                      (MAY 22, 2019)

 2          (PROCEEDINGS HELD IN OPEN COURT AT 9:04 A.M.)

 3          COURTROOM SECURITY OFFICER:  The Honorable United States

 4  District Court for the Northern District of Georgia, Atlanta

 5  Division, is now in session, the Honorable William M. Ray, II,

 6  presiding.

 7          THE COURT:  Thank you.

 8          So we're going to hear defendant' motion to exclude the

 9  expert opinion of Dr. Feinstein first.  Ms. Heintz, you present

10  that.  I reiterate that this motion will take 30 minutes.  You'll

11  get 15 minutes and you can reserve some of that time, if you wish.

12          MS. HEINTZ:  May I approach, your Honor, with the

13  PowerPoint?

14          THE COURT:  Yes.

15          MS. HEINTZ:  Good morning, your Honor.

16          Yesterday you asked a question that I want to make sure

17  that we answer today before I dive into the Daubert motions.  You

18  asked whether or not this inquiry that we put before you on these

19  motions can be left for trial and left for the jury.  The answer

20  to that question is no.

21          And the Advisory Committee Notes, Rule 23(f) and the

22  cases applying those notes and interpreting them explain that it's

23  critical at this phase to undertake the class inquiry to avoid the

24  burden and expense associated for both parties with litigating a

25  large class case all the way to trial just to then deal with these
```

1    questions at the conclusion of the merits.

2         It's also important, the second part of that is that the

3    Supreme Court has stated that at each turn of the questions that

4    you need to evaluate in this case, this is -- that these are

5    class-phase inquiries.

6         Now, as you can see on your screen, this is the chart

7    that I started with yesterday, the analysis that's before the

8    Court.  At each one of the turns, and we'll start at the top, the

9    Supreme Court has said this is a class-phase inquiry.

10        First, as to reliance, the Supreme Court in *Basic* said

11   plaintiffs have a burden to prove that reliance has been met at

12   this phase.

13        Second, as to price impact, if we get there, right, if

14   we get past the market efficiency analysis, the Supreme Court in

15   *Halliburton* said that defendants must have the right at the class

16   phase to rebut price impact.

17        Then next, if we get through that first reliance

18   inquiry, the Supreme Court in *Comcast* said that the damages

19   question, whether or not plaintiffs have put forth a model showing

20   that damages can be calculated on a class-wide basis, that inquiry

21   must be undertaken at the class phase.

22        And then this morning what we're talking about with the

23   Daubert motions, Daubert has appointed you as the gatekeeper, your

24   Honor, and we ask that you hold your post.  The Eleventh Circuit

25   in *Sher vs. Raytheon*, which I mentioned yesterday, said that the

1    inquiry of Daubert must be undertaken at the class phase when the

2    Court is faced with expert testimony related to whether or not a

3    Rule 23(b)(3) class can be certified.

4         And as I mentioned yesterday, the Eleventh Circuit in

5    *Brown vs. Electrolux* stated that at all junctures in this inquiry,

6    the presumption is against class certification.

7         Now, the Daubert inquiry that you're faced with here

8    today -- of course, there are two dueling Daubert motions I

9    suppose, if you will, that also go to the three inquiries that are

10   on the screen.  Now how do they go to those three inquiries?

11   Well, the experts here have submitted event study models.  The

12   event study models relate to market efficiency and whether or not

13   plaintiffs have met their burden to show the cause and effect

14   relationship between the news related to Southern Company and the

15   stock price.

16        If they get past that burden, then Professor Gompers'

17   event study relates to the price impact inquiry and whether or not

18   defendants have rebutted the market efficiency presumption if you

19   find it has been satisfied here.

20        And then, finally, of course, as to damages, both

21   experts have also submitted opinions related to damages in this

22   case.

23        Now, focusing on why the event models matter, it's both

24   as I mentioned to this market efficiency analysis under reliance

25   and to price impact.  And as we will discuss this morning, there

 1   are two critical differences between the models that Dr. Feinstein

 2   and Professor Gompers presented to you and discussed with you

 3   yesterday.  Those differences are the methodological process used

 4   to create those models and then the inputs, the event windows --

 5   excuse me, the variables, the event windows and the industry index

 6   which were selected based upon those methodologies.  And that's

 7   what we'll be talking to you about this morning.

 8            Now, turning to our motion to exclude Professor

 9   Feinstein, we'll see if I can --

10            THE COURT:  I want to go back to the thing you started

11   with.

12            MS. HEINTZ:  Absolutely, your Honor.

13            THE COURT:  So my question that I asked was a little

14   more nuanced than I think you interpreted it.  The question about

15   the class certification is if I have two experts that are

16   accepted -- and we're sort of into the Daubert motion now but that

17   was the statement that you made beforehand.  For example, we'll

18   talk about the model, the damages model, where arguably either

19   expert might be right, arguably either expert might be qualified

20   to render their opinion and arguably they utilize scientifically

21   accepted methods, so obviously they don't agree.  Then is it for

22   me to determine which one is right; or if I determine that each

23   could be right, whether that ultimately becomes an issue that the

24   jury decides when they decide the case?  Because I would expect

25   that if the class was certified, that we're going to argue about

1  those same things before a jury.  Am I wrong about that?

2          MS. HEINTZ:  Your Honor, it is your job to decide

3  whether or not plaintiffs have met their burden --

4          THE COURT:  So what is the burden?

5          MS. HEINTZ:  The burden, according to the Supreme Court

6  case in *Comcast*, is in a Rule 23(b)(3) case plaintiffs must put

7  forth a damages model that aligns and accounts for their theory of

8  liability.  And as we discussed yesterday, and I believe this will

9  get a little bit more to the Gompers Daubert but -- the Daubert

10  motion against Professor Gompers, sorry for my shorthand there --

11  as we discussed yesterday plaintiffs' theory in the case as was

12  written in black and white in their complaint is that this was a

13  materialization of the risk; the risk that the -- related to the

14  May 2014 COD, taking plaintiffs at their word, which that's their

15  complaint at this juncture.  They did not, their expert did not

16  put forth a model as Professor Gompers illustrated.

17          THE COURT:  Well, that's what Dr. Gompers says, but I

18  might interpret it differently.  I might not be able to determine

19  exactly who is right, but I might be able to determine that both

20  are qualified and both, depending on whose view you accept, that

21  it's a close call.

22          And so what I'm trying to figure out is, you know, if I

23  can't decide, then what do I do?  So let's -- let me ask you --

24  and I'm going to give you five more minutes, I'm going to make

25  sure you have time to argue what you need to argue.

1          MS. HEINTZ:  Thank you, your Honor.

2          THE COURT:  But let's assume this case goes to trial,

3    are these not arguments that are also going to be put to the jury?

4          MS. HEINTZ:  Ultimately if this case goes to trial,

5    damages are an element of the claim, so the jurors will be tasked

6    with determining damages in the case.

7          THE COURT:  Right.  And they would hear from Gompers and

8    they would hear from Feinstein and then they would have to decide

9    who they believed.  And if they believed Gompers, then they

10   conclude that there's not a damages model that works here, can't

11   award damages to this class of plaintiff.

12         I mean, I know we're talking in large measure

13   theoretically because not many of these cases do go to trial.  But

14   if that's where we found ourselves, is that what would happen?

15         MS. HEINTZ:  Yes, your Honor.  And I understand what

16   you're saying, but I think there's two critical points to be made.

17   First that *Comcast* asks the District Court to decide now at this

18   class phase whether or not there is a model -- whether or not the

19   class can be certified, because in our particular case --

20         THE COURT:  I understand that I have to decide whether

21   the class is certified, but I don't know that it is as clear-cut

22   as you would argue.  If I decided that, for example -- I mean, I'm

23   assuming it's a preponderance standard I'm operating under here,

24   no one has said anything other than that.  If I decide that the

25   preponderance standard is such where each experts' opinion is

1 equally acceptable, then I'm assuming then that becomes a jury

2 decision.  Now, we're talking theoretically, but I didn't bring

3 this up, you brought it up.

4         MS. HEINTZ:  That's fine, your Honor.

5         THE COURT:  So in that case then you argue at trial that

6 Gompers is right and Feinstein is wrong and that damages can't be

7 awarded because there's really no way to determine -- assuming all

8 the bad stuff happened that the plaintiff said happen, and I know

9 you don't accept that, and I certainly make no conclusion on that

10 either, but even if the jury were to believe that Southern Company

11 did these bad things and said things that they shouldn't have and

12 didn't say things that they should, you would argue there's just

13 no way to award damages because you can't calculate it, right?

14         MS. HEINTZ:  Yes, your Honor, but I believe that inquiry

15 can be short-circuited here today and that *Comcast* asks the court

16 to short-circuit that eventuality of trying a case all the way to

17 trial just to ultimately determine that damages can't be awarded

18 to the class because they're not calculable.

19         THE COURT:  If my decision was the end all be all that

20 you say it is, then that issue wouldn't even be put to the jury.

21 In other words, if what I was making was the decision on the same

22 standard, we wouldn't even argue about it because you would be

23 telling the jury that this has already been decided.

24         MS. HEINTZ:  Respectfully, your Honor, maybe I misspoke,

25 the inquiries are slightly different.  Here in the class phase the

1   question is whether or not plaintiffs have put forth a model

2   showing that damages can be calculated on a class-wide basis.  The

3   inquiry at trial is what the calculation of those damages are and

4   the other elements of their claims, showing loss causation,

5   showing a connection to the fraud, right.  It is a slightly

6   different inquiry at that phase.  But, yes, there are still

7   experts involved in calculating damages and the jury will

8   determine what the most reasonable measure of damages is if we get

9   that far.

10          THE COURT:  The problem is the way you argued it is as

11  if what -- the decision the way you argued it in your first part

12  was is this the same inquiry that has to be made now, and it's not

13  really the same inquiry.  My decision now is whether or not I find

14  under the Daubert standard that Dr. Feinstein can be believed

15  because he's, you know, qualified and has done his work the

16  correct way; and then, even so, if we get past that point, whether

17  or not his model is capable of producing the information that the

18  jury needs, right?

19          MS. HEINTZ:  Just to be very clear, we have not

20  Dauberted Professor Feinstein on his damages model, we are asking

21  the Court instead to do what the Ohio Court did in *Freddie Mac* and

22  say that his damages model does not account for the theory of the

23  case here, their theory of liability, right.  So it is an

24  evaluation of his model as compared to their theory that we're

25  asking them to undertake what Professor Gompers opined on

1  yesterday from the perspective of a financial economist, has he

2  shown that he can do it is the question, not has Professor

3  Feinstein calculated the damages.  That ultimately, if we get that

4  far, is a question for trial.

5        Sorry if I didn't explain kind of the nuances of those

6  two inquiries earlier.  But I think it is critical, just as the

7  court in *Freddie Mac* found, that *Comcast* does impose a burden on

8  plaintiffs at this point to articulate a damages methodology that

9  can account for their theory.

10        And as the court in *BP* in the Northern District of Texas

11  told us, it's not in every securities case that plaintiffs can

12  satisfy that burden.  And in that case for the

13  materialization-of-the-risk subclass that court found the expert

14  there didn't put forth a model, that expert used a model that was

15  not accounting for all of the bar graphs and inputs that Professor

16  Gompers explained to you yesterday.  And the court found we can't

17  certify this class because damages is an element of a 10(b)(5)

18  fraud claim and you haven't shown that common questions

19  predominate as to the class.  The risk there is that you have all

20  these individualized damages calculations.

21        As Professor Gompers explained yesterday that would be:

22  What was the risk?  What was the probability of the plant not

23  being completed, the Kemper plant, according to their allegations,

24  at the time that that shareholder purchased?  And what did that

25  shareholder know about the risk at the time they purchased?  That

