# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| MONROE COUNTY EMPLOYEES' RETIREMENT SYSTEM and ROOFERS LOCAL NO. 149 PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>           Plaintiffs,<br><br>v.<br><br>THE SOUTHERN COMPANY, THOMAS A. FANNING, ART P. BEATTIE, EDWARD DAY, VI, G. EDISON HOLLAND, JR., JOHN C. HUGGINS and THOMAS O. ANDERSON,<br><br>           Defendants. | CIVIL ACTION FILE NO:<br><br>1:17-cv-241-WMR<br><br>CLASS ACTION |

## **ORDER**

This matter is before the Court on Plaintiff Attorneys' Motion for Attorney Fees and Expenses. [Doc. 227]. Based on the record and the party's briefings on the issue, it is hereby ORDERED that the Motion for Attorney Fees and Expenses is **GRANTED** in the amount of 27.5% of the common fund.

I.     **BACKGROUND**

In January 2009, the Mississippi Power Company ("Mississippi Power"), a wholly owned subsidiary of Defendant The Southern Company ("Southern Company"), announced its plans to construct a "clean coal" power plant in Kemper County, Mississippi (the "Kemper Plant"). [Doc. 28 ("Compl."), ¶ 33]. Mississippi Power received notice in 2009 that the Internal Revenue Service certified the allocation of $133 million in tax credits to Mississippi Power in conjunction with the construction of the Kemper Plant, contingent upon meeting certain certification requirements, including the achievement of a commercial operation date ("COD") by May 2014. [*Id.* ¶¶ 4, 35]. Additionally, the entity charged with regulating utilities in Mississippi, the Mississippi Public Service Commission ("Mississippi PSC"), issued a certification of public convenience and necessity in June 2010, which authorized the acquisition, construction, and operation of the Kemper Plant.[1] [*Id.* ¶¶ 32, 36]. The authorization approved a construction cost limit of $2.88 billion and a ratepayer-funded allowance to cover financing of the construction costs through May 1, 2014. [*Id.* ¶ 36]. Any cost associated with the construction or financing

---

[1] In accordance with an order from the Mississippi Supreme Court, the Mississippi PSC issued a second order on April 24, 2012, again authorizing the acquisition, construction, and operation of the Kemper Plant and requiring Mississippi Power to provide monthly progress reports to the Mississippi PSC indicating if the Kemper Project was on schedule and within budget. Compl. ¶ 42; Mississippi PSC Order dated April 24, 2012 [Doc. 37-9].

beyond this amount or subsequent to May 1, 2014 would not be borne by Mississippi Power's rate-paying customers. [*Id*].

Beginning on July 28, 2010, Southern Company made public representations that the Kemper Plant would be operational by May 2014 up until 7 months before that date, at which time Defendants disclosed that the Kemper Plant would miss the deadline and be forced to repay the $133 million in IRS tax credits. [*Id.* ¶ 45]. On July 5, 2016, The New York Times published the results of its investigation into the efforts to begin the Kemper Plant's operation [Doc. 37-50]; [Compl. ¶¶ 48-55]. As alleged in Plaintiffs' Complaint, The New York Times article was the first revelation of any evidence of fraud related to the Kemper Plant project. [Compl. ¶ 55].

On January 20, 2017, Plaintiffs brought this class action on behalf of all persons who purchased or otherwise acquired Southern Company common stock between April 25, 2012, and October 30, 2013, against Southern Company and certain Southern Company executives for violation of the Securities Exchange Act of 1934. [*Id.* ¶ 2]. On April 11, 2017, Lead Plaintiff, Roofers Local No. 149 Pension Fund, was appointed alongside Lead Counsel Robbins Geller Rudman & Dowd LLP ("Robbins Geller"). [Doc. 22]. On June 12, 2017, Plaintiffs filed their Amended Complaint alleging that between April 25, 2012, and October 30, 2013, that Defendants violated Sections 10(b) and 20(a) of the Exchange Act by issuing false and misleading statements about the construction of the Kemper Plant. [Doc. 28].

3

On July 27, 2017, Defendants filed a Motion to Dismiss for failure to state a claim. [Doc. 37]. On March 29, 2018, that Motion was granted in part and denied in part. [Doc. 43 ("MTD Order")]. On April 6, 2018, the Court granted Defendants' Motion for Clarification of the MTD Order to clarify that Defendants' Motion to Dismiss Plaintiffs' Section 20(a) claim was denied as to all Defendants and that all the Individual Defendants remained in the case. [Doc. 47]. On May 23, 2018, Defendants moved for certification of the MTD Order, pursuant to 28 U.S.C. §1292(b), and requested a stay pending appeal. [Doc. 57]. On August 10, 2018, the Court denied Defendants' Motion for Reconsideration and Defendants' Motion for interlocutory appeal and stay. [Doc. 68].