```
 1  will lead to -- given the potential size of the class, individual
 2  inquiries would simply make a class action unmanageable here.
 3          THE COURT:  So I'm going to give you 12 more minutes
 4  here.  You were about three minutes in when I stopped you.
 5          MS. HEINTZ:  Thank you, your Honor, and I'll probably
 6  reserve roughly a minute for rebuttal if that's all right.
 7          So defendants here have moved to --
 8          THE COURT:  You don't have a clock but you --
 9          MS. HEINTZ:  I don't.
10          THE COURT:  All right.
11          MS. HEINTZ:  Professor Feinstein's -- defendants moved
12  to exclude Professor Feinstein's event study and his resulting
13  opinions on market efficiency because they are unreliable and
14  unscientific.
15          As you heard yesterday Professor Feinstein conducted
16  this event study with two problematic inputs, if you will.  And
17  those problematic inputs were based on invalid scientific
18  approaches.
19          First, Professor Feinstein used ends-driven event
20  windows in order to increase the number of statistically
21  significant days that he found under his event study.
22          Second, Professor Feinstein arbitrarily selected an
23  industry index to account for industry factors in his event study.
24  And Professor Gompers explained in detail both of those today, so
25  I'll try not to retread too much ground.
```

1          But Rule 702, and this is important, requires that in

2    order for the Court to rely upon an expert's scientific testimony,

3    that testimony, first of all, must be based on a scientific

4    method.  Professor Feinstein, we would argue, was not in many

5    respects.  And, second, that method must be reliable and then

6    reliably applied.  Professor Feinstein fails at each of those

7    steps.

8          Plaintiffs here, as I mentioned this morning, have the

9    burden, right.  And plaintiffs also have the burden under Daubert

10   to prove the admissibility of Professor Feinstein's testimony, but

11   they cannot prove that he meets the Daubert standard for Rule 702

12   here.

13         First of all, turning to the event windows.  So I'm

14   switching to the presentation I provided you this morning, your

15   Honor.  So this restates what I just said.  And then moving to

16   event windows.

17         As Professor Gompers explained yesterday, and as

18   Professor Feinstein admitted on the stand, when Professor

19   Feinstein looked at July 31st, he did not find a statistically

20   significant result on that date.  Professor Feinstein told you

21   yesterday, just like he said in his deposition, that meant he

22   should look at the second date to see if he could find statistical

23   significance.

24         It turns out on August 1st that date was not

25   statistically significant either; however, when he added them up,

1    as you see in the gray box at the bottom of slide four, he finds

2    statistical significance.  That is simply not supported in

3    financial economics.  That is not a reliable method.  And on top

4    of that the use of event windows for that day, July 31st, was not

5    supported by any of the facts in the record and was not supported

6    by any academic principles.

7         Now, you'll see on slide five the chart that Professor

8    Gompers walked you through yesterday.  And he walked through each

9    of the excuses that Professor Feinstein tried to put forward after

10   we filed this Daubert motion as to why he used two-day event

11   windows on July 31st.  Each of those falls flat.

12        Professor Gompers explained that the timing of the

13   conference call was simply the same as the other dates.  He

14   explained that the company announcements, the mix of the news, it

15   wasn't more complex than the other dates to which Professor

16   Feinstein used one-day windows.  There was simply no reason,

17   nothing different between July 31st and, for example, April 24th

18   right before it that you can see that justified the use of a

19   two-day window.

20        Finally, he also talked about the number of analysts

21   reports because Professor Feinstein used that as an excuse for a

22   two-day window.  And, again, that is not a basis for a two-day

23   window.

24        And I think it's really important here that the Court

25   see sort of in simplified terms how Professor Feinstein has tried

1    to justify his use of these two-day windows throughout time in

2    this case.   Initially on September 24th when he filed his report,

3    he gave the justifications that I just talked about; the earnings

4    conference call timing, the nature of the news, the timing of the

5    analyst report.   None of those three things justify a two-day

6    window.

7            And, in fact, at his deposition he said the timing

8    issues and complexity issues which I agree are not unique to this

9    event.   Not unique to this event, that's exactly the opposite

10   thing that he said in his report.

11           He also said in his deposition what I mentioned earlier,

12   that because July 31st was not responsive, didn't have a

13   statistically significant result, didn't get him the result that

14   he liked, he looked to the next day.

15           Defendants then filed a Daubert motion against Professor

16   Feinstein for this ends-driven, inappropriate methodology.

17   Professor Feinstein began to change his tune and revise his story.

18   In his declaration that he filed with the Court on February 19th,

19   many months after his initial report, he now comes up with a new

20   definition of complex because it contradicted prior statements.

21   Well, that's not supported in financial economics either as

22   Professor Gompers explained yesterday, nor is it accurate here.

23           He also added that complexity increased on these dates

24   because they were near the end of the class period.   Again, if

25   anything, the fact that they were towards the end of the class

period, under plaintiffs' own theory more information would have

been in the market about the Kemper plant and the schedule and the

May 2014 COD.  Professor Gompers explained that in his reports and

he explained it yesterday.  That does not council using a two-day

window.

Finally in his rebuttal report Professor Feinstein added

something new that the company needed -- announced in the

conference call on July 31st the need to issue a $700 million in

equity.  Professor Feinstein kept calling this a blockbuster event

yesterday.  It was no such thing as Professor Gompers explained to

you in detail, so I won't go back through that.  But, again, even

that last-ditch effort doesn't justify the use of two-day window

on July 31st, especially where the use of that window is

inconsistent with the other event dates in his index.

Now, it's well established that these sorts of

ends-driven approaches are grounds for excluding expert testimony

under Daubert and Rule 702.  In fact, Professor Feinstein was

excluded in a *Freddie Mac* case that we've talked about several

times for taking an ends-driven approach in an event study.  The

Court there stated that his selection of an event date, a slightly

different problem with his event study there, and his event study

was entirely improper because you are supposed to hypothesize and

then see your results.  You're not supposed to know your results

in advance.

Here instead -- here, just like there, Professor

1    Feinstein was searching for an end, a statistically significant

2    response.  And, again, we talked about yesterday, but why was he

3    doing this?  Because he wanted to help plaintiffs meet their

4    burden; he wanted to show statistical significance so that he

5    could conclude the market was efficient during the class period.

6           There are other cases that I could mention but in the

7    interest of time, I would refer the Court to our briefs.  One that

8    I do want to mention is *In Re Lipitor* where -- although a

9    different context, under Daubert grounds an expert was excluded

10   because he formed his opinion first.  He found that conclusion

11   first and then used statistical evidence to back into it.  That's

12   what happened here.

13          Your Honor also used the word "cherry-picking" yesterday

14   when asking a question.  That's exactly on point.  That's exactly

15   what Professor Feinstein did, he cherry-picked his event dates.

16   That is not proper.  That, in fact, is data mining.

17          Now I also want to talk about his industry index.  So as

18   we talked about yesterday, Professor Feinstein didn't really have

19   a scientific approach, and as Professor Gompers explained, much

20   less anything reliably scientific to choose an industry index

21   here.  His deposition testimony on this point is on the screen on

22   slide nine and it is telling.

23          When asked what -- whether he applied a scientific

24   approach and what methods he applied to get there through a series

25   of questions, and the deposition transcript's on file for your

Honor, he answered:  Some people apply tools, but I don't think that's an appropriate approach.  No tools?  A scientist, a financial economist is not going to apply any tools to choose his index?

As Professor Gompers explained yesterday, although it is objective in the sense that Professor Feinstein looks at a filing every time, that does not make it reliable.  And as I mentioned earlier, Daubert standards require reliability.

Now, it's important to note that he revised his method. In his original report he said I look at what's in the company's filings.  At his depositions he said I look at the SEC filings. And critically at his deposition he said, as is quoted on the side, I think the determination ought to be a fundamental determination of which companies are most like the target company.

Well, then later, months later, post-Daubert motion, he revised his method to say, oh, I always look at the index used for purposes of Regulation S-K.  Well, that post hoc revision doesn't help him again because while it may be objective, it is objectively wrong, as Professor Gompers testified, and it is unreliable.

On the next slide you'll see what the company used, the company's fundamental determination of its custom peer group which is in order to -- if you read on the slide, the company says the companies in the peer group are those that are believed to be the most similar to the company in both business models -- business

1  model and investors.  If he was going to do what he originally

2  said his approach was, this is where he would have ended up, a few

3  pages earlier in the proxy prior to the S&P EUI.

4          Now, again, as I mentioned we had an evolving method,

5  and it's, again, up here on the screen for the Court.  What's

6  critical to note is that after the defendants filed their Daubert

7  motion on February 4th of 2019, Professor Feinstein did two

8  things, unusual things:

9          First, he revised his deposition testimony, as you can

10 see on the screen in the blue line, to align with his new approach

11 that he then later included a couple of days later in his

12 declaration.  That's unusual.  That's not appropriate.  It's not

13 the reliable -- it's not reliable.  It's not a method that he

14 applied in choosing the index.

15         Now, really quickly, Rule 702 does mandate exclusion of

16 such a cavalier approach to expert opinions.  For example, in a

17 case we cited, *In Re Denture Cream Products*, the Court did just

18 that, ruling that where a report was not good science and is

19 not -- it is not admissible due to a combination of flaws.  That

20 is the inquiry the Court is faced with here.

21         And one thing that I would like to note is that even if

22 the Court does not want to exclude Professor Feinstein, it should

23 not give any weight whatsoever to this flawed and unreliable event

24 study.

25         I would like to reserve whatever time I have left for

1  rebuttal.

2          THE COURT:  Thank you.

3          MR. ALVARADO:  Good morning, your Honor.

4          THE COURT:  Good morning.

5          MR. ALVARADO:  I want to start by highlighting that we

6  heard some discussion about damages, which I think we'll talk

7  about probably a little bit later today, but just to be clear

8  there's been no challenge with respect to Professor Feinstein's

9  damages opinion in this case and it was not the subject of the

10  Daubert challenge.  I'm happy to discuss the points if you have a

11  particular interest in that, but I intend to address the points

12  that they make in their Daubert motion.

13          THE COURT:  Yes, sir.

14          MR. ALVARADO:  Is that appropriate?

15          So let's talk about what -- setting the stage.  We've

16  talked a lot about whether the Daubert motions in this particular

17  instance are critical.  They've cited a *Raytheon* case that I think

18  said really what *Regions* ended up saying in a securities case,

19  which is you should consider the expert testimony to the extent

20  it's critical to the determination of the underlying motion.

21          We pointed out that the single challenge to Professor

22  Feinstein's event study is not critical to anything in this case.

23  It's not even required.  It's icing on the cake.  And so the

24  Court, as we put in our motions, doesn't have to rule on the

25  Daubert motions at all, it can hold them abeyance.

1          The Court had yesterday and today in your colloquy with

2    Ms. Heintz some interesting questions and the inquiry about

3    whether or not we will just revisit some of this down the road on

4    the merits.  Of course we will.  These exact same issues will be

5    argued again.  Defendants will get up there and they'll have an

6    expert, either Professor Gompers or someone else, and he'll say

7    the model is insufficient, the model doesn't accurately capture

8    artificial inflation and probably five other things that I can't

9    think of right now, we'll have that argument.

10         They'll get up and say Professor Feinstein's loss

11   causation analysis is inappropriate because he uses a two-day

12   event window.  And we'll have the same argument and we'll point to

13   the same Craig MacKinlay article and say it is appropriate.

14         This actually happened with Professor Gompers and

15   Professor Feinstein in a trial earlier this year where -- on the

16   issue of loss causation, which is the flip side of price impact.

17   Professor Gompers attacked Professor Feinstein for using two-day

18   event windows and they had it out in the case on the merits on the

19   stand.

20         So these are not issues that go away after this point.

21   And that's why the case -- I'm sorry, the Court in *Coca-Cola* here

22   in this district, in Atlanta, said that very thing when addressing

23   a motion to exclude Professor Feinstein.  In that case one of the

24   bases that they wanted to exclude Professor Feinstein was on his

25   index.  And the *Coca-Cola* court said:  In any complex statistical

1  analysis there is potential for reasonable minds to disagree about

2  what variables you use in your event study.  That's all we have

3  here.  We have Professor Feinstein, who has a perfectly

4  acceptable, perfectly academically rigorous event study; and we

5  have another expert who has poked holes in two variables that he

6  uses in his event study.

7       So let's talk about what they do challenge.  As an

8  initial matter underlying their entire argument is -- I just want

9  to check the time.  Underlying their entire argument is -- their

10 argument requires that the Court accept the wrong legal standard

11 for determining market efficiency.  And so their arguments only

12 work, particularly their two-day window arguments, only work if

13 the court adopts a standard that has been rejected by the Supreme

14 Court; that stock prices have to occur within minutes and that you

15 can never look to the second day.  There is no such rigid rule.

16 It's been tried multiple times and it's gone up to the Supreme

17 Court at least twice in *Basic* and then in *Halliburton*, and both

18 times they made clear there is no set rule.  So that's the wrong

19 standard.

20      And when you look at Professor Feinstein's event study

21 through the lens of the correct standard, which is it's a

22 totality-of-the-circumstances approach, that it sometimes can take

23 longer, that stocks don't always react within minutes or within a

24 day, and you can absolutely look to see what happens on the second

25 day to determine -- to conclude that, in fact, the disclosure had

1   no effect on the stock price.  When you look at it through that

2   lens, there's no question that Professor Feinstein's event study

3   passes all of the tests.  It's not even a close call.

4           With respect to -- the question is did he use proper

5   methods and procedures.  Of course he did.  And he looked at all

6   one-day event windows, he reported his results for all one-day

7   event windows.  And in addition to that, he gave the Court an

8   indication of what happens if you look at the second day for two

9   dates that he explained factually why that was appropriate.  It's

10  not as though there is some hiding of bad results, all results are

11  available.  And even if you look just at one day, it's not even

12  close, it's five of seven.  It proves -- Professor Feinstein

13  explained yesterday why that could only occur -- finding five of

14  seven in this period, given the other statistically significant

15  days in this period, finding of five of seven, what are the

16  chances of finding that?  0.003 percent; almost impossible.  In

17  other words, to a 99.997 percent certainty you can conclude that

18  the stock was not inefficient for this particular company.  He did

19  the same test on the results in Professor Gompers' analysis and

20  came to 99.5 certainty.  So that's the -- that's the proper method

21  that he described, it's perfectly appropriate.

22          With respect to the event dates that they -- that we've

23  talked about.  As an initial matter, these selection of event

24  dates is not an issue.  That was the issue in *Freddie Mac,* did he

25  at the outset pick the right event dates?  It was during the

1   financial crisis.  There weren't good earnings announcements

2   during the '07/'08 period, so he used different dates.  The court

3   didn't accept the selection of event dates.

4          Here, this is a normal 2012/2013 period.  The company

5   had regular earnings announcement dates, he used all seven of

6   them, and there's no challenge because those are obviously

7   appropriate event dates.

8          With respect to the window, he looked -- as I described,

9   he looked at both one day, he gave the results, he reported them

10  clearly; and then he looked at two-day windows for two dates and

11  he gave the reports and reported them clearly.

12         Two-day event windows are appropriate both in the

13  academic literature.  Professor Feinstein explains that.  They're

14  also abundantly appropriate given the case law on this very issue.

15  Professor Gompers has gone around in many cases and made this

16  argument.  And without exception in the cases that he's had, it's

17  been rejected.  He was asked about those cases on the stand

18  yesterday.  There was a *Barclays* case where this very issue came

19  up and the court said it is standard to use two-day event windows

20  in event study analysis.  Professor Gompers agrees that it's often

21  a two-day event window that's looked at.  He has no response other

22  than to say he doesn't really read court opinions, so he couldn't

23  give any opinion on what that case said.

24         You can use two-day event windows.  Not only can you use

25  them, you can use them particularly when the facts and

circumstances suggest that you could.  And Professor Feinstein in

his reports and on the stand explained exactly why the facts of

this case suggested that you should look to the second day before

concluding -- remember, this is an investigation; an event study

is an investigation to rule out the notion that important news

does not move a stock.  Professor Feinstein could not conclude

that there was no price movement following an earnings

announcement before confirming that there wasn't a second movement

on the second day.  And that was particularly appropriate given

the unique circumstances of this case; given the late release of

news on July 31st; given the fact that there was an earnings call

late in the day, which is pretty rare for publicly-traded

companies; given that there was a blockbuster announcement given

that day.  Nearly a billion -- $700 million the market was

informed that Southern would have to issue equity on for the

Kemper plant, precisely because of problems at the plant it was

going to have to issue $700 million.

Defendants have tried to get around that fact by saying,

well, this was basically already known.  And what they point the

Court to is a disclosure in January of 2013 where the company said

we may have to issue between 0 dollars of equity and $300 million

of equity; 0 to 300.

Well, we get to July and they say, oh, whoops, by the

way, we're having these major problems, it's going to have

$700 million.  The market was stunned.  Every single analyst

 1   report, or virtually every single analyst report following that

 2   announcement, all the ones that I looked at, all of them are two

 3   things:  All of them are issued after the close of market on

 4   July 31st; and all of them make that a headline.  The market is

 5   shocked.

 6         And not only did they not already know based on this

 7   earlier disclosure that the defendants point you to, they pointed

 8   to that earlier disclosure and they said you told us in January it

 9   was going to be 0 to 300, we're stunned, it's 700 million.  This

10   is new news late in the day.  Of course in this type of scenario

11   it's appropriate to look at the second day.  And so there's no

12   question both from an academic perspective, a legal perspective

13   and a factual perspective that his investigation of two-day events

14   is perfectly appropriate.

15         With respect to the window -- I'm sorry, with respect to

16   the index, I mentioned the *Coca-Cola* case, that is a case that's

17   oddly right on point, oddly in this district.  There's not a lot

18   of law on challenges to an index.  There is one case that's in

19   a -- that I was able to see in a securities case, and it happens

20   to be a *Coca-Cola* case.  And the court there said the selection of

21   index is perfectly fine, Professor Feinstein's selection is fine.

22         Now, sure, the experts can disagree about why their's is

23   better or not better, but that is a common disagreement in complex

24   event study analysis.  And I can't exclude that index because you

25   both argue you're better.  If they both have a solid basis,

1   there's no basis to exclude it.

2           So not only is the law clear on that, but Professor

3   Feinstein's selection is the superior selection.  He uses an

4   objective.  He looks at what was the company doing during the

5   class period.  So he goes back in time and he says, I'm not making

6   any personal judgment.  Here's what they said was the best sector

7   index that investors should look to to compare their performance

8   vis-a-vis its competitors.

9           THE COURT:  Let me follow up on this point, if I can.

10  You say it's the better selection.  Do I have to go that far?  I

11  mean, your previous sentence or point seemed to suggest that when

12  you were referencing the *Coca-Cola* case is that as long as both

13  are good and acceptable, that that was all that really matters.

14          MR. ALVARADO:  I don't think you do, your Honor.  I

15  think that if you get to the point where you find that both are

16  acceptable, there's no need to engage -- and this is what the *In*

17  *Re NetBank* case, also here in Georgia, also a securities fraud

18  class action said at the class certification stage, it said:  I

19  don't need to engage in a battle of the experts when I have two

20  experts that in their field probably have acceptable opinions.

21  But if the Court does -- I can explain why the S&P EUI is better

22  and it's because it was the one that Southern told investors was

23  its sector industry comparator.

24          So his is objective.  His is the one that they told the

25  SEC they used.  He explained that clearly in his deposition.

1  There was some discussion about his deposition testimony earlier

2  in the argument.  And he explained it clearly in his deposition.

3  He said I use the index that the company tells the SEC is its best

4  comparator.  Did he say Regulation S-K?  No.  He said what they

5  tell the SEC.  Well, what they tell the SEC is pursuant to SEC

6  rule.  Regulation S-K is an SEC rule.

7          THE COURT:  Let me ask another question about it.  So am

8  I confined to the subjective reasons as to why he gave -- why he

9  selected that fund or is it more of an objective standard for me?

10          MR. ALVARADO:  I think that the objectiveness of

11  Professor Feinstein's selection is an indication of why it's

12  appropriate.

13          THE COURT:  Well, I understand that, but he also, in

14  fairness, equivocated at times about why he picked that fund or