Following the filing of Defendants' Answer to the Amended Complaint, discovery began.  On September 24, 2018, Lead Plaintiffs filed their Motion for Class Certification and for Appointment of Class Representatives and Class Counsel. [Doc. 77]. Plaintiffs submitted the expert opinion of Professor Steven P. Feinstein, Ph.D., CFA ("Professor Feinstein"), on market efficiency and damages. [Doc. 77-2]. On February 4, 2019, Defendants opposed class certification and moved to exclude certain of Professor Feinstein's opinions under Federal Rule of Evidence 702. [Docs. 106, 109]. In support of their submissions, Defendants submitted the opinions of Professor Paul A. Gompers, Ph.D. ("Professor Gompers"). [Doc. 106-2]. On March 29, 2019, Plaintiffs moved to exclude the opinions of Professor

4

Gompers. [Doc. 114]. The Court subsequently denied the competing motions to exclude the opinions of Professor Feinstein and Professor Gompers. [Doc. 138].

On August 22, 2019, this Court granted the Motion for Class Certification. [Doc. 151]. Defendants' appeal of the Motion for Class Certification has been filed with the Eleventh Circuit, and the action is currently stayed. No. 19-90015. On September 8, 2020, Plaintiffs filed a Motion for Settlement for Preliminary Approval. [Doc. 219]. That motion was granted on October 1, 2020. [Doc. 223].

The present Motion before the Court is Lead Counsel's Motion for Attorney Fees and Expenses. [Doc. 227]. Lead Counsel seeks to recover 30% of the settlement fund[2] as compensation for Plaintiffs' efforts in litigating the case and obtaining a favorable settlement of $87.5 million in cash for the class. Additionally, Plaintiffs' attorneys seek $853,866.45 in expenses incurred over the course of the litigation. [*Id.* at 1].

## II.   DISCUSSION

Generally, "all parties are to bear their own costs in litigation." *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991) (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975)). Yet, one recognized exception

---

[2] The amount of fees sought totals approximately $26.25 million.

to this principle is an award of attorneys in a class action "common fund" case, subject to court approval. *Id.* In these cases, the Eleventh Circuit has adopted the percentage-of-the-fund method of awarding attorneys' fees and has rejected the lodestar approach. *See Camden I*, 946 F.2d at 774 ("Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class.").[3] "The district court 'has great latitude in formulating attorney's fees awards subject only to the necessity of explaining its reasoning . . . .'" *Waters v. Int'l Previous Metals Corp.*, 190 F.3d 1291, 1293 (11th Cir. 1999) (quoting *McKenzie v. Cooper, Levins & Pastko, Inc.*, 990 F.2d 1183, 1184 (11th Cir. 1993)).

While district courts have great discretion in assigning fee percentages, the Eleventh Circuit has provided helpful benchmarks to guide district courts in determining what percentages are reasonable. Namely, the Eleventh Circuit has held that most fees are reasonable where they fall between 20-25% of the total fund.

---

[3] This percentage-of-the-fund approach comports with the standard private market contingent fee practice of being compensated on a percentage of the recovery. It also encourages plaintiffs' counsel to obtain the greatest recovery possible in the shortest time and reduces the burden on the Court in reviewing and calculating attorneys' hours and rates which would otherwise need to be scrutinized under the lodestar approach. *See Manners v. Am. Gen. Life Ins. Co.*, 1999 WL 33581944, at *29 (M.D. Tenn. 1999). The lodestar approach on the other hand requires courts to calculate reasonable counsel fees based on counsel's hours and hourly billing rates. *See* WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 15:90 (5th ed. 2020).

*Fought v. Am. Home Shield Corp.*, 668 F.3d 1233, 1242-43 (11th Cir. 2011) (citing *Camden I*, 946 F.2d at 774). Where the requested fee exceeds 25%, district courts are instructed to apply the *Johnson* factors in evaluating the reasonableness of the requested departure. *Id.* The *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances;[4] (8) the amount involved and the result obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client;[5] and (12) awards in similar cases. *Camden I*, 946 F.2d at 775 (citing *Johnson v. Ga. Hwy. Express, Inc.*, 488 F. 714, 717-719 (5th Cir.1974)).[6]

---

[4] This factor is not applicable to the circumstances of this case.

[5] This factor is not applicable to the circumstances of this case

[6] The Eleventh Circuit is clear in *Camden* that these factors do not represent an exhaustive list of considerations for district courts, nor are district courts required to apply the list exhaustively to each case. *Id.* ("The factors which will impact upon the appropriate percentage to be awarded as a fee in any particular case will undoubtedly vary.").