15  didn't pick that fund.  But I guess my point is it seems that I am

16  not confined to what he says as to why he picked the fund.  Really

17  all I'm -- you know, if he has picked a reasonable fund, which he

18  would argue that he did, it would seem that that's all that really

19  matters, you know, even if he just stumbled into it.  The

20  defendants would argue that if the reason -- if the reason he gave

21  doesn't make sense or is not clear, then maybe that's what --

22  that, you know, would show him to be unreliable as an expert.

23  But, you know, I really wonder about that.  It seems like you can

24  make the right decision or a right decision if there's multiple

25  and that that's okay.  So what's your view on that?

1          MR. ALVARADO:  Sure.  I think I agree with you.  I

2   think -- what I can say is that I'm unaware of any authority

3   suggesting that using objectivity and using the index that the

4   company had selected and told people as its best indicator, I'm

5   unaware of any authority saying that's not the right way.

6          What I am aware of is authority saying that what you

7   shouldn't do is pick it based on fit.  And that's exactly what

8   Professor Gompers did.  What he also pointed to and what

9   Ms. Heintz pointed to is an indication in the proxy statement that

10  they've quoted that says the custom peer group, which is the list

11  of companies that Professor Gompers used to create his index, that

12  they are -- they are closest in business model and investors.

13         Well, to be clear, what they're describing there is in a

14  compensation benchmarking section of their proxy they're saying

15  this is how we pay our executives; we look to companies that are

16  closest to us in business model and investors in order to

17  determine how much we should pay our investors, and that's a very

18  different analysis.

19         Companies look to other companies that are close to them

20  in business model and investors for compensation purposes all the

21  time.  They don't have to be in the same sector.  They look to

22  geographic region; they look to similar managerial structures;

23  they look to all sorts of things that have nothing to do with

24  industry sector.  That quote notably doesn't say these are the

25  companies that are our closest sector peers; it's business model

1 and investments for purposes of determining the executive

2 compensation.

3        If you want to look and see where they say this is our

4 closer sector peer, it's where they say here's our Reg S-K index

5 because that's the index that the SEC tells companies you have

6 to tell investors what is your closest sector index.  And in this

7 case at all periods it was the Regulation S-K index.

8        That's all I have.  Thank you.

9        MS. HEINTZ:  Just quickly, your Honor, I'll start with

10 two-day event windows.  Plaintiffs are saying that this turns on

11 the facts and circumstances to justify the use of two-day event

12 window.  If they are right, the facts and circumstances don't

13 justify the use here.  And, in fact, courts have rejected the use

14 of two-day event windows where there is no basis for them like

15 there is not here.

16        For example, in *Halliburton* on remand, as I mentioned

17 earlier in Texas the court found, quote:  The use of a two-day

18 window is inappropriate to measure price impact in an efficient

19 market.

20        Likewise, the Northern District of California in *In Re*

21 *Finisar* found that -- and rejected the notion of this delayed

22 price impact, finding that news is impounded in the stock price,

23 quote, in a matter of minutes.

24        And while the Supreme Court in *Halliburton* declined to

25 say how many minutes that was, Mr. Alvarado overstates the

1  standard.  They're not saying there isn't a standard, they just

2  declined to provide one at that point.  But the District Courts

3  afterwards, those two cases, along with several others, *In Re*

4  *Intuitive*, *In Re Security Capital*, have and have found that it's

5  in a matter of minutes.

6          Professor Feinstein has not explained how he can get

7  himself out of that standard event window without a bunch of

8  changing of his story and trying to save his report after a

9  Daubert motion was filed.

10          Now, on the index point very quickly, courts do look at

11  indices.  Indices are a critical input in an event study.  And the

12  method for choosing the index for the industry, that control in

13  the event study, determines its reliability.  That's the essence

14  of Daubert; was there a scientific method and was the method

15  reliably applied?  The answer is:  It was not here.

16          *In Re Executive Tele-Card, Limited, Securities*

17  litigation looked at what the index was; how was it determined;

18  was it precisely correlated?  Found it was not and excluded the

19  expert for -- because of serious reliability questions.  The Court

20  should do the same here today.

21          Now, one quick point is that plaintiffs' counsel

22  mentioned the case of *In Re NetBank*.  Well, that case, that

23  District Court case came before the Eleventh Circuit case *Sher vs.*

24  *Raytheon* that I mentioned earlier.  And as I mentioned, *Sher vs.*

25  *Raytheon* says that this Court is the gatekeeper; it should hold

1   the gate, it cannot kick the Daubert inquiry down the road as

2   plaintiffs have asked you to do here.

3            Thank you, your Honor.

4            THE COURT:  Thank you.

5            So we're now -- we'll move on to the plaintiffs' motion

6   to exclude Dr. -- Professor Gompers.

7            MS. COCALIS:  Good morning, your Honor.

8            THE COURT:  Good morning.

9            MS. COCALIS:  The essence of this Daubert challenge is

10  that Professor Gompers' opinions may be perfectly appropriate at

11  lecture halls at Oxford and in the finest universities.  His

12  opinions describe a different conception of an efficient market

13  than is used by the law.  And the purpose of expert testimony is

14  to help the juror of fact, which is you here, to consider the

15  relevant issues in dispute here.

16           Exacerbating this issue is the fact that his damages

17  opinion is based on a mischaracterization of plaintiffs' theory of

18  liability.  In confounding on helpfulness of his opinions is the

19  fact that his market efficiency and price impact opinions are

20  premised on his biased subjective industry index selection which

21  rendered those opinions unreliable under Daubert and Federal Rule

22  of Evidence 702.

23           Yesterday Professor Gompers readily testified that his

24  conception of an efficient market is inconsistent with the Supreme

25  Court precedent, which is binding here, inconsistent with the

1  Eleventh Circuit precedent, which is binding here, and

2  inconsistent with cases from this district.

3        Let's walk through some of the ways that his market

4  efficiency opinion are inconsistent with the legal standard at

5  class certification.

6        First, Professor Gompers testified that the speedy

7  reaction must occur within minutes.  But as you know, the Supreme

8  Court in *Halliburton* said that it refused to adopt a theory of how

9  quickly information must be incorporated into a stock price.  And,

10  in fact, the Eleventh Circuit in *Regions* held that plaintiffs are

11  not required to, quote:  Present evidence that the alleged

12  misrepresentations immediately moved the market price.

13        Second, Professor Gompers' conception of an efficient

14  market is inconsistent with courts throughout the country

15  regarding the *Cammer* and *Krogman* factors.

16        Dr. Gompers testified that the first four *Cammer* factors

17  are totally uninformative.  But, in fact, courts across this

18  country routinely rely on them.  They do consider them important.

19  Dr. Gompers even acknowledged in an expert report in the Northern

20  District of Georgia, the courts routinely rely on them.  And the

21  Eleventh Circuit in *Regions* makes clear that courts should look at

22  traditional indicia of market efficiencies such as trading on the

23  New York Stock Exchange, which is the *Cammer* factor.

24        Third, Professor Gompers testified yesterday that

25  plaintiffs can only prove market efficiency through an event study

examining the fifth *Cammer* factor.  But *Regions* held that

plaintiff prove market efficiency without an event study at all.

And *Regions* held that the fifth *Cammer* factor is not an

unwavering, evidentiary permit for proving market efficiency.  But

Dr. Gompers yesterday testified that the fifth *Cammer* factor is

the essence of market efficiency.  The essence of market

efficiency sounds very much like that it's in a wavering

evidentiary requirement, which is directly in conflict with

*Regions*.

        Fourth, the variables in his event study are

inconsistent with legal standard.  Professor Gompers says two-day

windows are inconsistent with market efficiency, period.  But

Circuit Courts and District Courts across the United States,

including in this circuit, say two-day window stock declines are,

quote, "strong empirical evidence of market efficiency," unquote.

        And, in fact -- you know what, your Honor, I would like

to address the *Halliburton III* case that was just mentioned.  So

they say that that was an instance where a two-day window was

rejected.  First I would like to point out that the court mentions

in the contest of price impact and not market efficiency.

        Second, the court specifically noted that that

corrective disclosure came out before the market closed -- or

before the market opened, so it had all day to incorporate that

information.

        And then third, the court specifically noted in that

1  same sentence that plaintiffs offered no explanation for why you

2  should look at a two-day window in that case.  And that's clearly

3  not the case here.

4          And lastly that case also went up on appeal and the

5  Fifth Circuit took it but it settled before the Fifth Circuit

6  could rule on that.

7          And just to go over another point about the two-day

8  window, my colleague, Mr. Alvarado, mentioned this, but

9  Dr. Gompers would have you believe, you know, the information that

10 came out on July 31st did not warrant looking at a two-day window.

11 And he pointed to the fact that months earlier they said $0 to 300

12 million, they may raise equity, may.  And then months later, 90

13 minutes before the market closed I -- we are, in fact, going to

14 raise equity; we are going to, in fact, raise equity because of

15 problems related to Kemper and it's going to be more than double

16 what we thought we may have to do.  That's important.

17         It's clear from his testimony that Professor Gompers

18 describes a different conception and efficient market than is used

19 by the law.  And defendants in their opposition do not dispute,

20 nor can they, that the Eleventh Circuit has held, just like the

21 Eighth, Ninth and Tenth Circuits, that expert opinions founded on

22 incorrect legal standards must be excluded.  As Professor Gompers'

23 opinion is -- he readily testified is inconsistent with legal

24 standards, it should be excluded here.

25         Next I would like to talk about why Dr. Gompers' damages

opinion is also unhelpful.  Dr. Gompers' damages opinion is that
plaintiffs failed to account for the unique facts in this case.
Ironically Dr. Gompers is not accounting for the unique facts pled
in this case.

Yesterday you heard Dr. Gompers testify that his
understanding of the case was that there were different
probabilities of Southern meeting the May 2014 COD date.  In fact,
all those demonstratives, all of them dealt with different
probabilities.  Not one dealt with the fact that there was
100 percent probability from the beginning of the class period.

Similarly, his expert report, all those examples gave
the fact that it was going to be 30 percent probability at some
point, maybe higher down the road.  None dealt with the actual
facts pled in this case that it was 100 percent.

And, you know, there's not one word in the complaint
about any probabilities.  No where do plaintiffs say, you know,
this hinted at a 30 percent, this hinted at a 40, no where.  And
in Judge Cohen's order, which I understand Dr. Gompers testified
he's not sure that he read, but there's nothing about
probabilities about the May 24th (sic) COD date.

And in Judge Cohen's order denying defendants' motion
for reconsideration of his motion to dismiss, nothing, nothing
about the probabilities.

And, you know, plaintiffs wrote their complaint and have
repeatedly stated -- they know what they wrote and have repeatedly

1  stated this is not their theory of liability.  And yesterday

2  Dr. Gompers testified that his damages opinion concerning the

3  materialization-of-the-risk theory, it would disappear if that

4  wasn't plaintiffs' theory.  And as we've repeatedly stated, as the

5  complaint says, as the motion to dismiss order says, there's

6  nothing about probabilities.  As such, his opinion cannot be

7  helpful to you in deciding the damages and it should be excluded.

8       Next I would like to discuss how Professor Gompers'

9  price impact and market efficiency opinions are unreliable because

10  his index selection was bias and subjective.

11       Yesterday Dr. Gompers testified that he tested six

12  different indices to find the one that had the best fit.  Now, in

13  his deposition testimony at page 132, lines 14 through 20, he

14  testify that he certainly would test 20 indices.  And why wouldn't

15  you test 20 indices?  That's because when you're testing for fit,

16  you're looking for the index that takes out as much as possible.

17       And further, you know, we've talked a lot about

18  consistency.  And as Dr. Feinstein mentioned yesterday, exact same

19  circumstances we've had, he chose the index that was pursuant to

20  SEC regulations.  There was also a custom peer group identified in

21  the SEC filings as well.  And in three cases that's happened where

22  Professor Gompers has opined on Professor Feinstein and never once

23  did he bring up this you should test for fit.  So in addition to

24  the fact that it's subjective and data mining, it's also

25  inconsistent with his past opinions.

1          And he testified yesterday that you use the same

2     regression analysis to find the fit that you do to find the

3     statistical significance.  And he would have this court believe

4     that he can magically just put his hand over the answer and not

5     look at that part.  And faced with this inconsistent -- and, as

6     you know, Dr. Gompers has previously said testing for fit is data

7     mining.  And faced with this inconsistency he said -- he said that

8     his original choice of indexes were objective, right.  But

9     those -- that assertion is belied by his opening report.

10          If you look at paragraph 61 of his opening report, he

11     explains why he decided to, quote:  Focus on an index consisting

12     of companies in Southern's custom peer group.  And he directly

13     cites in that paragraph the Sitton declaration.  And the Sitton

14     declaration is a declaration submitted by the defendants in this

15     case by Larry Sitton.  Larry Sitton is a current employee of

16     Southern.  And this Sitton declaration was not written until after

17     this case was pending after defendants have had the opportunity to

18     see plaintiffs' motion for class certification, after they had the

19     opportunity to see Professor Feinstein's report.  And this is what

20     he says he relies on, why he decided to focus on this index.

21          Lastly, I would like to discuss why his price impact

22     opinion is also not the product of reliable methodology.

23     Yesterday he put up a demonstrative saying there was no price

24     impact for the loss for corrective disclosure dates.  Didn't say

25     evidence of no price impact, no price impact.

1          But yet on cross he admitted that the absence of

2    statistically significant price adjustment following a corrective

3    disclosure does not support the null hypothesis that a

4    misrepresentation did not, in fact, impact the stock price.  And

5    that's because that's statistics 101, it's in economics textbooks

6    and it's even in the Brav Heaton article.  And the Brav Heaton

7    article, Professor Gompers said that's written by one of his

8    students who he routinely writes with.  And right there it says,

9    quote:  Courts err because of their mistaken premise that

10   statistical insignificance indicates the probable absence of a

11   price impact.  Faced with this critique, his -- faced with this,

12   his only critique about that statement was that it wasn't in a

13   peer-reviewed article.  Nothing has to be in a peer-reviewed

14   article to be true.  Two plus two equals four regardless of

15   whether it's in a peer reviewed article or not.

16          I would like to save the remaining time, if I have any,

17   for rebuttal.

18          THE COURT:  Thank you.

19          MS. COCALIS:  Thank you.

20          MS. HEINTZ:  Professor Gompers is a financial economist

21   and a world renown one at that whose credentials are beyond

22   reproach.  Plaintiffs have not challenged his qualifications and

23   credentials to testify here.

24          As he explained yesterday multiple times, he is here to

25   provide testimony as an expert in financial economics to assist

1    the Court with demystifying the economic analyses at issues here,

2    the economic issues the Court is faced with in light of the

3    Supreme Court's, in my words, not his, standards set forth for

4    proving -- for plaintiffs to prove their burden of reliance at

5    this stage under *Basic*, and for plaintiffs to prove their damages

6    burden required by *Comcast*, again, a Supreme Court case.  He is

7    here as the financial economist that defendants have put forth to

8    help the Court understand the financial economic analyses.

9          Many of counsel's arguments go towards the legal

10   arguments that Mr. McConnell will make on behalf of defendants

11   later today.  Professor Gompers should not be excluded for

12   testifying as an expert in his field.  Now, nonetheless,

13   plaintiffs have sat forth six arguments why the Court should

14   exclude Professor Gompers, four of those relate to market

15   efficiency and two of those relate to damages.  As I said, none

16   is a basis for exclusion, and I will take them in that order.

17         As to market efficiency, plaintiffs' arguments are for:

18         First, that he has an absolutist theory of market

19   efficiency.  And we've talked about this a little bit already, but

20   his theory is not absolutist.  It is, in fact, consistent with the

21   academic literature.  As Professor Gompers pointed out in his

22   declaration and as he pointed out on the stand yesterday, the

23   academic literature that Professor Feinstein tries to cite to

24   counter Professor Gompers' opinions actually supports Professor

25   Gompers if Professor Feinstein would have simply read the next

1  line.

2      Additionally, Professor Feinstein himself in his report

3  at paragraph 30 ascribes to the same efficient market quoting

4  Bromberg and Lowenfels, quote:  An efficient market is one which

5  rapidly reflects information and price.

6      This view of efficiency is also supported by the case

7  law of this circuit in the case of *FindWhat Investor Group vs.*

8  *FindWhat.com.*  That case says, quote:  An efficient market rapidly

9  and efficiently digests all available information and translates

10 that information into the process form of a stock price.

11     Other cases out of the Northern District of Texas as

12 well as the Fifth Circuit and others ascribe to this rapid theory.

13 It's not a basis for exclusion; in fact, plaintiffs, although with

14 the lengthy cross and mention of cases in which Professor Gompers

15 testified yesterday, cannot put before you a single case in which

16 Professor Gompers has been excluded for offering his opinions on

17 market efficiency.

18     As we discussed earlier, it's plaintiffs' expert,

19 Professor Feinstein, who misapplies well-settled scientific

20 principles and academic literature on the speed of reaction, not

21 Professor Gompers.

22     Now, plaintiffs' second contention is that by focusing

23 on *Cammer* Factor 5, the financial economist test of market

24 efficiency, he somehow has -- somehow his opinion is excludible

25 because that's the only of the *Cammer* factors he relies upon.  Now

1   these *Cammer* factors are out of the Northern District of Texas, so

2   are the Krogman factors.  Nonetheless, plaintiffs say because

3   Professor Gompers focuses on one of these eight out-of-circuit

4   factors, he must be excluded.  That's inconsistent with the fact

5   that plaintiffs themselves rely on that factor in their opening

6   motion to this Court trying to certify this class, even if

7   Mr. Alvarado wants to characterize it as icing on the cake, that

8   factor, the cause and effect factor, is critical.

9           As we discussed yesterday following *Regions* each of the

10  District Courts in this circuit to have addressed the questions

11  you're presented with here today and when faced with a cause and

12  effect event fifth factor analysis have looked and critically

13  evaluated that event study in deciding whether or not market

14  efficiency has been net.  His analysis, Professor Gompers'

15  opinion, is helpful to the Court.

16          Now, this argument is not a legitimate ground, as I've

17  mentioned.  And, in fact, several months ago the Northern District

18  of Ohio rejected the very argument that plaintiffs are making here

19  today stating that it is not a basis to reject there Professor

20  Bajaj's opinion on market efficiency, quote:  Such disputes with

21  Professor Bajaj's opinions go to the weight of his testimony, not

22  its relevance.  It's not legitimate grounds to exclude testimony.

23          Now, the next basis they assert is basically a converse

24  of what we have put in our Daubert motion, which, of course, was

25  filed prior to their's.  That's the event windows.  So

interestingly counsel this morning mentioned consistency in her

argument about Professor Gompers.  Let's talk about consistency.

In fact, it's the cornerstone of the scientific method.  If we

want to talk about consistency, that discussion and that problem

is with Professor Feinstein's use of event windows, not with

Professor Gompers' use of event windows.  Professor Gompers used

consistent one-day event windows on every day of the event study

model that he put forward to this Court.  That is reliable.  That

is standard.  That supports the market efficiency theory that has

been established, as Professor Gompers mentioned, since the '70s.

These are preferable to multi-day windows as the Court out of the

Southern District of New York said in *In Re Secured Capital*

*Assurance.*  It said, quote:  Long event windows may include noise

and information from other events making it difficult to isolate

the impact of the relevant event.  On top --

THE COURT:  So what was the length of the window used in

that case?

MS. HEINTZ:  I believe the windows were consistent

one-day event windows is my recollection, but we're happy to pull

that and provide that to the Court supplementally if you would

like me to do so.

THE COURT:  Yeah, if you can.  If y'all can do that,

that would be great.

MS. HEINTZ:  As supported by the courts likewise in the

*Halliburton* case that I referenced several times today, the Court

 1  there rejected the use of a two-day window finding it, quote:

 2  Inappropriate to measure stock price impact.  They also mentioned

 3  *Finisar* likewise rejected delayed price impact and longer event

 4  windows there.

 5          Plaintiffs haven't pointed additionally to any reason

 6  for a mix-and-match approach as they're advocating here.  They're

 7  trying to get Professor Gompers excluded because he applied a

 8  consistent approach; they would rather him apply a very unusual

 9  mix-and-match approach that's not supported by the scientific

10  literature.

11          And as we discussed in detail, we've gone through this

12  slide several times, there's no justification for doing so.  So,

13  of course, Professor Gompers did not apply inconsistent windows,

14  nor did he apply two-day windows.  This is not a ground to exclude

15  him.

16          Now, their next argument is related to his index

17  selection.  And, again, this is the converse of our argument on

18  our Daubert that they came up with in their retaliatory Daubert

19  motion.

20          Now, in opening statements yesterday you asked

21  Mr. Alvarado about the custom peer group and whether it was

22  created before or after this case.  And as you know, the custom

23  peer group is the index that Professor Gompers applied.  His

24  response was misleading.  Mr. Alvarado mischaracterized the

25  existence of the custom peer group.  It was in the company's proxy

1  statements well before this case was filed.

2         And I have the proxy statements here, your Honor, if you

3  would like them because -- and they are also filed in the case

4  already.  The proxy statements are the best evidence for when the

5  custom peer group was used by the company and as to which periods