Having considered the factual and procedural background of this case, along with the arguments made by Lead Counsel, the Court has determined that 27.5% represents a reasonable fee percentage in this case. The Court is satisfied that that this fee percentage will continue to incentivize high-caliber and vigorous representation while also preventing Lead Counsel from receiving a windfall without having endured the riskier stages of litigation. There are a number of factors that have led the Court to arrive at a percentage below the requested 30%, but still above the presumptively reasonable 25%.

### A. Several factors considered by the Court support the reasonableness of a 27.5% fee.

First, and foremost, the Court considered the stage of litigation during which this settlement was reached. Lead Counsel hastens to point out in their Memorandum of Law in Support of Lead Counsel's Motion for Attorneys' Fees and Expenses ("Memorandum on Fees") that Lead Counsel successfully achieved a greater-than-average settlement "in the face of significant risks". [Doc. 227-1 at 18]. But, also throughout the memorandum, Lead Counsel draws attention to the fact that Plaintiffs still must contend with a pending class certification appeal, a myriad of affirmative defenses, establishing liability, and proving damages. [*Id.* at 7-8]. In other words, even Lead Counsel is aware that much of the risk is still ahead. The Court must thus also be mindful of the fact that Lead Counsel has not taken on as much risk as would be possible. And, Lead Counsel would certainly not be entitled to a lower percentage

8

of the fund if it had successfully moved past any of these risky stages of litigation. For example, had the Eleventh Circuit granted Defendants' Motion for Review on this Court's order to certify the class and had Lead Counsel then successfully responded to that appeal, a favorable settlement which followed would perhaps be viewed differently.[7] It does not strain one's imagination to picture Lead Counsel citing its hard-fought litigation in the Eleventh Circuit as all the more reason 30% represents an appropriate percentage of the fund. Similarly, if Plaintiffs had survived a motion for summary judgment, a greater fee award would likely be warranted. Simply put, it is too early in the litigation to justify awarding what Lead Counsel itself admits is the maximum percentage that was sensibly requestable. Fee percentages that fall far outside the normal 25% should be present in cases of exceptional risk and not for those with only anticipated future risks.

Additionally, the Court evaluated the results achieved thus far by Lead Counsel. The results achieved is one of the most important factors considered in determining an appropriate fee award. *See Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) (when assessing the reasonableness of a fee, the "most critical factor is the degree of success obtained."); *see also Ressler v. Jacobson*, 149 F.R.D. 651, 655 (M.D. Fla. 1992) ("It is well-settled that one of the primary determinants of the

---

[7] The same could be said about a hypothetical event that does not depend on the discretion of the Eleventh Circuit, such as a Motion for Summary Judgement.

quality of the work performed is the result obtained."). Lead Counsel estimates that the settlement in this case represents between 16% and 28% of the maximum recoverable damages. [Doc. 227-1 at 17]. If true, this settlement represents a degree of investor restitution well above the norm,[8] which would weigh in favor of an upwards adjustment of the benchmark percentage. However, while the Court recognizes that this recovery is commendable, it also belabors the point previously made. Being able to achieve such a favorable recovery so early in the litigation suggests that a continued successful pursuit of the litigation could have yielded an even more favorable result for Plaintiffs. That favorable result would then necessarily lead to an increase in the percentage of attorneys' fees. The Court, based upon the totality of the factors, is thus satisfied that 27.5% adequately reflects the impressive results of this case.

Another factor considered by the Court in awarding a 27.5% fee is awards in similar cases. In Lead Counsel's Memorandum on Fees, reference is made to a study finding a median award of 33% for attorney fees in the Eleventh Circuit. Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in Class Actions:*

---

[8] *See* Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2019 Full-Year Review* (NERA Feb. 12, 2020) at 20, Fig. 13, available at: https://www.nera.com/content/dam/nera/publications/2020/PUB _Year_End_Trends_012120_Final.pdf (showing that the median ratio of settlement amount to investor losses in securities litigation was 2.1%).