6  it applies.  And I'm happy to approach with those if you would

7  like them.

8         THE COURT:  Yes, ma'am.  Thank you.

9         MS. HEINTZ:  I'm sorry, I didn't hear you.

10        THE COURT:  Yes, please.

11        MS. HEINTZ:  So Defendant's Exhibit 3 is the 2013 custom

12  peer group.  And these are filed, these are the filing copies.

13  And Defendant's Exhibit 4 is the 2014 custom peer group.

14        As your Honor can see in these filings, this is where

15  the company referenced the peer groups.  It was before this case

16  was filed.  The 2013 proxy explicitly states that it relates to

17  2012; the 2014 proxy explicitly states it relates to 2013.  And if

18  you -- apologies for not having this marked.  If you look at

19  the -- I think it's page 41 at the bottom, if I'm looking at this

20  correctly.  Oh, I apologize.  Page 40, if you flip open the page

21  at the top there it says, the quote that we've looked at multiple

22  times today:  Southern uses the custom peer group to compare the

23  total shareholder return relative to that of its peers.

24        Now, another mischaracterization that I would like to

25  correct counsel, when she was making her argument, talked about

1   Mr. Sitton, and she said that Professor Gompers testified that he

2   relied on his declaration.  Counsel misrepresented his testimony.

3   I asked him yesterday whether he created a -- chose his index

4   prior to looking at the Sitton declaration and he sat on the stand

5   and looked at you and said that that was correct, that he had

6   looked at the declaration after choosing an index.

7           The declaration was cited the same -- dated, excuse me,

8   the day -- either the day of or the day before we filed the brief.

9   This model, as you've heard, these are complicated models to

10  construct.  What they're asserting here is simply a

11  mischaracterization of his testimony and doesn't make sense.

12          Instead what Professor Gompers did is what you see on

13  slide five, a three-step reliable, well-accepted methodology for

14  selecting the index here.  He explained that methodology to you in

15  great detail yesterday.  And basically what he did was he first

16  identified a set of objectively chosen indices.  What are

17  reasonable indices to account for Southern Company's industry in

18  an event study.  And he explained to you that the reason that he

19  trying to find the right index was to account for the industry

20  factors so that he could show you and show this Court what amount

21  of the stock price, what percentage drop actually might have

22  related to Southern Company news.  That's what Professor Feinstein

23  was supposed to be doing.

24          And the second thing he did after looking at those

25  approximately six indices, he did regression models to see what

1  the R-Squared values that we've talked about yesterday, what was

2  the fit.  He then compared the fit of those indices.

3      And these are the results on slide seven, his R-Squared,

4  telling you how good his model is, how much explanatory power it

5  has, is 77.65 percent.  That's high.  And that's 4.4 percent

6  higher than Professor Feinstein's model.  That's not a basis for

7  exclusion, that's a scientific basis for you to be able to rely

8  upon this model.  It's well accepted in the field and it has

9  been accepted -- R-Squared has been accepted by the courts.

10      As I've mentioned earlier this morning, *In Re Executive*

11  *Tele-Card Securities* litigation out of the Southern District of

12  New York specifically looked at how well correlated the index was

13  used by the expert there, finding he didn't do it right excluded

14  him.

15      *Carpe vs. Aquila* law out of the Western District of

16  Missouri likewise in a different case found that the failure to

17  conduct event study comparing the stock price of the index to an

18  index of similar business is enough to exclude the expert.

19      And even if you don't want to exclude an expert based

20  upon his index, the *Halliburton* Court there looked at the models,

21  took an evaluation of plaintiffs' and defendants' models and

22  looked at the R-Squared and ultimately determined that the model

23  with the higher R-Squared was the more reliable one that the Court

24  could rely upon there for purposes of evaluating price impact.

25      And that brings me to that inquiry.  Although not

1  referenced really in their briefs, it was raised this morning

2  during argument.  Professor Gompers' price impact methodology was

3  well reasoned, it was sound.  And when you get to the price impact

4  phase of the case, your Honor, you have to decide which model to

5  use for price impact.  The burden becomes on defendants.  If we

6  get past the market efficiency phase, step one of reliance, if you

7  found plaintiffs have met that burden through whatever combination

8  of evidence, you know, that you're looking at that you find

9  reliable, then on the price impact phase it's -- we're up to bat,

10  if you will.  And it is our burden to put forth evidence that

11  shows you that there was no price impact on some of those dates.

12        And Professor Gompers did that.  He did that for four of

13  the five corrective disclosures using his reliable event study

14  that they really cannot attack.  They truly took the arguments

15  that we put in our Daubert motion and flipped them around and

16  tried to save Professor Feinstein's report.  The courts have

17  supported the use of one-day windows like Professor Gompers used.

18  The courts have supported looking at the R-Squared to try to

19  determine specifically, as they did in *Halliburton*, for price

20  impact.  Which is the reliable model?  Which of these models can

21  the Court look at to determine whether or not there was price

22  impact here?  The only reasonable answer is Professor Gompers'

23  model for that purpose.  It is reliable.

24        There's a scientific metric that you can look at to see

25  how reliable it is.  That's the R-Squared.  And, again, as is

1   still on the screen, it is a higher R-Squared.  And here bigger is

2   better.  Bigger is better.  Bigger is a better model when you're

3   talking about R-Squareds.

4          Now, why would Professor Feinstein and plaintiffs seek

5   to reduce the importance of the R-Squared?  Well, that's because

6   here the R-Squared matters.  The better model has different dates

7   like we talked about yesterday that are statistically significant

8   under when the event study is run.

9          And you asked questions yesterday about how many dates

10  are statistically significant under each of the models.  Under

11  Professor Feinstein's model, if you'll recall, under consistent

12  one-day event windows, there are five of seven days that are

13  statistically significant.  And under Professor Gompers' model,

14  which we would submit to you again is the only reliable model

15  here, there are three of seven days.

16         Professor Gompers told you on the stand that based upon

17  three of seven days a financial economist could not conclude that

18  that market was efficient.  Now, of course, whether a court can or

19  not, that's not what he's testifying about.  We would submit you

20  cannot because that would outweigh, right, the other structural

21  factors that they're talking about.  But even so, for price

22  impact, that is critical.  This model is correct.

23         So moving past the event dates, you move to those

24  corrective disclosure dates, the five dates we talked about

25  yesterday.  Under Professor Gompers' model, the only one that's

1   statistically significant is the first one, April 24th.  There's

2   no basis after that point for determining there's any -- for

3   continuing the class, excuse me.

4        And plaintiffs have tried to say that what Professor

5   Gompers did is not enough to disprove price impact.  Well, the

6   Supreme Court said event study is basically the best way, it's the

7   most reliable way, it's relied upon by courts across the country.

8        And, in fact, in the *Halliburton* case that's what was

9   done, an event study; an event study and evaluation of the news.

10  That's exactly what Professor Gompers did here.  He ran his

11  regression model, looked at what the statistically significant

12  price declines were, and then he took the next step of determining

13  whether or not there was any news, any positive news that day, any

14  negative news, but critically any positive news that could have

15  muted the stock price drop, right, and made it such that it wasn't

16  statistically significant.  He found none.

17       And plaintiffs have not refuted that evidence.  We have,

18  therefore, through Professor Gompers, disproven price impact as

19  Mr. McConnell will talk to you about as we conclude arguments

20  today.  But I think it's critical to understand the methodology

21  since they had tapped it this morning that Professor Gompers used

22  to get there.  What he did is standard in the field and it has

23  been used by courts.  And Mr. McConnell will expound upon that

24  later today.

25       Plaintiffs' allegations here simply are just red

herrings, that the R-Squared isn't reliable, that they don't like
it, that there's no way to do this.  Effectively, as I mentioned
yesterday morning, what they're asking you to do is say that no
matter what Professor Gompers did with his model or how he ran his
model, defendants -- there's nothing he could do, defendants can't
disprove price impact.  As I told you yesterday, the Supreme Court
in *Halliburton* expressly gave us the opportunity and said that
defendants must have the opportunity to rebut price impact.
They're trying to reduce *Halliburton* to a nullity, that's simply
not the law.

          Now, finally -- I'm not sure how much time I have
left --

          THE COURT:  You're probably out of it, but I'll give you
few more minutes.

          MS. HEINTZ:  Thank you, your Honor.

          I quickly hit damages because it's simply not a basis to
exclude him.  What they're asking you to do regarding damages and
exclude his critique of Professor Feinstein's opinions is
something that's never been done.  No expert has ever been
excluded for criticizing the sufficiency of a damages model.  He
applied well-accepted scientific principles.  He reviewed the
black and white letters of plaintiffs' complaint to see what their
liability theory was.  He relied upon methods that have been
tested by the courts, for example, in the *BP* case for what do you
do when the scientific -- or, excuse me, when the theory of

 1  liability is materialization of the risk.  There are more steps,

 2  there are more things to account for than Professor Feinstein

 3  accounted for in his model.  And the Eleventh Circuit, it's

 4  critical, has accepted this *Comcast* standard requiring a model.

 5          And, your Honor, it's really important to point out that

 6  during her argument counsel stated one thing.  She said that

 7  nothing -- she said there's nothing in the complaint -- and let me

 8  quote her, let me be careful.  She says, quote:  Nothing in the

 9  complaint about probabilities.  Well, how can plaintiffs mention

10  materialization of the risk is their theory of liability and she's

11  just conceded that there's nothing in the complaint about those

12  risks materializing?

13          What's happening is just inconsistent here, your Honor.

14  That is in black and white in their complaint.  Professor Gompers

15  took them at their word and said if you want to account for

16  materialization of the risk probability, those probabilities

17  changing over the course of the class period, which they haven't

18  identified for you yet but their allegations explain that it was

19  changing, there was more knowledge, there were disclosures, that's

20  what Professor Gompers did, he took them at their word.  There's

21  nothing in his critique that should be excluded.  Damages, their

22  model, does not account for their own theory of liability, and

23  they haven't shown us how Professor Feinstein can do it here.

24          Now, I'm out of time, but if the Court has any

25  questions.  Thank you, your Honor.

 1          Your Honor, you had asked about a case with event

 2   windows.  Would you like me to respond to that?

 3          THE COURT:  Yeah.  Well, I had asked you what the event

 4   window was.

 5          MS. HEINTZ:  Correct.  In the *Security Capital*

 6   *Assurance,* the discussion of the court was at page 600, note 5,

 7   saying that:  Event study methodology is instructive in assessing

 8   the plaintiffs' allegations.  Plaintiffs incorporate intervening

 9   events.  And it is not clear at this time, it does not appear that

10   there were specific event windows used.  The stage of that case

11   was the motion to dismiss stage.

12          THE COURT:  Okay.

13          MS. HEINTZ:  Thank you.

14          MS. COCALIS:  If I may, your Honor, I just have a few

15   points.  And I think counsel just mentioned one of them, that the

16   case that they -- the one case that they quoted for the Court's

17   proposition for that was on a motion to dismiss, not class

18   certification.  It was dealing with the analysis of loss

19   causation, again, not market efficiency.

20          And another point I would like to make is that, of

21   course, there's a -- you can have 100 percent risk that can

22   materialize.  There's nothing -- like -- I just don't understand

23   that point.  There's -- you -- of course you can have 100 percent

24   risk that can materialize.  There's no such thing that you can

25   only have a 30 percent risk to materialize.

1          Counsel stated that the -- I said Dr. Gompers testified

2  that -- testified that he relied on the Sitton declaration.  And I

3  believe that I cited to his report instead where he specifically

4  said in his report that the reason that he, quote, "focuses on an

5  index consisting of companies in Southern's custom peer group,"

6  end quote, and was -- one of the reasons was he cited the Sitton

7  declaration.

8          Another point I would like to make is that they don't

9  address the fact that his opinion is inconsistent with the legal

10 standard at all.  They just say -- which is the point I made.  He

11 may be a financial economic professor who may give opinions that

12 are correct in the halls at Harvard, but we're not here -- and

13 we're here to decide the legal issues.  And the law is very clear

14 that if an expert opinion is inconsistent with the legal standard,

15 that it should be excluded.  And there's reasons for that; because

16 it's prejudicial to plaintiffs.  They're trying to say that we

17 should have to meet this higher burden, which we, in fact, don't.

18         And with regard to the proxy statement and the custom

19 peer group, we never say that the custom peer group wasn't

20 mentioned at all in the proxy statements.  We're just making the

21 point that it wasn't an index.  And Professor Gompers cites --

22 initially cited in his report that it was one of the indexes that

23 was ignored by Dr. Feinstein.

24         I would just like to address the *FindWhat* reference.

25 That, again, did not deal with market efficiency.  They were

1  talking about loss causation, which is decided at a different

2  stage.

3          And that's all I have, your Honor.

4          THE COURT:  So, we'll take just a short recess, come

5  back and I'll hear from both sides on the ultimate issue of the

6  certification.

7          For purposes of it, I think to make your presentation --

8  to make your presentation coherent to me, you just need to assume

9  that both experts' testimony is going to be considered for

10 purposes of the certification; otherwise, I don't know how you

11 would argue it and we would just be backtracking then.

12         We'll take about five minutes.

13         (After a recess, the proceedings continued as follows:)

14         MR. ALVARADO:  If I can approach with some copies of the

15 present presentation that I would like to put on?

16         THE COURT:  Sure.

17         MR. ALVARADO:  This case is a case that's ideally suited

18 for class treatment.

19         Plaintiffs allege a widespread fraud that affected all

20 class members in the exact same manner.  The class should be

21 certified.  I would like to start to begin by highlighting the

22 background to the fraud in this case.

23         As the Court knows this case concerns a fraud related to

24 the Kemper plant, which was going to be a clean coal plant down in

25 Mississippi.  The defendants told the investing public that the

 1  Kemper plant would be finished by May 2014, that was one alleged

 2  false statement in that case.  Failing that date would been

 3  devastating and was devastating for the company, as we'll see.

 4       Defendants falsely and repeatedly told investors, not

 5  just that they would be completed by May of 2014, they told

 6  investors throughout the class period we are on target today,

 7  contemporaneously; we are on target, we are on schedule.  We have

 8  achieved certain milestones such as the first fire of the

 9  gasifier.  We are 75 percent complete with construction.  So this

10  is not a case that's confined solely to the May 2014 COD as you've

11  seen.

12       I think there's been some argument to suggest that

13  there's one false statement and one theory of liability.  In fact,

14  there are several categories of remaining false statements.  And

15  if one does a quick cursory review of the motion to dismiss

16  opinion in this case, one will see that there are many categories

17  of false statements that remain in this case.

18       All of these statements plaintiffs allege were

19  100 percent false when they were made.  There was no chance.  It

20  was impossible, in fact -- you will see the word impossible a lot

21  in the complaint and in the Court's order -- that it was

22  impossible to complete the May 2014 COD when defendants said it

23  would and they knew it; 100 percent certainty.  It was 100 percent

24  not on target when they said it was and so forth.

25       So let's take a look quickly at what the reality was

during the class period.  We had just barely started getting

documents in this case, but the evidence is already clear in April

of 2012 the very beginning of the class period, Tommy Anderson, a

named defendant in this case, is told now it appears we are not on

time and we're over budget, how do you explain?  What is going on

with regard to our revised completion date?  What are the steps

that you are taking to bring the project back on schedule?  "On

schedule," the exact same words, Judge.  This is remarkable.  This

is at the beginning of the class period.  And they're not on

schedule, they're off schedule.  How do we get back on schedule?

That's a named defendant.

Brett Wingo, the whistleblower in this case, also early

in the class period, he identifies a 40-week delay.  No matter how

you look at it, he says, there's just no getting around it,

40 weeks.  We're on schedule.  We're on track.  We're going to be

done by May 2014.  Not true.

Another example, April 2013, Ed Day, the CEO of

Mississippi Power and a named defendant in this case, he's still

waiting on the new schedule details.

The defendants knew that their statements were false.

They knew it from the beginning and they knew it all along.  They

concealed that information from investors.

Here's another e-mail from Ed Day in 2012:  Don't

communicate anything with respect to numbers and schedules

externally until I or Tommy Anderson and John Huggins, the

1  other -- his co-defendants in this case, until the three of us vet

2  that information and make sure that it's appropriate to be

3  submitted publicly, because what's going on inside doesn't match

4  what's going on outside, so don't say anything before I approve

5  it.

6         There was massive fallout from this fraud.  The SEC came

7  first, knocking on the door.  Then came an exposé with devastating

8  recounts of fraud; things like an engineer's joking that the

9  schedule was nothing more than a pretty little picture to show

10  everyone that -- how wonderful they were doing as opposed to what

11  was really going on on the ground.  Engineers joking that they're

12  eager to show progress to investors and regulators, overstated

13  certain milestones; again, exactly one of the allegations in this

14  case.

15         Ultimately, the plan -- the plans for the plant were

16  scrapped entirely.  The plant will never -- put aside May 2014

17  COD, there is no COD and the plant went $4 billion over budget and

18  it will never be the plant it was supposed to be and that they

19  promised investors.  Just last month the Department of Justice

20  came looking around, now they're doing an investigation into this

21  plant.  So the fallout continues to this day.  And the question

22  here for us today is:  Do these allegations warrant consideration

23  on a class-wide basis?  Of course they do.

24         In this circuit in particular, the Eleventh Circuit,

25  recognizes that class -- securities fraud class actions are

1  important for maintaining the integrity of the securities market

2  and for providing redress to absent class members who otherwise

3  wouldn't have redress for the damages that they sustained.

4      The Eleventh Circuit has said that their securities

5  fraud class actions are a particularly appropriate means, class

6  actions are a particularly appropriate means for deciding

7  securities fraud class actions.  The Eleventh Circuit has an

8  inclination to certify these types of cases.

9      So we've heard about *Raytheon* a couple times today,

10  which isn't a securities fraud class action.  It has nothing to do

11  with the standards that have been looked at when deciding whether

12  a straightforward securities fraud should be tried on a class-wide

13  basis; that the Eleventh Circuit favors such treatment.

14      And so what we have to establish is Rule 23(a) and (b).

15  We've done both.  We've established Rule 23(a), the class is

16  numerous.  There are common questions that must be answered by all

17  class members:  Did defendants commit fraud?  Was there damages?

18  Was there loss causation?  All of those answers are common --

19  questions are common to each class member.  There's no challenge

20  to either of these elements.

21      Typicality.  Plaintiffs claims are typical of absolute

22  class members, no challenge.  And adequacy, no challenge to the

23  fact that the class representatives in this case have fairly and

24  adequately represented the class and will continue to do so.

25      All we're here to talk about of all the requirements is

1  predominance under Rule 23(b)(3).  The Supreme Court has made

2  clear Rule 23(b)(3) is a test readily met in securities fraud

3  cases.

4         Defendants concede that common questions predominate

5  with respect to falsity, materiality, scienter and loss causation.

6  The only element that's challenged is reliance, but plaintiffs are

7  entitled to a fraud on the market presumption of reliance in this

8  case.  They're entitled to that presumption because of the

9  presumption that's afforded in *Basic* vs. *Levinson*.  When the

10  market first stock is efficient, investors are entitled to rely on

11  the market price of that stock because it's impounded with all the

12  important information that's out there in the market.  And how do

13  you prove that?  You prove that by showing the market was

14  efficient for the stock.

15         We have done that.  And we have done that pursuant to

16  the Eleventh Circuit's flexible approach to analyzing market

17  efficiency.  What the Eleventh Circuit says is that it rejects any

18  strict analytical -- mandatory analytical framework.  It says you

19  look at the totality of the circumstances.  It says that you

20  search for traditional indicia of efficiency.  That is the

21  standard in this circuit.  That is the standard that governs the

22  plaintiffs' motion.  That traditional indicia is clearly present

23  in this case.  It isn't even a close call.  In fact, all of the

24  traditional indicia efficiency that the Eleventh Circuit set out

25  is unchallenged in this case.

1          Southern traded on the New York Stock Exchange, the most

2    liquid market in the world, unchallenged.  Millions and millions

3    of shares, huge volume throughout the class period.  22.5 million

4    shares a week, unchallenged.  Of course it's huge volume.

5          Analyst coverage.  Thirty-one analysts at least during

6    the class period.  That is huge analyst coverage.  One hundred and

7    eighty-two market makers.  Two thousand articles written about

8    Southern during that class period.

9          Eligibility for Form S3 registration, obviously the

10   company satisfied that.  I think the requirement is $150 million.

11   In float I think Southern had something close to 40 billion

12   dollars.  It isn't even a close call.

13         And wide range of institutional investors.  There are

14   more than 1,300 huge institutional investors that held this stock

15   during the class period.  This is the indicia of efficiency that

16   the Eleventh Circuit instructs must be considered.   And when

17   that's present, market efficiency has been established.

18         But you can also, if you would like, look at the *Cammer*