*2009-2013*, 92 N.Y.U. L. Rev. 937, 948 (2017). However, closer inspection of the study reveals a more nuanced result. The 33% median figure combines all class action settlements. Because class action attorney fee percentages vary widely based upon the size of the settlement,[9] it would be more insightful to look at settlements with a larger fund. The same study points out that the average fee percentage is 22.3% when considering only cases with a settlement fund greater than $67.5 million. The Memorandum on Fees also cites a string of Eleventh Circuit cases where fee awards ranged from 30-35%. It is sufficient to say that, "'not uncommon'

---

[9] The idea that a larger settlement fund should beget a lower fee percentage is known as the sliding scale approach. The rationale behind this approach is that "[i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 339 (3d Cir. 1998) (internal quotation marks omitted). While not adopted in the Eleventh Circuit, the flexibility in evaluating reasonableness that is provided in *Camden I* has allowed for district courts to consider the size of the settlement in evaluating the reasonableness of fee requests. *See, e.g., Walco Invs., Inc., et al. v. Thenen, et al.*, 975 F. Supp. 1468, 1471 (S.D. Fla. 1997) (observing that, while it would be inappropriate in its case, "application of the sliding scale approach may be warranted in most mega-fund cases."). However, there are also compelling policy rationales that weigh against a sliding scale approach. *See Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006) ("By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for Class Counsel to settle too early for too little."). Regardless of the competing policy positions, as an empirical matter, it is clear that on average larger settlements result in smaller attorney fee percentages. *See* Eisenberg, Miller & Roy, *infra* pg. 12-13; ALISON B. PROUT & SAMIKA N. BOYD, BONDURANT MIXSON & ELMORE LLP, *Current Topics in Attorneys' Fees in Class Actions* 9-13 (2015) (surveying a number of percentage-of-the-fund fee awards in 2014 and 2015 and finding a range of 20-25% for common funds ranging from $50 million to $99.99 million).

is not tantamount to 'always awarded.'" *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1335 (S.D. Fla. 2001). Hence, based upon the totality of the factors, a 27.5% fee award fairly compensates Lead Counsel.

In considering the experience, reputation, and abilities of the attorneys, the Court recognizes that Lead Counsel is well-regarded in the legal community, especially in litigating class-action securities cases. In assessing the quality of representation, courts have also looked to the quality of the opposition the Plaintiffs' attorneys faced. *See Ressler*, 149 F.R.D. at 654. Here, Defendants were represented by highly regarded firms, Jones Day and Latham and Watkins LLP. The Court recognizes that counsel for all involved parties behaved in a highly professional manner and finds that this professionalism and skill is well rewarded by a 27.5% fee.

The Court also considered the novelty and difficulty of the legal and factual issues. Securities fraud cases often contain difficult legal and factual issues surrounding the challenging levels of proof required to establish liability. *See Id.* ("Plaintiff[s] faced all the multi-faceted and complex legal questions endemic to § 10(b) litigation, including proving *scienter*, materiality, causation, and damages."). This case centered around a large and complex construction project. Serious factual

questions surrounded plaintiffs' ability to establish falsity[10] and scienter.[11] Complex questions about the statistical significance of share price drops and variations in risk during the class period were also present. While this supports some increase from the 25% benchmark, the Court again finds that Lead Counsel is adequately rewarded by a 27.5% fee award.

### B. A cross-check utilizing the lodestar approach confirms that a 27.5% fee is reasonable in this case.

While not required by the Eleventh Circuit, performing a lodestar cross-check can help district courts evaluate the possible windfall Lead Counsel is receiving from a percentage-of-the-fund fee. *See* WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 15:86 (5th ed. 2020) ("[T]he lodestar cross-check guards against windfalls by providing a court with information about the relationship of the percentage award to class counsel's aggregate billing for the case.); *see also Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1343-44 (S.D. Fla. 2007) (using a lodestar cross-check); *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d at 1336 (using a

---

[10] Defendants contend, amongst other things, that they warned investors of potential delays that could impact their ability to maintain the schedule and achieve the May 2014 COD. [Doc. 37 at 20].

[11] Defendants contend, amongst other things, that they had a reasonable basis for believing that the May 2014 COD was achievable. [*Id.* at 28].

lodestar cross-check).[12] Based upon the analysis done by Lead Counsel, the lodestar for this case is $11,374,014. If one were to award the Lead Counsel's requested 30%, the result of a lodestar cross-check is a multiplier of approximately 2.31. A modest reduction of the fee percentage to 27.5% still results in a multiplier of approximately 2.12. This still represents a fantastic result that more than adequately compensates Lead Counsel for the risk undertaken due to the contingent nature of its representation.

### III. CONCLUSION

For the foregoing reasons, and based upon a thorough review of the record and a careful balancing of the many factors to be scrutinized in determining an appropriate fee award percentage, the Court finds that a fee award of 27.5% properly recognizes Lead Counsel's work in litigating this case.

**IT IS SO ORDERED**, this 4th day of February, 2021.



WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE

---

[12] The Court pauses here to clarify that a lodestar cross-check is not to be employed as a backdoor avenue for using the lodestar method itself. The Court solely considers this fact to help put the proposed fee award in perspective.