19   factors, *Cammer* and *Krogman*.  All of those have been established

20   without challenge.  *Cammer* Factors 1 through 5, as I mentioned

21   some of them overlap with the efficiency in the indicia of the

22   Eleventh Circuit.  But without challenge they're putting aside

23   Factor 5.  No one says word one about *Cammer* Factor 1 through 4,

24   or *Cammer* Factor 1 through 3.  It's because this is clearly

25   efficient stock.  This is one of the biggest companies in the

country.  It's one of the most closely followed companies in the

country.  And investors did not ignore important information with

respect to Southern Company.

So we have established market efficiency.  We have

complied with the Eleventh Circuit standard.  We've added to that

with the *Cammer* factors.  And we added to that with the Krogman

factors.

Pursuant to the Eleventh Circuit's flexible approach,

event studies are not required.  So in this circuit, the Eleventh

Circuit, has made clear they are not an unwavering evidentiary

requirement.  And, in fact, as the defendants like to point out,

there wasn't even an event studies in *Regions* proving that you can

prove market efficiency without -- importantly there was a

question about -- I can't remember what the question was

yesterday, but defendants' counsel stated something to the effect

of you wouldn't be out on an island if you did that.  Well, the

Court would be on an island if the Court found that the market for

this stock was not efficient just because of *Cammer* Factor 5.  No

court in this circuit has ever deemed a market inefficient where

all factors but *Cammer* Factor 5 were satisfied.  None.

In fact, defendants can point to one case where market

efficiency was found not to exist and it's a case down in Florida

and that case couldn't be different from this case.  It was a

penny stock.  It was a $20 million company, it didn't meet S-3

registration.  It had no analyst coverage at all, zero.  The one

1  case that they can muster where a Court deemed a market

2  inefficient is a case that has nothing to do with Southern

3  Company.  And so this -- an opinion in this case finding

4  inefficiency would be an extreme outlier.

5          Now the event study, as the Court knows, measures the

6  cause and effect relationship.  The existence of statistically

7  significantly declines proves and demonstrates the cause and

8  effect.  The existence of non-statistical significance does not

9  disprove market efficiency, and that's important to remember, and

10 we heard from the experts on this topic yesterday.

11         Plaintiffs' expert, Professor Feinstein, looked at the

12 seven dates that we've discussed, earnings dates, uncontested that

13 those are appropriate.  And he found that five of them were --

14 using a one-day window were statistically significant.  And with

15 two-day windows he found six of seven and for -- in both cases,

16 there's the one date that if the Court remembers was a mixed news

17 date, so no one -- there would be no expected significant

18 reaction, so put that one to the side.

19         This is compelling proof of market efficiency in

20 addition to all of the other factors we've talked about, which are

21 by themselves efficient.  This is additional compelling evidence

22 of market efficiency.

23         The Court asked a question yesterday of defense counsel

24 also, something along the lines of Professor Feinstein found five

25 of seven.  Do you think that's enough; if not, what would be

1  enough?  And I'm not sure we got an answer.  I think we landed on

2  the answer to that question is not of paramount importance.  But,

3  of course, it is, they're challenging his event study.  You don't

4  have to look far to the answer.  You can get that question

5  answered in a lot of different ways.  Professor Feinstein

6  conducted a test.  It establishes that you would only find that

7  result in basically never, .003 percent chance of finding that.

8         In *Regions* it said plaintiffs don't have to prove a set

9  number of unexpected disclosures resulting in an immediate price

10 impact.

11        In another case down in Florida in this circuit one of

12 the few that's analyzed these issues post *Regions*, there was an

13 event study.  The expert's report in that case found five of ten,

14 so half, less than -- far less than Professor Feinstein, five of

15 ten statistically significant.  The Court there said that's strong

16 evidence of market efficiency.

17        So the answer to the question is five of seven clearly

18 passes the test.  And even under Professor Gompers' test, three of

19 seven, or six really, passes the test with flying colors, with

20 99.5 percent certainty.

21        So we've talked about these issues, I won't belabor them

22 with respect to Mr. Feinstein's event study but it was an

23 appropriate study, he used the appropriate index and he used

24 appropriate event windows.

25        Just to expand on the event window point from a legal

1  perspective, we cite case after case in our paper talking about

2  the event window and why a two-day event window is perfectly

3  appropriate, or in some cases longer than two-day events, but what

4  we're talking about here is two.

5         The *Barclays* case, totally ignored.  You won't find any

6  distinction in that case in any of their briefs.

7         *Aranaz vs. Catalyst* down in Florida, another one,

8  another one of the few cases that has addressed this issue,

9  finding a two-day stock decline, strong empirical evidence of

10 market efficiency.  Look for a distinction of that case in

11 defendants' papers, you won't find one.

12        *In Re DVI*, Third Circuit Court of Appeals saying

13 sometimes it takes up to two days to incorporate new information.

14 Defendants said that was too long.  The Court rejected it, said

15 there's no set rule.  Look for a distinction of that case in the

16 papers, you won't find one.

17        *In Re Diamond Foods*, another case.  Defendants' expert

18 said that looking to the second day -- it was the defendants'

19 expert that said looking to the second day was -- is proper

20 because it was required to assess whether there are delayed price

21 responses to the event of interest.  Look for a distinction of

22 that one, you won't find one.

23        *Fogarazzo*, another case where multi-day event windows

24 were used.  And in that case the courts went a little further and

25 it explained some issues that are at issue in this case.  It said

1    when there is news late in the day, that perhaps could be a reason

2    to look at it.  And what the Court also said was -- and it

3    rejected an argument that you heard yesterday where Professor

4    Gompers got up and said -- I can't remember -- I didn't really

5    follow the response but it was something to the effect of you can

6    only look at two days if you can't precisely time the announcement

7    of the news that you're looking at.  The court in *Fogarazzo*

8    addressed that exact same argument and it rejected it; it said,

9    no, it's not only acceptable in instances where you can't

10   precisely time.  Look for a distinction of that case in the

11   briefs, it's not there either.

12          So it's widely recognized and established both in the

13   case law and the academic literature that we've discussed

14   throughout the day that two-day event windows are appropriate.

15          The *Halliburton III* case that they cite, as my

16   colleague, Ms. Cocalis, explained, that court explicitly said no

17   one gave it a reason to look to second day.  The announcement in

18   that case came before the market opened.  There was no later

19   disclosure of information.  Ninety minutes before the close of

20   trading in that case.  A totally and opposite analysis.

21          *In Re Intuitive*, it was the defendants in that case,

22   it's interesting.  Plaintiffs had shown a one-day significant

23   decline, and then the defendants wanted to add a second day to try

24   to disprove statistical significance.  And the Court said, I don't

25   need to look to the second day because plaintiffs have shown it on

1  the first day; similar to what Professor Feinstein says, which is,

2  if you don't have to go, you don't have to go but you're compelled

3  to confirm by looking at the second day whether the price reaction

4  continued.

5         And, finally, their third case, they have three as their

6  support for window analysis.  *In Re Finisar* was a price impact

7  case.  And in that case plaintiffs tried to prove price impact by

8  showing that the stock increased following a false statement, so a

9  different analysis than what we're using it for here.  And what

10 the plaintiffs did there said a false statement was made on day

11 one and let's look at what happened to the stock in the next weeks

12 and months following the false statement.  So the court is

13 addressing an attempt by prove price impact by looking at weeks

14 and months after the event date.  That has nothing to do with what

15 Professor Feinstein did in this case and what our event study

16 shows.

17        I mentioned the academic literature, it's in accord with

18 Professor Feinstein.  Of course you can look to the second day; of

19 course you should investigate; of course you should look at the

20 factual scenario on each day.  And, again, as we've said

21 throughout the proceedings, a lot of this has already been

22 addressed.

23        The Supreme Court -- it been raised to the Supreme Court

24 twice at least where defendants have attempted to get the test

25 tightened up; make a rule about how quick it is; say it has to

1   happen within this many minutes.  The court rejects that.  It says

2   there is no rule, it's a totality-of-the-circumstances analysis

3   and we're not setting limits.

4          So because we've so clearly proven price -- I'm sorry,

5   market efficiency, defendants are left with the daunting task of

6   proving that publicly-known statements had no price impact.  They

7   have to show -- they have to prove that no portion of the stock

8   declines that are at issue in this case were caused by the

9   misrepresentations that plaintiffs allege, and they haven't done

10  that.

11         THE COURT:  So let me ask you a question about that.

12  What kind of evidence hypothetically would prove that?

13         MR. ALVARADO:  They could show that there was no stock

14  decline on a correct disclosure date.  They could show that -- you

15  know, having not been my burden, I can't tell you all the ways but

16  their experts are smart --

17         THE COURT:  There's got to be a way, right, because

18  otherwise there wouldn't be the opportunity?

19         MR. ALVARADO:  The easiest way would be to establish

20  that there was no price decline on the stock date.

21         THE COURT:  The cases you mentioned about the price

22  going up, I guess if the price always went up, one day, two days

23  ten days afterwards, that might do it.  Have you seen any other

24  cases where a defendant has successfully rebutted the presumption

25  and shown that there was no pricing -- no price effect?

1          MR. ALVARADO:  The cases I'm aware of are the few cases

2   that the defendant cite in this case, which we can talk about.

3          THE COURT:  Okay.

4          MR. ALVARADO:  But certainly what -- the evidence that's

5   been proposed in this case, which is having their expert run a

6   different type of model and then say if a decline is not

7   statistically significant, it means you've proven price impact, he

8   got up there yesterday and he couldn't defend that.  He couldn't

9   say that you can rule out the possibility that a price stock

10  decline was caused by a misrepresentation just because the decline

11  on the day was significant.  He knows that's elementary statistics

12  and that is the truth.

13         Multiple courts have gotten this right.  They cite

14  *Halliburton III*, which is a case that did go down the statistical

15  significance decline.  It's important to note -- did go down a

16  non-statistically significant road.  It's important to note in

17  that case the plaintiffs didn't argue anything about that point.

18  They appeared to concede that a decline, if you have a

19  non-significant decline, it would prove no price impact.  It isn't

20  the case from a statistical perspective, it just isn't true that

21  that proves anything.  So that case, as Ms. Cocalis mentioned,

22  also went up on Rule 23(f), but we don't know what would have come

23  of it because it settled.

24         We cite case after case after case.  Yesterday there was

25  a suggestion that our only case is this case *Rooney* out of Texas,

1   and Texas was said with disdain, although *Halliburton* is their

2   main case, which was also from Texas.  But *Rooney* is a case -- it

3   is a rare case where the court really looked at this issue and it

4   really looked at the statistical realities of the argument and it

5   understood that when you're trying to disprove price impact with

6   an event study, your null hypothesis that you're testing is that

7   there is no price impact.  You don't prove the null hypothesis to

8   be true by getting a non-significant decline.  That doesn't prove

9   anything, it just tells you it's indeterminant.  And he makes that

10  clear, he says defendants make this argument, this is not true

11  from a statistical perspective, it proves nothing; you don't prove

12  the null hypothesis by showing a non-significant decline.

13       So it's not as though, as Ms. Heintz mentioned, we're

14  trying to say they don't get an opportunity to try.  They have an

15  opportunity.  They had their opportunity.  They tried and they

16  failed because all they did is they said we made a new event

17  study, which has its own problems which we've talked about, and

18  with our event study only one of the corrective disclosures is

19  followed by a statistically significant decline; ergo, the other

20  four we've proven price impact, we've shown you that that doesn't

21  prove anything.

22       The price impact analysis is binary.  Either defendants

23  proved that there was no price impact for this stock or they

24  don't.  It's not a mix-and-match what they're doing, which is to

25  say first let's do an event study and then let's try to have the

 1  court go day by day and knock off drops and have him conclude on

 2  this record that no portion of that decline could be attributed to

 3  the misrepresentations, that's a loss causation analysis.  Once

 4  defendants have failed to rebut the presumption, the Court can say

 5  they've failed to rebut the presumption and the inquiry ends.  The

 6  Court need not go through each day and lop off corrective

 7  disclosure dates.  That's a goal that they have in this case and

 8  it's been rejected in prior cases.

 9          And in one particular case, the same case, the *Rooney*

10  case that I mentioned in Texas, in that case in addition to the

11  statistical point that he made there were four corrective

12  disclosures in that case, only two of them were followed by

13  statistically significant declines.  And the defendant is making

14  the same argument.  They said at a minimum throw out those other

15  two so we don't have to deal -- so we don't have to pay damages on

16  those drops and we don't have to deal with them going forward.

17  And the court said, no, you haven't rebutted the presumption, so

18  I'm not going -- without the merits go through and make a judicial

19  determination that there's no chance that that drop was caused in

20  any part by the misrepresentations.

21          Another case, *Grae vs. Correction Corp of America*, I

22  don't know if the Court recalls but this was a case that initially

23  the class was not certified.  Defendants put in a lengthy notice

24  of recent authority saying all the reasons why they liked it.  And

25  then, of course, the court reversed herself realizing that she got

1   it wrong.  One of the issues in that case had to do with price

2   impact.  There were multiple dates, three corrective disclosure

3   dates in that case.  One was found to have -- one was -- it was

4   found that they had -- the defendants had failed to prove price

5   impact for at least one drop.  And the court said -- on that basis

6   it said regardless of the arguments with respect to the other

7   declines in this case, I don't need to get there on this -- at

8   this stage, that is something that I will determine on the merits

9   given that the presumption of reliance has not been rebutted.

10          Just what I just said, statistical significant decline

11  does not demonstrate price impact, it doesn't prove a price

12  impact.  And in any event, Professor Feinstein's event study shows

13  that there are statistically significant declines following four

14  of the five corrective disclosures; and importantly following the

15  first corrective disclosure in April of 2013 and the final

16  corrective disclosure in October of 2013.  So we have -- his

17  analysis shows that you bookend that period with statistically

18  significant declines, which are not -- which are not necessary at

19  this stage, but what they do show is that -- that it is more

20  likely that those declines were caused by the misrepresentations

21  with his study.

22          And as I mentioned, the price impact analysis is

23  something entirely different from a loss causation analysis.  What

24  you'll be asked to do at loss causation, sort of picking up on

25  what the Court mentioned earlier, you'll hear all of these issues

1   again undoubtedly; we'll talk about two-day windows, we'll talk

2   about corrective disclosures.  And at loss causation we'll have

3   our expert explain the portion -- the reasons why the disclosure

4   has released artificial inflation, they'll have an expert

5   typically who says there was zero artificial inflation and the

6   jury will be asked to decide who do you believe?  Do you believe

7   plaintiffs' excerpt?  Have they convinced you that the stock was

8   increased with fraud and that it was decreased from the fraud came

9   out; or do you believe defendants' expert?  And they'll say, look,

10  the decline wasn't even significant, how could it have been

11  statistically significant; that proves no damages.  And the jury

12  will have to decide that issue.

13          But, of course, it's undisputed and indisputable that

14  all five corrective disclosures in this case were followed by

15  stock price declines.  And, of course, they were.  They were huge

16  negative news to this company.  The market was intently focused on

17  this plant.  It was costing billions and billions of dollars by

18  the year; $500 million here, $400 million there.  The stock price

19  declined quickly with respect to each time bad news on this

20  company came out.

21          So not only have they rebutted the presumption but they

22  want the Court on this record to say I will hold as a matter of

23  law that zero dollars, not one cent of the decline on any of these

24  five days -- or any of the four days after April 2013 were caused

25  by the fraud in this case.  And it just can't be done on this

1  record.

2          THE COURT:  I know that you've got about 10, 15 more

3  pages, but you only have about 5 minutes left.

4          MR. ALVARADO:  I'll be quick.

5          Quickly, damages.  Again, something we've talked about

6  extensively.  Plaintiffs have a straightforward theory of

7  liability.  They have one theory of liability.  And they have one

8  theory of the sole alleged harm, it's straightforward, artificial

9  inflation.

10          As I've mentioned, our theory is that false statements

11  artificially inflated the stock and investors are entitled to per

12  share damages based on the inflation that they over paid during

13  the class period.

14          They'll be measured on a class-wide basis pursuant to

15  Professor Feinstein's straightforward three-step methodology.

16  It's the same methodology that's used in virtually all of these

17  cases.  He's explained to the extent that he needs to that -- the

18  ways in which he will employ evaluation tools if problems are

19  encountered.  And that methodology is routinely accepted across

20  the country.

21          THE COURT:  Can you address why Judge Pearson had it

22  wrong on this point?

23          MR. ALVARADO:  Sure.  And I think Professor Feinstein

24  tried to do that a little bit yesterday.  What happened in that

25  case was there was a discussion and that's why we've been very

1  clear about the difference between damages model, which is here is

2  the -- here's how the model works, here's what it does and here's

3  how you calculate damages for each class period.  And here are the

4  valuation tools that -- it's not knowable whether they'll be

5  needed in this case.  For example, if the defendants say -- or if

6  we encounter that there was confounding information on a

7  particular corrective disclosure date, bad news came out about

8  Kemper, but in addition to that oil prices went down, something

9  else, right.  So in those types of instances at the damages phase

10  on the merits when all the parties have analyzed the economic

11  realities of what was going on at the time, the expert may have to

12  disaggregate for confounding factors.  And at that stage that's

13  what -- those are the valuation tools that Professor Feinstein

14  discussed in what I mentioned.

15          In the *Freddie Mac* case what happened there was he was

16  being asked about the damages tools and he said, I don't know

17  which ones I'll use yet because, as I've described, they're not

18  knowable at this stage.  Defendants construed that as him saying,

19  I don't know what model I'm going to use.  And the court said, he

20  said he doesn't even know what model he's going to use.  He didn't

21  say that, he's talking about his tools.  So that's why he said I

22  want to be very clear, I'm talking about two different things.

23  And that's in our view what happened in that case down in Ohio.

24          The damages will be done the same way for everyone and

25  consistent with plaintiffs' theory of liability which, I'll just

1   close with this one, we've talked about it throughout the day,

2   we've tried to make it clear that our theory of liability in this

3   case is that for all of the things that I mentioned at the

4   beginning of this presentation, the May 2014 COD, the on-schedule,

5   on-track, we've achieved this milestone, those were false at the

6   time, 100 percent.  And so defendants' argument only works if

7   their argument about needing to account for varying levels of

8   inflation throughout the class period only works if the

9   probability was changing on those things throughout the class

10  period.  We've alleged that those weren't changing.  Those were

11  facts from the beginning of the class period.  Although Professor

12  Feinstein explained he can easily account for variations, if

13  necessary, in this case these are known facts at the time.

14          Plaintiffs don't allege it changed.  It was a fact, the

15  risks were concealed and they materialized through a series of

16  partial disclosures.  The risk that was being materialized was the

17  100 percent risk that you were missing the schedule.

18          Defendants have put up on the screen a couple times four

19  blurbs from the loss causation section of the complaint that have

20  the words "materialization of the risk."  And what those

21  allegations are meant to do is to convey to the reader that the

22  way that the -- the way that the risk underlying -- that was being

23  concealed by the fraud, that you were not going to be done on time

24  and that you were not on schedule, that reality materialized

25  through a series of partial disclosures.  It's a way to describe

how the information was released to the market.  Oftentimes the

disclosure is not a perfect -- doesn't match perfectly the

underlying fraud.  And so in cases, for example, where the

underlying fraud relates to the schedule but the corrective

disclosure relates to a cost overrun, the risk of missing the

schedule is being materialized through a disclosure related to

cost overruns.  So that's what we're talking about.  The words

"materialization of risk" describe loss causation, they don't

describe plaintiffs' theory of liability.

          And I would like to address the *BP* case, which I think

is their main case and they bring it up a lot.  And I was glad

they did because that's the perfect example of why that -- this is

not the type of materialization-of-the-risk case they're trying to

make it be.  In this case it was a known certainty it was not on

track and would not be finished; 100 percent from the beginning.

          In *BP*, recall, that case was about the deep water oil

spill.  There had not yet been an oil spill at the beginning of

the class period.  Plaintiffs allege that defendants at *BP*

misrepresented the risk of an oil spill.  And then there is an oil

spill.  So the Court said how can you determine what the true risk

was versus during the class period vis-a-vis 100 percent?  It

wasn't yet 100 percent until it happened.  So there could be a

mismatch of probability in that case.

          This is not an oil spill that later happened.  This is a

case that alleges that on day one of the class period and on day

```
 1   one which we saw at the beginning of this presentation a named

 2   defendant says we're not on track or, as told, how are we going to

 3   get back on schedule.  It's 100 percent certainty that they're not

 4   on schedule, so there's no mismatching of a changing probability

 5   throughout the class period.

 6               Affiliated UTE is another presumption available.

 7               And finally superiority is established, it's not

 8   challenged.  Of course, class action is the superior way to try

 9   this type of case.  So all of the Rule 23(a)(b) factors -- (a) and

10   (b) factors are satisfied and defendants haven't rebutted the

11   presumption and damages can be calculated on a class-wide basis.

12               THE COURT:  Thank you.  Sir.

13               MS. HEINZ:  Your Honor, may I approach with the

14   PowerPoint?

15               THE COURT:  Yes, ma'am.

16               MR. McCONNELL:  May it please the Court.

17               As explained during our opening by Ms. Heinz and as

18   demonstrated by the testimony yesterday, plaintiffs' motion for

19   class certification should be denied for three essential reasons.

20               First, plaintiffs have tried to show and prove that the

21   market was efficient through empirical evidence.  That empirical

22   evidence did not, in our view, meet their burden and because there

23   was competing evidence that was offered.  And the Court should

24   look at that and conclude that the market is not efficient for

25   reasons I'll explain.
```

1          Second -- and we'll probably be spending a lot of time

2    on this, your Honor -- even if the fraud in the market presumption

3    is met, then defendants have rebutted.  And I'll explain this more

4    fully, but *Halliburton II* explains that at this point it's a very

5    different analysis.  They have had their chance at the plate.

6    This is now time for the defendants to go forth with their

7    evidence.  And if that evidence is more persuasive that the stock

8    price wasn't affected on certain dates, then it is the Court's job

9    at this juncture to not allow those dates to be included in the

10   class because they cannot rely on presumption of reliance.  And

11   I'll get into that, but that's exactly what the *Halliburton II*

12   court said.

13          And that's -- so the question will be, you're going to

14   have to pick one:  Did the defendants on this rebuttal present

15   more salient is the word that the Supreme Court uses, more

16   persuasive evidence than plaintiffs with respect to those dates?

17   And we submit we did.

18          Third, plaintiffs fail to proffer a model demonstrating

19   that damages are capable of measurement on a class-wide basis.

20   And we contend the construct they have alleged here, what *Comcast*

21   talks about is you have to match your theory of liability.  And

22   it's our view they didn't here because they allege a specific form

23   of liability under the securities law, it's materialization of the

24   risk.  And it is our position those cases have not been treated,

25   they don't fall into this broad range of cases that a lot of time

```
 1   are approved in these situations.  It requires a different level

 2   of analysis and we respectfully submit Professor Feinstein doesn't

 3   address that analysis.

 4         So for any and all these reasons we respectfully submit

 5   that plaintiffs' motion should be denied in whole or in part.  And

 6   that the Eleventh Circuit, and this is very important and -- in

 7   thinking about this entire motion the Eleventh Circuit explained

 8   in the Brown vs. Electrolux case, and that's cited on page five of

 9   our brief, that, open quote:  A district court that has doubts

10   about whether the requirements of Rule 23 have been met should

11   refuse certification; refuse certification.

12         It goes on to say all -- open quote, "All else being

13   equal, the presumption is against class certification because

14   class actions are an exception to our constitutional tradition of

15   individual litigation," closed quote.  That's the Eleventh Circuit

16   from only three years ago explaining that this is a very, very

17   important juncture of the case.  So if there's any doubt, it is

18   supposed to go against plaintiffs.  There's not a presumption in

19   favor of.

20         Before I jump to the first argument, I did want to

21   correct one factual statement, I believe there were some

22   statements made that the Kemper plant never worked or never became

23   operational or was abandoned.  And I just want the Court to

24   understand, I don't want to let that sit, the Kemper plant did

25   create synthetic gas as it intended to do.  The technology was
```

1    first of its kind, taking coal, dirty coal and turning it into

2    clean synthetic gas, and they did it.  Now, the plant is currently

3    running as a combined-cycled power plant.  So this idea that

4    somehow this is just out there, I just wanted to disabuse that --

5              THE COURT:  What does combined-cycle mean?

6              MR. McCONNELL:  Combined cycle is a -- it's a plant,

7    it's a natural gas plant that is being used for at this time.

8    Part of the reason they're not using it for synthetic gas is gas

9    prices came down and it's a lot cheaper to just use natural gas

10   than it is to make it through synthetic gas.  That's a long and to

11   the side, but I did want to address that assertion first.

12             Let's go to market efficiency.  And, your Honor, I don't

13   think we actually have a lot of disagreement on this.  If I didn't

14   know any better, there were some notes coming out of my outline.

15   I agree with plaintiffs' counsel, this is a holistic analysis.

16   What the Eleventh Circuit said in *Regions* is quite clear, there's

17   no set framework.  You can consider *Cammer*.  You can consider

18   *Krogman*, we're not telling you how to weigh that.  That is up to

19   the Court to consider.

20             So we're fully -- we embrace *Regions* and we agree with

21   it, that you can look at this holistically.  But when you look at

22   it holistically, you also have to consider the fifth factor.

23   There's also no dispute that in prior Eleventh Circuit decisions

24   and generally accepted through the cases if you go through them

25   all, the fifth factor is the essence.  And even Dr. Feinstein

```
 1   agreed to that yesterday, it's the essence.  It's the one thing

 2   that you can actually test.  These other things are indicators,

 3   they're consistent with what we would expect to see for an

 4   efficient market, but was it really efficient and can you test for

 5   it?  And that's the fifth factor, and that's why *Cammer* says it

 6   was the essence.  And that's why courts generally devote so much

 7   time and effort to it.

 8           So then if we look at the fifth factor, the question

 9   becomes which one should we go with?  Should we -- and what I mean

10   by that, Dr. Gompers said there's three of seven days, and

11   Dr. Feinstein said there's six of seven.  So that's where we are

12   on those two analyses.  So how does the Court in this first phase,

13   right, we're in this first phase determining whether a presumption

14   should even be allowed, how should the Court look at that

15   evidence?  Well, you can weigh those two and look at them and

16   compare them.  And we think under that comparison it is clear that

17   the superior model is Dr. Gompers.

18           And we believe that it's superior for the two reasons

19   that are on this slide deck.  And this is slide three where it

20   says -- the first one is that there's an inferior industry index.

21   And also it talks about the selective use of two-day event

22   windows.  The Court is very familiar with both of these issues.

23   But let's turn to the first one.

24           There's been some disagreement -- I'll turn to slide

25   four, some disagreement as to, you know, is R-Squared important?
```

1    R-Squared, it's generally conceded -- this is a statistical

2    principle that -- all it means is explanatory power.  And what it

3    means is if you look at the *Par Pharm* quote there, statistics for

4    the two models show that one linear trend is more reliable in

5    explaining the movement observed in the historical data.

6              So all things being equal, would you rather prefer on

7    the model that's more statistically reliable than a model that's

8    less statistically reliable?  And as we mention in the *Halliburton*

9    *II* case and there's also this *Orange County* case, the courts say,

10   well, yeah, that's not really that difficult a proposition.  If it

11   has more explanatory power, if it has a tighter fit, then that

12   linear progression has a much better explanatory power of

13   explaining what we're testing.  So, of course, you should use

14   that.  And we submit that there's really no real disagreement on

15   that.

16             And then the question is, you know, why use the index?

17   Which index should you choose?  Should you choose an index that is

18   limited to the Reg S-K, or should you go about this in a different

19   approach?  As we explained, and as Ms. Heintz covered clearly this

20   morning, Dr. Gompers didn't restrict himself to some tunnel

21   vision, narrow view.  He did what scientists do; he said, let's

22   take an appropriate sample of indices, that makes since given the

23   composition of this company.  Let's test those and before we even

24   do the event study see what has the best fit, what has the best

25   explanatory power.  That's just logical scientific thought.

1          Dr. Feinstein on the other hand just said, well, I saw

2   this one index, there were actually two other peer -- there was

3   another index mentioned and a peer group mentioned, but he said

4   I go with the Reg S-K, we'll take him at his word.  But why is

5   that better?  And he fenced with this yesterday during the

6   examination, your Honor, when I asked him a few times:  Are you

7   saying that it's improper not to use this, or this is the only one

8   you could use?  And he couldn't answer that because of course you

9   can.

10          If you look at these cases, your Honor, in *Halliburton*,

11   there -- many times these indices are a combination of indices.

12   So it's not that you just pick an off-the-shelf index and that's

13   the conclusion.

14          And then we can also, though, step back and say is this

15   consistent with common sense?  Remember, we're trying to find the

16   closest peer group for this selection.  And the quality of the

17   index generally depends on the comparability of those companies.

18   Are they most like them?  Is this the same industry?

19          And during his deposition Dr. Feinstein agreed that the

20   best one to know who their closest peers are is Southern.  He says

21   in his transcript:  No one really knows Southern Company better

22   than Southern Company, and so I trust their determination.  And

23   that's the same protocol I use in other cases; if a company has

24   made a determination as to which are its best, most comparable

25   companies, I use their determination.

1          Well, your Honor, we know what that is.  The Southern

2     Company puts this in its proxy statements.  It says:  These

3     companies are those that are believed to be the most similar to

4     the company in both business model and investors.  That's their

5     words.  That's prelitigation.  That's years before this case is

6     ever filed.

7          Now, we're not saying that's the only one you had to

8     use, but to completely disregard it and not consider it when you

9     say that you trust their determination, how is that scientific?

10    And Dr. Gompers didn't just limit it to this, he included

11    everything, he included what Dr. Feinstein did, but he went with

12    the model with the highest explanatory power, and we recommend

13    that the Court does as well.

14         Now, let's turn to two-day windows.  We discussed a good

15    bit yesterday about whether one day is enough or two days is

16    enough.  Sometimes, your Honor, we just have to step back and take

17    a bigger picture, though.  These two-day event windows curiously

18    are being used, they're -- he's expanding the window precisely at

19    the same time they're trying to expand the class.  And if you have

20    up there yesterday, your Honor -- I don't think I had it on these

21    slides but it's Exhibit 7 (indicating) to Dr. Feinstein's report.

22    And the only time he started using two-day windows was after

23    April 24th, 2013.  That's a red flag.  Why would you do that?  One

24    day is working fine, why is it all of a sudden necessary to go to

25    two days?

1          We submit there wasn't an explanation.  The explanation

2    we're hearing now, your Honor, is that there was a 700 million

3    equity point raised during the investors call on July 31.  If that

4    was so important, your Honor, why wasn't that in his original

5    report?  He didn't mention that in his original report as a

6    justification for two-day windows.  He didn't mention it during

7    his deposition.  This was done after the fact trying to find some

8    type of justification to get to two-day windows.

9          And, your Honor, it's pretty clear, if you have an

10   efficient market -- and this is where all those *Krogman* Factors

11   and *Cammer*, they're saying it's overwhelming.  Well, this cuts

12   against them here.  If this is so overwhelmingly efficient, if

13   it's not even a close call, why in the heck has it taken two days

14   to process information?  They're saying an 8-K filed on the

15   afternoon of July 30th doesn't get baked into the price of

16   Southern stock until August 1st.  That makes no sense, your Honor.

17   Nothing supports that.  None of this case law that they're

18   mentioning supports that type of proposition.

19         And, yes, we have mentioned here on slide seven, you can

20   see where the *Halliburton* case, your Honor, specifically rejected

21   the use of a two-day window.  It said:  An efficient market is

22   said to digest or impound news into the stock price in a matter of

23   minutes.

24         Also the *Intuitive* case, your Honor, there -- and I want

25   to point this out -- that was five minutes; information became

1    available five minutes before the close.  And the court said

2    that's sufficient in an efficient market and it rejected the use

3    of a two-day window.

4         So next we get to what are you supposed to do with this,

5    your Honor?  And this is the comparison we have -- where we have 3

6    for Dr. Gompers, we believe 5 for one-day windows is -- that's

7    your *Cammer* 5, I've got all these other factors, what am I

8    supposed to do?  Well, we submit that it's still -- they haven't

9    gotten there.  And part of the reason is, your Honor, they say

10   that, no, you don't find cases which if you've got all these other

11   factors met, that the court goes the other way, that the fifth

12   factor isn't sufficient.  We disagree with that.

13        One is the *Freddie Mac* case.  It's reflected on this

14   slide nine that we have in front of you.  And the reason that I

15   say this, point this out, this is straight from Dr. Feinstein's

16   report comparing what he had for those same *Cammer* Factors and

17   *Krogman* Factors and comparing it to what he has here in Southern.

18   They're very, very close, your Honor, they're not very dissimilar.

19   But because of the deficiencies on the fifth factor, the court

20   there rejected it.  So that's a clear example.

21        There are other cases also as well.  The *George vs.*

22   *China Auto Systems* case did it.  The Kuna vs. Hanson (phonetic)

23   case did it.  The -- another *Freddie Mac* decision did it, 281

24   F.R.D. 174, in the and *Polymedica* case.  These are all cited.  But

25   I just want to point out, your Honor, this is not an isolated

 1  situation.

 2          But then let's just say, though, that we want to --

 3  you're at this place of, you know, I've got -- and this -- I want

 4  to get to the question that you've been asking:  What am I

 5  supposed to do with this?  What if I like Dr. Feinstein, he's an

 6  expert, seems to know what he's talking about, maybe.  Dr. Gompers

 7  seems to be a qualified expert.  They both have these models.  You

 8  know, what am I supposed to do?  Well, the Supreme Court tells us

 9  what we're supposed to do.  And I have some language that's

10  highlighted that I think would be helpful for the Court.

11          MR. EYE:  Permission to approach?

12          THE COURT:  Yes.

13          MR. McCONNELL:  It's at 280 there, your Honor, hopefully

14  it's tabbed at the right page.

15          And this is where Chief Justice Roberts is talking

16  specifically about the issue you're faced with right now.  And he

17  says -- and this is after in the context -- and I want to direct

18  your attention to a section there that he says:  Now suppose the

19  District Court determines that despite the defendant's study,

20  which is right now in this phase of the discussion back and forth,

21  let's just say the plaintiffs have carried its burden to prove

22  market efficiency but that the evidence shows no price impact with

23  respect to the specific misrepresentation challenged in the suit.

24  The evidence at the certification stage thus shows an efficient

25  market in which the alleged misrepresentation had no price impact,

1    and yet under EPJ's view, the plaintiff, the plaintiff's action

2    should be certified and proceed as a class action, with all that

3    that entails, even though the fraud-on-the-market theory does not

4    apply common reliance and thus cannot be presumed.

5         So the court then says, well, so what are you supposed

6    to do for assessing that price impact?  And the court continues

7    down a little bit there, your Honor, and it says:  While *Basic*

8    allows plaintiffs to establish that precondition indirectly,

9    through all these little factors they're throwing out, they can

10   prove it indirectly, it does not require courts to ignore a

11   defendant's direct, more salient evidence showing that the alleged

12   misrepresentation did not actually effect the stock market's price

13   and consequently that the *Basic* presumption does not apply.  So at

14   this phase, your Honor, you do have to pick them.

15        Does defendants -- have we provided more salient, more

16   persuasive evidence as to those two dates?  And we respectfully

17   submit we have.  And why have we?  For the same reasons I've

18   already mentioned.  We have a model.  They don't even dispute that

19   it has a higher explanatory power.  They don't question the

20   R-Squared calculation.  They have given on that issue.  That's not

21   even for dispute.  One-day event windows versus two.  It's

22   consistency as well.  And no real explanation for using two.  That

23   is more -- ours is more salient.  And they cannot meaningfully

24   challenge it.  And for those reasons, your Honor, we have carried

25   our burden with respect to that.

1          Now, with respect to that burden I just want to point

2  out one little thing.  There is some disagreement in the circuit

3  as to exactly what that burden is.  The Sixth Circuit in *Best Buy*

4  said it's a burden of production under rule -- Federal Rule of

5  Evidence 301 that defendants just have to come forward with

6  evidence and then it shifts back.

7          I'm not saying that's -- the other circuit, Second

8  Circuit, and there may be others, say, no, that's not how we look

9  at it; what we think *Halliburton II* means is defendants have the

10 burden of persuasion as well.  Now, we think the burden of

11 presumption is sufficient but nonetheless, your Honor, we accept

12 and we have carried our burden of persuasion on this point.  And

13 the reason we have carried the burden of persuasion is our model

14 is better.  The Court needs to make a choice as to which of those

15 two models explain the price activity on those two days.

16          THE COURT:  Let me jump in here then because we're sort

17 of dancing around I think the question that I asked earlier to the

18 plaintiff about, you know, how do you prove it, the price impact.

19 I mean, you -- Professor Gompers' model says that in July and in

20 October of 2013 there were -- that he could find -- he had

21 insignificant results.  So does that prove that there was no price

22 impact?  The plaintiff says it doesn't.  So I was asking the

23 plaintiff, well, what does prove that there was no price impact

24 and --

25          MR. McCONNELL:  And you didn't really get any examples.

```
 1              THE COURT:  So if you can address the same thing.

 2              MR. McCONNELL:  Sure.  Absolutely, your Honor.

 3              And what I would like to do, slide 11 will get to this,

 4    but also if you still have *Halliburton* there.  And, fortunately,

 5    it's in that same group of pages.  And if you go there, there's a

 6    section there that says:  Plaintiffs themselves can and do

 7    introduce evidence of the existence; do you see that, your Honor?

 8              THE COURT:  After the highlighted portion?

 9              MR. McCONNELL:  Yeah.  I don't have the case, so I

10    apologize.  Right here (indicating).  I'm sorry, your Honor.

11              THE COURT:  Okay.  That's right, you've got it right.

12              MR. McCONNELL:  Plaintiffs themselves can and do

13    introduce evidence of the existence of the price impact in

14    connection with event studies.  Regression analyses that seek to

15    show that the market price of the defendant's stock tends to

16    respond to pertinent publicly reported events.  Defendants, like

17    plaintiffs, may accordingly submit price impact evidence prior to

18    class certification.  What defendants may not do, *EPJ Fund*

19    insists, and the Court of Appeals held, is rely on that same

20    evidence, same evidence, prior to class certification for the

21    particular purpose of rebutting the presumption altogether.  This

22    restriction makes no sense and can readily lead to bizarre

23    results.  This double standard -- they're saying -- the Supreme

24    Court says we can rely on event studies too and we can rely on the

25    same standard.
```

1          And also, your Honor, I believe if you look at did we

2    provide more salient evidence that their misrepresentation did not

3    actually effect the stock price, the Supreme Court didn't define

4    what that meant, but Dr. Gompers did explain what that meant in

5    the field of financial economics.  And he said:  Effect means at

6    the 95th percentile you can't prove that null hypothesis or

7    disprove it.

8          That's what it means, that's what effect means in that

9    statistical jargon, and that's what he testified to yesterday.

10   And don't take our word for it.  This was addressed specifically

11   in these cases that I have in front of you, your Honor, and that

12   we cite in our briefs, the *Halliburton* on remand, the Court:

13   There was no statistically significant price reaction on

14   December 4th.  Accordingly, the Court finds a lack of price

15   impact.  That is in the court and it looked at those and it could

16   not have class certification for five of those six days.  That's

17   exactly what we're talking about here.

18         The other one, *In Re Intuitive*, the court found lack of

19   price impact there, also relying upon the 95th percentile.

20         And the cases that plaintiff cite, your Honor, which,

21   remember, this was in the replies, so we barely didn't get to go

22   into it, none of these really deal with statistical significance

23   being the benchmark.  What they deal with are price maintenance

24   cases where the plaintiff -- where the defendant didn't even deal

25   with the corrective disclosure or when the defendant didn't

1   present an event study, or in those situations where they actually

2   showed that they could -- lack of price impact or where there was

3   actual proof that it was statistically significant by the

4   plaintiffs.

5           The only case to support that position they're citing is

6   the *Rooney* decision.  And as we submit, the *Rooney* decision did

7   not provide -- is erroneously decided.  We think it's inconsistent

8   with the language in *Halliburton II*.  It's inconsistent with the

9   sister court in Texas in the *Halliburton* decision and these other

10  decisions.  We believe it's an outlier and the Fifth Circuit will

11  address that decision.

12          Now, if I could, I'm going to go ahead and quickly try

13  to deal with plaintiffs' *Comcast* issues.  And turning to that,

14  your Honor, the Eleventh Circuit has made it clear in the *Bussey*

15  decision, and that's an important decision on *Comcast*, that it's

16  an abuse of discretion to certify a class of plaintiffs if they

17  fail to offer proof at the class stage showing specifically how it

18  can quantify its alleged economic losses throughout the class

19  period.  And it also held that deferring that showing until the

20  merit stage is an abuse of discretion.  That's the Eleventh

21  Circuit from a few years ago.

22          Now, numerous courts have looked at this.  And on slide

23  17, your Honor, through 19, these are all decisions where courts

24  have said it was improper to proceed.  Not all these are

25  securities cases.  Some of them are, including the *BP* case, which

1   is the Fifth Circuit decision.  Two of these cases involve

2   Dr. Feinstein.  That's the *Freddie Mac* decision there on the

3   page -- bottom of page 17, third bullet.  And then also on *Sicav*

4   case that appears on slide 18, top of the page; both of those were

5   involving models.  So why here?

6          Well, plaintiff suggests that we're making much ado

7   about this materialization-of-risk thing.  Your Honor, as shown

8   on slide 16, we didn't make these words up.  They put in loss

9   causation, this is where we suffered our loss, this is how we

10  suffered our loss.  Your Honor, paragraph 193 they allege

11  materialization of the risk, that it was partially materializing

12  later.

13         And the next paragraph, 198, these are kind of like

14  charging paragraphs, these aren't lightweight paragraphs,

15  paragraphs 202, 207.  Now they're running away from that now.  I

16  get it.  I understand.  It's not convenient.

17  Materialization-of-the-risk theory is not easy under *Comcast*, but

18  they are the ones that allege that case.  And this is the

19  allegations that have proceeded here.  And for those reasons we

20  submit they have to be tested by that.  And have they done it?  We

21  submit they have not.

22         Under the *BP* case on the Fifth Circuit it emphasizes,

23  you have to disaggregate.  Remember that big loss, the windfall?

24  You have to figure out how to do that because if you can't tell me

25  how you're going to do it, you can't have a class action.  That's

```
 1  too much potential exposure.  That doesn't make any sense.  You
 2  have to quantify that now and tell me how you're -- or at least
 3  how you can go about doing it.  We don't have any of that here,
 4  your Honor.
 5          We don't have disaggregation.  He didn't even attempt to
 6  disaggregate, doesn't even talk about it.  Could not identify a
 7  forum when he has ever done that analysis.  He never said he did
 8  it before in any other matter.  He doesn't know what the amount of
 9  risk is at any given time.  He didn't know until yesterday that
10  some of these risks were actually known earlier in the class
11  period.  So none of these things have been considered and couldn't
12  have been considered when he wrote his report.
13          And for all those reasons, your Honor, we respectfully
14  submit that Dr. Feinstein's position -- well, plaintiffs' position
15  on Comcast is inadequate.  And the best paradigm to look at that
16  is under the BP line of cases, both the underlying case in the
17  District Court as well as the Fifth Circuit decision in the Ludlow
18  decision.
19          So, your Honor -- one second.
20          And the other thing that the plaintiffs say is that we
21  can get away from this materialization-of-the-risk thing because
22  that's not really what we said.  We said from day one that
23  they're -- we allege that there was zero chance, and you heard
24  that during the argument just now, that there was no chance that
25  this could ever get done by May 2014.  Your Honor, their complaint
```

1   doesn't say that.  It doesn't say it anywhere.  And they have an

2   obligation to allege with particularity those types of

3   allegations.

4            They cite paragraphs 115, A through D, 131, A through E,

5   and 124.  And they say, it's in there, go look in there, that's

6   where we make that allegation.  They don't say that.  They don't

7   use words that even remotely come close to that.  And if that was

8   really their theory of the case, you would think that would be

9   something that you would want to highlight.  And the reason is is

10  because they didn't have sufficiency to allege that in the

11  complaint.  It's not there.  They never did claim that there was a

12  zero chance.

13           That's why I asked Dr. Feinstein that question

14  yesterday.  And I'm just -- and this is the question that I asked

15  him:  Just asking for your understanding of their theory of

16  liability, the plaintiffs; and is it your understanding that this

17  is -- the theory liability is that the defendants knew that there

18  was a 0 percent chance of achieving the May 2014 in-service

19  deadline at the start of the class period?

20           The witness:  They didn't say it that way.  That's not

21  what's written in the complaint.

22           So now that they're trying to say there's 0 percent

23  chance raises even more questions about why they're running away

24  from their own theory.  And the reason is *Comcast* says you have to

25  provide a model to explain that theory.  They haven't done it, so

what they're doing, try to change the theory.  They're not allowed
to do that.  They're stuck with what they have in their complaint.

So, your Honor, in conclusion the Eleventh Circuit has
confirmed that a District Court that has doubts about whether the
requirements of Rule 23 have been met should refuse certification.
As demonstrated today, plaintiffs' class arguments and proof are
riddled with doubt.

First, plaintiffs' regression model is statistically
less reliable than defendants' model.

Second, plaintiffs need to modify their event window
after April 24, 2013, to try to show statistically significant
return after that date.

Third, plaintiffs rely on the 95 percent confidence
interval for their event study but argue that a different
unspecified amount should be used for their's.  Your Honor, you
just saw what Justice Roberts says, that defendants can use event
studies to prove lack of price impact, that's, I think, a fair
characterization.  They asked Dr. Feinstein yesterday:  Can
defendants ever show lack of price impact through event study?  He
said, no.  No.  Can't do it.  That shows you how out of step the
position they're asking the Court to take is from this, the
express language that we've read here during the hearing.

Last, plaintiffs make no attempt to specify how they
will calculate damages for their complicated
materialization-of-the-risk theory of liabilities.  These

1   deficiencies raise profound doubts under Rule 23, all of which

2   must be construed under the *Brown vs. Electrolux* case against

3   granting class certification.

4          And so, your Honor, going back to where we started, have

5   the plaintiffs proven, have they shown enough?  Well, *Halliburton*

6   *II* says what you can look at.  It's a holistic test for you to

7   consider.  You can look at both and if you say, okay, I think

8   under all the circumstances they at least get the presumption, but

9   then second, it's a whole different analysis, and it's our turn at

10  the plate.  And then the question is:  Did we provide more

11  persuasive evidence as to any of those dates?  That's the

12  analysis.

13         And they don't challenge our model meaningfully.  They

14  don't challenge the R-Squared, and they can't really challenge use

15  of a one-day window.  And we respectfully submit that that

16  analysis shows that lack of price impact in the 95th percentile,

17  which *Halliburton* in *Intuitive* says is sufficient.

18         And then damages, for the reasons I said, I don't think

19  they can certify the class on that basis.

20         So we respectfully submit if the Court concludes that

21  the fall-in-the-market presumption shouldn't apply, then

22  reliance -- individual questions of reliance would predominate,

23  the whole class would have to go out; or if the Court says that

24  under *Comcast* the entire damages are -- you haven't done it, you

25  have materialization of the risk, you didn't really tell me how

1  you're going to do it, that applies to the full class.

2       If you go only on price impact, your Honor, that takes

3  us to slide 21.  And I respectfully submit that the class can go

4  no later than April 24, 2013.  And the reason it can't go longer

5  than April 24, 2013, because we've heard some things, no, if it's

6  only one of those dates, you have to certify the whole class.  No.

7  As said in these other cases, you can't rely on the

8  fraud-on-the-market presumption for the dates that you say.  You

9  have to show individual reliance for those dates.  It just happens

10  that those dates here are July 2nd, 31, October 3 and

11  October 30th, those -- it's open.  All of those the proof would

12  have to be individualized proof.  And to address those, you can't

13  do that at the class stage.  So the predominance issues as to

14  those precise misrepresentations or corrective disclosures, the

15  individual proof would easily, easily overwhelm any common proof.

16  And that's what Justice -- Chief Justice Roberts says basically in

17  *Halliburton II*; if you can't meet these, then you don't have the

18  presumption for that days.

19       Thank you, your Honor.

20       THE COURT:  I'm going to give five minutes to the

21  plaintiff because you went a little bit longer.

22       MR. McCONNELL:  Oh, okay.  Thank you.

23       THE COURT:  I'm okay with that.  I'm going to give

24  them -- they were essentially on time, but I'll give them five

25  more minutes.

1          So did you want these -- did you want this back or can I

2     keep this, this index?

3          MR. McCONNELL:  Oh, I'm sorry.  You know what, I'm

4     going -- will it be helpful if I rip the cases --

5          THE COURT:  No, I can look up *Halliburton*.

6          MR. McCONNELL:  Thank you, your Honor.  I'm just trying

7     to make it easy.

8          THE COURT:  Thank you.

9          MR. ALVARADO:  Thank you, your Honor.  I'll try to be

10    brief.  Thank you for your patience throughout these two days.  I

11    know it's been pretty grueling.

12          THE COURT:  You don't have to be brief, you can take as

13    long as you want as long as it's five minutes or less.

14          MR. ALVARADO:  Starting with the index, we're looking

15    for a sector index in an event study and Professor Feinstein uses

16    the sector index that the company identifies as its sector index.

17    It's the same word even.

18          The custom peer group was not an index.  It was a list

19    of companies that was not based -- they were not selected because

20    they were based on the same sector.  They were used because they

21    were in the same business model and had the same type of investor,

22    that's what the quote they put up on screen was.  That has nothing

23    to do with its sector.  So if you're looking to see what sector

24    index should you use, you should look to what the company says is

25    its sector index.  In this case, it was S&P EUI.

1          Now a discussion of fit.  We don't agree -- we don't

2    quibble with the 77 percent versus 73-and-a-half percent, or

3    whatever the small differences is between the R-Squared that

4    they've identified.  What we quibble with is the exercise of

5    searching for the model with the tightest fit so that you can

6    explain away as much of the company movement as possible and

7    attribute it to sector indexes -- sector factors.  That's the

8    problem with searching for fit.  And that's why in source after

9    source that Professor Feinstein, and we cite in our papers, many

10   of which I actually found by looking at the support that Professor

11   Gompers had cited in his report for why he -- when he was

12   describing what fit means, we kept reading those and we put them

13   in our briefs.  They explain, don't only look at fit, though, this

14   can be a trap and so forth.

15          So the literature is clear that it is not the correct

16   answer in all cases.  And, in fact, S&P itself, when it described

17   how it comes up with the S&P EUI says and addresses:  Using

18   statistical methods to make an index can lead to illogical

19   results.  And that's exactly -- when you see statistical methods,

20   that's exactly what they're talking about.

21          Now, not only was the custom peer group the index that

22   Gompers created out of those companies not an index during the

23   class period, they also had to go to a current employee to help

24   bolster their decision.  They have a guy named Larry Sitton, who

25   wrote a declaration, who said, you know what, I know we had this

1  S&P EUI for our sector during the class period, but this other

2  stuff, these other companies were a better sector comparator.

3  Well, that's interesting because they had the opportunity to tell

4  that to SEC and the rules give them that opportunity.

5          So putting aside whether that's even appropriate at this

6  stage to say that what you told the SEC was your best sector

7  comparator wasn't true, this is after the fact and that is clearly

8  not a justification to rely on that index.

9          The $700 million point that was released late in the day

10  on July 31st, that information is in Professor Feinstein's initial

11  report.  It wasn't until the challenge that he looked at two days

12  that he explained this is the type of news that I -- this is why I

13  identify this news in my report.  This is not some new piece of

14  information.  It's always been in the case.  It's always been a

15  fact of the case that $700 million was dropped on the market at

16  2:30 p.m. in a trading day.  So, of course, he looked to the

17  second day.  And that's why the cases are clear that he looked to

18  the second day.  And that's why the defendants have no response to

19  those cases.

20          So there is no case in the Eleventh Circuit, as I

21  mentioned, that's found a market inefficient without *Cammer* Factor

22  5, zero cases.  It's never been done.  The cases -- they've

23  cobbled together a few.  The *Freddie Mac* case, in fact, in that

24  case the Court found that S-3 registration was not complied with,

25  so it wasn't that all the *Cammer* factors were complied with.

1          The other *Freddie Mac* case they mentioned in New York,

2   that case also had issues.  It was a preferred share, not a common

3   stock.  There weren't analysts assigned to the preferred share.

4   So not all the *Cammer* factors were satisfied in that case.

5          And in *Halliburton*, we're not saying ignore *Halliburton*.

6   We agree, *Halliburton* said defendants have an opportunity to show

7   that the misrepresentations, quote:  Did not actually effect the

8   stock price.  Yes.

9          And the Court said:  Plaintiffs use event studies to

10  prove price impact referring to the loss causation analysis.

11  That's what we will be -- after this the burden shifts back to us

12  to prove that, in fact, those stock price declines were caused by

13  the fraud.  We can prove it with event study analysis as part of

14  the analysis.  The problem is they're trying to disprove

15  something.  You disprove nothing with a non-significant decline.

16  And that's the statistical 101 basis.

17          Just because the Supreme Court said you have an

18  opportunity to do it doesn't mean that you should adopt a

19  statistical fallacy that you do it by proving an insignificant

20  reaction.

21          THE COURT:  I think this is a really big point because I

22  read what Justice Roberts said.  And if a non-significant decrease

23  doesn't disprove your point, then what's the purpose?  I mean,

24  it's not like you could have -- I mean, essentially, then, what he

25  would be saying is that the only way that the price study would

1  make any -- the market study would make any sense for a defendant

2  would be if it showed an increase.  And probably a significant

3  increase, not a non-significant increase, right, because what else

4  would it show?  Because you're saying -- you're telling me you

5  can't show the other because if it was a significant decrease,

6  that proves your point.  If it was insignificant, it does nothing

7  according to you, and so that means that the only thing that it

8  can be used for is if it increased the price significantly.

9           MR. ALVARADO:  If the defendants could show, not just

10 that the stock price didn't decline at all on an absolute basis,

11 but with an event study --

12          THE COURT:  It's not likely.  I mean, most stocks never

13 close the same price, you know, day to day.  So, you know, there's

14 always some minor changes in the market from day to day.  So, you

15 know, if we assume there's not going to be no change, it's going

16 to be one or the other.  And a significant decrease proves your

17 point.  A non-significant decrease doesn't really prove anything,

18 right?  And a non-significant increase doesn't really prove

19 anything.  So I'm just wondering what was Justice Roberts talking

20 about then?

21          MR. ALVARADO:  One thing that an event study could show,

22 even if stock price declined, it could show that the residual

23 return on that date was positive.

24          THE COURT:  Explain that.

25          MR. ALVARADO:  So, for example, if there was a drop in

1  this case, which there isn't, where Southern's stock price dropped

2  $1 but because of other -- through the regression with market and

3  sector indices, it's a residual increase, the market did much

4  worse than it --

5          THE COURT:  It fell worse?

6          MR. ALVARADO:  That would establish a lack of price

7  impact.  That's an example that comes to mind.

8          THE COURT:  Then if we assume the way the market

9  factors, then that's just like it's showing an increase, right,

10  from the get-go?

11          MR. ALVARADO:  Well, it's showing an increase given what

12  happened that day in the market.

13          THE COURT:  Right.  Bad news but yet it went up in

14  price.  Obviously, then it's hard to point to the bad news -- you

15  know, it's hard to point to the price differential as being tied

16  to the bad news because you don't really know why it went up.  I

17  guess there could be other factors too, but I'm just wondering

18  what he meant.

19          So you're really out of time.  But, you know -- so let's

20  end, okay, because I'm going -- I want to mention a couple of

21  things.

22          So I don't know what I'm going to do as it relates to

23  certification of the class.  I'm pretty sure that I'm not going to

24  grant either motions on Daubert related to either Professor

25  Feinstein or Professor Gompers.  I mean, they're both smart people

1  and they're both certainly educationally trained and experience-

2  wise.  I don't have reason, I don't believe -- you know, look,

3  Daubert is not me deciding at the Daubert stage who is best and

4  whoever is best, that's who we go with.  If that's the case, then

5  that would be summary judgment, right, we would only have one

6  expert witness and that's all that there is.  I mean, it's

7  referred to -- and I've read Daubert this morning, at least the

8  holding while we've been discussing all this.  I view Daubert as

9  what it says, as a gatekeeper; is their opinion reliable enough

10 for the jury to hear it?  And if it's reliable enough, if the

11 methods used are reliable enough, then the jury, the trier of

12 fact, can consider it.

13        And I don't have reason, I don't believe, to say that

14 either Professor Feinstein or Professor Gompers' methods and

15 opinions are not reliable enough to be considered.  That doesn't

16 mean that I don't necessarily have a view on who I like the best,

17 you know.  Heck, I got a wink from one of them yesterday, I don't

18 know if y'all saw it or not, everybody over here did, which was

19 unusual.

20        But, I mean, I'm going to consider their opinions that

21 you've argued this morning in your last motion for purposes of

22 trying to make these substantive decisions that I have to make,

23 but I'm going to let their opinions be considered.  And we'll

24 draft an order on the Daubert challenges.

25        As it relates to the main reason that we are here, which

1    is the motion to certify, I'm going to ask both sides to propose

2    an order that does what you want it to do.  I want you to cite the

3    cases that you think -- that you've quoted to me here today and a

4    lot of the documents you've given me that you think support your

5    conclusions.

6           Now, that doesn't mean that whichever side I rule that

7    I'm going to accept, you know, all that you say because I -- you

8    know, I come from the Appellate Court most recently where I often

9    there and here will retreat probably to the thing that I think is

10   most determinative.  I learned a word when I went to the Appellate

11   Court, pretermit, which I never really heard.  I didn't read a lot

12   of cases as a trial judge before except the holdings that lawyers

13   would give me or that I was looking for.  Pretermit in the

14   Appellate Court was a great word, it means I don't have to decide

15   other things, I just have to decide the thing that decides it.

16          Now, I don't know what I'm going to decide in this case,

17   but I don't know that I necessarily have to adopt all the

18   arguments that each of you make regardless of which side I choose

19   to go to, but I think you need to assume I'm going to address them

20   all because I don't know yet where I'm going.

21          As far as timing for a decision, I'm going to be out of

22   town next week.  I know you feel sorry for me that I spent two

23   days doing this right before I go on vacation, but I get to spend

24   all day on Friday on sex shop lawsuit.  So if y'all want to come

25   and listen to Constitutional law about that, then feel free to do

1  it.

2          So I'm sure given that this case, for the most part,

3  will be on my mind when I am thinking about work, I hope not to

4  think much about work, but, you know, probably my target's going

5  to be somewhere at the end of June before I issue an opinion.  I

6  want to give y'all time to draft your orders.  Today's the 22nd,

7  right?  So is 14 days enough time for both sides to draft an

8  order, do you think?

9          MS. HEINTZ:  Yes, for defendants, your Honor.

10          MR. ALVARADO:  Yes.

11          THE COURT:  If you'll submit it to me in a form that I

12  can -- in a Microsoft Word form that I can change and manipulate.

13  Ms. Lee will make sure that you know how to do that.  But my

14  timetable will be sometime around the end of June.

15          But let me just assume for a minute that the class is

16  certified -- because if it's not certified, it changes the whole

17  nature of the case -- assuming it is certified, what do you have

18  left discovery-wise?

19          MR. ALVARADO:  I had meant to raise that actually.  We

20  had been before your Honor earlier in April on a schedule, the

21  defendants wanted more time and the Court indicated that it was

22  going to grant the schedule that they wanted, but the order never

23  came through.  So I don't know --

24          THE COURT:  You submitted the order, it's just pending

25  with me?

1    MR. WATTS:  Yes, your Honor.  This is Bob Watts with the

2    defendants.  We did submit the order, I believe we submitted it to

3    Ms. Lee.  I can't remember if we actually filed on the docket, but

4    it was the one you asked for us to submit following the hearing in

5    April.

6            THE COURT:  Okay.  And y'all agree on that?

7            MR. ALVARADO:  Yes.

8            THE COURT:  Everybody agrees on the timing?

9            MR. ALVARADO:  Right.

10           THE COURT:  So I'll take a look at it sometime today and

11   try to get that out today.

12           MR. ALVARADO:  Just to answer your question, assuming

13   you adopt that schedule, it has discovery going through sometime

14   in early -- I'm sorry, in -- I don't have it off the top of my

15   head.

16           MR. WATTS:  If I can, the rolling production will end on

17   July 25th -- sorry, I can't see -- will end on July 25th and then

18   fact discovery will close sometime in November.  And if --

19           THE COURT:  This is -- I'm sorry, what is our case

20   number?  Is this an '18 case?

21           MR. WATTS:  1:17-cv --

22           THE COURT:  When was it filed?

23           MR. WATTS:  Originally filed in January of 2017.

24           THE COURT:  Of course, you could always settle the case.

25   And, you know, if class isn't certified, that changes things.

1  But, you know, I would love to try it by spring of 2020, but that

2  probably seems a little ambitious given what you've got left.

3        Yes, sir.

4        MR. McCONNELL:  Your Honor, I have one small

5  housekeeping.  I checked with plaintiffs this morning, I failed to

6  mark for identification the binder that I was using with

7  Dr. Feinstein yesterday.  And with plaintiffs' consent we're going

8  to mark that as Defendant's Exhibit 5.  It's a composite exhibit

9  which is just this notebook, but only those portions of it that I

10  showed to him.  And by my count it includes tab 1, 3, 7, 8, 9, 12,

11  20 and 24.

12        MR. DROSMAN:  Just for clarity, have you removed the

13  documents that --

14        MR. McCONNELL:  I'm going to, but for record purposes I

15  wanted to confirm that those were the only tabs that we did use

16  and only ones marked for purposes of identification.

17        MR. DROSMAN:  We have no objection as long as they're

18  removed, your Honor.

19        THE COURT:  So to be admitted as amended.  To be

20  admitted to be amended.

21        Anything else we need to talk about today?

22        MR. McCONNELL:  We're going to ask for a rush job on the

23  transcript, but given the 14-day turn around on the proposed

24  orders, if there is some delay, can we revisit the situation if we

25  can't get the transcript?

1         THE COURT:  Do we know how long Wynette is out of town?

2    Is she out all week?  So about the same as me then?

3         If you find that your transcript is not to you in enough

4    time, then let me know.  I'll be flexible with that but it's just

5    going to push out my decision a little longer because I'm not

6    going to start working on the case again actively until I get the

7    drafts from both of you.

8         MR. McCONNELL:  Understood.

9         THE COURT:  Anything else?

10        Have a good day.  Have a good flight back.

11             (PROCEEDINGS REPORTED WERE CONCLUDED)

12        _____

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4  UNITED STATES DISTRICT COURT

5  NORTHERN DISTRICT OF GEORGIA

6

7          I do hereby certify that the foregoing pages are a true

8  and correct transcript of the proceedings taken down by me in the

9  case aforesaid.

10          This the 10th of June, 2019.

11

12

13

14

15

16

17          _____
            PENNY PRITTY COUDRIET, RMR, CRR
18          OFFICIAL COURT REPORTER

19

20

21

22

23

24

25